FORM 104 (10/06)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Daniel White, individual and as Trustee, et al. | DEFENDANTS<br>Romspen Mortgage Limited Partnership; Romspen Investments Corporation; Adam Zarafshani,        Construction and Development, Inc. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Bruce Duke, Esq, Bruce J. Duke, LLC<br>788 Shrewsbury Ave., Suite 2220, Tinton<br>Falls, NJ 07724 (856) 701-0555 | **ATTORNEYS** (If Known) |

| PARTY (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Fiduciary Duty, Fraud in the Inducement, Fraud, Constructive Fraud, Real Estate Fraud, Negligent Misrepresentation, Negligence, Gross Negligence, Breach of the Duty of Good Faith and Fair Dealing, Economic Duress, Civil Conspiracy, Action in Accounting, Disallowance of Claims, Determination of Secured Creditor Status, Disallowance of Credit Bidding, Constructive Trust and Injunction

**NATURE OF SUIT**
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☑2 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☑1 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – reinstatement of stay
☑3 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☑4 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $    250,000,000.00 |

Other Relief Sought

FORM 104 (10/06), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>3443 Zen Garden, L.P. | | BANKRUPTCY CASE NO.<br>20-10410-HCM |
| DISTRICT IN WHICH CASE IS PENDING<br>WESTERN | DIVISIONAL OFFICE<br>AUSTIN | NAME OF JUDGE<br>H. CHRISTOPHER MOTT |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 20, 2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>BRUCE DUKE | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, if it is required by the court. In some courts, the cover sheet is not required when the adversary proceeding is filed electronically through the court's Case Management/Electronic Case Files (CM/ECF) system. (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | § § § | CHAPTER 11 |
| 3443 ZEN GARDEN, L.P. | § § | CASE NO. 1:20-10410-HCM |
| Debtor. | § § § | |

| | | |
|---|---|---|
| DANIEL WHITE, individual and as Trustee DAN WHITE FAMILY TRUST, A CANADIAN TRUST; DAN WHITE FAMILY TRUST, A CANADIAN TRUST; ABSOLUTE ENVIRONMENTAL WASTE MANAGEMENT INC, ABSOLUTE ENERGY RESOURCES INC, LOT 11 GP, LTD., LOT 11 LIMIITED PARTNERSHIP, ECO INDUSTRIAL BUSINESS PARK INC, SYMMETRY ASSET MANAGEMENT INC, LINCOLN 1861, INC.; | § § § § § § § § § § § § § § § | Adversary No. |
| Plaintiffs, | § § § | |
| vs. | § § | |
| ROMSPEN MORTGAGE LIMITED PARTNERSHIP; ROMSPEN INVESTMENTS CORPORATION; ADAM ZARAFSHANI; PANACHE CONSTRUCTION AND  DEVELOPMENT, INC., | § § | |
| Defendants. | | |

## ADVERSARIAL COMPLAINT

**PLAINTIFFS**, parties in interest in the above captioned Chapter 11 Bankruptcy

proceeding, file this twenty-six count Adversarial Complaint, sounding in (1) Breach of

Fiduciary Duty, (2) Fraud in the Inducement, (3) Fraud, (4) Constructive Fraud, (5) Real Estate

Fraud, (6) Negligent Misrepresentation, (7) Negligence, (8) Gross Negligence, (9) Breach of the

Duty of Good Faith and Fair Dealing, (10) Economic Duress, Civil Conspiracy, (11) Action in

Accounting, (18) Disallowance of Claims pursuant to 11 U.S.C. § 502, (12) Determination of

Secured Creditor Status pursuant to 11 U.S.C. § 506, (13) Disallowance of Credit Bidding 11

U.S.C. § 363(k), (14) Constructive Trust, and (15) Injunction.

## I.  JURISDICTION AND VENUE

1.      Plaintiffs commence this adversary proceeding pursuant to Rule 7001(1) and (9)

of the Federal Rules of Bankruptcy Procedure.  The Court has jurisdiction over this Adversary

proceeding pursuant to section 28 U.S.C. § 1334, and the July 10, 1984, Standing Order of

Referral of Cases to Bankruptcy Judges.  This Court also has jurisdiction over the entry of final

orders and judgments with respect to this "core" proceeding, pursuant to 28 United States Code

§§ 157(b)(2)(A), (E) and (O).  This Court has supplemental jurisdiction over any and all state

claims pursuant to 28 U.S.C. §§ 1367.  Venue is proper in this District (a) pursuant to 28 United

States Code §§ 1408 and/or 1409, and (b) pursuant to 28 U.S.C. 1391 (a) and (b), as a substantial

part of the events or omissions giving rise to subject claims occurred in this judicial district, and

a substantial part of the property associated with the subject claims is situate therein.

## II.  NATURE OF THE CASE

2.      The allegations herein emanate from Defendants' individual and/or collective,

collusive and/or conspiratorial conduct in utilizing a fraudulent "loan to own" scheme intended

and calculated by Defendants, or any of them, to rob Plaintiffs and the bankrupt-debtor of

ownership interests and expected profits in and related to the development/re-development of

property located in the City of Austin, previously owned by one or more of the Defendants.

3.      The loans and/or credit facilities arranged by the mezzanine lender Defendant,

were "hard money" loans with exorbitant interest, administration, participation, origination

and/or other hidden fees, conditioned upon unconscionable "construction related" contract terms/conditions, guarantees, and/or requiring gross over-collateralization (hereinafter "loan terms").

4.       The lender Defendant exercised virtually exclusive control over the satisfaction of loan terms, and injected itself directly into Plaintiffs' business with the Defendant developer/builder's assistance by ingratiating him and his company with favorable loan terms and other economic interests/benefits.

5.       Upon information and belief, the lender Defendant exploited the builder/developer's knowledge of Plaintiffs' financial and other affairs, position as Plaintiffs' Trustee, as well as builder/developer's position as developer and/or General Contractor, in a collusive and conspiratorial effort to induce, cause and/or otherwise precipitate default upon the bankrupt-debtor's property loan(s) and/or credit facilities.

6.       At all times material hereto, the lender Defendant acted in a capacity incommensurate with being a "mere lender," and preyed upon the economic interests of the Plaintiffs and/or the bankrupt-debtor to complete its collusive and conspiratorial scheme of precipitating the aforementioned default and, ultimately, taking over valuable commercial real estate in which Plaintiffs and had significant interests.

7.       After positioning itself to take possession of multiple real estate and business assets owned by Plaintiffs and/or the bankrupt-debtor, via fraudulently manufacturing and then inflating the bankrupt-debtor's debt, the lender Defendant, now seeks to launder its conspiratorial, fraudulent and/or otherwise illegal activity, by taking ownership of the bankrupt-debtor's Austin property as a credit bidder and post-petition super-priority financer, by way of a Court Order authorizing the planned takeover, all to the ultimate detriment of the Plaintiffs

3

and/or any of them.

### III.  PARTIES

8.      Plaintiff Dan White Family Trust (hereinafter "**DWFT**") was, at all times material to this Complaint, an Alberta-Canada Trust, duly formed, created and/or settled in the Province of Alberta for purposes, including, but not limited to, holding, managing, operating and/or investing all or any portion of the trust's assets (hereinafter "**DWFT** asset(s)") in the best interests of the trust and its Beneficiaries

9.      Plaintiff Daniel White ("**WHITE**"), at all times material hereto, is a Canadian citizen, residing in the Province of Alberta, asserting causes of action herein individually and/or as Trustee of the **DWFT** and/or **DWFT** assets.

10.     At all times material hereto **WHITE** was and continues to be a Trustee and/or a Discretionary Beneficiary of the Dan White Family Trust (hereinafter "**DWFT**"), engaged in and/or acting on behalf of **DWFT** and/or **DWFT** assets, in the course of the **DWFT's** business of holding, managing, operating and/or investing **DWFT** assets.

11.     At all times material hereto, **WHITE** held positions in **DWFT** assets including, but not limited to, officer, director, manager and/or other representative.

12.     In one or more of the aforementioned capacities and/or as a **DWFT** Trustee, **WHITE** made decisions for and/or caused corporate action by **DWFT** assets, to facilitate the **DWFT's** business of holding, managing, operating and/or investing all or any portion of the trust's assets.

13.     At all times material hereto, **WHITE,** in the course of conducting and/or executing **DWFT** business was, among other things, permitted to (1) appoint and/or nominate other trustees, create further **DWFT** corporations, (2) partnerships and/or other necessary

corporate business vehicles, (3) appoint/nominate **DWFT** asset managers, partners, officers and/or directors and/or (4) otherwise transfer, collateralize, pledge, and/or otherwise dispose of/utilize **DWFT** assets, to effect the purpose and/or *de facto* business of the **DWFT**.

14.     Plaintiff 1468527 Alberta Ltd., (hereinafter "**ALBERTA CORP**"), is a company duly formed and incorporated under the laws of the Province of Alberta, Canada, with a registered head office located at 9707 110th St. N.W., Suite 600, Edmonton, Alberta.

15.     At all times material hereto, the **DWFT** held and/or owned 1468527 Alberta Ltd., (hereinafter "**ALBERTA CORP**"), a company duly formed and incorporated under the laws of the Province of Alberta, Canada, with a registered head office located at 9707 110th St. N.W., Suite 600, Edmonton, Alberta.

16.     At all times material hereto, **ALBERTA CORP**, was the sole owner/shareholder of Purple Tree Int'l, Ltd. (hereinafter "**PURPLE TREE**"), an Alberta corporation duly formed and created under the laws of the Province of Alberta, Canada.

17.     At all times material hereto, **ALBERTA CORP**, was the sole owner/shareholder of Blue Roots Int'l, Ltd. (hereinafter "**BLUEROOTS**"), an Alberta corporation duly formed and created under the laws of the Province of Alberta, Canada.

18.     Plaintiff Lincoln 1861, Inc. (hereinafter "**LINCOLN**") was, at times material hereto, a corporation duly formed and incorporated under the laws of the State of Texas, with a principle office located in Austin Texas.

19.     At all times material hereto, **BLUEROOTS**, was the sole owner/shareholder of **LINCOLN**.

4811-1816-7240, v. 1

20.     At all times material hereto, the bankrupt-debtor entity 3443 Zen Garden L.P. (hereinafter "**ZEN**") was a Texas Limited Partnership with a head office located in Austin, Texas, comprised of one General Partner and two Limited Partners.

21.     At all times material hereto, 3443 Zen Garden GP, LLC (hereinafter "**ZEN GP**"), was a Texas Limited Liability Company with a head office in Austin, Texas, and was also the General Partner in **ZEN**.

22.     At all times material hereto, **PURPLE TREE**, was a fifty percent shareholder of **ZEN GP.**

23.     **LINCOLN** was at all times material hereto, a limited partner in **ZEN**.

24.     At all times material hereto, Jefferson 1801 Ventures, LLC (hereinafter "**JEFFERSON**"), was a Texas Limited Liability Company with a head office located in Austin, Texas and was also a limited partner in **ZEN**.

25.     As originally structured, the now bankrupt-debtor **ZEN** was owned as follows:

(a) **LINCOLN** (limited partner) seventy-four percent (74%);

(b) **JEFFERSON** (limited partner) twenty-four percent (24%); and

(c) **ZEN GP** (general partner) two percent (2%).

26.     At all times material to this Complaint, **ZEN** was an entity formed by its share and/or interest holders for the purpose of developing a tract of land located at 3501 Ed Bluestein Blvd., in East Austin, Texas, commonly referred to as the former "Motorola campus" (hereinafter referred to as the "**AUSTIN PROPERTY**").

27.     Plaintiff Absolute Environmental Waste Management Inc. (hereinafter "**ABSOLUTE WASTE**"), is a corporation duly formed and created under the laws of the

Province of Alberta, Canada, with a registered head office at 2833 Broadmoor Blvd., Suite 260, Sherwood Park, Alberta.

28.     Plaintiff Absolute Energy Resources Inc. (hereinafter "**ABSOLUTE ENERGY"**),  is a corporation duly formed and created under the laws of the Province of Alberta, Canada, with a registered head office at 2833 Broadmoor Blvd., Suite 260, Sherwood Park, Alberta.

29.     Plaintiff Eco-Industrial Business Park Inc. (hereinafter "**ECO**"), is a corporation duly formed and created under the laws of the Province of Alberta, Canada, with a registered head office at 2833 Broadmoor Blvd., Suite 260, Sherwood Park, Alberta.

30.     Plaintiff LOT 11 GP, Ltd. (hereinafter "**LOT 11 GP**"), is a corporation duly formed and created under the laws of the Province of Alberta, Canada, with a registered head office located at 1250 Hayter Rd., Edmonton, Alberta.

31.     Plaintiff Lot 11 Limited Partnership (hereinafter "**LOT 11 LP**"), is an Alberta Limited Partnership duly established, formed and/or created under the laws of the Province of Alberta, Canada, with a registered head office located at 1250 Hayter Rd., Edmonton, Alberta.

32.     At all times material hereto, **LOT 11 LP** was comprised of **LOT 11 GP** as its general partner, and **ECO** as its limited partner.

33.     Plaintiff Symmetry Asset Management, Inc. (hereinafter "**SYMMETRY**"), is a corporation duly formed and created under the laws of the Province of Alberta, Canada, with a registered head office located at 2833 Broadmoor Blvd., Suite 260, Sherwood Park, Alberta.

4811-1816-7240, v. 1

34.     At all material times, **DWFT** assets included **ABSOLUTE ENERGY**, **ABSOLUTE WASTE**, **ECO**, **LOT 11 GP**, **LOT 11 LP** and/or **SYMMETRY**, including any shares, financial interests, assets and/or real property owned and/or pledged by any one or more of the same (hereinafter "**PLEDGE ASSETS**").

35.     At various times material hereto, **WHITE** acted as Trustee/Principal and/or as a Director and/or Officer of any one or more the aforementioned **DWFT** assets, or otherwise permissibly delegated any relevant authority to act on behalf of the same, in order to effect and carry out the express purposes and/or business of the **DWFT**.

36.     At all times material hereto, in order to effect the purposes of the **DWFT** and/or otherwise carry on its business in the normal course, **WHITE**, **DWFT,** other **DWFT** Trustees and/or any **DWFT** asset, officer, director, manager, or other representative duly appointed/established, used **PLEDGE ASSETS** to Collateralize and/or otherwise caused said assets, or any of them, to Guarantee lender loans and/or credit facilities.

37.     Defendant Romspen Mortgage Limited Partnership (hereinafter "**ROMSPEN LP**") was, at all times material to this Complaint, an Ontario, Canada, limited partnership, formed under the laws of the Province of Ontario, with a registered head office located at 162 Cumberland Street, Suite 300, Toronto, Ontario.

38.     Defendant Romspen Investment Corporation (hereinafter "**ROMCORP**") was, at all times material to this Complaint, an Ontario-Canada corporation, duly formed and incorporated under the laws of the Province of Ontario, with a registered head office located at 162 Cumberland Street, Suite 300, Toronto, Ontario.

4811-1816-7240, v. 1

39.    At all times material hereto, defendants **ROMSPEN LP** and **ROMCORP** acted by and through their agents, servants, affiliates, employees and/or other representatives, including, but not limited to Richard Weldon (hereinafter "**WELDON**") and/or Wesley Roitman (hereinafter "**ROITMAN**").

40.    At all times material to this Complaint, **WELDON** and **ROITMAN**, were decision makers, controlling agents, servants, affiliates employees, managers, directors and/or other representatives of **ROMSPEN LP** and/or **ROMPCORP.**

41.    At all times material hereto, **ROMSPEN LP, ROMCORP**, **WELDON** and/or **ROITMAN** (hereinafter "**ROMSPEN**"), or any of them, acted individually and/or in concert one or more with any of the others, and with respect to financial and other transactions involving the Plaintiffs and/or any other **DWFT** asset.

42.    At all times material hereto **ROMSPEN** and/or its agents, servants, employees, affiliates and/or other representatives, acted in a fiduciary capacity and/or as Trustees for Plaintiffs **WHITE**, **DWFT**, **LINCOLN** and/or any other **DWFT** trust assets, as more fully and specifically set forth hereinafter.

43.    At all times material hereto, defendant **ROMSPEN** acted by and through the actions of its managers, agents, servants, employees, affiliates and/or other representatives, and for whose conduct **ROMSPEN** remained responsible and/or liable.

44.    At various times material to this Complaint, as more fully set forth hereinafter, **ROMSPEN** and its agents, managers, servants, employees, affiliates and/or other representatives

4811-1816-7240, v. 1

colluded and/or conspired, one with any one or more of the others, against the financial and/or

business interests of Plaintiffs and/or any other **DWFT** assets.

45.     Defendant Adam Zarafshani (hereinafter "**AZ**") is a citizen and resident of the

State of Texas residing at a last known address of 4101 Cat Mountain Road, Austin, Texas.

46.     Defendant Panache Construction and Development, Inc. (hereinafter

"**PANACHE**") is a Texas corporation with a registered office head office located at P.O. Box

26539, Austin, Texas.

47.     At all times material to this Complaint, Defendant **AZ** was a principal, Officer

and/or Director, as well as the controlling interest and/or shareholder, decision maker, agent,

servant, employee, manager, and/or other representative of **PANACHE**.

48.     At all times material hereto, **AZ** and **PANACHE**, acted individually and/or in

concert one with the other, with respect to transactions involving the Plaintiffs and/or any other

**DWFT** asset.

49.     At all times material hereto **AZ** and/or **PANACHE** acted by and through the

actions of their agents, managers, servants, affiliates, employees and/or other representatives,

including, but not limited to, Fara Ranijbaran (**AZ's** wife) (hereinafter "**RANIJBARAN**") and/or

Amanda Woodham (hereinafter "**WOODHAM**"),** for whose conduct **AZ** and/or **PANACHE**

remained responsible and/or liable.

50.     **EIGHTFOLD DEVELOPMENTS, LLC** (hereinafter "**EIGHTFOLD**"), was a

Texas Limited Liability Company with a registered head office in Austin Texas located at 3443

Ed Bluestein Blvd..

51.     At all times material hereto, **EIGHTFOLD** was a company controlled and operated by **AZ** individually and/or as a **DWFT** trustee, through which **AZ** purported to act as a "developer" or carry on business as a "development company."

52.     At all times material hereto, **AZ**, **PANACHE**, **RANIJBARAN**, **WOODHAM** and/or **EIGHTFOLD** (hereinafter "**AZGROUP**") and/or any of their other agents, managers, servants, affiliates, employees, and/or other representatives, acted in a fiduciary capacity and/or as Trustees for Plaintiffs and/or any other **DWFT** asset, as more fully and specifically set forth hereinafter.

53.     At various times material to this Complaint, as more fully set forth hereinafter, **AZGROUP** and its agents, managers, servants, affiliates, employees, and/or other representatives colluded and/or conspired, one with any one or more of the others, against the financial and/or business interests of Plaintiffs and/or any other **DWFT** asset.

54.     At various times material to this Complaint, as more fully set forth hereinafter, **AZGROUP** and **ROMSPEN** colluded and/or conspired, one with the other, against the financial and/or business interests of Plaintiffs and/or any other **DWFT** asset.

## IV.  <u>FACTS COMMON TO ALL COUNTS</u>

55.     Prior to its Receivership and ultimate Petition into Chapter 11 bankruptcy, **ZEN** was engaged in developing the **AUSTIN PROPERTY** into a 110 acre, mixed use, state-of-the-art campus slotted to include offices, hotels and other retail space, built using "green technology" and renewable energy resources.

4811-1816-7240, v. 1

56.     The **AUSTIN PROPERTY** was owned and/or managed by **ROMSPEN** prior to **ZEN's** involvement in its development.

57.     Plaintiff **WHITE** was familiar with **ROMSPEN** from dealings that preceded the Plaintiffs' involvement in developing the **AUSTIN PROPERTY**.

58.     At all times material to this Complaint, **ROMSPEN** held itself out to the public, the Plaintiffs and/or any other **DWFT** asset, as experienced lenders with a history of success in the field.

59.     At the time of filing this Complaint, **ROMSPEN's** website states:

   a.   The firm began operations in 1966 and the Romspen Mortgage Investment Fund was formed in 2006. Our investments are comprised mostly of commercial and industrial first mortgages on properties primarily across Canada and in parts of the United States. We provide customized mortgage solutions for term, bridge and construction financing in amounts up to $100 million. Our investment objectives are focused on capital preservation, strong absolute cash yields to investors and performance consistency. We are highly disciplined in our underwriting with loan-to-value ratios of approximately 65% and do not rely on leverage to achieve our returns. The current overall real estate mortgage portfolio exceeds $3.3 billion. Over the past 25 years we have invested over $7.2 billion in over 1000 real estate mortgages and have consistently earned strong absolute cash yields to investors.[1]

60.     At all times material hereto, **WHITE** relied on **ROMSPEN's** publically advertised expertise and experience as a disciplined and ethical investor/lender, in making decisions that affected himself, other Plaintiffs, and/or other **DWFT** assets, with respect to any and all loan and/or credit facility transactions with **ROMSPEN.**

61.     Based upon a combination of **ROMSPEN's** public and private representations, the Plaintiffs and/or any other **DWFT** asset, came to rely upon and trust **ROMSPEN**.

62.     Notably, at no time material hereto, did **ROMSPEN** offer a loan product to the Plaintiffs, and/or any other **DWFT** asset, commensurate and/or consistent with the fundamental

---

[1] See http://www.romspen.com/about-romspen/at-a-glance/default.aspx.

public message of its website including, but not limited to, **ROMSPEN's** lending strategies with emphasis on "capital preservation," disciplined "65% loan to value" strictures, "strong absolute cash yields to investors," and/or performance "consistency."

      **A.**    *__The "Canada Loans"__*

63.      On September 13, 2012, and continuing thereafter, **ROMSPEN** offered **WHITE, DWFT**, or any **DWFT** asset, a loan/credit facility that permitted total advances up to $40,000,000.00 Canadian (hereinafter "CAD"), that would ultimately be collateralized against two Fort McMurray, Alberta, properties "to be purchased," and any one or more **PLEDGE ASSET,** including LOT 11 LP., which owned real property then valued at $25,000,000.00 CAD.

64.      The lending terms were contained in Loan Commitments dated September 13, 2012 and June 6, 2013, the latter of which refers to, makes reference to, amends, replaces and/or incorporates loan terms of the former (hereinafter referred to as the "FM Commitments(s)")[2].

65.      At all times material hereto **ROMSPEN**, drafted the FM Commitments.

66.      The FM Commitments referring to the Fort McMurray property purchases, were executed by **WHITE, DWFT** and/or by duly authorized signatories on behalf of one or more **PLEDGE ASSET.**

67.      In the operative FM Commitment(s), **ROMSPEN** is expressly identified and/or described as a party transacting in capacities as both "lender" and "trustee."

68.      The amount of the FM Commitment was tied to the value of "properties to be purchased," as well as **LOT 11 LP** and/or any other **PLEDGE ASSETS'** shareholdings or real property.

---

[2] See FM Commitments dated September 13, 2012, and June 6, 2013, attached hereto collectively as Exhibit 1.

69.    A condition of the FM Commitment mandated a reduction in the maximum loan amount to $20,000,000 CAD, if the properties "to be purchased" were not acquired by the borrower(s).

70.    The FM Commitment contained other onerous conditions including, but not limited to, a daily calculated and monthly compounded 12 % interest rate, along with a 15 % participation fee on all generated profits.

71.    Absent the property acquisition, this loan effectively bore a loan-to-value ratio of 80% ($20,000,000.00 CAD advanced on $25,000,000.00 **LOT11** collateral), and was therefore substantially over-collateralized.

72.    Further, the participation fee required in the FM Commitment, is a *de facto* profit sharing condition normally reserved for equity investors which, absent a risk of obscuring the "lender-borrower" relationship, not for lenders.

73.    Upon information and belief, **ROMSPEN** knew that its cumulative loan terms and conditions were unfair and potentially illegal, inasmuch as the 15 % "participation fee" could inflate borrowing costs to stratospheric proportions, and also because its borrower was inadequately informed of this prospect.

74.    Contemplating usury boundaries, **ROMSPEN** inserted a usury rescue provision in section 29 of the June 6, 2013 FM Commitment, loan Commitment, to wit:

> The "interest" (as defined or determined by the statute establishing or defining illegal rates of interest) charged or chargeable ("interest") under the offer of credit in this Commitment, on the credit advanced pursuant to this Commitment or pursuant to any Security (any of which Interest provision is referred to as the "interest provisions") would, except for this paragraph, constitute an illegal rate of interest, then the Interest on the credit so advanced or secured will be reduced such that the total Interest under the Interest Provisions will be that amount or rate which collectively equates to that rate of interest that is 1% percent per annum less than the minimum rate that would be an illegal rate of interest, calculated according to the generally accepted actuarial practices and principles. Such reduction will be effected by reducing, or refunding to the Borrower,

4811-1816-7240, v. 1

such of the interest charges, and expenses (or a combination thereof) constituting Interest payable as may be designated by the Lender in its sole discretion.

75. Pursuant to section 34, the same Commitment did not require **ROMSPEN** to advance draws for any investment it did not approve.

76. Further, under section 37, **ROMSPEN** was vested with a contractual right to syndicate the loan.

77. Upon information and belief and, at all times material hereto, any and all **ROMSPEN** loans and/or credit facilities provided to Plaintiffs, other **DWFT** assets and/or **ZEN**, were usurious and/or otherwise unlawful.

78. Ultimately, the Fort McMurray properties were never purchased as contemplated in the FM Commitment.

79. By way of further commitment dated July 30, 2015, however, **ROMSPEN** extended **WHITE, DWFT** and/or other **DWFT** assets, a further loan in a maximum loan amount of $40,000,000.00 CAD, earmarked for the alternative purchase of property referred to as the "Lamont properties" located in Edmonton, Alberta (hereinafter the "Lamont Commitment").[3]

80. The Lamont Commitment, which amended and restated the FM Commitment "in its entirely," was once again collateralized via properties "to be purchased" and/or any of the aforementioned **PLEDGE ASSETS** or property owned by the same.

81. At all times material hereto, **ROMSPEN** drafted the Lamont Commitment.

82. Under the Lamont Commitment **ROMSPEN** is expressly identified and/or described as a party transacting in capacities both as "lender" and "trustee."

83. The Lamont Commitment also contained similar onerous interest rates, discretionary draw provisions and/or other loan fees.

---

[3] See "Lamont properties" Commitment letter dated July 30, 2015, attached hereto as Exhibit 2.

15

84.     In spite of **WHITE** having spent over $3,000,000.00 CAD prospecting the deal, **ROMSPEN** knew that the Lamont properties were unlikely to be purchased and had as its ultimate goal in the transaction, the collateralization of valuable **PLEDGE ASSETS** and/or properties owned by the same.

### B.     *The "MOS8 investments"*

85.     At or around the time of the "Lamont properties" Commitment, **ROMSPEN** agreed to source out alternative investment opportunities for **WHITE**, **DWFT**, and/or other **DWFT** assets.

86.     Upon information and belief, **ROMSPEN** was anxious to invest unused portions of **WHITE's** credit facilities, and put them to work for its own interests.

87.     Some time during the summer of 2014, **ROMSPEN** had information that the **AUSTIN PROPERTY** had recently been purchased for the nominal price of $5,000,000.00 USD, by a group of local investors that planned to develop the property as office and manufacturing space.

88.     When the investment group realized that it could not begin leasing the space immediately upon taking possession, the transaction failed and the **AUSTIN PROPERTY** was remarketed and/or opened to re-auction.

89.     At all times material hereto **ROMSPEN,** a lender experienced in commercial real estate investment, appraisal and/or construction development, was attracted to the prospect of lucrative profits that could flow from development of the site.

90.     At all times material hereto, Mos8 Partners Ltd. (hereinafter **MOS8 LP**), was a Texas limited partnership.

91.     At all times material hereto, **MOS8 LP's** general partner was Mos8 GP, LLC, a Texas limited liability company (hereinafter "**MOS8 GP**").

92.     At all times material hereto, **ROMSPEN** had an economic interest in and/or directly or indirectly controlled **MOS8 LP** and **MOS8 GP,** by way of, but not solely limited to, its managing partner **WELDON's** position as co-manager of **MOS8 LP** and **MOS8 GP** (hereinafter referred to as **"MOS8"),**

93.     **ROMSPEN** failed to disclose and/or explain the extent of its own economic interest in the **MOS8** transaction to **WHITE** and/or any one or more of the Plaintiffs.

94.     The **MOS8** limited partnership was formed for the express purpose of purchasing and ultimately developing the **AUSTIN PROPERTY.**

95.     In or about October 24, 2014, **ROMSPEN** made representations to induce and expressly advise **WHITE** to invest in the **MOS8** limited partnership, in which **ROMSPEN** had a direct financial interest.

96.     At all times material hereto, **ROMSPEN** knew or should have known that its advice and representations to induce **WHITE**, **DWFT** and/or any other **DWFT** asset, would give rise to a conflict of interest.

97.     In spite of knowing of a then arising and apparent conflict of interest, **ROMSPEN, WELDON** and/or **ROITMAN** communicated representations and/or advice to **WHITE** including, but not limited to**:**

(a)     written representations in an email dated October 27, 2014, stating:

(i)     that the **AUSTIN PROPERTY** was "perfect" for **WHITE**;

(ii)    that it was advisable that **WHITE** use un-advanced loan proceeds to invest in **MOS8** to purchase and participate in profits generated in the development of the **AUSTIN PROPERTY**; and

(iii)   that the **AUSTIN PROPERTY** could be acquired for $5,000,000 to $7,000,000 USD; and/or

(b)     verbal and/or other written representations that **WHITE** would be the benefactor of a "valet" investment, wherein **ROMSPEN** would manage **MOS8's**

development, leasing and sales, and **WHITE**, **DWFT** and/or other DWFT assets existing and/or to be formed, would earn significant profits in a short period of time, specifically, $100,000,000.00 within as little as two years.

98.     **ROMSPEN's** advice and inducements to **WHITE** created a conflict of interest

between:

(a)  **ROMSPEN** and **WHITE**, **DWFT** and/or any other **DWFT** assets, due to its legal status as trustee control over, ownership and/or other financial stake in the **MOS8** limited partnership; and/or

(b)  upon information and belief, between Romspen and secondary investors to whom  it owned fiduciary and/or other duties of care, disclosure, loyalty, and/or good    faith and fair dealings.

99.     At all times material to this Complaint, **WHITE**, **DWFT** and/or any other **DWFT**

assets, reasonably relied upon the expertise and experience underlying **ROMSPEN's**

representations and investment advice, pertaining to the **MOS8** limited partnership investment.

100.     Based upon **ROMSPEN's** advice, **WHITE**, **DWFT** and/or any other **DWFT**

asset, agreed to invest in the **MOS8** limited partnership.

101.     **WHITE**, **DWFT** and/or any **DWFT** asset, would not have invested in the **MOS8**

limited partnership absent **ROMSPEN's** advice and/or representations.

102.     Pursuant to an August 15, 2015, commitment (hereinafter the "**MOS8**

Commitment"),[4] **ROMSPEN** perfected its plan to invest **WHITE's** unused loan/credit facilities

by investing proceeds of the same in **MOS8** limited partnership interests, consistent with section

1(d) of the **MOS8** Commitment letter, stating:

"The proceeds of the second, third and fourth tranches of the loan will be used to (a) assist the borrowers providing loans and/or capital contributions to the Covenantors to make a capital contribution to (or purchase ownership interests in) MOS8 Partners, Ltd.,

---

[4] See **MOS 8** Commitment Letter dated August 31, 2015, attached hereto as Exhibit 3.

a Texas Limited Partnership . . . to assist the Texas LP in purchasing the property municipally known as 3501 Ed Bluestein Blvd., Austin Texas . . ..

103.    At all times material hereto, **ROMSPEN** drafted the **MOS8** Commitment.

104.    Under the **MOS8** Commitment, **ROMSPEN** is expressly identified and/or described as a party transacting in capacities both as "lender" and "trustee."

105.    **ROMPSEN** continues in its dual lender/trustee capacity throughout future loans and/or extensions of credit to **WHITE**, **DWFT**, and/or other **DWFT** assets.

106.    At all times material hereto, the **MOS8** loan marks the beginning of a related and co-dependent series of loan/credit facility transactions between **ROMSPEN** and Plaintiffs, all of which pertain to and/or are partially secured by the **AUSTIN PROPERTY**.

107.    In connection with its intent to develop the **AUSTIN PROPERTY**, **ROMSPEN** also entered into agreements with **MOS8** on or about August 31, 2015, to wit:

(a)    Co-development Agreement whereby **ROMSPEN** agreed to co-develop the **AUSTIN PROPERTY** with **MOS8**;

(b)    Co-Management Agreement whereby **ROMSPEN** agreed to co-manage the **AUSTIN PROPERTY** with **MOS8**;

(c)    Co-Leasing Agreement whereby **ROMSPEN** agreed to co-lease out the Austin Lands with **MOS8**; and

(d)    Co-Financing and Co-Sales Agreement, whereby **ROMSPEN** agreed to co-finance and co-sell the **AUSTIN PROPERTY** with **MOS8**.

108.    In spite of representations by **ROMSPEN** that the **AUSTIN PROPERTY** could be purchased for $5,000,000.00 to $7,000,000.00, **MOS8** ultimately purchased it for $13,000,000 USD on September 30, 2015.[5]

---

[5] See September 30, 2015 Purchase Statement, attached hereto as Exhibit 4.

109.     Upon information and belief, the substantial differential was related to other undisclosed commissions, fees and/or benefits that **ROMSPEN** and/or its agents, servants, affiliates employees and/or other representatives, negotiated and/or otherwise received in connection with the **AUSTIN PROPERTY** purchase transaction**.**

110.     Upon information and belief, while **ROMSPEN** agreed to co-finance **MOS8**, it did not contribute its own investment to the entity and/or any aspect of the **AUSTIN PROPERTY** development while it controlled **MOS8**.

111.     At all times material to this Complaint, **ROMSPEN** purchased the **AUSTIN PROPERTY** using **WHITE's** investment and/or credit facilities.

112.     **ROMSPEN** effectively lent itself **WHITE's** money/credit facility proceeds, secured by one or more **PLEDGE ASSETS**, in a conflict laden transaction that obligated only **WHITE**, **DWFT** and/or any other **DWFT** asset to repay (hereinafter the "**MOS8** transaction").

113.     Under the terms of the **MOS8** transaction, **ROMSPEN** effectively secured for itself  "risk free" ownership of **MOS8** and its assets, including, but not limited to, the **AUSTIN PROPERTY** and, ultimately, inserted itself into a position of control over a potentially lucrative multi-hundred-million dollar development (hereinafter the "**AUSTIN PROPERTY** development").

114.     In addition to using the assets, money and/or credit facilities of **WHITE**, **DWFT**, and/or other **DWFT** assets, **ROMSPEN** fully controlled **MOS8** and the **MOS8** development of the **AUSTIN PROPERTY**, absent input, disclosure and/or other oversight by **WHITE**, **DWFT** and/or any other **DWFT** asset.

4811-1816-7240, v. 1

115.    By all accounts, the **MOS8** transaction was not an arm's length transaction between lender and borrower and, therefore, in addition and/or alternative to already existent fiduciary duties imposed upon **ROMSPEN** as a "lender/trustee," it also imposed upon R**OMSPEN** and/or **MOS8** fiduciary and/or other legal duties of good faith and fair dealings, not otherwise inherent in the typical lender/borrower relationship.

116.    Upon information and belief, **ROMSPEN** has engaged, and will continue to engage other clients, in predatory and conflict-laden "loan"/investment practices similar and/or identical to the **MOS8** transaction, absent valid official "securities" or "investment advisor" license/registration and/or any other legal authority to do so.

### i) *ROMSPEN & MOS8's mismanagement/ failure to develop*

117.    To ensure its complete control and dominance over the **MOS8** development, **ROMSPEN** installed its own representative, Christopher Milam (hereinafter "**MILAM**"), to operate and/or manage the **MOS8** development.

118.    As part of his compensation, **ROMSPEN** also granted **MILAM** ownership interests in **MOS8**, without disclosing or securing the approval of **WHITE**, **DWFT** and/or any other **DWFT** asset.

119.    At all times material hereto, **MILAM** failed to effectively and competently manage, operate and/or otherwise perform any and/or all of his duties related to the **MOS8** development, due to his lack of qualifications/skill and his reckless and/or negligent conduct.

4811-1816-7240, v. 1

120.    **MILAM** failed to act competently and/or effectively in managing and/or operating the **MOS8** development of, the **AUSTIN PROPERTY,** in one or more of the following specific ways, including, but not limited to:

(a)    failing to competently plan the development;

(b)    failing to competently supervise the site and/or construction thereupon;

(c)    failing to disclose relevant knowledge of all financial matters related to and/or affecting **MOS8's** development of the **AUSTIN PROPERTY**;

(d)    misusing **MOS8** funds and assets over which he exercised control;

(e)    allowing the assets of **MOS8**, including $3,000,000.00 to $7,000,000.00 USD worth of valuable scrap (industrial equipment, copper wiring and/or other items including fixtures) to be remove from the **AUSTIN PROPERTY** by unauthorized and/or unknown third parties or, alternatively, absent disclosure to **MOS8** and/or in collusion with **ROMSPEN**, unlawfully removing or causing the removal of the same in an effort to sell, convert, and/or otherwise benefit himself and/or **ROMSPEN** economically from such unlawful activity;

(f)    attempting to convert the **AUSTIN PROPERTY** into a Data Center at a time when the same was neither commercially reasonable and/or financially viable in light of obvious lack of demand for such a Center;

(g)    failing to properly invoice and/or otherwise ensure regular book-keeping and/or accurate accounting for the **MOS8** development;

(h)    failing to complete a contemplated $1,000,000.00 USD land sale to Austin Transport Authority as directed and/or agreed;

(i)    failing to lease buildings, parking and/or other spaces that would generate substantial revenue;  and/or

(j)    failing to effect sub-division of non-core areas/parcels that would generate substantial revenue.

4811-1816-7240, v. 1

121.    At all times material hereto, **MILAM** did not deal fairly and/or failed to act honestly and in good faith with a view to the best interests of **MOS8, WHITE**, **DWFT** and/or any other **DWFT** asset, in executing his role as manager in the **MOS8** development of the **AUSTIN PROPERTY**.

122.    At all times material hereto, **MILAM** purposely, recklessly and/or negligently failed to comply with **MOS8's** Articles of Incorporation, Partnership and/or operative Shareholder agreements.

123.    At all times material hereto, **MILAM** failed to exercise the required care, diligence and/or skill of a reasonable ordinary prudent person, manager and/or Corporate Officer/Director, in the same and/or similar circumstances.

124.    At all times material hereto, **ROMSPEN**, **WELDON** and/or **ROITMAN**, knew or should have known of **MILAM's** incompetence, lack of skill and/or care, negligence and/or recklessness in relation to his role as manager of the **MOS8** development.

125.    In spite of **ROMSPEN** knowing of **MILAM's** ineffective, negligent, reckless, callous, incompetent and/or illegal conduct in relation to the **MOS8** development, **ROMSPEN** intentionally, recklessly, negligently and/or carelessly, allowed **MILAM** to continue operating the **MOS8** development, to the direct, proximate and ultimate detriment of **MOS8**, **WHITE**, **DWFT**, and/or **DWFT** assets.

126.    As a consequence of **ROMSPEN's** installation of **MILAM** as the manager of the **MOS8** development, and its subsequent failure to terminate and/or otherwise correct the mistakes and/or remedy the effects of **MILAM's** mismanagement, **MOS8** was unable to successfully develop the **AUSTIN PROPERTY** and its failure precipitated a $35,000,000.00 default on the **ROMSPEN/MOS8** loan.

127.    At all times material to the Complaint and in derogation of existing duties, **ROMSPEN** unreasonably, careless and/or recklessly hired **MILAM**.

128.    At all times material to the Complaint and in derogation of existing duties, **ROMSPEN** unreasonably, careless and/or recklessly failed to properly supervise **MILAM.**

129.    At all times material to the Complaint and in derogation of existing duties, **ROMSPEN** unreasonably, careless and/or recklessly retained and/or failed to terminate **MILAM.**

130.    When **WHITE** learned of **ROMSPEN's** and **MILAM's** intentional, reckless and/or negligent mismanagement of the **AUSTIN PROPERTY**, and the fact that **MOS8** was defaulting on the **ROMSPEN-MOS8** loan, he demanded that the **WHITE**, **DWFT** and/or any other **DWFT** investment, be returned immediately.

131.    In refusing to return the **MOS8** investment, **ROMSPEN** threatened to foreclose due to default, placing economic stress and/or duress upon **DW, DWFT** and/or other **DWFT** assets.

132.    At all times material hereto, the economic stress of the **MOS8** limited partnership failure, along with **ROMSPEN's** threat to foreclose, prompted **DW, DWFT** and/or **DWFT** assets to consider and/or take drastic steps to salvage their investment with **ROMSPEN** and guard against **ROMSPEN's** foreclosure upon valuable assets including, but not limited to, already collateralized valuable real estate located in Canada.

### ii) *The MOS8 "default solution"*

133.    At the time of **MOS8's** purported default, **ROMSPEN** claimed that it had advanced **MOS8** approximately $35,000,000.00 CAD, however, **MOS8's** development of the **AUSTIN PROPERTY** clearly evidenced no material construction progress.

134.    Further, the **AUSTIN PROPERTY** had been denigrated, damaged and/or diminished in value by **ROMSPEN's** mismanagement, to the extent of approximately $30,000,000.00 USD.

135.    Compounding these losses, **WHITE**, **DWFT**, **DWFT** assets and/or any of them, also contributed and expended other sums of money and/or incurred other costs on behalf of **MOS8**, in the course of the **MOS8** development attempt.

136.    **ROMSPEN** offered to "solve" the **MOS8** failure, by granting further loans and/or credit facilities to **WHITE**, **DWFT** and/or **DWFT** assets, existing and/or to be formed, for the purpose of purchasing the **AUSTIN PROPERTY** from **MOS8** and undertaking/continuing the development of the **AUSTIN PROPERTY**.

C.    ***First Zen "construction" loan:  Zen as developer***

137.    **ROMSPEN's** issued a commitment signed in July 2016,[6] amending former loan and/or credit facility agreements/commitments and resulting in a then current $40,000,000.00 CAD "first mortgage credit facility" (hereinafter the "**FIRST ZEN LOAN**").

138.    The purported purpose of the **FIRST ZEN LOAN** was to complete the acquisition of the **AUSTIN PROPERTY** and, thereafter, undertake its development.

139.    The **MOS8** default solution, however, was neither motivated by, nor transacted in good faith, and the terms of the **FIRST ZEN LOAN** foiled **ROMSPEN's** self-interested and predatory plan to continue converting, looting and/or fleecing **WHITE**, **DWFT** and/or **DWFT** assets, in order to precipitate default and misappropriate the **AUSTIN PROPERTY** and/or any other **PLEDGED ASSETS** securing the loan.

140.    Under the **FIRST ZEN LOAN**, **WHITE, DWFT, DWFT** assets and/or **ZEN,** was required to purchase the **AUSTIN PROPERTY** for $35,000,000.00 USD, a purchase price

---

[6] See unsigned "form" of July 2016 agreement, attached hereto as Exhibit 5.

almost triple **MOS8's** original purchase price even though it was damaged, denigrated and/or diminished in value in the approximate amount of $30,000,000 USD as a direct and proximate result of **ROMSPEN's** aforementioned mismanagement.

141.    This **FIRST ZEN LOAN** also required **WHITE**, **DWFT**, **DWFT** assets and/or **ZEN** to assume **MOS8's** debt.

142.    Ultimately, the **FIRST ZEN LOAN** obligated **ZEN** to a first mortgage credit facility, designed by **ROMSPEN** to transform **MOS8's** "bad debt" into a performing loan in "good standing," and to ensure the same was reflected upon **ROMSPEN's** books as such (hereinafter the "first churn").

143.    The first churn permitted **ROMSPEN** to re-collateralize and generate new origination and/or other fees associated with a performing loan, with the added **ROMSPEN** benefit of creating a "new investor" optic," oblivious to and/or obscured from a *de facto* and paradigm example of **ROMSPEN's** poor investment strategy and/or management performance, littered with self-dealing and conflicts of interest.

144.    Upon satisfying the **MOS8** loan obligation, **DW**, **DWFT**, **DWFT** assets and/or **ZEN**, still faced hurdles associated with the ownership and development of the **AUSTIN PROPERTY** including, but not limited to, the need for capital precipitated by **ROMSPEN's** (1) mismanagement of **MOS8**, (2) the **MOS8** loan terms and/or (3) the prospect of transforming the damaged **AUSTIN PROPERTY** site into a viable development.

145.    Upon information and belief, **WHITE**, **DWFT** and/o other **DWFT** assets invested, contributed, and/or otherwise lost millions a (outside of loan proceeds) developing the **AUSTIN PROPERTY**.

4811-1816-7240, v. 1

146.     At all times material to this Complaint, between protecting investments and expected profits, **WHITE, DWFT** and/or other **DWFT** assets**,** all had enormous stakes in the property's successful development.

147.     From in or about November, 2016, **WHITE**, **DWFT**, other **DWFT** assets and/or **ZEN**, continued to develop and invest in the **AUSTIN PROPERTY,** commensurate with its vision of ensuring an environmentally sustainable plan that incorporated "green technology" and renewable energy resources.

### i) *AZ:  Contractor, Trustees, Officers/Directors*

148.     During the continued efforts to develop the **AUSTIN PROPERTY**, **WHITE** frequented the site to ensure progress and contribute to all aspect of the project.

149.     On one such visit in 2017, **WHITE** was approached by **AZ**, who introduced himself as a "scrap buyer" interested in purchasing some furniture that was being sold as scrap.

150.     **AZ** made it known to **WHITE** that he was also a local builder/real estate developer who owned **PANACHE**, and was very familiar with the local construction and development scene.

151.     Thereafter, **AZ** made attempts to befriend and gain **WHITE's** trust, all the while attempting to infiltrate **WHITE's** business by falsely persuading him of **AZGROUP's** utility and indispensible value to the **AUSTIN PROPERTY** development.

152.     **AZGROUP** sought to induce and/or gain **WHITE's** trust by implying and/or making false and/or misleading representations including, but not limited to:

      (a)     **AZ** possessed requisite skills to be a **DWFT** Trustee;

      (b)     **AZ** possessed sufficient skill and resources to serve as an officer or director of one or more of the **DWFT** assets;

      (c)     **AZGROUP** possessed the skill and resources necessary to ensure timely

27

development of the **AUSTIN PROPERTY** within proposed budgetary guidelines;

(d)    **AZGROUP** had the, skill and resources to ensure timely development of the **AUSTIN PROPERTY** within proposed budgetary guidelines;

(e)    **AZGROUP** could use its experience and influence in the local construction industry to secure more favorable loan terms from **ROMSPEN**; and/or

(f)    **AZGROUP** could ensure adequate and timely construction draws from **ROMSPEN** in relation to the **ROMSPEN-ZEN** loan if **AZ** owned interests in **ZEN**.

153.    On a personal level, **WHITE** became fond of **AZ** and, over a short period of time, began to trust **AZ's** opinion and input as the same pertained to matters of business; in particular, matters related to the **AUSTIN PROPERTY** development.

154.    **WHITE** reasonably relied upon **AZGROUP's** representations in light of its purported business acumen and status as experienced builders and/or real estate developers with deep-rooted experience in the local construction industry.

155.    Based upon the aforementioned false and/or misleading representations, **WHITE** installed **AZGROUP** as **ZEN's** General Contractor in the **AUSTIN PROPERTY** development.

156.    At or around the same time and based upon the aforementioned false and/or misleading representations, **WHITE** also appointed **AZ** as a Trustee of the **DWFT**[7].

157.    At or around the same time, **WHITE** arranged for **AZ** to become a Director and/or Officer of various **DWFT** assets including, but not limited to one or more of the **PLEDGE ASSETS** and, ultimately, a partner in **ZEN** by way of shareholdings in **JEFFERSON**.

158.    **WHITE** would not have selected **AZ** for any of the aforementioned positions of trust, absent reliance upon **AZ's** false and/or misleading claims to expertise in construction,

---

[7] See Acceptance of Trustee Appointment by Adam AZ, attached hereto as Exhibit 6.

development and/or business.

159.    The aforementioned positions as Trustee and/or Corporate Director/Officer imparted substantial trust and control to **AZGROUP** over the affairs and business of **WHITE**, **DWFT**, **DWFT** assets and/or **ZEN**, including, but not limited to, control over important aspects of the **AUSTIN PROPERTY** development.

160.    At all times material hereto, **WHITE**, **DWFT**, other **DWFT** assets and/or **ZEN** specifically relied upon **AZGROUP** to manage business affairs and ensure development of the **AUSTIN PROPERTY** in a timely manner, within assigned/imposed budgetary parameters.

161.    Upon information and belief, **SYMMETRY's** financial records show that **WHITE, DWFT,** other **DWFT** assets and/or **ZEN,** spent approximately $8,000,000.00 USD continuing the **AUSTIN PROJECT** development that it inherited in shambles from **MOS8**.

162.    As **ZEN** made significant advancements in project development, **ROMSPEN** continued to insert itself into **ZEN's** business with a predatory eye toward precipitating default and acquiring the **AUSTIN PROPERTY**.

### D.    *The second Zen "construction loan" for $125,000.00*

163.    At all times material hereto, based upon its historical knowledge and familiarity with the **AUSTIN PROPERTY** development and, upon consideration of the property's potential value, **ROMSPEN** continued its predatory "loan to own" scheme by offering **ZEN** further loan/credit facilities, in a transaction that bore suspicious restrictions upon loan negotiations.

164.    Specifically, on February 1, 2018, **ROMSPEN** committed to lend and/or extend additional credit facilities to **ZEN** in the form of a maximum $125,000,000.00 USD "construction loan" (hereinafter the "**SECOND ZEN COMMITMENT**"). [8]

---

[8] See Second Zen Commitment Letter dated February 1, 2018, attached hereto as Exhibit 7.

165.    With a view toward completing the loan, the parties outlined the main terms upon which they intended to agree and proceeded to negotiate the loan contract.

166.    **ROMSPEN** suspiciously excluded **WHITE** from all loan negotiations, however, and demanded that **AZ** undertake negotiations on **ZEN's** behalf.

167.    Upon information and belief, **ROMSPEN** insisted upon dealing with **AZ** because, by the time of negotiations, **AZ** was colluding with **ROMSPEN** to further the lender's predatory "loan to own" scheme**.**

168.    **ROMSPEN** also suspiciously insisted that greater interests in **ZEN's** ownership structure be assigned/transferred to **AZ** and/or **JEFFERSON** (controlled by **AZ**).

169.    Specifically, **ROMSPEN** demanded that **JEFFERSON** become the controlling interest holder in **ZEN LP,** and that a 50% interest in **ZEN GP** also be assigned to **AZ**, effectively making **AZ** a 100% interest holder in **ZEN GP**.

170.    Upon information and belief, the ownership modification constituted undisclosed, improper and/or unlawful *quid pro quo* for **AZ's** continued collusion with **ROMSPEN.**

171.    Upon information and belief, **AZ** was earmarked by **ROMSPEN** as a "puppet insider" that could do **ROMSPEN's** bidding in furtherance of its overall predatory plan, and the ownership modification was part of **ROMSPEN's** attempt to increase **AZ**'s power and ensure that his position in ongoing transactions was not jeopardized by any other interest holder's ability to remove him from the same.

### i) *The April 27, 2018 "Loan Agreement"-missing signatures*

172.     **ROMSPEN** contends that on or about April 27, 2018, the parties reached agreement and executed a Construction "Loan Agreement"[9] and a Promissory Note[10] pertaining to the $125,000,000.00 construction loan (hereinafter "**SECOND ZEN LOAN"**).

173.     While **ROMSPEN** claims that the operative loan agreement was executed by **WHITE**, on behalf of himself and/or any other **DWFT** asset, including **ZEN**, the same is contested by Plaintiffs.

174.     R**OMSPEN** initially submitted an unsigned loan agreement to this Bankruptcy Court in support of its claims, however, the same did not contain **ROMSPEN's** signature and, only upon **WHITE** raising the issue before this Court and in foreclosure proceedings in Edmonton, Canada (hereinafter the "Edmonton proceedings"), did **ROMSPEN** resubmit a revised version that it purported to be the operative loan agreement evidencing both parties' signatures.

175.     A close examination of the loan agreement signature pages re-submitted by **ROMSPEN** in support of its creditor claims, however, reveals that there is no footer linking the **ROMSPEN** signature page with either the purported/operative loan document (version 12) or **WHITE's** signature page (version 8).

176.     Upon information and belief, and based upon Plaintiffs' review of related documents, **ROMSPEN** inserted and/or "slip sheeted" signature pages from previous and/or different loan documents into what it purports in these Bankruptcy proceedings, to be the operative loan document (properly executed by both parties) upon which it asserts both the validity and amount of its claim against **ZEN's** estate.

---

[9] See copy of Loan Agreement dated April 27, 2018, attached hereto as Exhibit 8.
[10] See $125,000,000.00 Promissory Note attached hereto as Exhibit 9.

177.    Upon further information and belief, **ROMSPEN** has "slip sheeted" signature pages in the aforementioned manner, in order to legitimate the loan document and its corresponding terms and conditions in order to use the same as a valid legal basis to assert its current claims in these Bankruptcy Court proceedings.

*178.*    At all times material hereto, the Plaintiffs and/or **ZEN**, relied and based its performance obligations solely upon loan terms contained in duly executed and valid loan agreements.

## ii) *Unreasonable loan terms*

179.    The terms of the **SECOND ZEN LOAN** agreement, once again afforded **ROMSPEN** the benefit of transforming an earlier loan, into a new performing loan in "good standing," that could be reflected as such on **ROMSPEN's** books and records (hereinafter the "second churn").

180.    Like the **MOS8** loan's first churn, the second churn also came complete with the repeated advantage of charging exorbitant loan fees and interest upon a previous loan's exorbitant fees and interest.

181.    At all times material hereto, **LOAN** unfairly compounded **ZEN's** debt, in the course of a conflict-laden transaction engineered to maximize **ROMSPEN's** goal of precipitating **ZEN's** default.

182.    At all times material hereto, **ROMSPEN** intended to continue its predatory scheme by increasing **ZEN's** debt obligation in collusion with **AZ**, at a time when **ZEN** was making and/or poised to make significant inroads and progress in developing the **AUSTIN PROPERTY**.

4811-1816-7240, v. 1

183. The **SECOND ZEN LOAN** required **WHITE, ZEN LP, ECO, LOT 11, EIGHTFOLD**, **ABSOLUTE ENERGY, ABSOLUTE WASTE, SYMMETRY** and/or other **DWFT** assets, all to execute personal and/or corporate guarantees.

184. Additionally, **ROMSPEN** required mortgages and general assignments of leases and rents be registered against **DWFT** assets, legally described as, "Mortgages and General Assignments of Leases and Rent against . . . Lot 12 (which was described as "the remainder of SW ¼ 17-53-23-4")" and two parcels of land as Lot 4 and Lot 11."

185. Further, the **SECOND ZEN LOAN** was grossly over-collateralized between both the **AUSTIN PROPERTY** and other **PLEDGE ASSETS** including real property in Alberta, Canada, worth in excess of $260,000,000 USD.

186. Upon information and belief, the loan terms evidence **ROMSPEN's** predatory intent to circumvent otherwise protective foreclosure mechanisms and/or related legal proceedings, in an effort to simply slide into ownership upon fulfillment of its plan to precipitate **ZEN's** default.

### iii) *unreasonable draw and "inspector" delays*

187. While **ROMSPEN** was obligated to disburse the proceeds of the **SECOND ZEN LOAN** in good faith, pursuant to certain agreed upon loan terms, **ROMSPEN** intentionally, recklessly and/or negligently delayed and/or failed to make requisite disbursements, in an effort to stagnate and/or otherwise thwart **ZEN's** development of the **AUSTIN PROPERTY**.

188. At all times material hereto, **ROMSPEN's** actions were incommensurate with standard industry lending practices geared toward ensuring performing loans.

189. At all times material hereto, **ROMSPEN's** conditions clearly exhibited its intention to precipitate **ZEN's** default and engineer a hostile takeover of the **AUSTIN PROPERTY**.

190. In spite of its purported status as **ZEN's** lender, **ROMSPEN** invoked discretionary and/or other onerous loan terms to influence, control and/or insert itself into **ZEN**'s business, in a manner wholly inconsistent with the typical lender/borrower relationship.

191. At all times material to the Complaint, **ROMSPEN** specifically embarked upon a pattern of imposing unreasonable conditions upon draw requests.

192. One instance of the aforesaid pattern involved a refusal to fund a draw request unless and/or until **AZGROUP** consented to **ROMSPEN's** inspection of **PANACHE's** books and records.

193. At all times material hereto, however, **PANACHE** was not the "borrower" and was not otherwise legally obligated to share its books and records with **ROMSPEN.**

194. Upon information and belief, **ROMSPEN** sought access to information contained within P**ANACHE's** books and records, in furtherance of its predatory efforts to position itself for recommencing the **AUSTIN PROPERTY** development upon precipitating **ZEN's** default.

195. Further, **ROMSPEN** threatened to refuse draws required under the **SECOND ZEN LOAN** unless **ZEN** permitted a **ROMSPEN** employee and a third-party general contractor, BTY U.S., LLC, upon the **AUSTIN PROPERTY** in the capacity of "inspectors," "progress monitors" and/or "quantity surveyors" (hereinafter "BTY").

4811-1816-7240, v. 1

196. Relatedly, **ROMSPEN** also threatened to refuse draw requests if **ZEN** did not agree to pay BTY, whose virtually full-time onsite services amounted to approximately $25,000.00 USD per month, further taxing **ZEN's** construction budget.

197. During its tenure, BTY inserted itself into every aspect of the development, far in excess of what might otherwise be expected from a lender's representative or inspector.

198. Even while BTY was being paid to supervise **ZEN's** construction progress, **ROMSPEN** regularly communicated and negotiated with **ZEN's** sub-contractors absent permission, approval and/or other instruction from **ZEN.**

199. At all times material hereto, delays in **ZEN's** progress were occasioned by the simultaneous presence and friction inherent in having two general contractors and/or "inspectors" (**AZGROUP** and BTY) directly involved in the **AUSTIN PROPERTY** decision-making process.

200. Ultimately, **ROMSPEN's** ever present and costly "quantity surveyor" was unable to report irregularities and/or failures in construction attributable to **ZEN.**

201. The lack of reported irregularities prompted **ROMSPEN** to direct BTY to change its standard protocols and focus its attention upon "accounts payable" and "draw conformance."[11]

202. Further, in spite of its purported neutrality, **BTY** had worked for **ROMSPEN** in the past, and its reporting failed to document late draws, sub-contractors not being paid and/or suppliers failing to deliver to the site, all of which was evident and thwarted **ZEN's** development/construction progress.

203. At all times material hereto, and upon information and belief, **BTY** was not a "neutral" quality surveyor, and the company was hired primarily for the purpose of gathering

---

[11] See BTY report of May 21, 2019, attached hereto as Exhibit 10.

"recognizance" that would serve **ROMSPEN's** planned efforts to position itself for recommencing development, upon precipitating **ZEN's** default.

204.    In further attempts to engineer its predatory takeover, **ROMSPEN** also interfered with **ZEN's** marketing and prospective lease negotiations.

205.    On at least one occasion **WELDON** travelled to the **AUSTIN PROPERTY** to personally meet with and influence the marketing efforts of **ZEN's** brokers.

206.    On another occasion, **ROMSPEN** engaged in direct and/or unauthorized negotiations with a potential tenant, holding itself out as having authority to contract with potential lessors.

207.    At all times material hereto, **ROMSPEN** purported to have unilateral discretion over whether and, in what amount, **ZEN**'s draw requests would be honored.

208.    Further, **ROMSPEN** demanded and wrongly assessed excessive and/or unreasonable fees in connection with **ZEN's** draw requests.

209.    Contrary to the loan commitment and, against the backdrop of **ZEN's** protests, **ROMSPEN** insisted upon paying its own fees out of **ZEN's** draw disbursements, placing further economic stress upon **ZEN's** construction budget.

210.    Out of a total of sixteen (16) draw requests by **ZEN**, eleven (11) of the same were funded late.

211.    On at least three occasions from the time **ZEN** acquired the property from **ROMSPEN/MOS8**, construction at the **AUSTIN PROPERTY** ceased as a direct and/or proximate result of **ROMSPEN's** intentional, reckless and/or grossly negligent refusal to fund draws requested by **ZEN.**

4811-1816-7240, v. 1

212.   **ROMSPEN's** predatory funding delays required **WHITE** and/or any other **DWFT** asset, to expend over $1,000,000.00 USD, solely to avoid supply stoppages and/or subcontractor mutiny.

213.   The cumulative effect of **ROMSPEN's** refusals occasioned scheduling delays that substantially impacted **ZEN's** ability to deal effectively with sub-contractors, suppliers and/or prospective tenants, all of which undermined and placed enormous economic pressure upon **ZEN, WHITE, DWFT** and/or other **DWFT** assets.

214.   In spite of the debilitating economic consequences suffered by **ZEN**, as a result of **ROMSPEN**'s pattern of draw refusal, **ROMSPEN** continued to earn substantial, interest and/or other fees during periods of delay.

### iv) *ROMSPEN thwarts ZEN's PACE loan financing efforts*

215.   At all times material to this Complaint, the State of Texas had an attractive sustainable energy program authorizing loans for commercial, industrial, and multi-family residential properties, pursuant to Chapter 399 of the Texas Local Government Code, otherwise known as the Property Assessed Clean Energy Act ("PACE").

216.   Texas PACE loans provided low-cost/long-term funding, for development projects into which aspects of energy efficiency and renewability were incorporated.

217.   Texas PACE loans bore significant economic benefits over traditional financing, including, but not limited to, repayment via property tax bill assessments.

218.   PACE loan eligibility depended upon the "mortgagee's" written consent, which was routinely granted by lenders based upon their own economic reasons including, but not limited to, strengthened borrower repayment ability and lower loan-to-value ratios.

219.    At all times material to this Complaint, **ZEN** intended to utilize PACE loan proceeds to offset the costs of developing the **AUSTIN PROPERTY**.

220.    Commensurate with its express plan to develop the **AUSTIN PROPERTY** using green technology and renewable resources, **ZEN** pursued a PACE lender to avail itself of this attractive financing option and, in October of 2018, **ZEN** secured a Texas lender PACE loan commitment for $25,000,000 in connection with the development of the **AUSTIN PROPERTY.**

221.    PACE financing terms required **ROMSPEN's** consent as Mortgagee, in light of the fact that the financing would effectively encumber the **AUSTIN PROPERTY**.

222.    At all times material hereto, **ROMSPEN** knew that PACE loan financing was a critical assumption underlying **ZEN's** ability to cover the costs of environmental and energy saving components of the **AUSTIN PROPERTY** development, and it likewise knew that such components were significantly attractive to potential lessors.

223.    Pursuant to Section 5.13(c)(iii) of the **ZEN CONSTRUCTION LOAN** agreement**, ROMSPEN** expressly agreed that a PACE loan would be considered a "Permitted Encumbrance" upon title.

224.    At all times material to this Complaint, **ZEN** repeatedly sought **ROMSPEN's** consent in connection with its PACE commitment, however, **ROMSPEN** repeatedly refused to oblige.

225.    Instead of acting in good faith, **ROMSPEN** attached other onerous conditions to its consent including, but not limited to, **ZEN's** execution of a general release for any and all of **ROMSPEN's** prior acts and/or omissions.

226.    **ROMSPEN's** attempt to condition its PACE loan consent upon said release, bespeaks its own then existing concern over liability to **ZEN** for breach of contract and/or

4811-1816-7240, v. 1

fiduciary duties, rooted in **ROMSPEN's** predatory conduct in relation to procuring and administering the **ZEN CONSTRUCTION LOAN**.

227.    **ROMSPEN** also threatened to withhold its PACE loan consent unless and/or until **ZEN** switched to a lender with whom **ROMSPEN** had a pre-existing relationship

228.    Notwithstanding **ZEN's** ultimately coerced decision to change lenders, **ROMSPEN** continued to withhold and/or refuse its consent for **ZEN's** PACE loan financing.

229.    **ROMSPEN's** persistent refusal to consent was intentional, reckless and/or negligent, and designed to jeopardize and thwart **ZEN's** successful completion of the **AUSTIN PROPERTY** development.

230.    **ROMSPEN's** refusal to consent also forced **WHITE**, **ZEN** and/or other **DWFT** assets, to expend over $1,000,000.00 USD in "green" related construction costs, contrary to **ZEN's** *ab initio* intention to cover the same out of anticipated PACE loan proceeds.

231.    At all times material hereto, **ROMSPEN** was obligated to act in good faith with respect to the PACE loan request, however, it denied **ZEN** the opportunity as part of its predatory plan to pressure **ZEN's** budget and precipitate default.

### v) *reduction in loan proceeds and pretextual default allegations*

232.    **ZEN** continued to develop the **AUSTIN PROPERTY**, in spite of **ROMSPEN's** refusal to consent to the PACE loan.

233.    In furtherance of its predatory scheme, **ROMSPEN** also hid and/or failed to account for money that should have flowed into **ZEN's** construction coiffures, including a condemnation award precipitated by a State of Texas condemnation plan involving a nearby correctional facility.

234.     As part of the aforementioned plan, the State condemned several acres of land along U.S. 183 that would inevitably have caused a detrimental effect and/or other damages to the **AUSTIN PROPERTY** development.

235.     After substantial and costly efforts advancing legal claims against the State, all of which were paid for by **ZEN**, a settlement that greatly enhanced the value of the **AUSTIN PROPERTY** was reached.

236.     As part of the settlement, a $597,199.50 USD compensation award that should have inured to **ZEN's** benefit, was paid over to **ROMSPEN's MOS8** entity.

237.     In spite of **ZEN**'s repeated inquiries and/or other demands, **ROMSPEN** failed and/or refused to provide **ZEN** with a proper accounting or otherwise explain how the award was distributed and/or applied.

238.     Further, **ZEN** fought a costly and extended battle with a local zoning/planning board to increase a "height restriction," applicable to the **AUSTIN PROPERTY**.

239.     The zoning accommodations secured in connection with  **ZEN's** efforts greatly increased the value of the **AUSTIN PROPERTY**.

240.     Thereafter, on or about August 16, 2019, **ROMSPEN** communicated written confirmation of its intent to limit disbursements under **ZEN's** promissory note to $102,000,000.00 USD instead of the maximum of $125,000,000.00 USD, agreed upon between the parties.

241.     **ROMSPEN** admitted as part of its explanation, that "promissory note" overstatement was  "routine practice" in this and other loans.

242.     **ROMSPEN's** spawned a flurry of spurious and pre-textual default allegations against **ZEN** in an effort to take over the **AUSTIN PROPERTY** development.

4811-1816-7240, v. 1

243.     **ROMSPEN** falsely and wrongfully claimed that **ZEN** misapplied loan proceeds and, therefore, **ZEN** was in default of the **ZEN CONSTRUCTION LOAN** agreement.

244.     At all material times, however, **ROMSEN** knew that each and every draw request was fully approved by its own inspectors.

245.     **ROMSPEN** falsely and wrongly claimed that **ZEN** failed to replenish interest reserves and, therefore, **ZEN** was in default of the **ZEN CONSTRUCTION LOAN** agreement.

246.     At no time material hereto, however, did the **ZEN COMMITMENT**, **ZEN-NOTE** and/or the **ZEN CONSTRUCTION LOAN** agreement, confer any such obligation upon **ZEN**.

247.     **ROMSPEN** falsely and wrongly claimed that **ZEN** was in default due to a "Balancing Event" (unfunded advances less than required to complete identified construction work).

248.      **ROMSPEN** however, failed to honor contract provisions requiring it to send notice of any "Balancing Event" and, therefore, **ZEN** was not in default based thereupon.

249.     At all times material hereto, **ROMSPEN** manufactured the aforementioned claims in order to justify its default assertions against **ZEN**.

250.     On October 7, 2019, in connection with its false assertions of **ZEN's** default under the **ZEN CONSTRUCTION LOAN** agreement, **ROMSPEN** attempted to coerce **ZEN** into signing a "Forbearance Agreement."

251.     Under the terms of the Forbearance Agreement, **ROMSPEN** agreed to hold off enforcement and/or exercise of mythical rights arising out of illusory acts of default which it falsely ascribed to **ZEN**, in exchange for concessions including, but not limited to (a) **ZEN's** admission of actual default, (b) **ZEN's** acknowledgment that **ROMSPEN** was no longer

4811-1816-7240, v. 1

obligated under the **ZEN CONSTRUCTION LOAN** agreement and (3) **ZEN's** surrender of a deed in lieu of foreclosure.

252.     Thereafter, **ZEN** issued a Notice of Default to **ROMSPEN,** on October 9, 2019[12]

253.     In response to **ZEN's** Notice of Default, **ROMSPEN** communicated its own Notice of Default to **ZEN** on October 11, 2019.[13]

E.     _**Post-default duress-ROMSPENS's forbearance and release requests**_

254.     At all times material hereto, **ROMSPEN** continued to coerce and/or otherwise pressure **WHITE** and/or **ZEN** into signing a Forbearance and/or other settlement agreement.

255.     On October 17, 2019, after rejecting **ROMSPEN's** coercive settlement attempts**,** **WHITE**, **EIGHTFOLD**, and **ZEN,** via **AZ,** initiated Texas State Court litigation against **ROMSPEN** in Travis County, Texas (Cause No. D-1-GN-19-007269), sounding in Fraud, Breach of Duty of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Negligent Misrepresentation, Breach of Contract and Declaratory Relief under the Texas Uniform Declaratory Judgment Act.

256.     In an email dated October 19, 2019, AZ confirms **ROMSPEN's** plan to effect a hostile takeover of the **AUSTIN PROPERTY,** and the fact that he was enlisted to facilitate the same, stating:

> In terms of what you asked me to do a short while ago, I cannot not tell you what they communicate to me. Even though it is a moving target, and what
>
> they are doing goes beyond fraud, it is financial terrorism. What they are proposing orally is that basically that:
>
> > 1- They will take over the property.
> > 2- They would leave me in and
> > 3- If I stabilize the property, get it to completion, they will not take

---

[12] **See** Notice of Default to **ROMSPEN** dated October 9, attached hereto as Exhibit11.
[13] **See** Notice of Default to **ZEN** dated October11, attached hereto as Exhibit 12.

4811-1816-7240, v. 1

any action against the assets in Edmonton.

> That is the summary of the BS that they are proposing. That means the $3.2 million I put in evaporates and pretty much all the other money I have put in will evaporate and handed to them on a silver platter.[14]

257.     Upon information and belief, **AZ's** email is written with the intention of generating an "**AZ-WHITE**" alignment optic and while, at all times material hereto, **AZ** continued to work in collusion with **ROMSPEN** to facilitate its takeover plan, AZ also intended to water test the prospect of "switching sides," to the extent the same was viable and otherwise in **AZGROUP's** optimal and/or best financial interests.

258.     **AZ's** *modus operandi* is borne out in statements in the same email, to wit:

> I understand that you are rightfully angry and that this is driving a stake through both of our hearts. You and I cannot talk about the fraud that they   have   committed. That is a known fact. Can we get them? Yes, we can. It will take money to do it and my first stress right now is money. If you can raise some cash this week, I will unleash everything at my disposal towards them . . . .  I will go to the end of the world with you. But . . . we do not have any soldiers nor any ammunition.

259.     Upon information and belief, at all times material hereto, **AZGROUP** had embezzled and/or unlawfully funneled funds greatly exceeding **AZ's** claimed "$3.2 million" from sources including, but not limited to, **WHITE**, **DWFT**, other **DWFT** assets, **ZEN** and/or **EIGHTFOLD** (an entity **AZ** used to perform "development services" and receive various other payments).

260.     While the Texas State Court lawsuit was still pending, **ROMSPEN** and **AZ** desperately stepped up efforts to hatch a settlement agreement with **WHITE** to resolve **ZEN's** dispute with **ROMSPEN**.

261.     **WHITE's** receipt of information from **AZ**, confirming **ROMSPEN's** plan to take over the **AUSTIN PROPERTY,** prompted him to take steps to safeguard his own and related

---

[14] See **AZ** email to **WHITE** dated October 19, 2019, attached hereto as Exhibit 13.

interests in the **AUSTIN PROPERTY** and to protect other more valuable **PLEDGE ASSETS** in Canada against foreclosure.

262.     Nearing the end of October, 2019, in an effort to protect investments in the **AUSTIN PROPERTY**, **WHITE** engaged a broker and had procured a potential buyer for the property.

263.     **AZ** and **ROMSPEN's** then existing interests in the **AUSTIN PROPERTY,** were incommensurate with the prospect of **WHITE** finding a buyer and, upon information and belief, **ROMSPEN** encouraged **AZ** to devise a plan to thwart **WHITE's** efforts to sell.

264.     In early November 2019, **AZ** called and threatened **WHITE's** broker, claiming there would be "consequences" if he attempted to bring prospective buyers anywhere near the **AUSTIN PROPERTY**.

265.     Upon information and belief, **AZ's** threats against the broker were designed to protect **AZGROUP's** own contractual/economic interests in **ROMSPEN** acquiring the **AUSTIN PROPERTY**.

266.     In early November 2019, **WHITE** agreed to meet with **AZ** at the **AUSTIN PROPERTY** to discuss terms of a Settlement Memorandum and/or Forbearance Agreement (hereinafter "settlement agreements") geared toward resolving then current disputes between **ROMSPEN** and **WHITE**, **DWFT**, **DWFT** assets and/or **ZEN.**

267.     When **WHITE** failed to voluntarily sign the settlement agreement(s), **AZ** then threatened **WHITE**, telling him that he would cause tax and/or other problems for him personally, and that he would report **WHITE** to FBI "contacts" who owed him "favors" if he reused to sign the agreement(s).

4811-1816-7240, v. 1

268.     **WHITE** refused to sign the settlement agreements against the backdrop of **AZ's** threats, whereupon **AZ** assaulted him with a chair and a steel bar, before forcibly removing **WHITE** from the **AUSTIN PROPERTY**.

269.     **WHITE** reported the incident involving **AZ** to the local police, however, the matter was not further investigated.

270.     At all times material hereto, **AZ** had a history of threatening and coercing **DWFT** asset employees, when they failed to comply with his requests to hide and/or obfuscate acts of misappropriation and/or other misdeeds from **WHITE** and/or other **DWFT** assets.

271.     Shortly after **AZ** threatened and assaulted **WHITE**, he was asked to resign from his positions as trustee, officer and/or director of any of the **DWFT** assets.

272.     Against the backdrop of **AZ's** threats and acts of violence toward **WHITE** and his broker, settlement attempts subsided.

273.     Thereafter, in or about November 26 2019, **AZ** agreed to the appointment of a Receiver in the Texas lawsuit, in his capacity as a Director of **ZEN**.

274.     Thereafter, on November 27, 2019, absent consent and/or other permission from **WHITE** and/or **ZEN**, **AZ** unilaterally caused the Texas lawsuit to be non-suited/withdrawn.

275.     The withdrawal of the Texas lawsuit favored **ROMSPEN**, who was left with the choice of continuing the action.

276.     While still under management of a Court appointed receiver, **ROMSPEN** unilaterally deployed approximately $6,000,000.00 USD in the form of protective funding, fees and/or other interest, over **WHITE's** objection, and in direct contravention of **WHITE's** counsel's admonition to refrain from further dispersing funds.

277.    On April 15, 2020, **ZEN** was petitioned into bankruptcy.

### IV.    FACTS PARTICULAR TO DEFENDANT AZ

278.    Upon information and belief, **AZ's** initial meeting with **WHITE** was not coincidental but rather, it took place at the behest of others including a local lender, lawyer, **ROMSPEN** and/or other individual(s) familiar with the **AUSTIN PROPERTY's** development potential.

279.    At all times material hereto**, AZ** calculated and preyed upon **WHITE's** local vulnerability as a wealthy Canadian businessman, unfamiliar with the Austin construction and development scene, and in need of connections to pursue his project.

280.    **AZ** sought to ingratiate himself unto **WHITE** in order to prey upon a future trusted friendship that would inevitably provide him easy business opportunity and the chance to exploit **WHITE's** assets and wealth.

281.    From the beginning of his involvement as **WHITE's** friend and general contractor, he gleaned insight into the value of the **AUSTIN PROPERTY** and other valuable **WHITE** assets that were made known to him including, but not limited to, the **DWFT** and its holdings.

282.    **AZ** and **WHITE** shared family and other personal experiences during the tenure of their friendship and, from all outward appearances, **WHITE** reasonably believed in the *bona fides* of the friendship and that he could trust and rely upon **AZ** in matters of business based upon their confidential relationship.

283.    After **AZ** the appointment of trustee for the **DWFT**, **WHITE's** trust in **AZ** was fortified based upon anticipated fiduciary obligations that emanated from **AZ's** position(s).

284.    At all times material hereto, however, **AZ** used his position as a **DWFT** trustee and/or related positions as an officer and/or director of several **DWFT** trust assets in order to serve **AZGROUP**'s interests.

## A.    *AZ's operation and management of ABSOLUTE*

285.    After becoming a Director of **ABSOLUTE**, **AZ** owed common law and/or statutorily imposed duties of care under the Alberta Business Corporations Act including, but not limited to, the following:

(c)    the duty to act honestly and in good faith with a view toward **ABSOLUTE's** best interests when exercising his powers and discharging his duties as an officer or corporate Director;

(d)    the duty to disclose any and all information **AZ** had in relation to matters relating to the financial interests of **ABSOLUTE**;

(e)    the duty to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances when exercising his powers and discharging his duties as an officer or corporate director;

(f)    the duty to comply with the provisions of the Alberta Business Corporations Act and its regulations; and/or

(g)    the duty to comply with **ABSOLUTE's** articles, bylaws and/or any unanimous shareholder agreements;

286.    While he was a Director of **ABSOLUTE**, **AZ** pledged the company's asset as collateral for the **SECOND ZEN LOAN** by **ROMSPEN**, in which **AZGROUP** had an interest, but for which he failed to disclose and/or otherwise seek permission.

287.    **AZ** terminated **ABSOLUTE's** then existing key and competent employees, in order to replace the same with new employees whom were beholden unto him.

288.     At all times material hereto, **AZ** adopted plans and pursued business objectives

that served **AZ** and/or **AZGROUP's** financial interests, but were not in the best interests of

**ABSOLUTE**.

289.     At all times material hereto, while acting as a Director of **ABSOLUTE**, **AZ**

engaged in the following acts, incommensurate with **ABSOLUTE's** best interests:

    (a) entered into commercially unreasonable contracts;

    (b) adopted business plans and pursued business objectives that lacked financial
        viability and/or commercial reasonableness;

    (c) failed to contest inaccurate tax assessments, thereby causing tax assessments to
        accrue against **ABSOLUTE's** land assets;

    (d) failed to generate revenue;

    (e) embezzled and/or converted monies and/or assets

    (f) failed to generate new leases;

    (g) failed to generate new business opportunities; and/or

    (h) mismanaged **ABSOLUTE** in a manner causing it to lose customers and
        accompanying revenues.

290.     **AZ** resigned as a Director of **ABSOLUTE** on October 29, 2019, but thereafter

continued to collude and/or conspire with **ROMSPEN** in a manner that endangered

**ABSOLUTE's** assets from being foreclosed upon by **ROMSPEN**.

291.     Upon resigning, **AZ** disseminated **ABSOLUTE's** confidential business, financial

and/or tax records absent permission and/or other authority to do so.

292.     Upon resigning, **AZ** intentionally interfered with contractual relationships

between **ABSOLUTE** and it employees by encouraging one or more employees to engage in

corporate espionage.

4811-1816-7240, v. 1

293.    Upon resigning **AZ** intentionally encouraged **ABSOLUTE's** employees to breach their own fiduciary and/or other of fidelity and confidentiality, including those arising contractually from employment agreements.

294.    **ABSOLUTE** was a successful and profitable corporation with annual revenues exceeding $3, 200,000 CAD, prior to **AZ's** Directorship and exercise of control over and misuse of **ABSOLUTE's** assets.

295.    Upon information and belief, **AZ** looted and/or embezzled **ABSOLUTE's** profits in the course of his management and/or control of the company.

296.    At all times material to this Complaint **AZ** conspired with **WOODHAM** and/or **ROMSPEN** to injure **ABSOLUTE**, and used **ABSOLUTE** to perform unlawful acts.

### B.    *AZ's operation and management of ECO*

297.    Likewise, on October 26, 2018, **AZ** individually and/or as **DWFT** trustee, became a director of **ECO**.

298.    As a result of becoming a Director of **ECO**, **AZ** owed common law and/or statutorily imposed duties of care under the Alberta Business Corporations Act including, but not limited to. the following:

(h)    the duty to act honestly and in good faith with a view toward **ECO's** best interests when exercising his powers and discharging his duties as an officer or corporate Director;

(i)    the duty to disclose any and all information **AZ** had in relation to matters relating to the financial interests of **ECO**;

(j)    the duty to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances when exercising his powers and discharging his duties as an officer or corporate director;

(k)     the duty to comply with the provisions of the Alberta Business Corporations Act and its regulations; and/or

(l)     the duty to comply with **ECO's** articles, bylaws and/or any unanimous shareholder agreements;

299.    During his tenure as a Director of **ECO, AZ** failed to disclose any and all information **AZ** had in relation to matters affecting the financial interests of **ECO**.

300.    While he was a Director of **ECO, AZ** pledged the company's asset as collateral for the **SECOND ZEN LOAN** by **ROMSPEN**, in which **AZGROUP** had an interest, but for which he failed to disclose and/or otherwise seek permission.

301.    **AZ** terminated **ECO's** then existing key and competent employees, in order to replace the same with new employees whom were beholden unto him.

302.    At all times material hereto, **AZ** adopted plans and pursued business objectives that served **AZ** and/or **AZGROUP's** financial interests, but were not in the best interests of **ECO**.

303.    At all times material hereto, while acting as a Director of **ECO, AZ** engaged in the following acts, incommensurate with **ECO's** best interests:

(a) entered into commercially unreasonable contracts;

(b) adopted business plans and pursued business objectives that lacked financial viability and/or commercial reasonableness;

(c) failed to contest inaccurate tax assessments, thereby causing tax assessments to accrue against **ECO's** land assets;

(d) failed to generate sales revenue;

(e)  embezzled and/or converted monies and/or assets

(f) failed to generate new leases;

(g) failed to generate new business opportunities; and/or

       (h) mismanaged **ECO** in a manner causing it to lose customers and accompanying revenues.

304.    **AZ** resigned as a Director of **ECO** on October 29, 2019, but thereafter continued to collude and/or conspire with **ROMSPEN** in a manner that endangered **ECO's** assets from being foreclosed upon by **ROMSPEN**.

305.    Upon resigning, **AZ** disseminated **ECO's** confidential business, financial and/or tax records absent permission and/or other authority to do so.

306.    Upon resigning, **AZ** intentionally interfered with contractual relationships between **ECO** and it employees by encouraging one or more employees to engage in corporate espionage.

307.    Upon resigning **AZ** intentionally encouraged **ECO's** employees to breach their own fiduciary and/or other of fidelity and confidentiality, including those arising contractually from employment agreements.

308.    Prior to October 26, 2018, **ECO** was a successful and profitable corporation that had earned over $100, 000,000.00 CAD in revenue.

309.    Upon information and belief, **AZ** looted and/or embezzled **ECO's** profits in the course of his management and/or control of the **ECO**.

310.    At all times material to this Complaint **AZ** conspired with **WOODHAM** and/or **ROMSPEN** to injure **ECO**, and used **ECO** to perform unlawful acts.

      **C.**    <u>***AZ as Trustee***</u>

311.    As a result of becoming a **DWFT** trustee, **AZ** owed the following duties to the **DWFT** and/or other **DWFT** assets:

      (a) fiduciary duty;

      (b) a duty of fidelity;

      (c) a duty of good faith;

      (d) a duty of candor and disclosure;

      (e) a duty of care that required him to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances when exercising his powers and discharging his duties;  and/or

312.    As a result of these duties, **AZ** was required to:

      (a) act honestly and in good faith with a view to the best interests of the **DWFT**, and/or other **DWFT** assets, when exercising his powers and discharging his duties;

      (b) disclose any and all information that had in relation to matters relating to the financial interests of the **DWFT** and/or **DWFT** assets;

      (c) exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances when exercising his powers and discharging his duties;

      (d) comply with the provisions of the Alberta Business Corporations Act and its regulations;

      (e) comply with the trust documents and all applicable partnership agreements, articles, bylaws and unanimous shareholder agreements; and

313.    Notwithstanding his aforementioned duties **AZGROUP** engaged in conduct that was contrary to the **DWFT** and/or other **DWFT** assets.

314.    At all material times **AZ** specifically excluded **WHITE** from negotiating with **ROMSPEN**, claiming that **ROMSPEN** demanded to deal directly with **AZ**.

315.    At all times material hereto **AZGROUP** engaged in self-dealing, to the detriment of the **DWFT** and/or **DWFT** assets.

4811-1816-7240, v. 1

316.    **AZ** met privately with **ROMSPEN** to finalize the site's Construction Contract.

317.    In spite of being a **DWFT** trustee and/or fiduciary to one or more **DWFT** assets, **AZ** effectively awarded a lucrative construction contract to **PANACHE**, creating a conflict of interest.

318.    The **PANACHE** construction contract contained payment obligations in excess of fair market value and were not in the best interests of the **DWFT** and/or any other **DWFT** asset.

319.    **AZ** also had private meetings with **ROMSPEN,** wherein they finalized the fundamental tenets of the **SECOND ZEN LOAN** in the amount of $125,000,000.00 USD.

320.    **AZ** negotiated loan terms that included economic benefits to **AZ** and/or **AZGROUP**, including, but not limited to, payments of loan proceeds directly to **PANACHE**.

321.    At all material times, **AZ** colluded and/or conspired with **ROMSPEN** to ensure that every construction draw under the **SECOND ZEN LOAN**, went directly into **PANACHE's** bank account, thereby avoiding checks and balances designed to ensure against misappropriation of draw proceeds.

322.    **AZ** stealthily included an $8,100,000.00 payment to **PANACHE** in the **SECOND ZEN LOAN**, however, he failed to seek approval and/or otherwise disclose the same to **WHITE** and/or the **DWFT.**

323.    At all material times hereto, **AZ** persuaded and/or convinced **WHITE** to pledge virtually all of his North American assets, in addition to undertaking personal guarantees, in connection with securing **ROMSPEN** construction loans.

324.    In the alternative, **AZ** himself as **DWFT** Trustee, Director and/or Officer of any **DWFT** asset, unilaterally caused **PLEDGE ASSETS** to be collateralized in connection with **ROMSPEN's SECOND ZEN LOAN**.

325.     At all times material hereto, the pledge of such significant assets should have been presented to a full board of **DWFT** trustees, and agreed to and formalized by a formal **DWFT** resolution.

326.     At all material times **AZGROUP** failed to:

(a)  perform the **AUSTIN PROPERTY** construction in a good and/or workmanlike manner;

(b)  failed to use acceptable and proper construction methods in the course of attempting to build and/or construct structures on the **AUSTIN PROPERTY**;

(c)  failed to construct the **AUSTIN PROPERTY** development in compliance with an acceptable construction schedule;

(d)  failed to construct the **AUSTIN PROPERTY** within prescribed construction budgets;  and/or

(e)  failed to maintain insurance coverage on the **AUSTIN PROPERTY**.

327.     In addition to the foregoing, **AZGROUP** has also violated health and occupational safety regulations in the course of the **AUSTIN PROPERTY** development, including, but not limited to, conducting asbestos abatement without following OSHA regulations and, thereby, placing the lives of on site workers at risk and causing the prospect of further economic damage to the **DWFT** and/or any other **DWFT** asset.

328.     Upon information and belief, **AZGROUP** has permitted the use of unlawful and/or undocumented workers in construction upon the **AUSTIN PROPERTY** and provided housing for said workers as part of their compensation and/or for illegal fees, all in derogation of the Immigration and Tax laws of the United States.

329.     Upon information and belief, **AZ's** conduct related to the hiring and/or housing of undocumented workers, jeopardizes the continuing viability of the **AUSTIN PROPERTY** development and places **WHITE**, **DWFT** and/or other **DWFT** trust assets at risk of payable tax assessments, government penalties and/or other fines.

4811-1816-7240, v. 1

330.    In the course of **AZ's** tenure as **DWFT** trustee, he transferred and/or attempted to transfer ownership of **DWFT** assets to himself, including, but not limited to, a BMW motor vehicle.

331.    Upon information and belief, in the course of **AZ's** tenure as a **DWFT** trustee, he issued loans to himself in excess of  $4,000,000.00, from the **DWFT** and/or other **DWFT** assets, absent appropriate loan documentation and upon terms that were commercially unreasonably.

332.    At all material times **AZGROUP** earned secret and/or undisclosed profits to the detriment of the **DWFT** and/or any other **DWFT** asset.

333.    At all times material hereto, **AZ** acted contrary to the interests of the **DWFT** and/or any other **DWFT** asset by, among other things, threatening **WHITE's** real estate agent while he sought to facilitate the sale of the **AUSTIN PROPERTY**.

334.     At all times material hereto, **AZ** acted contrary to the interests of the **DWFT** and/or any other **DWFT** asset by, among other things, refusing to allow prospective purchasers to view the **AUSTIN PROPERTY.**

335.    At all material times **AZ** acted contrary to the best interests of the **DWFT** by mismanaging and/or engaging in the aforementioned unauthorized, unpermitted and or otherwise unlawful conduct as a Director of **ABSOLUTE** and/or **ECO**.

336.    At all material times **AZ** acted contrary to the best interests of the **DWFT** by mismanaging and/or engaging in unpermitted and or otherwise unlawful conduct as a Director of other **PLEDGE ASSETS**.

337.    After **AZ** resigned as trustee of the **DWFT**, he slandered and/or caused **DWFT** to be libeled via statement he made in the local print news and/or elsewhere to third parties, including: (a) that **WHITE** was involved in committing and/or being investigator for tax crimes,

(b) that **WHITE** and/or the **DWFT** were insolvent and unable to meet financial obligations necessary for **ZEN's** successful completion of the **AUSTIN PROPERTY** development, (c) that **WHITE** made false and/or fraudulent allegations in the context of the Texas Petition, and/or (d) that **WHITE** was responsible for the failure of the **AUSTIN PROPERTY** development.

338.    **AZGROUP** acted in a manner contrary to **DWFT** and/or **DWFT** assets by withdrawing Texas litigation on behalf of **WHITE** and **ZEN**.

339.    Upon information and belief, when **AZ** resigned as a **DWFT** trustee he left corporate chaos in his wake, in order to avoid revelation of his fraudulent, unlawful and/or unethical conduct as a **DWFT** trustee.

## FIRST CAUSE OF ACTION
(*Breach of Fiduciary Duty: All Plaintiffs as Against ROMSPEN*)

340.    Paragraphs one (1) through three-hundred-and-thirty-nine (339) are realleged as if the same were set forth fully herein.

341.    At all times material hereto, **ROMSPEN** owed Plaintiffs various duties based upon its express status as "trustee" in one or more of the written agreements between the parties including, but not limited to, the FM Commitment, the Lamont Property Commitment and/or the **MOS8** Commitment, all of which ostensibly refer to the same loan and/or credit facility that **ROMSPEN** extended to **WHITE**, **DWFT** and/or **DWFT** assets in said capacity.

342.    In addition to being named as a "trustee" in the aforesaid agreements, **ROMSPEN** and **WHITE**, **DWFT** and/or other **DWFT** assets conducted business together for many years prior to the **MOS8** loan and/or the **ZEN CONSTRUCTION LOANS** and had developed a special and/or confidential relationship, wherein **ROMSPEN** held a position of trust and confidence with respect to **WHITE, DWFT** and/or **DWFT** assets.

343.     At all times material hereto, **ROMSPEN** also inserted itself into **WHITE's** business and/or maintained strict control over the actions of **WHITE**, **DWFT** and/or **DWFT** assets, to wit, (1) installing its own manager, co-broker and/or developer as part of the **MOS8** transaction for substantial fees and/or in contemplation of substantial profits to be made, (2) controlling the partnership interests in the **MOS8** investments, (3) owning property and/or managing interests for **WHITE**, (4) lending money but strictly conditioning draws upon its discretion and/or refusing draws in order to impose its will upon development of the **AUSTIN PROPERTY**, (5) installing its own employees and/or quantity surveyors on a full time basis upon the **AUSTIN PROPERTY**, (6) controlling and/or otherwise influencing the **AUSTIN PROPERTY's** General Contractor **AZGROUP**, (7) dealing directly with tenants, suppliers and/or sub-contractors on the **AUSTIN PROPERY** development site, and/or (8) essentially excluding **WHITE** from any and all negotiations in favor of dealing with his Contractor AZGROUP.

344.     For these reasons and other reasons, **ROMSPEN** had a special, confidential and fiduciary relationship in relation to **WHITE**, **DWFT** and/or other **DWFT** assets, and therefore owed them corresponding duties including, but not limited to, the duties of candor, disclosure, loyalty, confidentiality, heightened care, good faith and fair dealing and/or the general duty not to induce contractual relations via fraud.

345.     **ROMSPEN** breached aforementioned duties in one or more of the following ways, including, but not limited to:

(a)  failing to act honestly and in good faith in dealing with Plaintiffs;

(b)  failing to place before and/or prioritize any one or more of the Plaintiffs' interests over its own;

(c)  earning unauthorized profits or undisclosed secret profits at Plaintiffs' expense;

4811-1816-7240, v. 1

(d)  failing to disclose its own financial interests in transactions involving **WHITE**, **DWFT** and/or other **DWFT** assets;

(e)  failing to disclose any and all information had by **ROMSPEN** relating to the financial interests of the Plaintiffs;

(f)  failing to account for monies received by the State of Texas in connection with a condemnation settlement award;

(g)  fraudulently inducing the Plaintiffs to enter into agreements that were not in their best interests;

(h)  acting as trustee and lender without proper disclosures to Plaintiffs;

(i)  charging excessive fees and interest upon loans/credit facilities;

(j)  "churning" loans for its own interest at Plaintiffs' expense;

(k)  engaging in a pattern of self dealing and conflict laden transaction with Plaintiffs;

(l)  mismanaging the **MOS8** partnership and permitting its own representatives, **MILAM**, to use $35, 000,000.00 USD of Plaintiffs credit facilities without any construction and/or development progress and, causing the **AUSTIN PROPERTY** to suffer $30,000,000.00 USD in damages.

(m)  unlawfully attempting to precipitate default and take over Plaintiffs' **AUSTIN PROPERTY**;

(n)  making false default allegations in an effort to acquire the **AUSTIN PROPERTY**; and/or

(o)  attempting to coerce Plaintiffs into settling disputes in a manner that involved surrender of the **AUSTIN PROPERTY** and a general release of all liability for prior acts of misconduct.

346.    At all times material hereto, the Plaintiffs and/or any of them suffered injury and damages as a direct and proximate cause of the aforesaid breaches by **ROMSPEN**.

347.    **ROMSPEN's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff is entitled to recover exemplary damages from **ROMSPEN** in an amount exceeding $250, 000,000.00 USD.

4811-1816-7240, v. 1

### SECOND CAUSE OF ACTION
### *(Fraud in the Inducement;  All Plaintiffs as against ROMSPEN)*

348.    Paragraphs one (1) through three-hundred-and-forty-seven (347) are realleged as if the same were set forth fully herein.

349.    **ROMSPEN** advised **WHITE**, **DWFT** and/or other **DWFT** assets, to invest in the **MOS8** limited partnership representing, *inter alia,* that the opportunity was a "perfect" "valet" investment for **WHITE** who would participate in profits from the **AUSTIN PROPERTY** real estate development, and earn as much as $200,000.00 USD in as little as two years.

350.    At all times material hereto**, ROMPSPEN** knew that its representations were materially false.

351.    At the time of their making, **ROMSPEN** lacked knowledge of the truth of its representations, yet continued their positive assertion.

352.    At all material times hereto, **ROMSPEN's** statements were made intentionally and/or in reckless disregard of the truth.

353.    At all times material hereto, **ROMSPEN's** representations were made with the specific purpose of inducing **WHITE** to act on the investment.

354.    **ROMSPEN** knew, or should have known, that its statements would induce **WHITE** to act.

355.    At all times material here, **ROMSPEN** never intended to perform as promised in the manner represented to **WHITE** in connection with the aforesaid inducement.

356.    At all times material hereto, **WHITE** reasonably, justifiably and/or detrimentally relied upon **ROMSPEN's** statements in agreeing to the **MOS8** investment.

357.    As a result of the aforesaid inducement, **WHITE** entered into the **MOS8** agreement/contract to his detriment.

358.     As a direct and proximate result of the aforesaid inducements, **DWFT** and/or other **DWFT** assets have suffered, and will continue to suffer, injury and/or damages.

359.     **ROMSPEN's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff is entitled to recover exemplary damages from **ROMSPEN** in an amount exceeding $250, 000,000.00 USD.

### THIRD CAUSE OF ACTION
### *(Fraud: All Plaintiffs as against ROMSPEN)*

360.     Paragraphs one (1) through three-hundred-and-fifty-nine (359) are realleged as if the same were set forth fully herein.

361.     **ROMSPEN** specifically agreed orally and/or under the terms of the **ZEN CONSTRUCTION COMMITMENT**, the accompanying Promissory Note and/or the purported **ZEN CONSTRUCTION LOAN** agreement, that it would (1) lend Plaintiffs and/or any of them $125,000,000.00, and (2) that it would not withhold its consent to PACE financing.

362.     At all material times, these and other representations procured and/or otherwise caused **WHITE** to execute agreements and/or otherwise assent to **ROMSPEN's** loan terms.

363.     Such representations, against the backdrop of Plaintiffs' intention to continue and/or commence the **AUSTIN PROPERTY** development, caused **WHITE**, **DWFT** and/or any other **DWFT** asset, to enter into loan agreements with **ROMSPEN.**

364.     At all times material hereto **ROMPSPEN** deliberately concealed and/or failed to disclose its intention to overstate the promissory note and reduce loan amounts from $125, 000,000.00 to $102,000,000.00 USD.

365.     **ROMSPEN's** explanation that the loan reduction was "routine practice" evidences its *ab initio* intention to lend less than was promised.

366.     At all times material hereto **ROMPSPEN** deliberately concealed and/or failed to disclose its intention to withhold consent for PACE Loan financing that, at all material times hereto, was a critical assumption relied upon by Plaintiffs, or any of them, in budgeting for and ultimately assessing its financial wherewithal to successfully develop the **AUSTIN PROPERTY**.

367.     At all times material hereto, **ROMSPEN's** aforesaid misrepresentations caused Plaintiffs, or any of them, to enter into loan transactions without clearly understanding duties, obligations and/or risks incurred.\

368.     The aforesaid intentional misrepresentations, contained in written agreements drafted by **ROMSPEN**, induced **WHITE** to enter into such agreements on behalf of **DWFT** and/or any other **DWFT** asset.

369.     **ROMSPEN's** misrepresentations were made with the specific purpose of inducing **WHITE** to act on the investment.

370.     **ROMSPEN** knew, or should have known, that its misrepresentations would induce **WHITE** to act.

371.     **ROMSPEN's** misrepresentations caused **WHITE** to enter into loan transactions on behalf of **DWFT** and/or any other **DWFT** asset, assuming key loan terms were operative, however, at all material times, **ROMSPEN** never intended to honor the same.

372.     At all times material hereto, **ROMSPEN** never intended to perform as promised in connection with the loan agreements it induced **WHITE** to sign on behalf of the **DWFT** and/or any other **DWFT** asset.

4811-1816-7240, v. 1

373.     At all times material hereto, **WHITE** reasonably, justifiably and/or detrimentally relied upon **ROMSPEN's** intentional misrepresentations in agreeing to and/or otherwise executing, or causing the execution of, written agreements related to the **SECOND ZEN LOAN.**

374.     As a direct and proximate result of the aforesaid intentional and material misrepresentations of fact, along with the resultant inducements, **DWFT** and/or other **DWFT** assets have suffered, and will continue to suffer, injury and/or damages.

375.     **ROMSPEN's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff is entitled to recover exemplary damages from **ROMSPEN** in an amount exceeding $250, 000,000.00 USD.

### FOURTH CAUSE OF ACTION
#### (*Constructive Fraud: All Plaintiffs as to ROMSPEN*)

376.     Paragraphs one (1) through three-hundred-and seventy-five (375) of the **SECOND CAUSE OF ACTION**, are realleged as if the same were set forth fully herein.

377.     **ROMSPEN's** aforementioned duties stemmed not only from its express status as "trustee" under **MOS8** and other subsequent loan agreements/transactions, but also from the extreme and substantial control it exercised over the Plaintiffs' **MOS8** limited partnership investment and other property and/or projects owned/operated by Plaintiffs, or any of them.

378.     In spite of being directly and/or indirectly in a position of control, authority, and confidence, with respect to **WHITE**, **DWFT** and/or other **DWFT** assets, **ROMSPEN** prioritized its own financial interests over those of the Plaintiffs and secreted its own financial stake, all to the Plaintiffs' detriment.

4811-1816-7240, v. 1

379.    As a result of **ROMSPEN's** breached legal, equitable and/or other fiduciary duties, its conduct constitutes constructive fraud as against the Plaintiffs, or any of them. \

380.    As a direct and proximate result of the aforesaid constructive fraud, **DWFT** and/or other **DWFT** assets have suffered, and will continue to suffer, injury and/or damages.

381.    **ROMSPEN's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff is entitled to recover exemplary damages from **ROMSPEN** in an amount exceeding $250, 000,000.00 USD.

## FIFTH CAUSE OF ACTION
### (*Real Estate Fraud Tex. Bus. & Com. Code § 27.01(a)*
### *All Plaintiffs as to ROMSPEN*)

382.    Paragraphs one (1) through three-hundred-and eighty-one (381), of the **SECOND CAUSE OF ACTION,** are realleged as if the same were set forth fully herein.

383.    At all times material hereto, **ROMSPEN's** fraudulent inducement of the Plaintiffs, was related to real property located in Austin Texas and/or Edmonton Canada.

384.    As a direct and proximate result of the aforesaid inducement, **WHITE**, **DWFT** and/or other **DWFT** assets have and will continue to suffer damages.

## SIXTH CAUSE OF ACTION
### (**Negligent** *misrepresentation: All Plaintiffs as to ROMSPEN*)

385.    Paragraphs one (1) through three-hundred-and-eighty-four (384), are realleged as if the same were set forth fully herein.

386.    **ROMSPEN** advised **WHITE**, **DWFT** and/or other **DWFT** assets, to invest in the **MOS8** limited partnership representing, *inter alia,* that the opportunity was a "perfect" "valet"

investment for **WHITE**, who would participate in profits from the **AUSTIN PROPERTY** real estate development, and earn as much as $200,000,000.00 USD in as little as two years.

387.    **ROMSPEN** also advised **WHITE** in writing and/or orally, that it was prepared to loan **WHITE**, **DWFT** and/or other **DWFT** assets up to $125,000,000.00 to complete the **AUSTIN PROPERTY** development.

388.    Further, **ROMSPEN** communicated its willingness to give its consent for PACE loan financing in order to facilitate Plaintiffs' completion of the **AUSTIN PROPERTY** development.

389.    At all times material hereto **ROMSPEN's** representations constituted communications made in the course of business and/or in a transaction in which it had a pecuniary interest.

390.    At all times material hereto, **ROMSPEN** had a pecuniary interest in **MOS8**, as well as pecuniary interests arising out of the **FIRST** and **SECOND ZEN LOANS**, which were both related to the original **MOS8** loan.

391.    At all times material hereto, **ROMSPEN** supplied false information to guide others in the course of their business including, but not limited to, **WHITE**, **DWFT** and/or other **DWFT** assets.

392.    At all times material hereto, **ROMSPEN** knew and/or should have known that its false information would misguide Plaintiffs' with respect to their own business including, but not limited to, business involving loans and/or credit facilities extended to one or more Plaintiffs by **ROMSPEN** in connection with developing the **AUSTIN PROPERTY**.

393.    **ROMSPEN** failed to exercise reasonable care in gathering and/or disseminating the aforesaid false information.

394.    Plaintiffs and/or any of them suffered financial loss as a consequence of their justifiable reliance upon **ROMSPEN's** representations.

### SEVENTH CAUSE OF ACTION
(**Negligence**: *All Plaintiffs as to ROMSPEN*)

395.    Paragraphs one (1) through three-hundred-and ninety-four (394), are realleged as if the same were set forth fully herein.

396.    At all material times hereto, **ROMSPEN** owed Plaintiffs, or any of them, a duty of reasonable care.

397.    At all times material hereto, **ROMSPEN** had a duty to avoid foreseeable risks of harm to others including, but not limited to the Plaintiffs.

398.    The aforesaid duty required **ROMSPEN** to exercise the care, attention and/or skill, of or an ordinary prudent person in the same and/or similar circumstances, in its dealings with the Plaintiffs.

399.    Despite its duty of reasonable care, however, **ROMSPEN** failed to act reasonably in relation to the Plaintiffs, or any of them, in one or more of the following ways:

(a) hiring **MILAM** and allowing him to mismanage the **AUSTIN PROPERTY**;

(b) failing to supervise **MILAM** and/or remedy his mismanagement at a meaningful time;

(c) retaining **MILAM** in spite of knowing that he did not possess the care and skill necessary to properly manage the **AUSTIN PROPERTY**, and protect the Plaintiffs' interest therein;

(d) failing to heed the advice of BTY quantity surveyors with respect to necessary funding of the **AUSTIN PROPERTY** development;

(e) failing to consent to the PACE loan in order to facilitate development of the **AUSTIN PROPERTY**;

(f) refusing to honor draw requests in spite of BTY's reports stating that there were no construction irregularities or mismanagement of draws;

65

(g) failing to account for and apply or advance monies received in connection with settlement of **ZEN's** condemnation related claims against the State of Texas;

(h) failing to disclose any and all information had by **ROMSPEN** relating to the financial interests of the Plaintiffs;

(i) failing to disclose its self-dealings;

(j) failing to prevent the loss of up to $7,000.000.00 in valuable scrap upon taking over the **AUSTIN PROPERTY** via its ownership of MOS8

(k) refusing to allow **WHITE** to participate in negotiating Construction Loans and/or the **SECOND ZEN LOAN**;

(l) requiring that **AZ's** ownership in **ZEN** be increased so as to make him a controlling partner;

(m) interfering with tenants, subcontractors and/or suppliers on the **AUSTIN PROPERTY**;

(n) reducing the anticipated loan amount from $125,000,000.00 to $102,000,000.00;

(o) providing confidential information about **WHITE**, **DWFT** and/or other **DWFT** assets;

(p) paying draws directly to **PANACHE** instead of **ZEN**.

400.    As a direct and proximate result of the aforementioned wanton and careless behavior, the **AUSTIN PROPERTY** development has been thwarted and/or halted, to the financial and/or other detriment of the Plaintiffs or/any of them.

401.    As a direct and proximate cause of the aforementioned careless behavior, **ROMSPEN** has caused **ZEN's AUSTIN PROPERTY** development to fail, and thereby caused injury and damages to the Plaintiffs and/or any of them.

402.    As a direct and proximate result of **ROMSPEN's** aforementioned wanton and careless conduct, the Plaintiffs have suffered, and will continue to suffer, injury and/or damages.

4811-1816-7240, v. 1

## EIGHTH CAUSE OF ACTION
### (*Gross Negligence/Recklessness: All Plaintiffs as to ROMSPEN*)

403.    Paragraphs one (1) through four hundred two (402) are realleged as if the same were set forth fully herein.

404.    At all times material hereto, **ROMSPEN** acted with reckless and/or wanton disregard for the wellbeing and/or financial interests of the Plaintiffs and/or any of them.

405.    At all times material hereto, **ROMSPEN's** reckless behavior toward Plaintiffs included, but was not limited to:

(a) continuing to retain **MILAM** in spite of knowing that he did not possess the care and skill necessary to properly manage the **AUSTIN PROPERT**, and protect the Plaintiffs' interest therein;

(b) failing to consent to the PACE loan in order to facilitate development of the **AUSTIN PROPERTY**;

(c) refusing to honor draw requests in spite of BTY's reports stating that there were no construction irregularities or mismanagement of draws;

(d) failing to account for and apply or advance monies received in connection with settlement of **ZEN's** condemnation related claims against the State of Texas;

(e) failing to prevent the loss of up to $7,000.000.00 in valuable scrap upon taking over the **AUSTIN PROPERTY** via its ownership of **MOS8**

(f) refusing to allow **WHITE** to participate in negotiating Construction Loans and/or the **SECOND ZEN LOAN**;

(g) reducing the anticipated loan amount from $125,000,000.00 to $102,000,000.00; and/or

(h) paying draws directly to **PANACHE** instead of **ZEN**.

406.    As a direct and proximate cause of the aforementioned reckless behavior, **ROMSPEN** has caused **ZEN's AUSTIN PROPERTY** development to fail, and thereby caused injury and damages to the Plaintiffs and/or any of them.

67

407.    **ROMSPEN's** conduct toward **WHITE**, **DWFT** and/or **DWFT** assets constituted gross negligence.

408.    As a direct and proximate result of **ROMSPEN's** aforementioned wanton and careless conduct, the Plaintiffs have suffered, and will continue to suffer, injury and/or damages.

409.    **ROMSPEN's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff is entitled to recover exemplary damages from **ROMSPEN** in an amount exceeding $250, 000,000.00 USD.

## NINTH CAUSE OF  ACTION
### *(Breach of Good Faith and Fair Dealings: All Plaintiffs as to ROMSPEN)*

410.    Paragraphs one (1) through four hundred-and nine (409) of the **FIRST CAUSE OF ACTION** are realleged as if the same were set forth fully herein.

411.    At all times material hereto, **ROMSPEN** maintained a special and/or confidential relationship with Plaintiffs, or any of them, from which the duty of good faith and fair dealings flowed to Plaintiffs.

412.    At all times material hereto, the relationship between **ROMSPEN** and Plaintiff, or any of them, was characterized as one of unequal bargaining power favoring **ROMSPEN**, from which the duty of good faith and fair dealings flowed to Plaintiffs.

413.    As a result of **ROMSPEN's** failure to deal fairly and in good faith, Plaintiffs have suffered, and will continue to suffer, injuries and/or other damages.

414.    **ROMSPEN's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity,

4811-1816-7240, v. 1

Plaintiff is entitled to recover exemplary damages from **ROMSPEN** in an amount exceeding $250, 000,000.00 USD.

### TENTH CAUSE OF ACTION
### (*Economic Duress:  All Plaintiffs as Against ROMSPEN*)

415.    Paragraphs one (1) through four hundred-and-fifteen (415) are realleged as if the same were set forth fully herein.

416.    At all times material hereto, **ROMSPEN** and Plaintiffs were engaged in a continuing contract.

417.    On one or more occasions, **ROMSPEN** threatened to terminate and/or refuse to honor essential terms of its contracts with Plaintiffs.

418.    **ROMSPEN** threatened to foreclose after precipitating and/or causing **MOS8's** mismanagement and/or failure to develop the **AUSTIN PROPERTY**, forcing **WHITE**, **DWFT** and/or other **DWFT** assets to accept new and/or substitute financing terms including, but not limited to:  (1) purchasing the **AUSTIN PROPERTY** and/or (2) assuming **MOS8's** debt.

419.    **ROMSPEN** also placed unreasonable conditions upon draw payments at critical times during the construction under threat of default, whereupon Plaintiffs, under duress, were forced to accept **ROMSPEN's** conditions/terms.

420.    At all times material hereto, **ROMSPEN** placed Plaintiffs in a situation of economic distress, leaving Plaintiffs no choice but to accept and/or agree to **ROMSPEN's** terms.

421.    At all times material hereto, **ROMSPEN's** economic distress caused the Plaintiffs, or any of them, substantial economic harm, loss of opportunity and/or other injury and damages.

4811-1816-7240, v. 1

## ELEVENTH CAUSE OF ACTION
(*Breach of Fiduciary Duty: All Plaintiffs as to AZ and PANACHE*)

422.    Paragraphs one (1) through four-hundred-and twenty-one (421) are realleged as if the same were set forth fully herein.

423.    At all times material hereto, **AZ** was a duly appointed trustee of the **DWFT**, in addition to being a named **DWFT** trustee, **WHITE** and/or other **DWFT** assets had developed a special and/or confidential relationship with **AZ**, wherein **AZ** held a position of trust confidence with respect to **WHITE, DWFT** and/or **DWFT** assets.

424.    Further, at all times material hereto, **AZ** also inserted himself into **WHITE's** business and/or maintained control over the actions of **WHITE**, **DWFT** and/or **DWFT** assets, to wit, (1) unilaterally negotiating the **SECOND ZEN LOAN**, (2) unilaterally negotiating the **PANACHE** construction contract with **ROMSPEN**, (3) orchestrating his own controlling partnership interest in **ZEN** and thereby controlling the **AUSTIN PROPERTY** development, (4) excluding **WHITE** from all communications with **ROMSPEN**, (5) failing to provide **WHITE** , **DWFT** and/or other **DWFT** asset, information necessary to assess and make decisions affecting the **AUSTIN PROPERTY** development, (6) receiving all construction loan draws through **PANACHE** instead of **ZEN** and/or (7) threatening **WHITE** and/or his brokers when they attempted to procure buyers for the **AUSTIN PROPERTY**.

425.    At all times material hereto, **AZ** had a special, confidential and fiduciary relationship in relation to **WHITE**, **DWFT** and/or other **DWFT** assets and, at all material times, owed them corresponding duties including, but not limited to the duties of candor, disclosure, loyalty, confidentiality, heightened care, good faith and fair dealing and/or the general duty not to induce contractual relations via fraud.

426. **AZ** breached aforementioned duties in one or more of the following ways, including, but not limited to:

(a) failing to act honestly and in good faith in dealing with Plaintiffs;

(b) failing to place before and/or prioritize any one or more of the Plaintiffs' interests over its own;

(c) earning unauthorized profits or undisclosed secret profits at Plaintiffs' expense;

(d) failing to disclose his own financial interests in transactions involving **WHITE**, **DWFT** and/or other **DWFT** assets;

(e) failing to disclose any and all information relating to the financial interests of the Plaintiffs;

(f) fraudulently inducing the Plaintiffs to enter into agreements with **PANACHE** that were not in Plaintiffs' interests;

(g) charging excessive fees under construction contracts he negotiated for himself;

(h) engaging in a pattern of self dealing and conflict laden transaction with Plaintiffs, or any of them;

(i) mismanaging the **AUSTIN PROPERTY**;

(j) mismanaging and/or breaching fiduciary duties owed to **ABSOLUTE** and **ECO**;

(k) firing key employees of **DWFT**;

(l) unlawfully attempting and/or conspiring with **ROMSPEN** to precipitate default of the **SECOND ZEN LOAN**, and thereafter take over the **AUSTIN PROPERTY**; and/or

(m) attempting to coerce Plaintiffs into settling disputes in a manner that involved surrender of the **AUSTIN PROPERTY** and a general release of all liability for prior acts of misconduct.

427. At all times material hereto, the Plaintiffs and/or any of them suffered injury and damages as a direct and proximate cause of **AZ's** aforesaid breaches of duty.

428. **AZ's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff

is entitled to recover exemplary damages from **ROMSPEN** in an amount exceeding $250,000,000.00 USD.

## TWELFTH CAUSE OF ACTION
### (*Breach of Fiduciary Duty:  ABSOLUTE and ECO as to AZ and PANACHE*)

429.    Paragraphs one (1) through four-hundred-and-twenty-eight (428) are realleged as if the same were set forth fully herein.

430.    At all times material hereto, **AZ** was a Manager, Officer and/or Director of **ABSOLUTE** and **ECO** (hereinafter the "companies"), and was charged with various legal and/or other duties of care in relation thereto.

431.    At all times material hereto, **AZ** breached the aforementioned duties in one or more of the following ways, to wit:

    (a)   engaging in aforementioned acts which were incommensurate with the best interests of the companies;

    (b)   disseminating confidential information belonging to the companies;

    (c)   interfering in contractual obligations of company employees;

    (d)   looting and/or embezzling company profits;

    (e)   converting and/or attempting to convert assets belonging to the companies for personal use;

    (f)   terminating key employees upon whom the companies depended for continued viability;

    (g)   unlawfully pledging assets of the companies without **DWFT** authorization and/or otherwise disclosing financial interests related to the same;

    (h)   colluding and conspiring with **ROMSPEN** in an manner affecting the assets of the companies;  and/or

    (i)   encouraging employees to breach fiduciary duties owed to the companies.

432.    At all material times hereto, **AZ's** conduct in breaching duties owed to the companies, proximately caused Plaintiffs to suffer injuries and/or other economic damages.

72

433.    **AZ's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff is entitled to recover exemplary damages from **AZGROUP** in an amount exceeding $250, 000,000.00 USD.

## THIRTEENTH CAUSE OF ACTION
### (*Fraud in the Inducement: All Plaintiffs as to AZ and PANACHE*)

434.    Paragraphs one (1) through four hundred-and-thirty-three (433) are realleged as if the same were set forth fully herein.

435.    At all times material hereto, **AZ** represented to **WHITE** that he bore the requisite skills, fidelity, loyalty and/or business acumen to serve as a Trustee of the **DWFT** and/or an Officer/Director of any **DWFT** asset.

436.    Further, **AZ** represented he had the requisite skills, fidelity, loyalty and/or business acumen to manage and/or operate **DWFT** assets including, but not limited to, **ABSOLUTE** and/or **ECO**.

437.    Further, that **AZ** and/or **AZGROUP** bore the professional skills, experience, business connections and/or wherewithal, to serve as General Contractor of the **AUSTIN PROPERTY** development.

438.    Further, **AZ** represented that he had the skill, experience and wherewithal to effectively negotiate the **SECOND ZEN LOAN** with **ROMSPEN**.

439.    Further, **AZ** represented that he had the skill, experience and wherewithal to effectively negotiate **PANACHE's** construction contract with **ROMSPEN**.

440.    At all times material hereto**, AZ** knew that his representations were false and/or lacked knowledge of their truth at the time they were made.

441.    At all times material hereto, **AZ's** statements were made intentionally and/or in reckless disregard of the truth.

442.    At all times material hereto, **AZ's** representations were made with the specific purpose of inducing **WHITE** to appoint him as a **DWFT** trustee and/or officer/director of one or more **DWFT** assets.

443.    At all times material hereto, **AZ's** representations were made with the specific purpose of inducing **WHITE** to appoint **AZ** to one or more positions that would allow him to negotiate the **SECOND ZEN LOAN** and the **PANACHE** construction contract.

444.    At all times material hereto, **WHITE** reasonably, justifiably and/or detrimentally relied upon **AZ's** statements and/or representations.

445.    Based upon **AZ's** false representations, **WHITE** named **AZ** as a **DWFT** trustee and authorized that capacity via written agreement executed by **WHITE** and/or any other **DWFT** trustee.

446.    Based upon **AZ's** false representations, **WHITE** entered into written agreements and/or resolutions authorizing/acknowledging **AZ** as a manager, officer and/or director of one or more of the **DWFT** assets including, but not limited to, **ABSOLUTE** and **ECO**.

447.    In one or more of the aforementioned appointed capacities **AZ** negotiated, completed and/or otherwise perfected (1) the **SECOND ZEN LOAN**, and (2) the **PANACHE** construction contract, both obligating **WHITE**, **DWFT** and/or any other **DWFT** to the terms and conditions of the same.

448.    At all times material hereto, **AZ** never intended to perform as promised in the trustee agreement and/or the agreements effecting his corporate positions as manager, officer and/or director of any **DWFT** asset, **ABSOLUTE** and/or **ECO**.

4811-1816-7240, v. 1

449.    At all material times, **AZ** knew and/or should have known that his statements would induce **WHITE** to act.

450.    As a direct and proximate result of the aforesaid inducement, **WHITE, DWFT** and/or other **DWFT** assets have suffered, and will continue to suffer, injury and damages.

451.    **AZ's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff is entitled to recover exemplary damages from **AZGROUP** in an amount exceeding $250, 000,000.00 USD.

## FOURTEENTH CAUSE OF ACTION
### (*Constructive Fraud: All Plaintiffs as to AZ and PANACHE*)

452.    Paragraphs one (1) through four hundred-and fifty-one (451) of the **ELEVENTH CAUSE OF ACTION**, are realleged as if the same were set forth fully herein.

453.    **ROMSPEN's** aforementioned duties stemmed not only from its express status as "trustee" under **MOS8** and other subsequent loan agreements/transactions, but also from the extreme and substantial control it exercised over the Plaintiffs' **MOS8** limited partnership investment and/or other property and/or projects owned/operated by Plaintiffs, or any of them.

454.    As a result of **AZ's** breach of legal, equitable and/or other fiduciary duties, his conduct constitutes constructive fraud as against the Plaintiffs, or any of them.

455.    As a direct and proximate result of such constructive fraud, **WHITE**, **DWFT** and/or other **DWFT** assets have suffered, and will continue to suffer, injury and/or damages.

456.    **AZ's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff

75

is entitled to recover exemplary damages from **AZGROUP** in an amount exceeding $250, 000,000.00 USD.

## FIFTEENTH CAUSE OF ACTION
(*Real Estate Fraud Tex. Bus. & Com. Code § 27.01(a)*
*All Plaintiffs as to AZ and PANACHE*)

457.    Paragraphs one (1) through four-hundred-and-fifty-six (456), of the **THIRTEENTH CAUSE OF ACTION**, are realleged as if the same were set forth fully herein.

458.    At all times material hereto, **AZ's** fraudulent inducement of the Plaintiffs was related to real property located in Austin Texas and/or Edmonton Canada.

459.    As a direct and proximate result of the aforesaid inducement, **WHITE**, **DWFT** and/or other **DWFT** assets have and will continue to suffer damages.

## SIXTEENTH CAUSE OF ACTION
(**Negligent** *misrepresentation*: *All Plaintiffs as to AZ and PANACHE*)

460.    Paragraphs one (1) through four hundred-and-fifty-nine (459) are realleged as if the same were set forth fully herein.

461.    At all times material hereto **AZGROUP's** representations constituted communications made in the course of business and/or in a transaction in which it had a pecuniary interests.

462.    At all times material hereto, **AZ** had a pecuniary interest in being (1) a DWFT trustee, (2) officer/director of **ABSOLUTE** and/or **ECO**, (3) the General Contractor of the **AUSTIN PROPERTY** development, (4) the **PANACHE** construction contract, and/or (5) the **SECOND ZEN LOAN**.

463.    At all times material hereto, **AZ** supplied false information to guide others in the course of their business including, but not limited to, **WHITE**, **DWFT** and/or other **DWFT** assets.

464.     At all times material hereto, **AZ** knew and/or should have known, that its false information would misguide Plaintiffs with respect to their own business including, but not limited to, Plaintiffs' business dealings and interests in the **AUSTIN PROPERTY** development, and both the **SECOND ZEN LOAN** and **PANACHE's** construction contract.

465.     At all times material hereto, **AZ** failed to exercise reasonable care in gathering and/or disseminating the aforesaid false information.

466.     Plaintiffs and/or any of them suffered financial loss as a consequence of their justifiable reliance upon **ROMSPEN's** representations.

**SEVENTEENTH CAUSE OF ACTION**
(**Negligence**: *All Plaintiffs as to AZ and PANACHE*)

467.     Paragraphs one (1) through four-hundred-and sixty-six (466) are realleged as if the same were set forth fully herein.

468.     At all material times hereto, **AZGROUP** owed Plaintiffs, or any of them, a duty of reasonable care.

469.     At all times material hereto, **AZGROUP** had a duty to avoid foreseeable risks of harm to others including, but not limited to, the Plaintiffs.

470.     The aforesaid duty required **AZGROUP** to exercise the care, attention and/or skill, of or an ordinary prudent person and/or contractor in the same and/or similar circumstances, in its dealings with the Plaintiffs.

471.     In spite of its duty of reasonable care, however, **AZGROUP** failed to act reasonably in relation to the Plaintiffs, or any of them, in one or more of the following was:

> (a) failing to complete the **AUSTIN PROPERTY** construction in a good and/or workmanlike manner;

> (b) failing to use acceptable and proper construction methods in the course of attempting to build and/or construct structures on the **AUSTIN PROPERTY**;

(c) failing to operate the **AUSTIN PROPERTY** development in compliance with an acceptable construction schedule;

(d) failing to construct the **AUSTIN PROPERTY** within prescribed construction budgets;

(e) failing to comply with OSHA health and safety regulations;

(f) permitting undocumented workers to work in the course of the **AUSTIN PROPERTY** developments;

(g) failing to maintain insurance coverage on the **AUSTIN PROPERTY**;

(h) failing to ensure adequate insurance coverage;

(i) excluding and/or secreting **WHITE** from negotiations with **ROMSPEN**;

(j) advising **WHITE** and/or other **DWFT** assets to pledge assets including the **AUSTIN PROPERTY** and other real estate in Canada, in connection with **ROMSPEN's SECOND ZEN LOAN**;

(k) advising **WHITE** and/or other **DWFT** assets to act as guarantors to the **SECOND ZEN LOAN**;

(l) terminating key employees at **ABSOLUTE** and **ECO**;

(m) permitting disclosure of confidential information belonging to **ECO** and **ABSOLUTE**;

472. As a direct and proximate result of the aforementioned wanton and careless behavior, the **AUSTIN PROPERTY** development has been thwarted and/or halted, to the financial and/or other detriment of the Plaintiffs or/any of them.

473. As a direct and proximate cause of the aforementioned careless behavior, **AZGROUP** has caused the **AUSTIN PROPERTY** development to fail, and thereby caused injury and damages to the Plaintiffs and/or any of them.

474. As a direct and proximate result of **AZGROUP's** aforementioned wanton and careless conduct, the Plaintiffs have suffered, and will continue to suffer, injury and/or damages.

## EIGHTEENTH CAUSE OF ACTION
### (*Gross Negligence/Recklessness: All Plaintiffs as to AZ and PANACHE*)

475.     Paragraphs one (1) through four-hundred-and seventy-four (474) are realleged as if the same were set forth fully herein.

476.     At all times material hereto, **AZGROUP** acted with reckless and/or wanton disregard for the wellbeing and/or financial interests of the Plaintiffs and/or any of them.

477.     At all times material hereto,  **AZGROUP's** reckless behavior toward Plaintiffs included, but was not limited to:

    (a)  failing to comply with OSHA health and safety regulations;

    (b)  permitting undocumented workers to work on the **AUSTIN PROPERTY**;

    (c)  failing to maintain insurance coverage on the **AUSTIN PROPERTY**;

    (d)  advising **WHITE** and/or other **DWFT** assets to pledge assets including the **AUSTIN PROPERTY** and other real estate in Canada in connection with **ROMSPEN's SECOND ZEN LOAN**;

    (e)  advising **WHITE** and/or other **DWFT** assets to act as guarantors to the **SECOND ZEN LOAN**;

    (f)   permitting disclosure of confidential information belonging to **ECO** and **ABSOLUTE**;

478.     As a direct and proximate cause of the aforementioned reckless behavior, **AZGROUP** has caused the **AUSTIN PROPERTY** development to fail, thereby causing injury and damages to the Plaintiffs and/or any of them.

479.     At all times material hereto, **AZGROUP's** conduct toward **WHITE, DWFT** and/or **DWFT** assets constituted gross negligence.

480.     As a direct and proximate result of **AZGROUP's** aforementioned wanton and careless conduct, the Plaintiffs have suffered, and will continue to suffer, injury and/or damages.

481.    **AZGROUP's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff is entitled to recover exemplary damages from **AZGROUP** in an amount exceeding $250, 000,000.00 USD.

## NINETEENTH CAUSE OF ACTION
### *(Breach of Good Faith and Fair Dealings: All Plaintiffs as to ROMSPEN)*

482.    Paragraphs one (1) through four-hundred-and eighty-one (481) of the **ELEVENTH CAUSE OF ACTION**, are realleged as if the same were set forth fully herein.

483.    At all times material hereto, **AZGROUP** maintained a special and/or confidential relationship with Plaintiffs, or any of them, from which the duty of good faith and fair dealings flowed to Plaintiffs.

484.    At all times material hereto, the relationship between **AZGROUP** and Plaintiffs, or any of them, was characterized as one of unequal bargaining power from which the duty of good faith and fair dealings flowed to Plaintiffs.

485.    As a result of **AZGROUP's** failure to deal fairly and in good faith, Plaintiffs have suffered, and will continue to suffer, injuries and/or other damages.

486.    **AZGROUP's** conduct was undertaken with a state of mind upon which the law predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already sustained economic losses and those in respect of future economic loss and/or other opportunity, Plaintiff is entitled to recover exemplary damages from **AZGROUP** in an amount exceeding $250, 000,000.00 USD.

4811-1816-7240, v. 1

## TWENTIETH CAUSE OF ACTION
### *(Civil Conspiracy:  All Plaintiffs as all Defendants)*

487.    Paragraphs one (1) through four-hundred-and eighty-six (486) are realleged as if the same were set forth fully herein.

488.    At all times material hereto **AZGROUP** and **ROMSPEN** acted in concert, colluded and/or conspired, one with any one or more of the others, to achieve unlawful purposes against one or more of the Plaintiffs including, but not limited to, one or more of the following:

       (a) defrauding Plaintiffs to precipitate default by **ZEN** and thereafter foreclose or otherwise acquire the **AUSTIN PROPERTY** and/or other economic interests or benefits attendant thereupon;

       (b) defrauding Plaintiffs, to precipitate default by **ZEN** and, thereafter, foreclose upon the Edmonton properties that secured the **SECOND ZEN LOAN;**

       (c) defrauding Plaintiffs for economic gain and/or benefits;

       (d) breaching fiduciary duties owed to the Plaintiffs, in efforts to precipitate default by **ZEN** and thereafter foreclose or otherwise acquire the **AUSTIN PROPERTY** and/or other economic interests or benefits connected therewith;

       (e)  breaching fiduciary duties owed to Plaintiffs, in efforts to precipitate default by **ZEN** and, thereafter, foreclose upon the Edmonton properties that secured the **SECOND ZEN LOAN;** and/or otherwise

       (f) breaching fiduciary duties owed to the Plaintiffs for economic gain and/or benefits.

489.    At all times material hereto, **AZGROUP** and **ROMSPEN** actually agreed to act toward the accomplishment of the aforesaid unlawful purposes by, engaging in fraudulent and dishonest conduct more fully set forth hereinbefore in the **FIRST** through **FIFTH,** and **TENTH** through **FIFTEENTH CAUSES OF ACTION.**

490.    Among the many overt acts in furtherance of such civil conspiracy were (a) excluding **WHITE** from contract negotiations and/or dealings with **ROMSPEN**, (b) arranging draw payments to be deposited directly into **PANACHE's** bank account, (c) disseminating

and/or removing confidential information belonging to Plaintiffs, (d) using threats and/or

violence to coerce unfair settlements resulting in **ROMSPEN's** acquisition of the **AUSTIN**

**PROPERTY**, (e) using threats and/or violence to prevent Plaintiffs, or any of them, from selling

the **AUSTIN PROPERTY**, (e) piling on debt by continuing to advance draws directly to

**PANACHE**, in spite of any sign that **PANACHE** was advancing construction commensurate

with the amount of the draws, and/or (f) failing to pay and/or delaying payment of sub-

contractors to thwart progress on the **AUSTIN PROPERTY.**

491.    As a direct and proximate result of the Defendants' unlawful and conspiratorial

conduct, the Plaintiffs have suffered, and will continue to suffer, injury and/or damages

492.    **AZGROUP's** conduct was undertaken with a state of mind upon which the law

predicates and/or permits the imposition of exemplary damages and, given the Plaintiffs' already

sustained economic losses and those in respect of future economic loss and/or other opportunity,

Plaintiff is entitled to recover exemplary damages from **AZGROUP** in an amount exceeding

$250, 000,000.00 USD.

### TWENTY-FIRST CAUSE OF ACTION
***(Determination as to Secured Status Pursuant to 11 U.S.C. § 506***
***Plaintiffs as against ROMSPEN***)

493.    Paragraphs one (1) through four-hundred-and thirty (339) are realleged as if the

same were set forth fully herein.

494.    **ROMSPEN** has claimed secured creditor status in this Chapter 11 Case.

495.    **ROMSPEN** claims its secured status based upon certain mortgages and/or other

instruments filed against real estate, ultimately belonging to Plaintiffs.

496.    In light of **ROMSPEN's** breaches of fiduciary duty, fraud in the inducement, real

estate fraud, constructive fraud, negligence, gross negligence, bad faith and unfair dealings

and/conspiracy, as set forth in the respective **CAUSES OF ACTION** herein, Plaintiffs seek a determination from this Court as to the extent and validity of **ROMSPEN's** liens pursuant to 11 U.S.C. § 506.

## TWENTY-SECOND CAUSE OF ACTION
### *(Disallowance of Claims Pursuant to 11 U.S.C. § 502: Plaintiffs as against ROMSPEN)*

497.     Paragraphs one (1) through four-hundred-and ninety-six (496) are realleged as if the same were set forth fully herein.

498.     11 U.S.C. § 502 allows for disallowance of certain claims filed in the Chapter 11 Case.

499.     In light of **ROMSPEN's** breached of fiduciary duties, fraud in the inducement, real estate fraud, constructive fraud, negligence, gross negligence, bad faith and unfair dealings, and/or civil conspiracy, as set forth in the respective **CAUSES OF ACTION** herein, **ROMSPEN's** claims should be disallowed in whole and/or part.

500.     Plaintiffs seeks determination by this Court that **ROMSPEN's** claims be disallowed in whole and/or part, pursuant to 11 U.S.C. § 502

## TWENTY-THIRD CAUSE OF ACTION
### *(Objection/Disallowance of Credit Bidding; Pursuant to 11 U.S.C. § 363(k): Plaintiffs as against ROMSPEN)*

501.     Paragraphs one (1) through five hundred (500) are realleged as if the same were set forth fully herein.

 allows for disallowance of certain claims filed in the Chapter 11 Case.

502.     Pursuant to 18 U.S.C. 363(k) "credit bidder" status can be disallowed by the Court "for cause" and/or upon "good cause shown."

503.    **ROMSPEN's** breaches of fiduciary duty, fraud in the inducement, real estate

fraud, constructive fraud, negligence, gross negligence, bad faith and unfair dealings, and/or civil

conspiracy, as set forth in respective **CAUSES OF ACTION** pled herein, constitute "cause"

and/or "cause shown," for disallowing **ROMSPEN** the benefit of "credit bidder" status in this

case.

## TWENTY-FOURTH CAUSE OF ACTION
### *(Action in Accounting Plaintiffs as against ROMSPEN, PANACHE and AZ)*

504.    Paragraphs one (1) through five-hundred-and three (503) are realleged as if the

same were set forth fully herein.

505.    **ROMSPEN**, **PANACHE** and/or **AZ** were, at all times material hereto, related to

Plaintiffs, as fiduciaries.

506.    As fiduciaries, **ROMPSEN, PANACHE** and/or **AZ**, undertook obligations

within a duty of full disclosure of pertinent financial information was inherent.

507.    At all times material hereto, the disclosure obligations applied to all financial

matters including, but not limited to, those which related to the **AUSTIN PROPERTY**

development.

508.    In spite of clear and obvious duties owed to Plaintiffs by all defendants, all of

them have refused and/or otherwise failed to disclose or otherwise communicated the

aforementioned financial information.

509.    Said refusal and/or failures place Plaintiffs at an unfair advantage with respect to

the advancement and/or protection of Bankruptcy claims and/or other legal rights.

510.    Based upon the nature of the relationships between Plaintiffs and Defendants,

Plaintiffs request this Court to order disclosure of the financial records sought.

## TWENTY-FIFTH CAUSE OF ACTION
### *(Constructive Trust: Plaintiffs as against ROMSPEN, PANACHE and AZ)*

511.    Paragraphs one (1) through five-hundred-and ten (510) are realleged as if the same were set forth fully herein.

512.    Based upon the **CAUSES OF ACTION** pled herein, and facts alleged in support thereof, including actual and/or constructive fraud, the Plaintiffs seek an equitable order imposing a constructive trust upon the **AUSTIN PROPERTY** and/or any related assets.

513.    Based upon the allegations herein, the Defendants have been unjustly enriched by millions of dollars as a result of their fraudulent conduct.

514.    At all material times, the conduct of any one or more of the defendants constituted a wrongful taking of Plaintiffs' property.

515.    Such a constructive trust would be traceable to a *res* in which one or more Plaintiffs has an interest.

516.    A constructive trust is warranted in this case, in order to prevent unjust enrichment of the Defendants related to fraud, misappropriation of funds and the breach of fiduciary duties.

517.    The constructive trust should be imposed over Defendants' assets, in an amount equal to or greater than the Plaintiffs' damages claimed in this Complaint.

## TWENTY-SIXTH CAUSE OF ACTION
### *(Injunction: Plaintiffs as against ROMSPEN, PANACHE and AZ)*

518.    Paragraphs one (1) through five-hundred-and seventeen (517) are realleged as if the same were set forth fully herein.

519.    The actions and conduct of the Defendants and/or any of them have caused, and will continue to cause, immediate and/or immanent irreparable harm to Plaintiffs.

520.    The unique nature of the **AUSTIN PROPERTY** and Plaintiffs' interests therein, leave Plaintiff with no adequate remedy at law and/or money damages would be insufficient to redress the irreparable harm caused by Defendants' conduct.

521.    The Plaintiffs are likely to succeed on the merits of their fraud and/or negligent related claims.

522.    The Plaintiffs seek mandatory and/or prohibitive injunctive relieve as necessary to protect its interests and/or legal rights.

**WHEREFORE** the Plaintiffs make prayer to this honorable Court for the following remedies, orders and awards, as against any one or more of the Defendants:

(a)  Compensatory damages;

(b)  Exemplary damages in an amount not less than $250,000,000.00;

(c)  Attorneys Fees;

(d)  Costs of this action;

(e)  Statutory Attorneys Fees, Costs and Special damages pursuant to *Tex. Bus. & Com. Code*;

(f)  Determination as to Defendants' Secured Status Pursuant to 11 U.S.C. § 506;

(g)  Disallowance of Claims Pursuant to 11 U.S.C. § 502;

(h)  Orders pertaining to Plaintiffs' Objection to Defendant **ROMSPEN's** ability to credit bid,

(i)  Disallowance of Credit Bidding as to **ROMSPEN**, pursuant to 11 U.S.C. § 363(k);

(j)  Order for Accounting;

(k)  For the imposition of a constructive trust over assets of Defendants procured through fraud, breach of contract, misrepresentation, and/or unjust enrichment; For pre-judgment interest at the highest legal rate and for the longest period of time allowed by law on all elements of damage claimed herein;

4811-1816-7240, v. 1

(l)  Pre and post-judgment interest at the highest legal rate allowed by law on the amount of the judgment entered by the Court from the date of judgment until collected; and

(m)  Such further and other relief this Court deems just and proper.

RESPECTFULLY SUMITTED
BRUCE J. DUKE, LLC
**Attorneys for Daniel White, Individually and as Trustee for the Dan White Family Trust, A Canadian Trust; Dan White Family Trust, A Canadian Trust; Absolute Environmental Waste Management Inc.; Absolute Energy Resources Inc.; Lot 11 GP, Ltd.; Lot 11 Limited Partnership; Eco Industrial Business Park, Inc.; Symmetry Asset Management, Inc.; and Lincoln 1861, Inc.**

By: _____
      Bruce J. Duke, Esq.
      788 Shrewsbury Avenue
      Suite 2220
      Tinton Falls, NJ 07724
      (856) 701-0555
      brucedukeesq@gmail.com
      Admitted *Pro Hac Vice*

4811-1816-7240, v. 1