

**ROMSPEN**

**Our File:  8212**

June 6th, 2013

Symmetry Asset Management Inc.
1250 Hayter Road
Edmonton, AB, T6S 1A2
<u>Attention:  Dan White</u>

Dear Dan:

**Re:       $40 Million (Maximum) First Mortgage Financing (the "Loan")**
**Ft. McMurray Property**
**Eco-Industrial Business Park (Lot 11), Edmonton**

We are pleased to inform you that, on the basis of the information and the documents supplied by you, Romspen Investment Corporation as trustee (the "Lender") hereby submits to you this offer of mortgage financing ("Commitment") in connection with the properties above mentioned and more fully described in Section 4 below.

**This Commitment must be accepted by the Borrower and received by the Lender, together with the Standby Deposit as hereinafter set out, no later than 5 days from the date hereof, failing which this Commitment shall become null and void without further notice.**

1.     <u>**BORROWER**</u>

A limited partnership or other single-purpose entity to be formed, acceptable to the Lender (the "Borrower"), which represents that it will be the legal and beneficial owner of all property and assets comprising the security required pursuant hereto.

2.     <u>**COVENANTOR**</u>

A limited partnership to be formed to own the Edmonton Property (defined below)(the "Covenantor").

The Covenantor, jointly and severally with the Borrower, covenants and agrees to satisfy all terms, conditions and requirements herein contained and each of the Borrower and Covenantor acknowledge and agree that their obligations hereunder, including, without limitation, the obligations to repay the Loan, shall constitute primary obligations and shall be joint and several.

3.     <u>**APPROVED LOAN AMOUNT**</u>

The maximum approved loan amount is $40,000,000 (the "Loan Amount").   The Loan is comprised of two facilities:

(a) a facility of approximately $20,000,000, to assist the Borrower in acquiring the Ft. Mac Property (the "Acquisition Facility"); and

(b) a facility of approximately $20,000,000, to assist the borrower in paying the costs of developing the Ft. Mac Property (the "Development Facility")

## 4.  PROPERTIES AND PROJECT

Those properties set out in Schedule Q (the "Properties", and each, a "Property", and, individually, the "Ft. Mac Property" and the "Edmonton Property").  The improvements that the Borrower intends to construct on the Ft. Mac Property are herein referred to as the "Project".

## 5.  ADVANCE DATES

Subject to the terms of this Commitment, the first advance of the Loan ("First Advance") shall take place on the completion of the Borrower's acquisition of the Ft. Mac Property ("First Advance Date"). Subsequent advances of the Loan as part of the Development Facility (each, an "Advance") will be made by way of periodic advances on a cost-to-complete basis in accordance with the Approved Plans and the Project Budget (as defined in Schedule A), as the Project proceeds, upon the satisfaction or waiver by the Lender, as applicable, of all conditions precedents set forth herein or in the Security. Each Advance will be for not less than $500,000, and Advances will not be made more often than once per month.  The total advanced at any time must not exceed the cost in place. Each advance of funds under the Loan is referred to as an "Advance".

## 6.  INTEREST RATE

The interest rate for Loan is 12% per annum, calculated and compounded monthly, in arrears, on the amounts advanced from time to time from each Advance date, as well after as before maturity, default or judgment.

During the first 12 months of the Loan Term, interest shall accrue.  Commencing in the 13th month of the Loan Term, the Lender may require the borrower to make monthly interest payments of up to 75% of the interest accrued on the Loan Amount from the beginning of the 13th month, and any accrued and unpaid interest and costs thereon.  The Lender will determine the amount of such monthly interest to be paid, in its sole discretion, by taking into account, among other things, any payments received from lot sales on the Ft. Mac Property, the value of its Security, and the progress of the development of the Project on the Ft. Mac Property.  The Lender will give the Borrower notice before the expiry of the 11th month of the Loan Term of its determination of the amount of such required interest payment.

## 7.  TERM

The term of the Loan is 2 years commencing from the Interest Adjustment Date (the "Loan Term"). The date on which the Loan Term expires is sometimes referred to herein as the "Loan Maturity Date".  The Loan shall not be repaid prior to the Loan Maturity Date, unless a prepayment privilege is provided herein.

The "Interest Adjustment Date" will be either the 1st or the 15th (as chosen by the Lender) of the month following the First Advance Date.

8. **USE OF FUNDS**

The proceeds of the Loan will be used to:

    (a) assist the Borrower in purchasing the Ft. Mac Property (as to approximately $20,000,000);

    (b) assist the Borrower in advancing the Project in accordance with the Approved Plans and the Project Budget (as to approximately $20,000,000); and

    (c) pay fees and transaction costs.

9. **SECURITY**

The following security for the Loan shall be granted in favour of the Lender, in form and content satisfactory to the Lender and its legal counsel (hereinafter collectively referred to as the "Security"):

9.1    a first-ranking mortgage of each Property, in the Loan Amount;

9.2    a first-ranking general assignment of all present and future rents pursuant to leases and offers to lease (Offers to lease and leases affecting the Properties are herein collectively referred to as the "leases". That is, the word "lease" herein shall be deemed to include any offer to lease) affecting the Properties together with all insurance and indemnities covering the said rents and of all income and accounts derived from the Properties including all proceeds receivable from early termination of any of the leases and all other benefits and advantages to be derived therefrom. The Lender may in addition, in its absolute discretion, require attornment or attornment and subordination agreements to be entered into by the tenant under any of the leases. Any security interest granted by a tenant in favour of the Borrower shall be assigned and transferred to and in favour of the Lender under the terms of the assignment of rents granted to the Lender;

9.3    first-ranking specific assignments of all leases for tenants occupying or to occupy more than 5% of rentable area or generating more than 5% of total rental revenue, and of all rents payable under such leases, of all insurance indemnities covering the said rents and of all income and accounts derived therefrom, including all proceeds received from early termination of such leases, together with tenant acknowledgements for such tenants in the form set forth in Schedule "F" hereto and, if required by the Lender, attornment or attornment and subordination agreements in respect thereof. The Lender shall be entitled to register the specific assignments of such leases and to require notices of each such lease to be registered against title to the Properties by the Borrower in such order as requested by the Lender;

9.4    general security agreements charging all the personal property of the Borrower and Covenantor, respectively, including, without limitation, goods, chattel paper, documents, accounts, intangibles, securities, monies, books and records and all replacements of, substitutions for and increases, additions and accessories to the foregoing and proceeds thereof, present and future;

9.5    a specific assignment of all the Borrower's right, title and interest in, to and under all material contracts and agreements affecting or with respect to the Properties and the Project, as required by the Lender, with all necessary consents of the other parties thereto;

9.6 acknowledgment of the status and terms of any contracts affecting or with respect to the Properties and the Project including, without limitation, any pertaining to ownership, insurance, shared facilities, passageway agreements or other similar matters specifically, but without limitation, confirming the good standing of such contracts and the rights of the Lender under its security;

9.7 if any Property is a condominium, a specific assignment of all of the Borrower's right, title and interest in and to all purchase agreements, sales proceeds and purchaser deposits. In addition all condominium association voting rights shall be assigned to the Lender, or its nominee;

9.8 if any charge or security interest is to be registered with the Lender's prior written consent on title to any Property or against the Borrower or Covenantor in subordinate priority to the Lender's security such subordinate charge or secured party shall provide to the Lender a subordination and standstill agreement in a form acceptable to the Lender;

9.9 an unconditional, joint and several covenant by the Covenantor as principal debtor and not as surety for the performance of all obligations of the Borrower with respect to the Loan, it being understood that the Lender shall not be obliged to proceed against the Borrower or to enforce or exhaust any security before enforcing its rights against the Covenantor;

9.10 assignment of all insurance policies with respect to the Properties and the Project and all proceeds and benefits therefrom in favour of the Lender;

9.11 assignment, postponement and subordination by the respective shareholders or partners of the Borrower and Covenantor, and their general partners ("General Partners"), in favour of the Lender, of any and all loans, indebtedness, distributions of income and/or capital owing or due to them from time to time by the respective Borrower and/or Covenantor;

9.12 an environmental indemnity from the Borrower and Covenantor;

9.13 a completion guarantee from the Covenantor;

9.14 a pledge of all issued and outstanding partnership interests of the Borrower and Covenantor;

9.15 a pledge of all shares of the General Partners of the Borrower and of the Covenantor;

9.16 such further and other security as legal counsel for the Lender may reasonably require.

## 10. TRANSACTION FEES AND RELATED COSTS

| | |
|---|---|
| Administration Fee: | $1,000 |
| Lender's Fee: | $3%** |
| Insurance Risk Management Fee: | $1,500* |
| Lender's Basic Legal Fee (estimated): | $30,000* |
| Lender's Advance Fee (per Advance): | $1,000 |
| Lender's Legal Fee (per Advance): | $500* |

\* plus disbursements and taxes, if applicable.
\*\*payable as to 2% upon each Advance, and 1% of the aggregate of all Advances, at the earlier of maturity, default or prepayment

In addition to the aforementioned, the Borrower agrees to pay all costs, fees and expenses in connection with the transaction contemplated by this Commitment, including, without limitation:

10.1 engineering, environmental assessment, appraisal, credit information, inspection, architectural, project monitoring, cost consultancy, survey and any and all other professional and advisory costs as may be reasonably incurred by the Lender;

10.2 registration, recording and filing fees, taxes and the like with regard to all documents required by the Lender's solicitors to be registered, recorded or filed.

Such fees and costs may, at the option of the Lender, be deducted from any advance of the Loan.

## 11.   **STANDBY DEPOSIT**

In consideration of the issuance of this Commitment and in recognition of the considerable effort that the Lender must immediately undertake in order to make funds available for closing, the Borrower agrees to submit to the Lender, together with this executed Commitment, $250,000 ("Standby Deposit"), by way of a certified cheque, draft or wire payable to the Lender. The Lender hereby acknowledges receipt of $50,000 as part of the Standby Deposit.

The Standby Deposit shall bear no interest while in the possession of the Lender. Save as otherwise provided for herein, such Standby Deposit shall be credited to the Borrower at the time of the first advance of the Loan.

## 12.   **ADVANCES AND CONDITIONS PRECEDENT**

12.1   General

12.1.1 Subject to the other terms and conditions set forth in this Commitment, the Lender shall disburse the proceeds of the Loan to or on behalf of the Borrower in the amounts and as specified in Section 3 herein.

12.1.2 The Borrower and Covenantor shall be the legal and beneficial owners of a good and marketable freehold title to the Properties and all personal property associated therewith.  The Properties and the personal property related thereto or used in connection with the operation thereof or which is necessary to the use and operation thereof, shall be free and clear of all security interests, claims or other encumbrances, with the exception of the Security provided for in this Commitment and encumbrances permitted by the Lender, the whole to the complete satisfaction of legal counsel for the Lender.

12.1.3 All taxes, assessments, utility charges and other charges affecting the Properties, other than amounts which are not yet due and payable, or, in respect of the Edmonton Property, which are being appealed or contested in a diligent

manner, shall have been paid prior to each advance of the Loan, failing which they shall be paid from the proceeds of any advance.

12.1.4 The Borrower and Covenantor shall fulfill all their obligations under any laws entitling a creditor to exercise rights against the Properties.  In this respect, the they shall provide to every government office, utilities provider, and other authority named by the Lender, an authorization by which the Lender or any person authorized by it as its legal counsel, agent or manager, shall be able to obtain, confirmation that all payments, declarations and other filings of the such parties are up to date, whether the authority concerned has issued or will issue a default notice or demand for payment  to any party and whether any such notice concerns arrears.  Each such authorization shall remain in effect and will be replaced as required by the Lender from time to time until the Loan has been fully repaid.

12.1.5 Within five (5) business days from acceptance of this Commitment, the Borrower and Covenantor shall deliver to the Lender's legal counsel the following documents (where applicable):

12.1.5.1 copies of all contracts affecting the Properties or the Project or relating thereto, including, without limitation, executed offers to lease or leases, standard offer and lease agreements and all information related to such leases.

12.1.5.2 if any Property is a condominium, copies of all condominium documentation, including the condominium corporation's by-laws;

12.1.5.3 required insurance policies;

12.1.5.4 evidence that property taxes have been paid or, in respect of the Edmonton Property, are being appealed or contested in a diligent manner;

12.1.5.5 certified copy of a resolution of the Borrower's and Covenantor's General Partner's board of directors authorizing this transaction;

12.1.5.6 certified copies of the constating documents of the Borrower and of Covenantor, and the General Partners;

12.1.5.7 an original up to date surveys of the Properties prepared by a duly qualified land surveyor showing the location of all improvements on the Properties accompanied by a certificate wherein the surveyor confirms that the location of the improvements comply with applicable municipal set-back requirements (or, if not, setting on details of the non-compliance); such survey must be in a form acceptable to the Lender's counsel; and

12.1.5.8 any other documents required hereunder and reasonably requested by legal counsel for the Lender.

12.2     Advance Requirements

The advance of the Loan is conditional upon the receipt by the Lender of the following documents, in form and substance satisfactory to the Lender and upon fulfillment by the Borrower and Covenantor of the following conditions precedent as well as those set out in Schedule A or Schedule B hereto or elsewhere herein, to the entire satisfaction of the Lender:

12.2.1    the Security and any other documents relating to the Loan that are required or contemplated hereunder or which the Lender and its legal counsel may deem necessary, shall have been received and approved to the complete satisfaction of the Lender and its counsel and duly executed and registered and perfected, as the case may be and all approvals required by the Lender or its counsel shall have been given;

12.2.2    a lender's title insurance policy issued by an insurance company acceptable to the Lender and in form and content satisfactory to the Lender the premium for which will be paid by the Borrower or Covenantor.

12.2.3    a favourable opinion of the Borrower's, General Partners' and Covenantor's counsel on the due formation, power and authority of the Borrower and Covenantor, the due authorization, execution, delivery, validity and enforceability of this Commitment and the Security and such other matters as the Lender or its counsel may reasonably require;

12.2.4    a certificate of the Borrower and/or Covenantor confirming the truth and survival of the representations and warranties contained herein;

12.2.5    receipt of a fully executed original copy of the purchase and sale agreement and amendments thereto for the Properties and favourable opinion report thereon prepared by the Lender's counsel, if applicable;

12.2.6    evidence that the Borrower and Covenantor have complied with their obligations with respect to insurance requirements as more fully set out in Schedule "L", together with a favourable opinion of the Lender's insurance consultant on the adequacy of all insurance policies and or bonding required to be delivered or maintained hereunder;

12.2.7    evidence that all taxes, rates, assessments and charges which may be levied or imposed against the Properties or the Borrower's or Covenantor's businesses, including all utilities charges and all amounts capable of forming a charge against the Properties, have been paid in full or, in respect of the Edmonton Property, are being appealed or contested in a diligent manner. The Guarantor will provide full disclosure of the property tax appeal in respect of the Edmonton Property, and, depending on the results of the Lender's due diligence investigations, the Lender may, as a condition of the First Advance, require a holdback or payment into escrow of the disputed amount;

12.2.8    evidence that the Borrower and Covenantor have complied with all statutory requirements for deduction at source and remittance to applicable fiscal authorities, including, without limitation, those under the *Income Tax Act* (Canada), the *Excise Tax Act* (Canada), the *Canada Pension Plan Act* (Canada) or the *Employment Insurance Act* (Canada).;

12.2.9    evidence that the income generated from the Edmonton Property and the income to be generated from the Project are at levels satisfactory to the Lender, in its sole and absolute discretion;

12.2.10   evidence, to the Lender's satisfaction, of sufficient cash equity invested by the Borrower in the Project from its own funds, and a satisfactory review of such equity arrangements and the sources of such equity;

12.2.11   site inspections of the Properties have been completed on behalf of the Lender and the results of the inspections are satisfactory to the Lender;

12.2.12   the construction schedule, contractors, cost estimates and quality standards for the Project shall be consistent with the pro forma Project scope as approved by the Lender;

12.2.13   satisfactory interviews with the Borrower's principals have been conducted by the Lender;

12.2.14   the entrance by the Borrower into a contract with a general contractor acceptable to the Lender, on terms and conditions acceptable to the Lender, and the issuance of payment and/or performance bonds in respect of the contract or subcontracts, as the Lender may require;

12.2.15   prior to any Advance in respect of the Project, an architect's certificate in the form set out in Schedule O and addressed to the Lender certifying that the Project complies with all applicable construction, zoning and other governmental requirements;

12.2.16   the Lender and its legal counsel shall have approved the site plan for the Project as approved by the governmental authority having jurisdiction and all other plans submitted in connection with the Project;

12.2.17   an environmental report prepared, at the expense of the Borrower, by qualified environmental consultants acceptable to the Lender, addressed to the Lender or, alternatively, accompanied by a letter of transmittal from the environmental consultants who prepared the report allowing the Lender to rely upon the same and to use it for mortgage purposes, disclosing no site contamination or hazardous substances and confirming, to the satisfaction of the Lender, that the Properties comply with Environmental Laws (as defined in Schedule B hereof).  The Borrower and Covenantor hereby agree to provide all available information with respect to environmental matters and to fully disclose to the Lender any relevant facts about environmental matters promptly as they come to light;

12.2.18  an appraisal and feasibility report about the Properties and the Project in form and substance satisfactory to the Lender, prepared at the expense of the Borrower by a qualified appraiser acceptable to the Lender, addressed to the Lender or, alternatively, accompanied by a letter of transmittal from the appraiser allowing the Lender to rely upon it and to use it for mortgage purposes;

12.2.19  copies of all leases affecting the Properties, executed by the parties thereto, including, without limitation, those listed in Schedule "G" hereto, or a certified rent roll in a form acceptable to the Lender and reviewed by and found satisfactory to the Lender and its counsel.  In addition, an estoppel certificate from each tenant occupying or to occupy 5% or more of the Properties; total rentable area or generating 5% or more of total rental revenue from the Properties and attornment and subordination agreements from tenants as required by the Lender, shall have been executed by the tenants as required and found satisfactory to the Lender;

12.2.20  if there are existing structures on the Properties, a report from a qualified structural engineer, addressed to the Lender, addressing the structural soundness of those existing improvements, the contents of which are acceptable to the Lender;

12.2.21  no event shall have occurred and be continuing or would result from making of any advance under the Loan, which constitutes an event of default or would constitute an event of default under any of the Borrower's or Covenantor's obligations, except when such default is cured by notice or elapsed time or both;

12.2.22  the Lender and its counsel shall have approved all contracts and documents affecting or with respect to the Properties and the Project;

12.2.23  if the Property is a leasehold interest under a ground lease, a copy of the ground lease and, if applicable, insurance trust agreement and any other agreement entered into with the ground lessor;

12.2.24  if the Project includes subdividing the Property to create condominiums, all draft condominium documents;

12.2.25  true copies of all plans which have been submitted to the municipality or to any other government authority in connection with the Project;

12.2.26  true copies of all significant contracts respecting the Project including, without limitation, the agreement with the general contractor, if any, and any project management agreement;

12.2.27  any co-owners agreement or trust agreement in effect with respect to a Property;

12.2.28  evidence of compliance with *The Proceeds of Crime (Money Laundering) and*

*Terrorist Financing Act* (Canada) and Regulations, including but not limited to:

(a) Each signing officer (up to 3) is to provide, **at least 3 days prior to funding,** the completed Agent Examination of Identification as set out in Schedule C;

(b) Borrower, Covenantor and General Partners are to provide, **at least 3 days prior to funding,** with the following:

    (i)    Corporation profile report or Certificate of Status confirming their existence;

    (ii)   Executed Certificate of Incumbency setting out the names of all directors and officers, and the office held by each officer;

    (iii)  Executed director(s)' resolution authorizing the transaction;

    (iv)  Shareholders' or partners' register.

12.2.29   approval by the Lender of the limited partnership agreement of the Borrower, including, without limitation, the provisions in respect of the Participation Units (as defined herein), including, among other things, audit rights, major decision rights, rights with respect to fundamental changes and other changes that would affect the value of the Participation Units, and other protective provisions for the Participation Units; and

12.2.30   determination by the Lender's tax advisors of no adverse income tax consequences in respect of the Participation Units;

12.2.31   approval by the Lender of the limited partnership agreement of the Covenantor;

12.2.32   notwithstanding anything contained herein, no advances shall be made by the Lender until such time as the Lender is in receipt of, and has reviewed, all due diligence material referred to in Schedule A of the letter agreement dated September 13, 2012, and not hereinbefore requested; and

12.2.33   notwithstanding anything contained herein, no advance shall be made by the Lender until the Lender is advised by its legal counsel that, having regard to all the circumstances, such advance should be made.

## 13.    REPRESENTATIONS AND WARRANTIES

The Borrower, the General Partners and the Covenantor (the "**Credit Parties**", and each, a "**Credit Party**"), as applicable, represent and warrant to the Lender, which shall be true and correct for each Advance hereunder, as follows, and acknowledge that the Lender is relying on all such representations and warranties in entering into this commitment and making all Advances of the Loan hereunder.

13.1.1    The request for and use of proceeds of any Advance by the Borrower will constitute an affirmation or re-affirmation by each Credit Party of the representations and warranties contained herein and in any document related hereto, including, without limitation, any Security delivered pursuant hereto;

13.1.2    Each Credit Party is an entity duly organized and validly existing and in good standing under the laws of the jurisdiction of formation/ incorporation/amalgamation/continuance, as applicable, and registered to do business in each jurisdiction in which it carries on business;

13.1.3    Each Credit Party has full corporate power, right and authority to enter into and perform its obligations under each of the documents to which it is a party and has full corporate right, power and authority to own and operate its assets and property and to carry on its business;

13.1.4    The execution and delivery by each Credit Party of this Commitment and the applicable Security and the performance of its obligations thereunder do not and will not conflict with or result in a breach of any of the terms, conditions or provisions of its charter documents or bylaws;

13.1.5    The execution and delivery by each Credit Party of this Commitment and the applicable Security and the performance of its obligations thereunder have been duly authorized or will, prior to the First Advance Date, have been ratified by all necessary corporate or other action, and no authorization under any applicable law and no registration, qualification, approval, designation, declaration or filing with any government body, agency or authority having jurisdiction over any Credit Party is or was necessary therefore, except as contemplated herein;

13.1.6    Each Credit Party possesses all consents, approvals, permits and authorizations under any applicable law which are necessary in connection with the operation of their respective businesses.  All such consents, approvals, permits and authorizations are in full force and effect and no Credit Party is in default in any respect thereunder which default would have a material adverse effect.  No action exists, is pending or threatened which has as its object the revocation, amendment or qualification of any such consent or authorization and all applicable appeal periods in respect of such actions have expired;

13.1.7    No Credit Party is in default in any respect under any material indenture, mortgage, deed of trust, agreement or other instrument to which they are a party or by which they or any of their property may be bound and which default would have a material adverse effect on their property or their prospects;

13.1.8    Each applicable Credit Party is the legal and beneficial owner of the applicable Property, and will have good and marketable title and possession thereto, free from all mortgages, charges, liens or other encumbrances whatsoever, except for the Security and Permitted Encumbrances, and no person other than Dan White has any direct or indirect interest in the Properties, other than has been disclosed to and agreed to by the Lender;

13.1.9    Each Credit Party has filed all tax returns which are required to be filed by each of them and has paid or remitted when due all taxes, assessment and government charges imposed upon them which if unpaid could result in any charge or other encumbrance on their properties except such tax, assessment

or charge which is being contested in good faith and for which the applicable Credit Party has made adequate reserves;

13.1.10   The applicable Credit Party has obtained and is in compliance (i) with all terms and conditions of all authorizations which are required under any environmental law, the non-obtaining of which and the lack of compliance with which would have a material adverse effect, and (ii) with all environmental laws, non-compliance with which would have a material adverse effect. No Credit party generates hazardous materials or transports, treats or disposes of any hazardous materials nor is any Credit Party aware of any underground storage tanks or surface contaminants located on the Properties other than those that have been reported to the Lender.   No Credit Party, to the best of their knowledge, has ever caused or permitted (i) a release of any contaminant from or on a Property or (ii) any hazardous materials to be placed, held, located or disposed of on or under a Property the effect of which could reasonably be anticipated to have a material adverse effect.   No enforcement action, investigation or outstanding order from any official body in respect of any hazardous materials or release of contaminants is existing, threatened or impending;

13.1.11   The Property is zoned to permit the improvements being constructed by the Borrower and is in compliance with all relevant zoning and by-laws of the applicable municipality and the Borrower has all permits, certificates, approvals or permissions required for the construction of the improvements;

13.1.12   The applicable Credit Party has complied and will, at all times during the prosecution of the Project and in the operation of the Edmonton Property, comply with the requirements of the *Builder's Lien Act* (Alberta) and the regulations pursuant thereto;

13.1.13   All property taxes, levies, assessments, penalties or other costs payable to a municipality or other local government in respect of each Property have been paid and no such amount is in arrears or is due and unpaid, other than amounts in respect of the Edmonton Property which are being appealed or contested in a diligent manner.

13.1.14   Each Credit Party has provided the Lender or its solicitors with true, complete and correct copies of all constating documents including registers of directors, partners and shareholders;

13.1.15   All information pertaining to the current and proposed uses of the Properties and viability of the Project and the Credit Parties' financial condition have been fully disclosed to the Lender. There is no legal action instituted, threatened or pending against the any Credit Party or any Property or Project which has not been disclosed to the Lender in writing in connection with the application for the Loan and the Borrower has no notice of any work orders, deficiency notices or notices of violation pertaining to any Property;

13.1.16   All financial and other information provided by the Credit Parties to the Lender, including but not limited to financial and other information provided in respect of the

values and other matters pertaining to the Properties and the Project is true and accurate and may be relied upon by the Lender in executing this Commitment and making the Loan;

## 14. **GENERAL COVENANTS**

Notwithstanding any other provision of this Commitment, each Credit Party, as applicable, covenants and agrees as follows.

14.1.1 Upon obtaining (i) knowledge of the occurrence of any default under any agreements to which any Credit Party is a party, (ii) notice of litigation, arbitration, or proceedings before any official body, or (iii) information respecting the business, operations or financial condition of such Credit Party as the Lender may from time to time reasonably request, promptly to give the Lender details of such occurrence or other matter including copies of relevant documents;

14.1.2 To preserve and maintain in full force and effect its qualifications to carry on business including, without limitation, all rights, consents and authorizations relating thereto and not cease to conduct its business as conducted at the date of this Commitment, and to conduct its business in a proper, efficient and businesslike manner and in accordance with good business practices;

14.1.3 To comply with all applicable laws and duly observe in all material respects all consents and authorizations and valid requirements of any governmental body, agency or authority having jurisdiction;

14.1.4 To keep proper books of account in accordance with sound accounting practice, and provide the Lender with such financial information in respect of the Properties and Project that the Lender may request, and to provide the Lender with access thereto during normal business hours;

14.1.5 To permit the Lender or any representative of the Lender on reasonable notice to visit and inspect the Properties and to interview architects, contractors, and others involved with the Project, in the presence of a representative of the Borrower;

14.1.6 To keep in force insurance in respect of the Properties and the Project which meets the Lender's requirements herein or in the Security;

14.1.7 To keep the Properties or cause the Properties to be kept in good repair, working order and condition consistent with all consents, authorizations, and applicable laws and, from time to time, (i) to make and cause to be made all needful and proper repairs, renewals, replacements, additions and improvements thereto in accordance with prudent management practices, and (ii) not to permit to be terminated or suspended for any period of time any of its right, title or interest in or to any authorization or consent applicable to the Project;

14.1.8    To maintain and cause to be maintained and to defend and take all action necessary or advisable at any time and, from time to time, to maintain, defend, exercise, or renew their right, title and interest to their respective properties and assets including, without limitation, the Properties and the Project;

14.1.9    To make full and timely payment of all obligations hereunder whether now existing or hereafter arising and duly comply with all the terms and covenants contained in this Commitment or in any other agreements entered into pursuant hereto;

14.1.10    To pay and discharge as they become due all payments due and owing under, or with respect to, any previous indebtedness created or security given by them to any person and will observe, perform and carry out all the terms, covenants, provisions and agreements relating thereto and any default in payment of any monies due and payable under or relating to any previous indebtedness or security or in the observance, performance or carrying out of any of the terms, covenants, provisions and agreements relating thereto will be deemed to be a default hereunder at the option of the Lender and any and all remedies available to the Lender hereunder by reason of any default hereunder or by law or otherwise will be forthwith available to the Lender;

14.1.11    To notify the Lender promptly upon obtaining knowledge of the institution or anticipated or threatened institution of any proceedings for the expropriation of any part of the Properties or of any other part of their respective property or assets if such expropriation could reasonably be anticipated to affect the Project. If any such property or assets are taken or damaged in or by any such expropriation proceedings or otherwise, the awards of compensation payable to any Credit Party as a result of such expropriation shall be and are hereby assigned to the Lender;

14.1.12    At the Borrower's cost and expense, upon request of the Lender, duly execute and deliver, or cause to be duly executed and delivered, such further instruments and do and cause to be done such other acts as may be necessary or proper in the reasonable opinion of the Lender to carry out more effectually the provisions and purposes of this Commitment or any other agreements entered into with the Lender;

14.1.13    To diligently construct the Project and perform and do all things and acts that are necessary to complete the Project in accordance with the Approved Plans and the Project Budget;

14.1.14    In the event of cost overruns or other unforeseen developments in prosecuting the Project, to use their own money as may be required by the Lender from time to time to pay those costs so that, at all times, the unadvanced portion of the Loan will not be less than the Lender's then current estimate of the cost to complete the Project;

14.1.15    To make all requests for Advances using the form of draw request required by the Lender;

14.1.16 To provide undertaking/cost completion guarantee executed by the Credit Parties, agreeing to complete the Project and to fund from their own resources, all costs overruns, (that is, costs in excess of the Project Budget determined on a cumulative basis), as soon as such overruns arise or are identified by the Lender. The Borrower will not be eligible for further Advances until such cost overruns are funded by the Borrower or Covenantors; and

14.1.17 At all times and in particular on the date of each Advance, Borrower shall comply with all requirements of the *Builder's Lien Act* (Alberta) (the **"BLA"**) and the regulations pursuant thereto. The Lender may retain from any Advance such amounts as it considers advisable to protect its interest from subordination or other prejudice under such legislation. The Borrower shall provide additional security, information and documentation as may be required by the Lender to preserve and ensure in all respects the absolute priority of the Security over any rights of any existing or potential lien claimants. The Lender reserves the right to hold back additional amounts due to suppliers or contractors, which may be due under the BLA. Furthermore, the Lender shall have the right to make payments directly to suppliers or contractors for the Borrower's account as if advanced directly to the Borrower, as the Lender may deem necessary.

14.1.18 If any Credit Party is in default in any covenant to be performed by them hereunder or under the Security, the Lender may perform any covenant capable of being performed by the Lender and if the Lender is put to any costs, charges, expenses or outlays to perform any such covenant, they will indemnify the Lender for such costs, charges, expenses or outlays and such costs, charges, expenses or outlays incurred by the Lender (including solicitors' fees and charges incurred by the Lender on a substantial indemnity basis) and will be secured by the Security;

14.1.19 That in any judicial proceedings taken to enforce this Commitment and the covenants hereunder or to enforce or redeem the Security or to foreclose the interest of the Borrower in any property subject thereto, the Lender will be entitled to costs on a substantial indemnity basis.

## 15. <u>NEGATIVE COVENANTS</u>

The Credit Parties covenant with the Lender that they will not, without the consent in writing of the Lender:

15.1     make changes to the Approved Plans (including, without limitation, water lines, sewer lines, roads, electricity lines, and other such infrastructure), to the Project timetable, or any material changes to the Project Budget without the prior written consent of the Lender. A "material change" means a variance of $25,000 or greater from the Project Budget approved by the Lender;

15.2     make, give or create or attempt to make, give or create any mortgage, charge, lien, security interest or encumbrance upon any Property or the Project or any part or parts thereof, including personal  property collateral subject to any of the Security, except as permitted by this Commitment;

15.3     make any payments to any person other than in the normal course of business;

15.4     except in accordance with the Project Budget previously approved by the Lender,  make any payments of salaries, bonuses or other remuneration to:

(a) any shareholder, partner, director or officer of the Borrower or Covenantor;

(b) any person related by blood or marriage to any of the persons described in (a) above;

(c) any corporation controlled by the Borrower or the Covenantor or by the Borrower or the Covenantor and their respective associates (within the meaning of the word "associate" as defined in the *Business Corporations Act* (Ontario)); or

(d) in any calendar year in aggregate in excess of the amount prescribed by the Lender from time to time in writing (and if no amount is prescribed the amount will be the amount paid in the calendar year prior to the calendar year in which the Security is executed);

15.5    make any payment (whether for principal, interest or otherwise) on account of indebtedness owing to, or when initially incurred was owing to, partners, shareholders or directors of the Borrower or Covenantor or related companies or individuals;

15.6    make loans or extend credit to any person (including specifically if it is a corporation, any partner, directors, officers or shareholders of the Borrower or the Covenantor and any person related by blood or marriage to such persons or any corporation controlled by such person or relative or by the Borrower or the Covenantor) except customers of the Borrower in the ordinary course of business;

15.7    purchase or redeem any of the shares or ownership interests or otherwise reduce the share or partnership capital of the Borrower or the Covenantor;

15.8    in any way vary or alter the share or partnership ownership structure of the Borrower or Covenantor or permit the transfer of any shares or other ownership interests of the Borrower or Covenantor;

15.9    declare or provide for any dividends or other payments based upon share or partnership capital of the Borrower or Covenantor;

15.10  except for operating lines of credit maintained in the ordinary course of business, raise or borrow any money from any person other than the Lender, shareholders of the Borrower or Covenantor and trade creditors of the Borrower or Covenantor in the ordinary course of business; or

15.11  guarantee, indemnify any person for, or endorse for accommodation, the obligations of any other person, directly or indirectly.

## 16.    EVENTS OF DEFAULT

16.1    The whole of the outstanding balance of the Loan (including principal, interest, bonus and costs) will immediately become due and payable and the Security will become enforceable in each and every of the following events (each an "**Event of Default**"):

16.1.1  if any Credit Party fails to observe or perform something required to be done or some covenant or condition required to be observed or performed hereunder or pursuant to

the Security, including but not limited to the payment of monies when due hereunder, whether principal, interest, fees, costs or other charges;

16.1.2 if any Credit Party does, or permits to be done, anything which they have herein agreed not to do or permit to be done hereunder or pursuant to the Security or this Commitment;

16.1.3 if any representation or warranty given by any Credit Party (or any director or officer thereof) hereunder or pursuant to the Security is untrue in any material respect;

16.1.4 if an order is made or a resolution passed for the winding-up of any Credit Party, or if a petition is filed for the winding-up either of any Credit Party;

16.1.5 if any Credit Party commits or threatens to commit any act of bankruptcy or becomes insolvent or makes an assignment or proposal under the *Bankruptcy and Insolvency Act* (Canada) or a general assignment in favour of its creditors or a bulk sale of its assets, or if a bankruptcy petition is filed or presented against any Credit Party;

16.1.6 if any proceedings with respect to any Credit Party is commenced under the *Companies Creditors Arrangement Act* (Canada);

16.1.7 if any execution, sequestration, extent or any other process of any Court become enforceable against any Credit Party or if a distress or analogous process is levied against the property of any Credit Party or any part thereof;

16.1.8 if any Credit Party permits any sum which has been admitted as due by it or is not disputed to be due by it and which forms or is capable of being made a charge upon any Property or the Borrower's interest therein or other properties and assets subject to the Security, in priority to the Security to remain unpaid after proceedings have been taken to enforce the same as a prior charge;

16.1.9 if any Credit party defaults in any material respect in observing or performing any term, covenant or condition of any debt instrument or similar obligation by which it is bound, whether secured or not;

16.1.10 if, without the prior written consent of the Lender, any Credit Party sells, agrees to sell, sub-lease, or otherwise disposes or agrees to dispose of any Property or Borrower's interest therein or any part or parts thereof or any interest therein;

16.1.11 if, without the prior written consent of the Lender, any Credit Party grants or agree to grant any further mortgage over the any Property or the Project or any part or parts thereof or any interest therein or otherwise permit any of any Property to be encumbered in any manner other than by encumbrances specifically permitted hereunder;

16.1.12 if any Credit Party defaults under any material contract entered into by them with respect to the Project;

16.1.13 if, without the prior written consent of the Lender, there is, in the opinion of the Lender, a change of effective control of any Credit Party;

16.1.14 if the Borrower, either directly or indirectly, ceases or threatens to cease to carry on business;

16.1.15 if, in the sole opinion of the Lender, an adverse material change in risk occurs in respect of any Credit Party, any Property or the Security;

16.1.16 if the Lender in good faith and on commercially reasonable grounds believes that the ability of any Credit Party to repay the Loan to the Lender or to perform any of the covenants contained in this Commitment or the Security is impaired or is about to be impaired or in jeopardy; or

16.1.17 if an event of default occurs under any of the Security.

16.2    The Lender may waive any Event of Default, provided always that no waiver by the Lender or any failure to take any action to enforce its rights or to enforce any security will extend to or be taken in any manner whatsoever to affect any subsequent Event of Default or the rights resulting therefrom.

16.3    All remedies stipulated for by the Lender hereunder or in any of the Security will be deemed to be in addition to and not restrictive of the remedies which the Lender might be entitled to at law or in equity and the Lender may realize any of the Security or any part thereof in such order as it may be advised and any such realization by any means will not bar realization of any other security or any part or parts thereof nor will any single or partial exercise of any right or remedy preclude any other or further exercise thereof nor will the failure on the part of the Lender or any delay in exercising any rights under this Commitment or any of the Security operate as a waiver.

16.4    If an Event of Default has occurred and is continuing, in addition to and not in limitation of any rights now or hereafter granted under applicable law or the Security, the Lender may without notice to the Borrower and at any time and from time to time set-off, apply or transfer any or all sums owing from time to time by the Lender to the Borrower towards the satisfaction of the outstanding balance of the Loan (including principal, interest and other amounts owing).

The Credit Parties agree to indemnify and save harmless the Lender and each of its directors, officers, employees and agents from and against all liabilities, claims, losses, damages, costs and expenses in any way caused by or arising directly or indirectly from or in consequence of the occurrence of any Event of Default under this Commitment or under the Security.  The Credit Parties further agree to indemnify and save harmless the Lender and each of its directors, officers, employees and agents from and against all liabilities, claims, losses, damages, costs and expenses (including investigation costs, clean up costs, and any other actions necessary pursuant to any applicable environmental laws, and all reasonable legal fees, costs and expenses, on a solicitor and own client basis), asserted against or for the account of the Lender, in any way caused by or arising directly or indirectly from or in consequence of the occurrence of any material non-compliance by any Credit Party or any of their agents or other representatives of applicable environmental laws.  The indemnities provided for in this paragraph shall survive the termination of this Commitment and the repayment of the Loan.

## 17.    **TERMINATION**

In the event the Borrower is in default for any reason whatsoever under the terms of this Commitment, or if it does not fulfill the conditions for disbursement of the Loan in accordance with the terms and conditions contained herein or in any other agreement or document relating to this Commitment, no later than five (5) business days prior to the First Advance Date, or if any information or document supplied by the Borrower is found to be incomplete or inaccurate in a material respect or if for any reason the Borrower does not accept all or a part of the proceeds of the Loan when the Lender makes them available, the parties to this Commitment hereby acknowledge that the Lender shall be entitled, at its discretion, to cancel its obligations under this Commitment and to retain the Standby Deposit as liquidated damages. In that event, this Commitment shall thereafter, subject as hereinafter provided, be void and of no further effect, without any further recourse by either party against the other except that, notwithstanding the forfeiture of the Standby Deposit, the Borrower and Covenantor shall remain liable and be required to pay and reimburse the Lender all fees, costs and expenses as set out in Section 10 whether or not the Loan is made.    Provided that, if the Borrower's offer to purchase the Ft. Mac Property is not accepted by the vendor, this Commitment shall be void and of no further effect, and the Lender shall be entitled to retain $50,000 of the Standby Deposit, plus an amount sufficient to reimburse itself for all of its fees legal fees incurred to the date of such notice.  These agreements with respect to the Standby Deposit and the Borrower's and Covenantor's obligations to pay fees, costs and expenses are enforceable by the Lender notwithstanding the termination of this Commitment, each of such covenants and agreements having an independent existence from the other rights and obligations under this Commitment.

## 18.    **OTHER FINANCING TERMS**

18.1    Repayment and Monthly Instalments

Subject to the provisions of Section 6, interest computed as provided in Section 6 shall be payable monthly in arrears on the same day of each and every month throughout the Loan Term. The Lender may, in its sole discretion, apply a portion of the proceeds from any Advance to pay the interest accrued to the date of the Advance. The Lender may also, in its sole discretion, withhold from the proceeds of any Advance sufficient money to be a reserve for paying interest which will accrue thereafter on the Loan until the cash flow from the Project is sufficient to service the Loan.

With respect to any advance under the Loan, funds shall be deemed advanced on the earliest of:

(i)    the date that the funds are removed from the Lender's account and designated to the Borrower's account or as the Borrower may direct, or

(ii)    the date upon  which  the Borrower or its authorized representative has requested the funds to be advanced; or

(iii)    in the case of the first advance, the date scheduled for the first advance as herein set out or as amended pursuant to any written agreement between the Borrower and the Lender.

Upon expiry of the Loan Term, the principal of the Loan, together with interest and all other amounts due and owing by the Borrower to the Lender under the Security (as defined herein) shall become immediately due and payable.

It is hereby agreed that in case default shall be made in payment of any sum to become due for interest at any time appointed for payment thereof as aforesaid, compound interest shall be payable and the sum in arrears for interest from time to time, as well after as before maturity, shall bear interest at the rate aforesaid. If the interest and compound interest are not paid within one (1) month from the time of default, a rest shall be made and interest at the rate aforesaid shall be calculated on the aggregate amount (including all unpaid interest) then due, as well after as before maturity, and so on each month. All such interest and compound interest shall be a charge upon the Property.

18.2    Reserve Fund for Realty Taxes

The Borrower shall maintain all tax accounts current.  However, the Lender shall have the right to require the establishment of a reserve for payment of property taxes and payment of monthly payments based on the Lender's estimate of the annual taxes in accordance with the provisions of the standard mortgage terms set out in Schedule B hereto.

The Lender shall not be responsible for the payment of any taxes except as expressly provided for in the Commitment or the Security.

The Lender acknowledges that the Covenantor owner of the Edmonton Property is appealing the property tax assessment thereon.  Such Covenantor covenants and agrees to keep the Lender informed as to the progress of such appeal and to pay all property taxes when due upon the conclusion of a final settlement or a final unappealable determination thereon.


18.3    Method of Payment of Monthly Instalments of Interest

The Borrower shall remit payments via an automatic debit service, by submitting the Authorization Form attached hereto as Schedule "D", together with a "void" cheque. If there are any changes to the Borrower's regular payment, the Lender will provide notice at least ten (10) days in advance of the debit. The account information provided in this respect will be kept confidential.

18.4    Condition upon Maturity

In the event that the Borrower fails to repay the principal and interest outstanding on the Loan Maturity Date or any renewal thereof agreed to by the Lender, the Lender may, at its sole discretion, extend the mortgage for a period of one (1) month from the original Loan Maturity Date or any renewal thereof agreed to by the Lender, at an interest rate equal to the higher between the Interest Rate for the Loan and the then Royal Bank of Canada Prime Rate per annum plus five percent (5.00%) per annum, calculated and payable monthly.  If the Lender does so elect to extend the term for one month but the Loan has not been repaid or renewal has not been finalized within this one (1) month period, then there will be no further extensions and the Lender may exercise its remedies under the Security.

The interest rate applicable will be determined by the Lender as of the first (1st) Banking Day of the month in which the Loan matures.

In this Commitment, "Royal Bank of Canada Prime Rate" means the rate of interest, expressed as a percentage per annum, published and quoted by Royal Bank of Canada or its successor at the bank's head office in Toronto, Ontario, as a reference rate then in effect for determining interest rates on commercial loans in Canadian Dollars in Canada and which is commonly known as the bank's prime lending rate.

"Banking Day" for the purposes of this clause, will mean a day on which the said head office in Toronto, Ontario, for the Royal Bank of Canada or its successor is open for business and which is not a Saturday, Sunday, civic or statutory holiday.

All other terms and covenants under the existing Security shall continue to apply after the term of the Loan is so extended.

The Loan may be paid in full at any time during the one (1) month extension period without notice, bonus or penalty, other than payment of the Extension Fee and any applicable discharge fees as hereafter set out.

An extension fee which is the greater of Five Thousand Dollars ($5,000.00) or one percent (1.00%) of the outstanding balance shall be added to the principal balance if the Lender elects to extend the term of the Loan under this clause.

## 19.    LEGAL COUNSEL

The title report, Security and all other documents relating to the Loan shall be prepared by the Lender's counsel who shall act on behalf of the Lender:

Witten LLP
Attention:   John Little

The Borrower shall be responsible for all legal costs involved in the preparation, settlement, execution and delivery of this Commitment, the Security and all other documentation related to the Loan.

## 20.    PREPAYMENT PRIVILEGE

The Borrower shall, when not in default, have the right to prepay all of the amount outstanding under the Loan prior to the Loan Maturity Date, on any payment date (i.e. each monthly anniversary of the Interest Adjustment Date), upon giving the Lender one (1) month written notice in advance of payment, or upon payment of a bonus equal to one (1) month's interest, in lieu of such notice.

## 21.    PARTIAL DISCHARGES

Provided the Loan and Security are not in default and are in all respects in good standing, the Lender agrees to provide a partial discharge of its Security upon the closing of a sale of the Edmonton Property to a bona fide arm's-length purchaser, upon the fulfillment and satisfaction of each of the following conditions to the complete satisfaction of the Lender:

(a) such partial discharge is permitted by law;

(b) the Lender receives:

    i.  the Net Sales Proceeds from such sale; or

    ii.  acceptable alternative security, to its complete satisfaction, in its sole discretion, acting reasonably;

(c) such partial discharge (if granted) will not impact the value or enforceability of the Lender's remaining Security, and the ratio of the Loan to the value of the Security remaining after the granting of such partial discharge, as determined by the Lender, is at a level acceptable to the Lender; and

(d) the Lender's is paid its reasonable legal fees and expenses for such partial discharge.

"Net Sales Proceeds" means the amount determined by subtracting from 100% of the gross sales proceeds from the sale of the Edmonton Property as approved by the Lender: (i) reasonable legal fees as approved by the Lender; (ii) reasonable (as compared to the sale of a similar property) real estate commissions, (iii) GST remittances to be paid by the Edmonton Property owner, (v) other adjustments on the statement of adjustments for the Edmonton Property as approved by the Lender.

## 22.  SURVEY

The Borrower shall deliver to the Lender within five (5) business days prior to the first advance for its examination an up-to-date fully monumented survey of each Property prepared by a duly qualified Alberta land surveyor showing, inter alia:

22.1    boundaries and dimensions of the Property;

22.2    location of all buildings and other improvements (if any) on the Property and, if any structure offends municipal set-back requirements, the amount of the encroachment on the set-back area;

22.3    names of adjacent streets;

22.4    location of all registered easements, rights of way, etc.

The survey certificate shall be approved by the legal counsel for the Lender.  If said survey is not an original signed and sealed survey, the Borrower hereby undertakes to deliver to the Lender, at least five (5) business days prior to the disbursement of the first advance of the Loan, three (3) original signed and sealed copies of the said survey.  In addition, the Borrower shall deliver to the Lender: (i) at least five (5) business days prior to the disbursement of the first advance of the Loan, a letter, in form satisfactory to the legal counsel of the Lender, from the land surveyor who has prepared the same addressed to the Lender confirming that the Lender may rely upon such survey; and (ii) immediately prior to each advance, a solemn declaration of a senior officer of the Borrower certifying that, since the preparation of the said survey, no new easement has been created, no

construction or modification of any building shown thereon has been effected and no new construction has been erected by a neighbor along the boundaries of the land described therein.

## 23.    REFINANCING

23.1    The Lender shall have a right of first opportunity to finance or arrange any replacement financing for each Property, or for any further development of such Property or any improvements to be developed on such Property (herein collectively referred to as the "Permanent Financing").

23.2    In connection therewith the Borrower shall provide to the Lender in writing as soon as same is applicable a request for Permanent Financing together with all information necessary for the Lender to process such request and within a reasonable time after delivery to the Lender of all reasonably required information, the Lender shall be given a first opportunity to provide an offer of Permanent Financing.

23.3    The Lender shall also be given a continuing right of first refusal to provide an offer of Permanent Financing to the Borrower on terms substantially the same as any other written offer of financing received from a third party lender, which the Borrower is prepared to accept and copy of which the Borrower shall provide to the Lender.

## 24.    OWNERSHIP OF THE BORROWER AND COVENANTOR

The Borrower and entity Covenantors declare and represent that their ownership is as follows:

*Borrower*

| Type of Security | | Owner |
|---|---|---|
| | | |
| | | |
| | | |

*Covenantor*

| Type of Security | | Owner |
|---|---|---|
| | | |
| | | |
| | | |

## 25.    SPECIAL PROVISIONS

25.1 **Participation Fee**

As a collateral advantage to the Lender, and in consideration of the Lender agreeing to make the Loan to the Borrower at the interest rates provided herein and on the other terms and conditions set out herein, the Borrower agrees to issue to the Lender or its nominee limited partnership units of the Borrower ("Participation Units"). The Participation Units will entitle the holder thereof to 15% of the net profits realized from the development, sale and/or earlier refinancing of any portion of the Ft. Mac Property upon the closing of any such sale or refinancing, and to 15% of any net lease payments, upon the leasing of any portion of the Ft. Mac Property. For the purposes of the foregoing:

(i) net profits shall be calculated in accordance with IFRS and allocated reasonably to the portion of the Property sold, with no deduction or allocation of expenses made for any overhead, salaries to Dan White or any other employee of the Borrower or Covenantor, or any other expenses paid to any related party; and

(ii) net lease payments shall be calculated as the net rent received after payment of all realty taxes and other operating costs required to be paid by the landlord, less any interest payable to third party lenders.

For greater certainty, the Lender's (or its nominee's) ownership of the Participation Units will continue regardless of the repayment of indebtedness under the Loan.

The terms upon which the Participation Units are to be issued will be set out in a limited partnership agreement, which limited partnership agreement shall be on terms and conditions satisfactory to the Lender, in its sole discretion. .

## 26. <u>CROSS-DEFAULT</u>

The Borrower and Covenantor hereby acknowledge that any default with respect to this Loan will constitute a default with respect to any other debt owing by any of them to the Lender or to an affiliate of the Lender. Vice versa, a default in paying any other debt of the Borrower or a Covenantor owing to the Lender or to an affiliate of the Lender will constitute a default with respect to this Loan. For the purpose of this clause, "affiliate" has the meaning given in the *Business Corporations Act* (Ontario).

## 27. <u>SIGNAGE</u>

Subject to compliance with applicable municipal by-laws, the Lender shall be entitled to place on the Ft. Mac Property signage indicating the Lender's participation in the funding of the Project.

## 28. <u>ADVERTISING BY LENDER</u>

The Lender may, in its advertising, describe and/or picture the Properties without identifying the Borrower or Covenantor. The cost of any such advertising shall be paid by the Lender.

The Borrower agrees that Lender may advertise the availability of the within Loan to its potential investors by providing details of the Loan by any means whatsoever including but not limited to, letter, fax, e-mail and posting on the Lender's website.

29.    **MAXIMUM RATE**

If the "interest" (as defined or determined by the statute establishing or defining illegal rates of interest) charged or chargeable ("Interest") under the offer of credit in this Commitment, on the credit advanced pursuant to this Commitment or pursuant to any Security (any of which Interest provision is referred to as the "Interest Provisions") would, except for this paragraph, constitute an illegal rate of interest, then the Interest on the credit so advanced or secured will be reduced such that the total Interest under the Interest Provisions will be that amount or rate which collectively equates to that rate of interest that is 1% per annum less than the minimum rate that would be an illegal rate of interest, calculated according to generally accepted actuarial practices and principles. Such reduction will be effected by reducing, or refunding to the Borrower, such of the interest, charges, and expenses (or a combination thereof) constituting Interest payable as may be designated by the Lender in its sole discretion.

30.    **FURTHER ASSURANCES**

The Credit Parties shall with reasonable diligence do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated by the Commitment, and shall provide such further documents or instruments required by the Lender as it may deem necessary or desirable to effect the purpose of this Commitment and carry out its provisions.

31.    **APPLICABLE LAW**

The terms and conditions of this Commitment as well as all other documents relating to the execution of the transactions provided for by this Commitment shall be governed by and interpreted in accordance with the laws of the Province of Alberta and the Borrower and Covenantor hereby irrevocably attorn to the jurisdiction of the courts of the Province of Alberta.

32.    **AMENDMENT**

The terms or requirements of this Commitment or any security may not be waived or varied orally, or by any course of conduct of any officer, employee or agent of the Lender.  Any amendment to this Commitment must be in writing and signed by a duly authorized officer of the Lender and the Borrower; provided, however, that the Lender may unilaterally extend the date for return of this Commitment or receipt of any documentation upon written notice to the Borrower.

33.    **ASSIGNMENT BY BENEFICIAL OWNER AND/OR BORROWER**

Neither the Borrower nor the Covenantor shall assign its rights or obligations pursuant to the Commitment or the security required by the Commitment, in whole or in part, without the Lender's prior written consent, which consent may be withheld in the Lender's sole and absolute discretion.

34.    **NO OBLIGATION TO ADVANCE**

It is understood that neither the preparation nor the registration of any of the documents contemplated herein shall bind the Lender to advance the funds or any unadvanced portion thereof, it being agreed that the advance of funds or any part thereof from time to time shall be in the sole, absolute, unfettered and unqualified discretion of the Lender.

## 35.    ENUREMENT

This Commitment shall enure to the benefit of the Lender and its successors and assigns and be binding upon the Borrower, the Covenantor and their respective heirs, personal representatives,, successors and assigns.

## 36.    CONFIDENTIALITY

The Borrower and Covenantor acknowledge and agree that the terms and conditions recited herein are confidential between the Borrower, the Covenantor and the Lender. The Borrower and Covenantor agree not to disclose the information contained herein to a third party without the express consent of the Lender.

## 37.    ASSIGNMENT AND SYNDICATION

The Lender shall have the right from time to time, without the consent of the Borrower, to assign, sell, pledge, convey, syndicate, grant participations or transfer all or any portion of the Loan and Security, whether directly or by way of securitization, and as part of any such transaction the Lender is hereby authorized to provide to prospective participants in such transactions all information received by the Lender regarding the Credit Parties, the Properties and the Project. Borrower agrees to cooperate with Lender's efforts to do any of the foregoing and to execute all documents reasonably required by Lender in connection therewith which do not materially adversely affect Borrowers' rights under the Loan Documents.

## 38.    CREDIT AUTHORIZATION AND CONSENT TO DISCLOSURE

The Lender  may collect, retain, release, disclose, exchange, share, transfer and assign from time to time, as it may determine in its sole discretion, all information and materials (including financial statements and information concerning the status of the Loan, such as existing or potential Loan defaults, lease defaults or other facts or circumstances which might affect the performance of the Loan) provided to or obtained by it relating to the Borrower, the Covenantor,  the General Partners, the Properties or the Loan (both before and after the disbursement of funds and/or default thereunder) without restriction and without notice to or the consent of any Borrower or Covenantor or General Partner (and such parties hereby irrevocably consents thereto):

(a) to any person who has, who acquires, or who proposes to acquire an interest in the Loan;

(b) to the respective third party advisors and agents (such as lawyers, accountants, auditors, consultants, appraisers and credit verification sources) of such persons;

(c) to the public or any group in any offering memorandum, prospectus or other disclosure document relating to any sale, syndication or securitization of the Loan (including all initial and continuing disclosure requirements), regardless of format or scope of distribution;

(d) to the public or other interested persons, directly or indirectly through information service providers or other market participants, for the purpose of providing market

       information from time to time relating to the status of the Loan or any related securitization or any interest therein, regardless of format or scope of distribution;

    (e)  to any governmental authority having jurisdiction over the Lender or over any sale, syndication or securitization of the Loan or any trade of any interest therein;

    (f)  to any other person in connection with the sale, syndication or securitization of the Loan, including insurers and rating agencies; and

    (g)  to any other person in connection with the collection or enforcement proceedings taken under or in respect of the Loan.

Without limiting the foregoing, each Borrower and Covenantor hereby consents to the Lender obtaining all information as may be necessary from all available sources as to the creditworthiness of each Borrower or Covenantor and acknowledges that the Lender may collect or come into possession of personal information relating to certain individuals either comprising or otherwise connected with the Borrower or Covenantor which information may include contact information (mailing address, e-mail address, telephone number or fax number), financial information and status (bank account numbers, existing debts, personal net worth or credit history), date of birth, place of employment and social insurance number. Each Borrower and Covenantor acknowledges and agrees that such personal information may be used by Lender in connection with the processing, approving, funding, servicing and administering the Loan and any sale, syndication or securitization of the Loan, and in so doing the Lender may disclose and otherwise deal with personal information in the same manner and to the same persons as provided in the preceding paragraph without restriction, acting reasonably, and without notice to or the consent of any Borrower or Covenantor or any related individual. Each Borrower and Covenantor for itself and on behalf of its directors, officers, shareholders and principals, hereby consents to and authorizes such use and disclosure of all such personal information by the Lender and represents and warrants that it has full power and authority to give such consent and authorization.

## 39.   <u>MATERIAL ADVERSE CHANGES</u>

In the event that at any time either before the advance of funds under the Loan or while any indebtedness remains outstanding pursuant to the Loan, the Lender discovers a discrepancy or inaccuracy in any written information, statements or representations made or furnished to the Lender by or on behalf of the Borrower or Covenantor or concerning the Properties, the Project, or the financial condition and responsibility of the Borrower or Covenantor or in the event that the Lender discovers any material adverse change in the value of the Properties or the financial status of the Borrower or Covenantor or any lessee on which the Lender relied in making any advances pursuant to the Loan, which material change, discrepancy or inaccuracy cannot be or is not rectified by the Borrower or Covenantor or lessee (as applicable) within 30 days after written notification thereof by the Lender to the Borrower or to Covenantor or lessee, the Lender shall be entitled to decline to advance any funds pursuant to the Loan and at its option terminate this Commitment or in the event that any funds have already been advanced, to declare any and all amounts advanced together with interest thereon and any costs incurred by the Lender to such date, to be forthwith due and payable.

## 40.   <u>ENTIRE AGREEMENT</u>

This Commitment, together with its schedules and any agreements, instruments and other documents herein contemplated to be entered into between, by or including the parties hereto constitute the entire agreement between the parties hereto pertaining to the subject matter of this Commitment and supersede all prior agreements, understandings, negotiations and discussions,

whether oral or written, with respect thereto. There are no other warranties or representations and no other agreements between the parties hereto in connection with the Loan provided for herein except as specifically set forth in this Commitment and the Borrower's application relating thereto.

## 41.    JOINT AND SEVERAL OBLIGATIONS

If there is more than one Borrower, all payment and performance obligations of the Borrower existing from time to time under this commitment, the Security and all other documents related or entered into pursuant hereto and thereto (collectively, the "Obligations"), shall constitute joint and several obligations of the all the Borrowers and each of them. Each Borrower expressly represents and acknowledges that it is part of a common enterprise with the other Borrowers and that any advances of the Loan made by the Lender to one or more persons who is a Borrower hereunder are and will be of direct and indirect interest, benefit and advantage to each of the Borrowers. Each Borrower acknowledges that any draw request or other notice  or request given by one Borrower to the Lender shall bind each Borrower, and that any notice given by the Lender or its agent to any Borrower shall be effective with respect to all Borrowers. Each Borrower acknowledges and agrees that each Borrower shall be liable, on a joint and several basis, for the Loan and all other Obligations, regardless of which Borrower actually may have received the proceeds of the Loan or other extensions of credit or the amount of such loan received or the manner in which the Lender accounts among the Borrowers for the Loan advanced, or other extensions of credit on its books and records, and further acknowledges and agrees that Loan and other extensions of credit to any Borrower inure to the mutual benefit of all the Borrowers and that the Lender is relying on the joint and several liability of the Borrowers in extending the Loan hereunder.

## 42.    SCHEDULES

The following documents marked "X" are attached as schedules to this Commitment and form a part hereof:

| | | |
|---|---|---|
| X | Schedule A | Standard Construction Conditions |
| X | Schedule B | Standard Charge Terms and Conditions |
| X | Schedule C | Certificate of Identification |
| X | Schedule D | Pre-authorized debit form for automatic deduction from bank account of Borrower to which must be attached a specimen cheque |
| | Schedule E | Specimen of an irrevocable letter of credit to be remitted to the Lender for the Performance Deposit |
| X | Schedule F | Tenant Acknowledgment |
| X | Schedule G | Certified Rent Roll (or a certified rent roll in a form acceptable to the Lender) |
| X | Schedule H | Draw Request |

| X | Schedule I | Draw Certificate |
|---|---|---|
| X | Schedule J | Tax Waiver Side Letter |
| X | Schedule K | Subordination and Non-Disturbance Agreement |
| X | Schedule L | Insurance Requirements |
|   | Schedule M | Certificate of Independent Legal Advice and/or Representation |
| X | Schedule N | Subordination and Standstill Agreement |
| X | Schedule O | Sample form of Architect's Certificate of Opinion |
| X | Schedule P | Deficiency and Completion Agreement |

## 43. DATES OF EXPIRY

43.1    The Security documents shall be properly executed and delivered to the Lender's solicitors, where applicable, in registerable form no later than three (3) business days prior to the First Advance Date and the advance of funds must take place no later than the First Advance Date.

43.2    If on or before the date specified in Section 43.1 the security documents provided to the Borrower or its solicitors have not been so delivered or the first advance has not been made by the First Advance Date, the Lender may at any time thereafter, in its sole discretion, terminate its obligations under this Commitment and may retain the Standby Deposit as liquidated damages.

43.3    The Lender may, at its sole option from time to time, elect to extend the above-mentioned date by which the Security documents are to be executed and delivered or the date by which the Loan is to be advanced or any of the other time periods contained in this Commitment. Notwithstanding any such extension, time shall remain of the essence of this Commitment and all other terms and conditions shall remain unchanged.

## 44. WAIVER

The terms and conditions contained in this Commitment are inserted for the exclusive benefit of the Lender and may be waived in whole or in part by the Lender at any time. No advance, either singularly or collectively, shall constitute a waiver of any of the Borrower's or Covenantor's obligations nor obligate the Lender to make further advances.

The Lender's failure to insist upon a strict performance of any obligation or covenant of this Commitment by the Borrower or Covenantor or to exercise any option or right herein shall not be a waiver, or relinquishment for the future of such obligation or covenant, option or right, but the same shall remain in full force and effect and the Lender shall have the right to insist upon the strict

31

performance by the Borrower or Covenantor of any and all of the terms and provisions of this Commitment and the security documentation.

## 45. COUNTERPARTS

This Commitment may be executed in one or more counterparts, each of which so executed will constitute an original and all of which will constitute one and the same agreement. This Commitment may be executed by any party and transmitted to the other party or parties by facsimile or other electronic means and if so executed and transmitted this Commitment will be for all purposes as effective as if the party in question had delivered an executed original.

ROMSPEN INVESTMENT CORPORATION

By:

Name: MARK HILSON

Title: MANAGING GENERAL PARTNER

I have authority to bind the corporation.

## ACCEPTANCE

We hereby accept the terms and conditions set out in this Commitment and submit the Standby Deposit, on this_____6_____ day of M̶a̶y̶, 2013.
                                          JUNE

Dan White, on behalf of the general partners of the Borrower and Covenantor to be incorporated and formed.

Witness: _____

_____
Per: Dan White


# ADDITIONAL CONDITIONS OF BORROWER AND COVENANTOR

Lender will not put in an offer for the acquisition of the Fort McMurray Property unless and until this commitment to fund the loan is unconditional.

Lender also acknowledges that at the whole and sole discretion of the Borrower and Covenanter this loan facility can be utilized for any other financing needs of the Borrower and Covenanter if the Fort McMurray acquisition transaction is not completed.

## SCHEDULE Q
## PROPERTIES

***Ft. Mac Property:***

Municipal Address:

Legal Description:                    •

Borrower represented
Value of the Property:

Permitted Financial
Encumbrances:                    None.

***Edmonton Property:***

Municipal Address:

Legal Description:                    •

Borrower represented
Value of the Property:            $25,000,000

Permitted Financial
Encumbrances:                    None.