61404825.12

# LOAN AGREEMENT

Between

**3443 ZEN GARDEN LIMITED PARTNERSHIP,**
as Borrower

and

**ROMSPEN MORTGAGE LIMITED PARTNERSHIP**
as Lender

Dated: April 27, 2018

1

# TABLE OF CONTENTS

**Page**

I   DEFINITIONS; PRINCIPLES OF CONSTRUCTION ......... 1
    Section 1.1    Capitalized Terms ......... 1
    Section 1.2    Principles of Construction ......... 1
    Section 1.3    Reference to Specific Property Owners ......... 1
    Section 1.4    Other Business Activities by Guarantors ......... 1

II  GENERAL TERMS ......... 2
    Section 2.1    Acquisition Loan ......... 2
    Section 2.2    Loan Commitment; Disbursement to Borrower ......... 2
    Section 2.3    Additional Loan Advances ......... 3
    Section 2.4    Mandatory Principal Payments ......... 8
    Section 2.5    Application of Payments ......... 8
    Section 2.6    Fees ......... 8
    Section 2.7    Taxes ......... 8

III CONDITIONS PRECEDENT ......... 10

IV  REPRESENTATIONS AND WARRANTIES ......... 11
    Section 4.1    Borrower Representations ......... 11
    Section 4.2    Survival of Representations ......... 18

V   BORROWER COVENANTS ......... 18
    Section 5.1    Existence; Compliance with Legal Requirements ......... 18
    Section 5.2    Hazardous Materials ......... 19
    Section 5.3    Certain Prohibited Actions ......... 19
    Section 5.4    Taxes and Other Charges ......... 19
    Section 5.5    Performance of Agreements ......... 20
    Section 5.6    Notices ......... 20
    Section 5.7    Access to Property ......... 20
    Section 5.8    Compliance ......... 20
    Section 5.9    Cooperation in Legal Proceedings ......... 20
    Section 5.10   Insurance Benefits and Condemnation Awards ......... 20
    Section 5.11   Further Assurances ......... 20
    Section 5.12   Financial Reporting ......... 21
    Section 5.13   Title to the Property ......... 22
    Section 5.14   Estoppel Statements ......... 22
    Section 5.15   Business Purposes; Use of Property ......... 23
    Section 5.16   Contracts ......... 23
    Section 5.17   Maintenance of Property Following Completion; Payment for Labor and Materials; Alterations ......... 23
    Section 5.18   Transfer or Encumbrance of the Property ......... 24
    Section 5.19   ERISA ......... 25
    Section 5.20   Affiliate Transaction ......... 26
    Section 5.21   Service Rights ......... 26
    Section 5.22   Purchase Options ......... 26
    Section 5.23   Confirmation of Representations, Warranties and Covenants ......... 26
    Section 5.24   Subdivision Maps ......... 26
    Section 5.25   Delivery of Business Plan of Borrower ......... 26
    Section 5.26   Equity Contribution ......... 26
    Section 5.27   Anti-Terrorism ......... 26

Section 5.28 Leases ................................................................................................ 27
Section 5.29 After Acquired Property ......................................................................... 28
Section 5.30 Construction Advisor .............................................................................. 29
Section 5.31 Licenses .................................................................................................. 29
Section 5.32 Dividends and Distributions .................................................................. 29
Section 5.33 Condominium Regime ............................................................................ 29

VI CASUALTY; CONDEMNATION; ESCROWS .................................................... 30
Section 6.1 Insurance; Casualty and Condemnation ................................................ 30
Section 6.2 Tax and Insurance Escrows .................................................................... 36
Section 6.3 The Management Agreement .................................................................. 37
Section 6.4 Prohibition Against Termination or Modification ................................ 37
Section 6.5 Replacement of Manager ....................................................................... 37
Section 6.6 Interest Reserve ...................................................................................... 37

VII DEFAULTS ........................................................................................................ 38
Section 7.1 Events of Default .................................................................................... 38
Section 7.2 Remedies ................................................................................................. 40
Section 7.3 Right of Entry ......................................................................................... 42
Section 7.4 Costs of Enforcement ............................................................................. 42
Section 7.5 Violation of Legal Requirements ........................................................... 43
Section 7.6 Remedies Cumulative ............................................................................. 43

VIII TRANSFER OF LOAN AND REFINANCING ................................................. 43
Section 8.1 Lender's Transfers .................................................................................. 43
Section 8.2 Register ................................................................................................... 43
Section 8.3 Participations ........................................................................................... 44
Section 8.4 Waiver .................................................................................................... 44
Section 8.5 Collateral ................................................................................................ 44
Section 8.6 Right of First Opportunity to Offer Permanent Financing ................... 45
Section 8.7 Request .................................................................................................... 45

IX EXCULPATION .................................................................................................. 45
Section 9.1 Full Recourse .......................................................................................... 45
Section 9.2 No Waiver ............................................................................................... 45

X INDEMNIFICATION ......................................................................................... 45
Section 10.1 Indemnification ...................................................................................... 45
Section 10.2 Duty to Defend, Attorneys' Fees and Other Fees and Expenses ......... 45
Section 10.3 Changes in Laws Regarding Taxation .................................................. 46
Section 10.4 No Credits on Account of the Debt ...................................................... 46
Section 10.5 Recording of Security Instrument ......................................................... 46
Section 10.6 Brokers and Financial Advisors ........................................................... 46

XI WAIVERS ............................................................................................................ 47
Section 11.1 Waiver of Counterclaim ........................................................................ 47
Section 11.2 Marshalling and Other Matters ............................................................. 47
Section 11.3 Waiver of Notice ................................................................................... 47
Section 11.4 Trial by Jury .......................................................................................... 47
Section 11.5 Credit Authorization and Consent to Disclosure ................................. 47

XII MISCELLANEOUS ............................................................................................. 50
Section 12.1 Survival ................................................................................................. 50
Section 12.2 Governing Law ...................................................................................... 50

Section 12.3    Modification; Waiver in Writing ..................................................................51
Section 12.4    Delay Not a Waiver .............................................................................................51
Section 12.5    Notices ..................................................................................................................51
Section 12.6    Headings ...............................................................................................................52
Section 12.7    Severability ..........................................................................................................52
Section 12.8    Preferences ...........................................................................................................52
Section 12.9    Expenses ...............................................................................................................53
Section 12.10   Relationship of Borrower and Lender..................................................................53
Section 12.11   No Joint Venture or Partnership; No Third Party Beneficiaries. ........................53
Section 12.12   Publicity ................................................................................................................54
Section 12.13   Subrogation. ..........................................................................................................54
Section 12.14   Duplicate Originals; Counterparts. ......................................................................54
Section 12.15   Liability ................................................................................................................54
Section 12.16   Prior Agreements ..................................................................................................54
Section 12.17   No Usury................................................................................................................54
Section 12.18   Construction ..........................................................................................................55
Section 12.19   Invalidity of a Provision, Principles of Construction, Lender's Discretion ........55
Section 12.20   Lender....................................................................................................................55
Section 12.21   Limitation on Liability..........................................................................................56
Section 12.22   Appointment of Servicer and Delegation of Lender Rights ................................56
Section 12.23   Intentionally Deleted.............................................................................................56
Section 12.24   Advertising............................................................................................................57
Section 12.25   Delay Outside Lender's Control ...........................................................................57
Section 12.26   Signage..................................................................................................................57
Section 12.27   Modification, Waiver in Writing ..........................................................................57
Section 12.28   Set-Off...................................................................................................................57

**SCHEDULES AND EXHIBITS**

SCHEDULE 1.1        DEFINITIONS
SCHEDULE 2.2.2      SOURCES AND USES OF FUNDS
SCHEDULE 3.1        CONDITIONS PRECEDENT
SCHEDULE 4.1(d)     PENDING LITIGATION
SCHEDULE 4.1        DISCLOSURE SCHEDULE
SCHEDULE 4.1(w)     ORGANIZATIONAL STRUCTURE CHARTS
SCHEDULE 5.1.2      RENT ROLL
EXHIBIT A-1         FORM OF U.S. TAX COMPLIANCE CERTIFICATE
EXHIBIT A-2         FORM OF U.S. TAX COMPLIANCE CERTIFICATE
EXHIBIT A-3         FORM OF U.S. TAX COMPLIANCE CERTIFICATE
EXHIBIT A-4         FORM OF U.S. TAX COMPLIANCE CERTIFICATE

6140482S.12

# LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of April 27, 2018 (as such agreement may be amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), is between **ROMSPEN MORTGAGE LIMITED PARTNERSHIP**, an Ontario limited partnership, having an address at 162 Cumberland Street, Suite 300, Toronto, Ontario M5R 3N5 (together with its successors and assigns, "**Lender**"), **3443 ZEN GARDEN LIMITED PARTNERSHIP**, a Texas limited partnership, having an address at 4210 Spicewood Springs Road, Suite 205, Austin, Texas 78759 ("**Borrower**"), and the Borrower Parties listed herein.

## W I T N E S S E T H :

WHEREAS, Borrower desires to obtain the Loan from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the making of the Loan by Lender to Borrower and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I

## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1** Capitalized Terms. All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in **Schedule 1.1** attached hereto.

**Section 1.2** Principles of Construction. All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Whenever the context requires, each gender shall include all other genders. Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular and to the singular include the plural, the part includes the whole, the term "including" is not limiting (and means, including without limitation), and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." Any reference to any of the following documents includes any and all alterations, amendments, restatements, extensions, modifications, renewals, or supplements thereto or thereof, as applicable: this Agreement or any of the other Loan Documents. All exhibits and schedules attached hereto are incorporated herein by reference for all purposes.

**Section 1.3** References to Specific Property Owners. Whenever any provision in this Agreement requires the performance of an action or the making of a representation or warranty which can only be performed or made by the fee simple owner of property, such as the Borrower in relation to the Austin Property or the Edmonton Owners in relation to the Edmonton Property, any reference to the "Borrower Parties" therewith shall mean the fee simple owner of the particular parcel of Property.

**Section 1.4** Other Business Activities by Guarantors. Lender acknowledges that the Guarantors are actively engaged in other business activities ("**Other Business Activities**") and that, notwithstanding any other provision of this Agreement or the other Loan Documents, Guarantors' engagement in such Other Business Activities, in and of itself, shall not constitute an Event of Default under this Agreement or the other Loan Documents, unless such Other Business Activities subsequently shall cause a Material Adverse Change.

## II    GENERAL TERMS

### Section 2.1    Acquisition Loan.

(a)    Acquisition Loan.    Romspen Investment Corporation, an Ontario corporation and an Affiliate of Lender ("**RIC**"), previously made a loan ("**Acquisition Loan**") to Lot 11 Limited Partnership, an Alberta limited partnership and Absolute Energy Resources, Inc., an Alberta corporation (the "**Edmonton Owners**"), pursuant to that certain Amended and Restated Commitment Letter dated as of July 30, 2015 by and between RIC and Lot 11 and AER, as amended by: (i) Supplement No. 1, dated as of August 31, 2015; (ii) Supplement No. 2, dated as of May 31, 2016; (iii) Supplement No. 3, dated as of June 17, 2016; (iv) Supplement No. 4, dated as of July 29, 2016; (v) Supplement No. 5, dated as of November 9, 2016; and (vi) Supplement No. 6, dated as of July 21, 2017; (as amended from time to time and as modified and supplemented hereby, the "**Acquisition Loan Agreement**"), and guaranteed by (among others) Borrower pursuant to that certain guarantee dated as of August 19, 2016 from Borrower to RIC (together with any amendment, reaffirmation, ratification or modification thereto, "**Acquisition Guaranty**"), and secured by, among other things: (x) that certain mortgage dated September 25, 2013 and registered as Instrument No. 132335491 in the Alberta Land Title Offices (together with any amendment or modification thereto, "**Prior Acquisition Security Instrument**"); and (y) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 14, 2016, recorded on November 14, 2016 under Document No. 2016189773 in the Official Property Records of Travis County, Texas (together with any amendment or modification thereto, "**Prior Austin Security Instrument**," and together with the Acquisition Loan Agreement, the Acquisition Note, the Prior Acquisition Guaranty, the Prior Acquisition Security Instrument, and each other document evidencing or securing the Acquisition Loan, each as may be amended or modified from time to time, the "**Acquisition Loan Documents**"). The current outstanding principal amount of the Acquisition Loan is CAD \$35,479,831.72 as of April 17, 2018, accruing at a per diem amount thereafter (until the end of April 2018) of CAD \$9,811.56.

(b)    Payoff of Acquisition Loan.    As set forth in Section 2.2.2 below, the Term Tranche (as reflected on Sources of Uses and Funds) shall be used for the repayment in full of the Acquisition Loan on the Closing Date. Upon the funding of the Term Tranche and repayment of the Acquisition Loan to RIC, Lender shall cause RIC to execute releases and/or discharges of the Acquisition Loan Documents (as necessary) and deliver same to the Title Company or such other Person for recording and/or registration (as applicable) and/or Borrower.

(c)    RELEASE.    AS A MATERIAL PART OF THE CONSIDERATION FOR EACH PARTY'S EXECUTION OF THIS AGREEMENT, BORROWER PARTIES AND RIC, LENDER AND ALL OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, LOAN SERVICING AGENTS, ATTORNEYS, AFFILIATES AND SUBSIDIARIES ("LENDER PARTIES") HEREBY EACH UNCONDITIONALLY AND IRREVOCABLY JOINTLY AND SEVERALLY RELEASE AND FOREVER DISCHARGE THE OTHER FROM ANY AND ALL LIABILITIES, OBLIGATIONS, ACTIONS, CLAIMS, CAUSES OF ACTION, SUITS, PROCEEDINGS, DEMANDS, DAMAGES, COSTS AND EXPENSES OF EVERY KIND WHATSOEVER, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES, ARISING FROM OR RELATING TO ANY ALLEGED ACT, OCCURRENCE, OMISSION OR TRANSACTION OF WHATSOEVER NATURE OCCURRING OR HAPPENING WITH RESPECT TO OR ARISING OUT OF THE ACQUISITION LOAN AND THE ACQUISITION LOAN DOCUMENTS.

### Section 2.2    Loan Commitment; Disbursement to Borrower.

**Section 2.2.1    Loan Commitment.**    Subject to the terms and conditions set forth herein, including satisfaction of the Conditions Precedent set forth in **Schedule 2.2** hereof and the requirements of Section 2.2, Lender agrees to make the Loan available to Borrower in multiple advances from time to time during the Availability Period in a maximum aggregate principal amount ("**Maximum Loan Principal Amount**") not to exceed at any time the lesser of: (i) sixty-five percent (65%) of the value of the Property as determined by the most recent appraisal received by Lender (at Borrower's cost) performed by an appraiser

satisfactory to Lender, and (ii) One Hundred Twenty-Five Million and 00/100 U.S. Dollars (USD$125,000,000.00). The Loan shall bear interest and otherwise be payable as provided in the Note and this Agreement; provided, however, that in any event, the principal balance, all accrued but unpaid interest and all other sums owing on the Loan shall be due and payable in full on the Maturity Date or earlier, if the Note is accelerated pursuant to this Agreement or any of the other Loan Documents. Any holder of the Note shall be entitled to the benefits of this Agreement and the other Loan Documents. Borrower may not re-borrow any principal amount repaid in respect of the Loan, unless the Note is amended to provide for such re-borrowing. Borrower and the Borrower Parties are either Affiliates or under common ownership or control and as such, the Borrower Parties acknowledge and agree that each Borrower Party has a direct interest and will obtain direct benefits from the making of the Loan by Lender to Borrower.

**Section 2.2.2    Use of Proceeds.** Borrower shall use the proceeds of the Loan in accordance with the terms of the Loan Documents, including, without limitation, the Sources and Uses of Funds set forth on **Schedule 2.2.2**, and for no other purpose. On the Closing Date, Borrower shall receive (i) one (1) borrowing hereunder with respect to the Term Tranche necessary to repay to RIC the U.S. Dollar equivalent of the outstanding amount of the Acquisition Loan as of the Closing Date (which amount is CAD $35,479,831.72 as of April 17, 2018, accruing at a per diem amount thereafter (until the end of April 2018) of CAD $9,811.56. RIC will use the USD/CAD exchange rate it customarily uses for currency conversions; (ii) one (1) borrowing hereunder with respect to the Infrastructure Tranche (as reflected on the Sources of Uses and Funds) in the amount to be shown on Lender's Initial Advance statement, and (iii) one (1) borrowing hereunder with respect to the Buildings F, H and J Tranche (as reflected on the Sources of Uses and Funds) in the amount to be shown on Lender's Initial Advance statement. Such amounts are collectively referred to herein as the "**Initial Advance**", and the proceeds of which shall be applied in accordance with the Sources and Uses of Funds and each Building Budget. Additionally, a portion of the initial Loan Advance shall be used to fund the Interest Reserve Fund (as hereinafter defined) and as such, not disbursed on the Closing Date but rather pursuant to the provisions of Section 6.6 below.

**Section 2.3    Additional Loan Advances.** During the Availability Period, subject to compliance by Borrower with the terms and conditions of this Agreement, including but not limited to, satisfaction of the conditions precedent set forth in **Schedule 2.2** hereof, Borrower may request additional advances of the Loan (each, an "**Additional Advance**") not more frequently than twice per month during the first three (3) months of the Loan Term and thereafter once per month (in the aggregate as to Additional Advances) for: (i) Infrastructure Expenditures; and (ii) Buildings F, H and J Expenditures each in an amount of not less than Two Hundred Thousand and 00/100 Dollars (USD$200,000.00); by submitting to Lender a written request in the form set forth as **Part C** of **Schedule 2.2** hereof signed by an authorized representative of Borrower (each a "**Request for Advance**"), subject to satisfaction of the following terms and conditions:

(i)    each Request for Advance shall state the purpose and use of the funds to be received as a result of such Additional Advance;

(ii)    each Request for Advance shall include: (1) the proposed amount of the requested Additional Advance; and (2) the proposed disbursement date of the requested Additional Advance, which disbursement date must be a Business Day and must be at least ten (10) Business Days after the date of delivery to the Lender the Request for Advance; and (3) delivery of the following documents:

(A)    Certification by the Lender's Construction Advisor (or by an architect, engineer or other qualified inspector acceptable to Lender) that all construction, to and through the date of the closing of the particular Advance, has been performed in accordance with the applicable Plans and Specifications, conforms to all applicable Legal Requirements, and is satisfactory to the Lender in all material respects.

(B)    Interim Sworn Affidavit of the applicable General Contractor, confirming the names and addresses of all subcontractors and suppliers who or which have rendered materials and/or services to the Project since the date of the last update to the Title Policy, together with original

releases of lien from all parties paid from the immediately preceding draw request, and stating the amounts owed at the time of Closing to all such subcontractors and suppliers.

(C)     General Contractor's Interim Lien Release, executed by the General Contractor and releasing all lien rights for work for which payment has been made, reserving the right to the release of any retainage.

(D)     Consents from all other parties who entered into contracts for provision of materials and/or services to the Project after the date of Closing of the Loan as the Lender reasonably may require, to the Assignments and Consents affecting their contracts and agreements being assigned, and from any guarantors of the performance of the obligations of such parties under such contracts and agreements, thereof, together with the confirmation by such parties that they will continue to perform and guaranty performance of such contracts and agreements, as the case may be, after enforcement of and realization on such Assignment and Consents by Lender.

(E)     Copies of all permit inspections issued by Governmental agencies since the date of the immediately preceding request for an Additional Advance.

(F)     Copies of all invoices that will be paid upon disbursement of such Additional Advance or for which Borrower will receive reimbursement for prior payment, upon receipt of such Additional Advance;

(G)     Such other information, papers, instructions and documents as the Title Insurer may require for the issuance of endorsements to the Title Insurance Policy, showing the Austin Security Instrument continues to be a first position lien as to the Austin Property and describing any other encumbrance affecting the Austin Property since the date of issuance of the Title Insurance Policy.

(iii)     Periodically, at the request of the General Contractor, in addition to the regular Requests for Advance, Borrower shall have the right to make unscheduled Requests for Advance for "large-ticket" items as required by the progress of the Work. Approval of such "large-ticket" Requests shall be in the sole discretion of the Lender.

(iv)     If Borrower revokes a Request for Advance, Borrower shall pay to Lender all costs and expenses incurred by Lender as a result of such revocation;

(v)     Lender may, in its discretion, or Borrower may request that Lender, make a direct payment to any contractor (rather than reimbursement). Lender shall make such payment to such contractors, as requested by Borrower, following receipt of a conditional lien waiver conditioned solely upon payment of such contractor's invoices then due, followed by a lien waiver (with no conditions) following such direct payment.

(vi)     each Request for Advance, once delivered to Lender, shall, unless otherwise stated, constitute a representation, warranty, and certification by Borrower as of the date of that Request for Advance that:

(A)     both before and after the making of the Request for Advance, all of the Loan Documents are valid, binding, and enforceable against each Borrower Party, as applicable;

(B)     all terms and conditions precedent to the making of the Request for Advance, including the applicable conditions precedent set forth in **Schedule 2.2** hereof are satisfied, and shall remain satisfied through the date of the requested Additional Advance;

(C)     the making of the requested Additional Advance shall not cause the aggregate principal amount of all Advances under the Loan to exceed the Maximum Loan Principal Amount;

(D)    to the best of the Borrower Parties' knowledge, no Event of Default has occurred or is in existence, and no Event of Default exists or will arise on the making of the requested Additional Advance;

(E)    the representations and warranties contained in this Agreement and the other Loan Documents are true and correct in all material respects and will be true and correct in all material respects upon the making of the requested Additional Advance;

(F)    the Request for Advance does not violate the terms or conditions of any contract, indenture, agreement, or other borrowing of any Borrower Party; and

(G)    the requested Additional Advance will be used for the items set forth on the Sources and Uses of Funds and the applicable Budget for which Borrower is requesting such Additional Advance, and such Request for Advance shall not exceed the amount allocated for such purpose set forth on the Sources and Uses of Funds and the Applicable Budget (unless otherwise approved by Lender, in its sole discretion);

(vii)    Lender may withhold from all Additional Advances amounts necessary to comply with applicable statutory mechanics' lien retainage requirements;

(viii)    in addition, prior to any Additional Advance for the payment of Infrastructure Expenditures:

(A)    Lender shall have: (1) approved the Infrastructure Plans and Specifications; (2) received copies of all necessary Licenses and Permits relative to the Infrastructure Work and evidence that the same are in full force and effect; (3) approved of the Construction Schedule relating to the Completion of the Infrastructure Work; (4) approved each of the General Contractor Agreement and the Architect Agreement (as applicable) relative to the Infrastructure Work to be executed by Borrower with a Lender-approved General Contractor and a Lender-approved Architect (as applicable), and received an Assignment and Consent from each such party; (5) approved (prior to their execution) of all Construction Contracts then in effect relative to the Infrastructure Work and upon Lender's request, received an executed Assignment and Consent for each applicable party who is to receive proceeds of such Additional Advance for the payment of Infrastructure Expenditures; (6) received a list of all Project Documents in effect as of the date of such Request for Advance and copies of any new Project Documents executed after the Closing Date or the date of the last Request for Advance, as the case may be; and (7) received confirmation that all Taxes for the Austin Property that have become due and payable through such date have been paid (or are being properly contested pursuant to the terms set forth in Section 5.4 below) and all insurance premiums attributable to the Policies that have become due and payable as of such date have been paid;

(B)    Lender's Construction Advisor (or an architect, engineer or other qualified inspector acceptable to Lender) shall have certified that the applicable work with respect to which the Additional Advance for the payment of Infrastructure Expenditures has been requested has been completed in good and workmanlike manner in accordance with all applicable Legal Requirements and the Infrastructure Plans and Specifications;

(C)    in no event shall the amount of any Additional Advance requested with respect to any Infrastructure Expenditure be for an amount more than the amount set forth in the Infrastructure Budget with respect to such Infrastructure Expenditure unless Lender has otherwise approved any change order and modification to the Infrastructure Budget;

(D)    in no event will the aggregate of all Additional Advances actually made hereunder for the payment of Infrastructure Expenditures exceed USD$17,000,000.00 (the "**Infrastructure Tranche Maximum**");

(E)     Lender shall have determined that no Balancing Event shall have occurred as to the Infrastructure Expenditures (or Borrower shall have delivered immediately available funds to Lender in the amount necessary to avoid a Balancing Event as to the Infrastructure Expenditures, which funds shall be disbursed to Borrower for the payment of Infrastructure Expenditures prior to the making of any further Additional Advances for the payment of Infrastructure Expenditures);

(F)     Lender's Construction Advisor (or an architect, engineer or other qualified inspector acceptable to Lender) has certified that the Infrastructure Work is progressing in material compliance with the Construction Schedule approved by Lender, subject to extension in the event of *Force Majeure*; and

(ix)     in addition, prior to any Additional Advance for the payment of Buildings F, H and J Expenditures:

(A)     Lender shall have (1) approved the Building F Plans and Specifications, the Building H Plans and Specifications, and/or the Building J Plans and Specifications, as applicable, (2) received copies of all necessary Licenses and Permits relative to the Building F Work, the Building H Work, and/or the Building J Work, as applicable, and evidence that the same are in full force and effect; (3) approved of the Construction Schedule relating to the Completion of the Building F Work, the Building H Work, and/or the Building J Work, as applicable; (4) approved each of the General Contractor Agreement and the Architect Agreement (as applicable) relative to the Building F Work, the Building H Work, and/or the Building J Work, as applicable, to be executed by Borrower with a Lender-approved General Contractor and a Lender-approved Architect (as applicable), and received an Assignment and Consent from each such party; (5) approved (prior to their execution) of all Construction Contracts then in effect relative to the Building F Work, the Building H Work, and/or the Building J Work, as applicable, and upon Lender's request, received an executed Assignment and Consent for each applicable party who is to receive proceeds of such Additional Advance for the payment of Buildings F, H and J Expenditures; (6) received a list of all Project Documents in effect as of the date or the date of the last Request for Advance and copies of any new Project Documents executed after the Closing Date or the date of the last Request for Advance, as the case may be; and (7) received confirmation that all Taxes for the Austin Property that have become due and payable through such date have been paid (or are being properly contested pursuant to the terms set forth in Section 5.4 below) and all insurance premiums attributable to the Policies that have become due and payable as of such date have been paid;

(B)     Lender's Construction Advisor (or an architect, engineer or other qualified inspector acceptable to Lender) shall have certified that the applicable work with respect to which the Additional Advance for the payment of Buildings F, H and J Expenditures has been requested has been completed in good and workmanlike manner in accordance with all applicable Legal Requirements and the Building F Plans and Specifications, the Building H Plans and Specifications, and/or the Building J Plans and Specifications, as applicable;

(C)     in no event shall (i) the amount of any Additional Advance requested with respect to any Building F Expenditure be for an amount more than the amount set forth in the Building F Budget with respect to such Building F Expenditure unless Lender has otherwise approved any change order and modification to the Building F Budget, (ii) the amount of any Additional Advance requested with respect to any Building H Expenditure be for an amount more than the amount set forth

in the Building H Budget with respect to such Building H Expenditure unless Lender has otherwise approved any change order and modification to the Building H Budget, and (iii) the amount of any Additional Advance requested with respect to any Building J Expenditure be for an amount more than the amount set forth in the Building J Budget with respect to such Building J Expenditure unless Lender has otherwise approved any change order and modification to the Building J Budget;

(D)     in no event will the aggregate of all Additional Advances actually made hereunder for the payment of Buildings F, H and J Expenditures exceed USD$46,000,000.00 (the "**Buildings F, H and J Tranche Maximum**");

(E)     Lender shall have determined that no Balancing Event shall have occurred as to the Buildings F, H and J Expenditures (or Borrower shall have delivered immediately available funds to Lender in the amount necessary to avoid a Balancing Event as to the Buildings F, H and J Expenditures, which funds shall be disbursed to Borrower for the payment of Buildings F, H and J Expenditures prior to the making of any further Additional Advances for the payment of Buildings F, H and J Expenditures);

(F)     Lender has determined that the Building F Work, the Building H Work, and/or the Building J Work, as applicable, is progressing in material compliance with the Construction Schedule approved by Lender, subject to extension in the event of *Force Majeure*; and

(G)     upon Completion of the Building F Work, the Building H Work, and/or the Building J Work, as applicable, if required by Lender, Borrower shall deliver to Lender an Officer's Certificate certifying: (i) the aggregate amount of costs incurred in connection with the Completion of the Building F Work, the Building H Work, and/or the Building J Work, as applicable, noting all such costs not yet paid by Borrower, (ii) that no portion of the Loan proceeds to be applied towards the Building F Work, the Building H Work, and/or the Building J Work, as applicable, has been applied to pay or reimburse any costs or expenses other than the applicable construction costs, together with interest and fees incurred in connection with the Building F Work, the Building H Work, and/or the Building J Work, as applicable, and (iii) that all work has been completed in accordance with all Legal Requirements and the Project Documents.

(x)     in addition, Borrower agrees to the following with respect to Additional Advances for the payment of Buildings F, H and J Expenditures:

(A)     Lender shall fund Building F Expenditures up to an amount necessary to cause Building F to be in a tenant-ready condition; and

(B)     Lender shall fund Building H Expenditures and Building J Expenditures up to an amount necessary to complete the shell construction of Building H and Building J. Any additional amounts to be funded in connection with Building H Expenditures or Building J Expenditures shall be conditioned upon Borrower executing binding Leases with tenants approved by Lender for Building H and Building J, as applicable, which Leases shall be on market terms (approved by Lender) for initial terms of no less than three (3) years.

(xi)     Prior to Lender making the final Additional Advance hereunder, Borrower shall be required to deliver to Lender an "as-built" Survey and a certificate of occupancy of the Austin Property, together with a certification by Lender's Construction Advisor (or by an architect, engineer or other qualified inspector acceptable to Lender) as to the Completion of the Infrastructure Work, the Building F Work, and Building H Work and the Building J Work.

The requesting of any Additional Advance shall constitute, without the necessity of specifically containing a written statement to such effect, a confirmation, representation and warranty by Borrower to Lender that all of the applicable conditions to be satisfied in connection with the making of such Additional Advance have been satisfied (unless waived in writing by Lender) and that all of the representations and

    warranties of Borrower set forth in the Loan Documents are materially true and correct as if made on (and with respect to facts and circumstances existing as of) the date on which such Additional Advance is made, except as otherwise permitted by the terms and conditions hereof.

Even if Borrower is divested, for whatever reason, of any portion of Borrower's or the Borrower Parties' interest in the Austin Property, Lender may, at Lender's sole reasonable option, but without any obligation to do so, continue to make Additional Advances under this Agreement to Borrower or, subject to all terms and conditions of this Agreement, to that Person or Persons that succeed to Borrower's or the Borrower Parties' title and interest in the Property; *provided, however*, that all sums so disbursed shall be deemed Advances under this Agreement and be secured by the Security Instruments and all other Liens or security interests securing the Debt.

The amount and date of each Advance under the Loan, the principal balance from time to time outstanding under the Loan, the interest rate with respect to the Loan, the amount and date of any repayments of the Loan under this Agreement or under the Note, and the amount and date of the application of any Escrow Funds held by the Lender ("**Book Transactions**") shall be noted on Lender's books and records, which, absent manifest error, shall be conclusive evidence of each such Book Transaction; *provided, however*, that any failure by Lender to make such notation or any error in such notation, shall not relieve Borrower of its obligation to pay to Lender all amounts actually owed to Lender when due under the terms of the Loan Documents. Upon Borrower's request and subject to Borrower's payment of Lender's standard fee therefor, Lender shall provide written notice to Borrower of such Book Transactions.

**Section 2.4** Mandatory Principal Payments. If the outstanding principal amount of the Loan at any time exceeds the Maximum Loan Principal Amount, Borrower shall immediately upon Lender's request pay to Lender in immediately available funds an amount sufficient to reduce the outstanding principal amount of the Loan so that it does not exceed the Maximum Loan Principal Amount. Furthermore, Borrower shall promptly pay to Lender all Insurance Proceeds and Awards as more particularly provided in Article VI of this Agreement. Borrower shall pay the entire Debt to Lender on the Maturity Date.

**Section 2.5** Application of Payments. Absent a Declaration of Default by Lender, all payments received by Lender shall be applied: (i) first, to pay any outstanding costs, expenses, or fees owed to Lender or any Affiliate pursuant to this Agreement or any other Loan Documents until such amounts have been paid in full, (ii) second, to pay interest due on the Loan until paid in full, and (iii) third, to pay principal on the Loan, in the inverse order of maturity, until paid in full. All payments received by Lender, whether or not received during the continuation of an Event of Default, shall be applied by Lender to payment of the Debt in any order or priority that Lender in its sole discretion may elect.

**Section 2.6** Fees. On the date of execution of this Agreement, Borrower shall pay to Lender or its Affiliate(s) all fees incurred by Lender, including but not limited to the Origination Fee as a fee for Lender or its Affiliate(s) arranging the Loan and all other fees listed in the Loan Term Sheet. Borrower shall pay to Lender or its Affiliate(s) an advance fee of $1,000 on the date of each Advance of the Loan under this Agreement.

**Section 2.7** Taxes.

(a) Payments Free of Taxes. Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Legal Requirements. If any applicable Legal Requirement (as determined in the good faith discretion of Borrower or Lender) requires the deduction or withholding of any Taxes from any such payment by Borrower, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Legal Requirements. If such Tax is an Indemnified Tax, the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by Borrower. Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Legal Requirements, or at the option of the Lender timely reimburse it for the payment of, any Other Taxes.

    (c)    Indemnification by Borrower. Borrower shall indemnify Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

    (d)    Evidence of Payments. As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this Section 2.7, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

    (e)    Status of Lender.

    (i)    Lender, if reasonably requested by Borrower, shall deliver such documentation prescribed by applicable Legal Requirements or otherwise reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.

    (ii)    Without limiting the generality of the foregoing, in the event that Borrower is a U.S. Person:

    (A)    Lender shall deliver to Borrower (in such number of copies as shall be requested by Borrower) on or prior to the date hereof (and from time to time thereafter upon the reasonable request of Borrower), whichever of the following is applicable:

    1)    if Lender is claiming the benefits of an income tax treaty to which the United States is a party: (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty; and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

    2)    executed originals of IRS Form W-8ECI;

    3)    if Lender is claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit A-1** to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed originals of IRS Form W-8BEN; or

    4)    to the extent Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of **Exhibit A-2** or **Exhibit A-3**, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable, provided that if the Lender is a partnership and one or more direct or indirect partners of such Lender are claiming the portfolio interest exemption, such Lender may provide a U.S. Tax Compliance Certificate substantially in the form of **Exhibit A-4** on behalf of each such direct and indirect partner;

    (B)    Lender shall deliver to Borrower (in such number of copies as shall be requested by the recipient) on or prior to the date hereof (and from time to time thereafter upon the reasonable request of Borrower), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such

supplementary documentation as may be prescribed by applicable law to permit Borrower to determine the withholding or deduction required to be made; and

(C)    if a payment made to Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that Lender has complied with Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. (All of the foregoing documents described in (A) through (C) above shall be referred to as the "Tax Exemption Documents").

If Lender fails or refuses timely to provide any of the Tax Exemption Documents to Borrower: (i) Borrower shall be entitled to pay or withhold any Tax as required by applicable Legal Requirements in the absence of the delivery of such Tax Documents; and (ii) the provisions of Sections 2.7(a) and 2.7(c) shall not be applicable. Lender agrees that if any Tax Exemption Document it previously delivered expires or becomes obsolete or inaccurate in any respect to Lender's knowledge, it shall update such Tax Exemption Document or promptly notify Borrower of its legal inability to do so.

(f)    Treatment of Certain Refunds. If any Party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has received an indemnification payment pursuant to this Section 2.7 (including by the payment of additional amounts pursuant to this Section 2.7), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying Party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified Party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified Party be required to pay any amount to an indemnifying Party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid, apart from the payment of the Tax Refund itself.

(g)    Survival. Each party's obligations under this Section 2.7 shall survive any assignment of rights by Lender, the termination of this Agreement, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

## III

## CONDITIONS PRECEDENT

**Section 3.1**    As a material inducement to Lender to make the Initial Advance under the Loan on the Closing Date, Borrower hereby represents and warrants to Lender that Borrower has satisfied all of the conditions precedent set forth in Part A on **Schedule 3.1** attached hereto, and Borrower acknowledges that Lender would not fund the Initial Advance under the Loan on the Closing Date unless all of such conditions precedent were so satisfied (or waived by Lender) by the Closing Date. The obligation of Lender to make the Initial Advance under the Loan on the Closing Date is subject to the condition precedent that Borrower has satisfied all of the conditions precedent set forth in Part A on **Schedule 3.1** attached hereto. Furthermore, the obligation of Lender to make any Additional Advances under the Loan after the Closing Date is subject to, in addition to the requirements set forth in Section 2.2 hereof, the condition precedent that Borrower has satisfied all of the conditions set forth in Parts A and B on **Schedule 3.1** attached hereto prior to each Additional Advance.

## IV      REPRESENTATIONS AND WARRANTIES

**Section 4.1      Borrower Representations.**  Borrower represents and warrants to the Lender as of the date hereof and as of the Closing Date (if such date is different), except as otherwise disclosed on the Disclosure Schedule attached hereto as **Schedule 4.1** that:

(a)      **Organization.**  Borrower has been duly organized and is validly existing and in good standing in the jurisdiction in which it is organized.  Borrower is duly qualified to do business and is in good standing in the state in which the Austin Property is located and in each jurisdiction where Borrower is required to be so qualified in connection with its properties, businesses and operations.  Borrower has all necessary rights, Licenses, permits, authorizations, approvals, governmental and otherwise, and full power and authority to own the Austin Property and carry on its business as now conducted.  Borrower has the full right, power and authority to operate, renovate, construct, lease and develop the Austin Property, to encumber the Austin Property as provided herein and to perform all of the other obligations to be performed by Borrower under the Loan Documents.  The sole business of Borrower is the ownership, renovation, construction, development, management and operation of the Austin Property.

(b)      **Enforceability.**  Each Borrower Party has taken all necessary action to authorize the execution, delivery and performance of the obligations of this Agreement and the other Loan Documents to which it is a party, and such obligations shall be the valid and binding obligations of the respective Borrower Parties.  This Agreement and such other Loan Documents to which each Borrower Party is a party have been duly executed and delivered by or on behalf of each Borrower Party and each Borrower Party has obtained or received all required consents and approvals, corporate, governmental or otherwise, and this Agreement and such other Loan Documents to which each Borrower Party is a party constitute legal, valid and binding obligations of each such Borrower Party enforceable against each such Borrower Party in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting rights of creditors generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by any Borrower Party, including the defense of usury or similar doctrines, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable except to the extent such unenforceability may be the result of bankruptcy, insolvency, reorganization or similar laws affecting rights of creditors generally or general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

(c)      **No Conflicts.**  The execution and delivery of this Agreement and the other Loan Documents and the performance of the obligations thereunder by the Borrower Parties will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, operating agreement, certificate of incorporation, bylaws or any other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, License, registration or qualification of or with any court or any such regulatory authority or other Governmental Authority or body required for the execution, delivery and performance by the Borrower Parties of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

(d)      **Litigation.**  There are no actions, suits, proceedings or investigations at law or in equity now pending or, to Borrower's best knowledge, threatened against or affecting any Borrower Party or the Property, other than as previously disclosed to Lender by Borrower or as described on **Schedule 4.1(d)**.

(e)      **Agreements.**  Neither Borrower nor any Borrower Party is a party to any agreement or instrument or subject to any restriction, which could have a Material Adverse Effect on Borrower,

that Borrower Party or the Austin Property. Neither Borrower nor any Borrower Party is in default in any respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower or a Borrower Party is a party or by which Borrower, a Borrower Party or the Austin Property is bound. Borrower has no Indebtedness under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than: (a) obligations incurred in the ordinary course of the operation, renovation, construction and development of the Property and (b) obligations under the Loan Documents.

(f) **Title.** Borrower has good, marketable and insurable fee simple title to the real property comprising the Austin Property, free and clear of all Liens whatsoever except the Permitted Encumbrances. There are no options, rights of first refusal, rights of first offer or similar rights, which affect the Austin Property or any portion thereof except as previously disclosed to Lender in writing. Each of Lot 11 Limited Partnership and Eco-Industrial Business Park Inc., as applicable, has good, marketable and insurable fee simple title to the real property comprising the Edmonton Property, free and clear of all Liens whatsoever except the Permitted Encumbrances. There are no options, rights of first refusal, rights of first offer or similar rights, which affect the Edmonton Property or any portion thereof except as previously disclosed to Lender in writing.

(g) **Boundaries.** All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property, except those which are insured against by the Title Insurance Policy.

(h) **Purchase Options.** Neither the Property nor any part thereof or interest therein are subject to any purchase options, rights of first refusal or offer to purchase or other similar rights in favor of third parties.

(i) **No Bankruptcy Filing.** (A): (i) Borrower is solvent (within the meaning of all Bankruptcy Laws) and no bankruptcy, reorganization, insolvency or similar proceeding with respect to any Borrower Party under any Bankruptcy Law has been initiated, and (ii) the entering into the Loan Documents to which any Borrower Party is a party does not constitute a fraudulent conveyance by any Person; and (B) no petition in bankruptcy has been filed by or against Borrower in the last seven (7) years, and Borrower has not, in the last seven (7) years, ever made any assignment for the benefit of creditors or taken advantage of any applicable Bankruptcy Laws. No Borrower Party has entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and each Borrower Party has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities and its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of the obligations of Borrower).

(j) **Full and Accurate Disclosure.** No statement of fact made by any of the Borrower Parties in this Agreement or in any of the other Loan Documents, nor any written materials relating to the business, operations or condition (financial or otherwise) of any of the Borrower Parties or the Property that were supplied to Lender in connection with Lender's due diligence investigation contains (or, in the case of such written material, at the time supplied contained) any untrue statement of a material fact or omits (or omitted, as the case may be) to state any material fact necessary to make the statements contained therein or in any of the Loan Documents not misleading.

(k)     Regulatory. None of the Borrower Parties is an "**employee benefit plan**" (as defined in Section 3(3) of ERISA), subject to Title I of ERISA, and none of the assets of the Borrower Parties constitutes or will constitute "**plan assets**" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (i) none of the Borrower Parties is a "**governmental plan**" within the meaning of Section 3(32) of ERISA and (ii) transactions by or with any of the Borrower Parties are not subject to state statutes regulating investments of, and fiduciary obligations with respect to, governmental plans. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "**margin stock**" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents. Borrower is not a "**foreign person**" within the meaning of § 1445(f)(3) of the Code. Borrower is not (i) an "**investment company**" or a company "**controlled**" by an "**investment company**," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate Borrower's ability to borrow money.

(l)     FIRPTA. Borrower is not a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

(m)     Compliance. Borrower, Borrower Parties and the Austin Property and the uses thereof comply with all applicable Legal Requirements. Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, and all required zoning, building code, land use, environmental, development plan, preliminary site plan, subdivision, and other similar permits or approvals (collectively, the "**Licenses**") necessary for the operation, renovation, construction and development of the Austin Property for its current uses and for the conduct of Borrower's and the Borrower Parties' businesses and all such Licenses remain in full force and effect. None of the foregoing are subject to revocation, suspension, forfeiture or modification. Neither Borrower nor the Borrower Parties, nor the Property is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower, any Borrower Party or any other Person in occupancy of or involved with the operation, development, or use of the Austin Property any act or omission affording the federal government or any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's or the Borrower Parties' obligations under any of the Loan Documents. The use and development of the Austin Property contemplated thereby comply and shall at all times comply with applicable Legal Requirements, including all applicable zoning resolutions, zoning ordinances, development requirements, building codes and environmental laws. There are no outstanding notices of any uncorrected violations of any Legal Requirements with respect to the Austin Property, and Borrower is not aware of the threat of any such notices.

(n)     Financial Information.

(i)     The balance sheet, income statement and statements of cash flow and other financial data that have been delivered to Lender in respect of the Austin Property and each applicable Borrower Party, including those required under Article III: (A) are true, complete and correct; (B) accurately represent the financial condition of the Austin Property and/or the applicable Borrower Party as of the date of such reports or statements and contain no misrepresentation or omission; and (C) have been prepared in accordance with Acceptable Accounting Principles consistently applied throughout the periods covered, except as disclosed therein; and (D) have not been amended, modified or revised in any manner. Borrower does not have any Indebtedness, liabilities, contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that could have a Material Adverse Effect, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no Material Adverse Change in the financial condition, operations or business of Borrower, or the Austin Property, or the Austin Property from that set forth in said financial statements.

(ii)     Each Borrower Party has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. No

Borrower Party knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

(o)    Casualty; Condemnation and Assessments.    The Property is free from any material damage by Casualty. No Condemnation or other proceeding has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of any roadways providing access to the Property or for any easements or public right-of-ways, except with respect to the Austin Property for that cause of action styled *"Central Texas Regional Mobility Authority and the State of Texas, Condemnor, vs. MOS8 Partners, Ltd., a Texas limited partnership, MOS8 GP LLC, in its capacity as General Partner, Condemnees,"* Cause No. C-1-CV-15-010397 in the Probate Court of Travis County, Texas, the rights to condemnation proceeds or compensation for taking granted thereunder have been assigned to Borrower by the named Condemnees thereunder (the **"Pending Austin Condemnation"**). There are no pending or proposed special or other assessments for public improvements affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments, and to Borrower's knowledge, there are no other facts or circumstances which would cause the Taxes and Other Charges for the Property for the Fiscal Year in which the Closing Date occurs or the next following Fiscal Year to be significantly higher than the Taxes and Other Charges for the Property assessed and imposed for the Fiscal Year prior to the Fiscal Year in which the Closing Date occurs.

(p)    Insurance.    Borrower has obtained and has delivered to Lender a certificate of insurance reflecting the insurance coverages, amounts and other requirements set forth in this Agreement and there have been no acts or omissions that would impair the coverage of any such Policies or the benefits of the mortgage endorsements, and Borrower shall deliver to Lender certified copies of all such Policies within five (5) Business Days following the date of this Agreement.

(q)    Flood Zone.    None of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards or, if any portion of the Improvements or the Property is located within such area, Borrower has obtained and will maintain the insurance prescribed in Section 6.1.1(a)(iv).

(r)    Filing and Recording Taxes, Taxes.    All transfer taxes, recording taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes or recording taxes, charges or fees or similar charges required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid or will be paid on the Closing Date. All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Security Instruments, have been paid.

(s)    Single-Purpose.

(i)    Borrower hereby represents and warrants to, and covenants with, Lender that as of the date hereof and until such time as the Debt shall be paid in full:

(A)    Borrower has not owned, does not own and will not own any asset or property other than (1) the Austin Property, and (2) incidental personal property necessary for the ownership, renovation, construction, development, management, or operation of the Austin Property.

(B)    Borrower has not engaged in and will not engage in any business other than the ownership, renovation, construction, development, management, and operation of the Austin Property and will continue to conduct and operate its business in accordance with the terms of the Loan Documents.

(C)    Borrower has not incurred and will not incur any Indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than: (1) the Debt; and (2) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding one percent (1%) of the outstanding principal amount of the Loan at any time;

provided that any Indebtedness incurred pursuant to subclause (2) shall be (x) due not more than sixty (60) days past the date incurred and paid on or prior to such date, and (y) incurred in the ordinary course of business. No Indebtedness other than the Debt may be secured (superior, subordinate or pari passu) by the Austin Property.

(D)     Borrower has not entered into, is not a party to and will not enter into or be a party to any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower or any Affiliate of any constituent party, except in the ordinary course of business and on terms and conditions that are disclosed to Lender in advance and that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

(E)     Borrower has not made and will not make any loans or advances to any Person (including any Affiliate or constituent party), and has not acquired and shall not acquire obligations or securities of any Borrower Party or any Affiliate of Borrower or any Borrower Party.

(F)     Borrower is and will remain solvent and Borrower has at all times during its existence paid and will continue to pay its debts, liabilities and expenses (including, as applicable, shared personnel and overhead expenses) only from its assets as the same shall become due.

(G)     Borrower has not undertaken and will not undertake any Material Action without the prior unanimous written consent of all of its partners or members, as applicable.

(H)     Borrower has done or caused to be done and will do all things necessary to observe all organizational formalities and preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, and will not amend, modify, terminate or fail to comply with the provisions of its Organizational Documents.

(I)     Borrower has at all times during its existence maintained and will continue to maintain all of its accounts, books, records, financial statements and bank accounts separate from those of its Affiliates and any other Person. Borrower's assets have not been and will not be listed as assets on the financial statement of any other Person, provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates if (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person, and (ii) such assets shall be listed on Borrower's own separate balance sheet. Borrower has and will file its own tax returns (to the extent it is required to file any such tax returns) and will not file a consolidated federal income tax return with any other Person. Borrower has at all times during its existence maintained and will continue to maintain its books, records, resolutions and agreements as official records.

(J)     Borrower has been and will be, and has held at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate of Borrower or any constituent party of Borrower), has at all times conducted and will continue to conduct business in its own name, has at all times corrected and shall correct any known misunderstanding regarding its status as a separate entity, has not identified and shall not identify itself or any of its Affiliates as a division or part of any other Person and has maintained and shall continue to maintain and utilize separate stationery, invoices and checks bearing its own name.

(K)     Borrower has maintained and will continue to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(L)     Neither Borrower nor any constituent party of Borrower has sought or will seek or effect the liquidation, dissolution, winding up, consolidation, or merger, in whole or in part, of Borrower.

(M)     Borrower has not commingled and will not commingle the funds and other assets of it with those of any Affiliate or constituent party or any other Person, and Borrower has not controlled and will not control the decisions with respect to the daily affairs of any other Person.

(N)     Borrower has maintained and will continue to maintain its assets in such a manner that it would not be costly or difficult to segregate, ascertain or identify its assets from those of any Affiliate or constituent party of it or any other Person.

(O)     Other than in connection with the Acquisition Loan, Borrower has not assumed or guaranteed or become obligated for the debts of any other Person and has not held itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person, and after the Closing Date, Borrower will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(P)     Borrower has at all times during its existence held, and will continue to hold, all of its assets in its own name.

(Q)     Except as specifically provided in Borrower's Organizational Documents, no other Person has ever guaranteed or become obligated for Borrower's debts at any time during its existence, and except as specifically provided in the Loan Documents or its Organizational Documents, Borrower will not permit any other Person to guarantee or become obligated for its debts at any time in the future.

(R)     No other Person has ever held, and Borrower will not permit any other Person to hold, out its credit as being available to satisfy the obligations of any other Person.

(S)     Borrower has not at any time during its existence bought or held, and will not in the future buy or hold, evidence of Indebtedness issued by any of its Affiliates or equity interest holders (direct or indirect).

(T)     Borrower has at all times during its existence allocated fairly and reasonably (and paid or charged for, as applicable), and will continue to allocate fairly and reasonably (and pay or charge for, as applicable), any overhead expenses that are shared with an Affiliate of Borrower, including paying for office space provided by and services performed by any employee of an Affiliate of Borrower.

(U)     Borrower will comply with or cause the compliance with all the representations, warranties and covenants in this Section 4.1(s).

(V)     Borrower has not permitted and will not permit any Affiliate or constituent party independent access to its bank accounts.

(W)     Borrower has paid and shall pay the salaries of its own employees (if any) from its own funds and has and maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(X)     Borrower has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred.

(Y)     Borrower has not at any time during its existence pledged, and will not in the future pledge, its assets for the benefit of any other Person.

(Z)     No other Person has ever pledged, and Borrower will not permit any other Person to pledge, its assets for such other Person's benefit.

(AA)    No other Person has ever identified, and Borrower will not permit any other Person to identify, Borrower as a division of any other Person.

(BB)   Borrower either (i) has no, and will have no, obligation to indemnify its officers, directors, managers, members, shareholders or partners, as the case may be, or (ii) if it has any such obligation, such obligation is fully subordinated to the Debt and will not constitute a claim against Borrower if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation.

(CC)   Borrower will consider the interests of its creditors in connection with all corporate, limited liability company or limited partnership actions.

(u)   **Hazardous Materials.** Borrower hereby represents and warrants to Lender that the representations and warranties contained in the Environmental Indemnities are true and correct. Except for any specific limitation, satisfaction, or assignment of this Agreement and the exercise by Lender of any of its rights or remedies hereunder, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

(v)   **Contracts.** Except as set forth on **Schedule IV**, there are no service, maintenance or other contracts affecting the use, operation or maintenance of the Property that are not terminable on one month's notice or less without cause and without a termination fee, penalty or premium. True and correct copies of all contracts or the termination provision set forth therein) (together with all amendments, modifications or supplements thereto) have been delivered to Lender. All service, maintenance or other contracts affecting the Property entered into by Borrower or its Affiliates have been entered into at arm's-length in the ordinary course of Borrower's business. To the best of Borrower's knowledge, all service, maintenance or other contracts affecting the Property have been entered into by Borrower or its Affiliates (including those entered into by the prior owners of the Property) have been entered into at arms-length in the ordinary course of business and provide for the payment of fees in amounts not in excess of existing market rates.

(w)   **Principal Place of Business.** Borrower's principal place of business as of the date hereof is 3443 Ed Bluestein Boulevard, Austin, Texas 78701.

(x)   **Borrower's Ownership Structure.** Borrower has provided to Lender the structure chart attached hereto as **Schedule 4.1(w)**, which structure chart is a true and correct description of Borrower's ownership structure, setting forth all Persons who own, directly or indirectly, ownership interests in Borrower and no other Person (whether disclosed or undisclosed) directly or indirectly owns any ownership interest in Borrower.

(y)   **Service Rights.** Except as set forth on **Schedule 4.1**, no Service Rights have been granted to any Person in connection with or relating to the Property. To the extent Service Rights have been granted to any Person as set forth on **Schedule 4.1**, Borrower (and no other Person) is entitled to receive any and all compensation with respect to the Service Rights.

(z)   **Affiliate Transaction.** Except as set forth on **Schedule 4.1**, Borrower has not entered into any Affiliate Transactions. Any agreement with an Affiliate of Borrower shall provide that such agreement may be terminated on no more than thirty (30) days prior notice, with or without cause, and without penalty, and providing that if Lender acquires the Property or an ownership interest in Borrower, directly or indirectly, then Borrower and such Affiliate agrees that Lender (or such purchaser at foreclosure) may terminate the subject agreement at any time upon notice to the Affiliate with or without cause or the payment of any premium or penalty. If such agreement is not terminated in accordance with the immediately preceding sentence, Lender shall have the right, and Borrower hereby irrevocably authorizes Lender and irrevocably appoints Lender as Borrower's attorney-in-fact coupled with an interest, at Lender's sole option, to terminate the agreement on behalf of and in the name of Borrower, and Borrower hereby releases and waives any claims against Lender arising out of Lender's exercise of such authority.

(z)   **Loan Proceeds.** No Affiliate of Borrower or any Person in which Borrower or any Affiliate of Borrower owns an interest (direct, indirect or beneficial interest in Borrower) or is receiving any portion of the proceeds of the Loan.

(aa)     Conditions Precedent.  Borrower has fulfilled and satisfied all of the conditions precedent set forth in Part A on **Schedule 3.1** and will fulfill and satisfy all other conditions precedent set forth on **Schedule 3.1** before obtaining any Additional Advances after the Closing Date.

(bb)     Easements; Utilities and Public Access.  All easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "**Easements**"), if any, necessary for the full utilization and development of the Property for its intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder.  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses.  All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement.  All roads necessary for the use and development of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

(cc)     Separate Lots.  The Austin Property is comprised of one (1) or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot not a part of the Austin Property.

(dd)     Taxes and Assessments.  All Taxes and governmental assessments owing in respect of the Property have been paid or an escrow of funds in an amount sufficient to cover such payments has been established hereunder; *provided, however*, if any such Taxes are being disputed as provided in Section 5.4, then the provisions of Section 5.4 shall control.  There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(ee)     Condominium Obligations.  Borrower is in compliance with the Declaration, Bylaws, and Rules.

**Section 4.2     Survival of Representations.**  Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any Obligations remain owing to Lender under this Agreement or any of the other Loan Documents by Borrower; provided, however, that those particular representations and warranties set forth in this Agreement and/or in the other Loan Documents which by their terms expressly survive the repayment of the Debt shall survive the complete payment of the Debt.  Absent proof of actual knowledge thereof to the contrary, all representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.  Borrower acknowledges that the representations and warranties contained in the Loan Documents are a material inducement to Lender to make the Loan.

## V

## BORROWER COVENANTS

From the date hereof and until payment and performance in full of all Obligations of Borrower under the Loan Documents, Borrower hereby covenants and agrees with Lender that:

**Section 5.1     Existence; Compliance with Legal Requirements.**  Borrower and each Borrower Party shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, Licenses, permits and franchises and to promptly comply with all Legal Requirements applicable to Borrower, the particular Borrower Party and the Austin Property.  Borrower shall not dissolve, terminate, liquidate, merge with, consolidate into or acquire another Person, and Borrower shall continue to comply with the provisions of Section 4.1(s) throughout the Term.  Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all of its property used or useful in the conduct of its business.  Borrower will not change its name, identity (including its trade name or names) or, if not an individual, its corporate, partnership or other structure without Lender's prior written consent, except as otherwise expressly provided herein.  Borrower will qualify to do business and will remain in good standing

under the laws of the state in which the Austin Property is located and in each jurisdiction as and to the extent the same is required for the ownership, maintenance, management and operation of the Austin Property.

**Section 5.2       Hazardous Materials.** Borrower shall comply strictly and in all respects with the covenants set forth in the Environmental Indemnities.

**Section 5.3       Certain Prohibited Actions.**

(a)        Borrower shall not make any change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business. Borrower shall not directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior written notice thereof and executing, if necessary, and delivering to Lender such additional UCC Financing Statements or financing statement amendments as Lender may require in order to reflect such change in Borrower's principal place of business or chief executive office and to maintain the perfection of all Liens and security interests created by the Loan Documents; or (ii) take any action or permit any action or inaction which could result in Borrower not being in compliance with Section 4.1(s) or (iii) cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of its business in its reasonable judgment. Borrower shall comply in all respects with Section 4.1(s) of this Agreement.

(b)        Borrower shall not to make any change, amendment or modification to the Organizational Documents of Borrower without Lender's prior written consent.

(c)        No Borrower Party shall make any change, amendment or modification to the Organizational Documents of such Borrower Party without Lender's prior written consent.

**Section 5.4       Taxes and Other Charges.** The Borrower Parties shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Austin Property or any part thereof prior to delinquency. Borrower will deliver to Lender or Lender's designee receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent no later than thirty (30) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. The Borrower Parties shall not suffer and shall promptly cause to be paid and discharged any Lien which may be or become a Lien against the Austin Property, other than Permitted Encumbrances, and shall promptly pay for all utility services provided to the Austin Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges or the existence of any Lien, provided that: (i) no Declaration of Default remains outstanding; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of all Leases and other documents or instruments to which Borrower is subject and shall not constitute a default thereunder, and such proceeding shall be conducted in accordance with all Legal Requirements; (iii) Borrower shall notify Lender in writing of any such contest and shall diligently and in good faith contest such Taxes, Other Charges or Lien by appropriate legal proceedings which shall operate to prevent the enforcement or collection thereof and the sale of the Austin Property or any part thereof, in satisfaction thereof; (iv) Borrower shall have furnished to Lender a cash deposit, or an indemnity bond satisfactory to Lender with a surety satisfactory to Lender, in an amount equal to 125% of the Taxes, Other Charges or Lien claim, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, to assure payment of the matters under contest and to prevent any sale or forfeiture of the Property or any part thereof, and (v) Borrower shall promptly, upon final determination thereof, pay the amount of any such Taxes, Other Charges or Lien(s), together with all costs, interest and penalties which may be payable in connection therewith. In addition, if the Taxes, Other Charges or Lien(s) are not paid in full when Borrower commences such contest, then such proceeding shall suspend the collection the disputed amount of Taxes, Other Charges or Lien from the Austin Property. Lender may pay over any such cash deposit or part thereof held by Lender or liquidate any other security and pay same over to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established. Notwithstanding the foregoing, Borrower shall immediately upon request of Lender pay (and if Borrower shall fail so to do, Lender may, but shall not be required to, pay or cause

to be discharged or bonded against) any such Taxes, Other Charges or Lien claim notwithstanding such contest, if in the good faith opinion of Lender, the Property or any part thereof or interest therein may be in danger of being sold, forfeited, foreclosed, terminated, canceled or lost. In addition, Borrower shall pay to Lender upon demand, any reasonable costs incurred by Lender in ensuring compliance by Borrower with this Section 5.4, including reasonable attorneys' fees, monitoring and evaluating compliance and any tax service fees.

**Section 5.5** **Performance of Agreements.** Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all principal, interest, costs, fees and expenses to the extent required under, the Loan Documents. Borrower and the Borrower Parties shall observe and perform each and every term to be observed or performed by them pursuant to the terms of the Loan Documents and any other agreement or recorded instrument affecting or pertaining to Borrower, the Borrower Parties or the Property, given by Borrower or the Borrower Parties to Lender for the purpose of further securing the Obligations.

**Section 5.6** **Notices.** Borrower shall immediately upon receipt give written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower, the Borrower Parties or the Property. Borrower shall promptly advise Lender of any Material Adverse Change and of the occurrence of any Event of Default.

**Section 5.7** **Access to Property.** Borrower and the Borrower Parties shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon not less than forty-eight hours (48) hours advance notice or such shorter period of notice as circumstances may dictate, provided, however, if any part of the Property is occupied by third party tenants (unaffiliated with Borrower) under Leases, the notice and inspection periods contained in such Leases shall apply.

**Section 5.8** **Compliance.** Neither Borrower nor any Borrower Party shall commit, and Borrower and the Borrower Parties shall use their best efforts not to allow any other Person in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording any Governmental Authority the right of forfeiture as against the Austin Property or any part thereof or any monies paid in performance of Borrower's or the Borrower Parties' obligations under any of the Loan Documents.

**Section 5.9** **Cooperation in Legal Proceedings.** Borrower shall reasonably cooperate with Lender with respect to any proceedings against Borrower or involving the Property before any court, board or other Governmental Authority, which may in any way affect the rights of Lender hereunder, or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

**Section 5.10** **Insurance Benefits and Condemnation Awards.** Borrower and the Borrower Parties shall reasonably cooperate with Lender in obtaining for Lender the benefits of any Insurance Proceeds and Awards lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any reasonable expenses incurred in connection therewith (including attorneys' fees and disbursements, expense of an appraisal on behalf of Lender in case of a fire or other Casualty affecting the Property or any part thereof) out of such Insurance Proceeds or Awards, as applicable.

**Section 5.11** **Further Assurances.** Borrower and the Borrower Parties will, at the cost of Borrower and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers, boundary surveys, footing or foundation surveys, plans and specifications, appraisals, title and other insurance reports and agreements and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender, the property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of Borrower's covenants under this Agreement or for filing or recording the Security Instruments, or for complying with all Legal Requirements. Borrower and/or a Borrower Party, on demand, will execute and deliver one or more financing statements or other instruments, to evidence or perfect more effectively the security interest of Lender in the Property, and if Borrower or a Borrower Party fails to execute and deliver any of the foregoing within five (5) Business Days after such request by Lender, Borrower

and the Borrower Parties grant to Lender an irrevocable power of attorney coupled with an interest for the sole purpose of exercising and perfecting any and all rights and remedies available to Lender pursuant to this Section 5.11, and hereby authorize Lender to execute in the name of Borrower or the applicable Borrower Party or without the signature of Borrower or the applicable Borrower Party to the extent Lender may lawfully do so upon five (5) days' notice to Borrower and the applicable Borrower Party (except in the case of exigent circumstances), any such financing statements or other instruments, and Borrower and the Borrower Parties hereby acknowledge and agree that neither Borrower nor any Borrower Party shall have a claim or cause of action against Lender arising out of Lender's exercise of Lender's rights under this Section 5.11 or the execution and/or recordation of any instruments by or on behalf of Borrower or a Borrower Party pursuant to the foregoing power of attorney, unless such claim or cause of action results from Lender's gross negligence or willful misconduct.

**Section 5.12    Financial Reporting.**

(a)    Borrower and Edmonton Owners will keep and maintain or will cause to be kept and maintained in accordance with Acceptable Accounting Principles, proper and accurate books, records and accounts reflecting all of the financial affairs, income and expenses of Borrower, Edmonton Owners and the Property, as applicable. Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. Borrower shall pay any usual and customary costs and expenses incurred by Lender to examine Borrower's accounting records as Lender shall determine to be necessary or appropriate in the protection of Lender's interest. Borrower shall furnish or make available to Lender and its agents convenient facilities for the examination and audit of any of any of Borrower's or Edmonton Owners' books and records.

(b)    Borrower and Edmonton Owners will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year, a complete copy of Financial Statements for Borrower and Edmonton Owners for such Fiscal Year prepared in accordance with Acceptable Accounting Principles and audited by an Approved Accounting Firm. Borrower's and Edmonton Owners' annual Financial Statements shall be accompanied by an Officer's Certificate stating that such annual Financial Statements present fairly the financial condition of Borrower, Edmonton Owners and the Property and that the Leases have not been amended, modified or canceled.

(c)    Borrower will furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items accompanied by an Officer's Certificate stating that such items are true, correct and complete in all respects and fairly present the financial condition and results of the operations of Borrower and the Austin Property (subject to normal year-end adjustments) as applicable: (A) quarterly and year to date Financial Statements; (B) a current rent roll for the Austin Property, and (C) the actual capital expenditures for the Austin Property with respect to such period; (D) all new Leases, Lease amendments or other documents affecting the Rents executed since the last such statement; (E) a comparison of the budgeted income and expenses and the actual income and expenses for such period; and (F) a summary report containing each of the following with respect to the Austin Property: (i) rent per square foot payable by each Tenant, and (ii) aggregate occupancy of the completed calendar year: (i) rent per square foot payable by each Tenant, and (ii) aggregate occupancy of the Austin Property as of December 31. Borrower shall also deliver to Landlord, on a monthly basis within twenty (20) days of the end of each month, any notice received from a Tenant threatening non-payment of Rent or alleging a default by Landlord, requesting a termination of a Lease or a material modification of any Lease or notifying Borrower of the exercise or non-exercise of any option provided for in such Tenant's Lease, or any other similar material correspondence received by Borrower from Tenants during the subject month.

(d)    Prior to the Closing Date, Borrower shall prepare and deliver to Lender a budget, (separate and apart from the Building F Budget, the Building J Budget, the Building H Budget and the Infrastructure Budget associated with the Work and the Condominium Annual Budget) including all planned capital expenditures in respect of the Austin Property other than the Work (the "**Approved Initial Operating Budget**"). Thereafter, Borrower shall submit to Lender by November 1 of each year an Annual Budget for the succeeding Fiscal Year. Lender shall have the right to approve each Annual Budget (which approval shall not be

unreasonably withheld or delayed) and Annual Budgets approved by Lender hereinafter be referred to as an "**Approved Annual Operating Budgets**." In the event that Borrower incurs an extraordinary operating expense or extraordinary capital expenditure not set forth in the Approved Annual Budget (each an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval. Until such time that any Annual Budget has been approved by Lender, the prior Approved Annual Budget shall apply for all purposes hereunder; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Other Charges, Insurance Premiums and utility charges, and all other expenses shall be adjusted by the CPI.

(e)    Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible) such further detailed information, including Borrower's tax returns, with respect to the operation of the Austin Property (as applicable) and the financial affairs of Borrower or the Property as may be requested by Lender.

(f)    Borrower will furnish to Lender a monthly management report, monthly bank statements, and copies of canceled checks for the development and operation of the Property. Lender reserves the right to require Borrower to open a dedicated bank account exclusively for the Austin Property.

**Section 5.13**    Title to the Property.

(a)    Borrower, the Edmonton Owner and the Borrower Parties, as applicable, will warrant and defend: (i) the title to the Property (as applicable) and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances), and (ii) the validity and priority of the Lien of the Security Instruments on the Property and the perfection and priority of the Liens created by the Loan Documents, including any UCC Financing Statements, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender on demand for any losses, costs, damages or expenses (including attorneys' fees and court costs) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person, provided, however, Borrower shall be entitled to be reimbursed for all such expenditures incurred in connection with actions taken by it hereunder, from proceeds of the Title Insurance Policy.

(b)    If requested by Lender, Borrower shall provide Lender with an endorsement to the Title Insurance Policy, extending the Effective Date of the Title Insurance Policy to the date of such "bring-down" endorsement, as requested by Lender.

(c)    Lender agrees that the PACE Loan shall be a Permitted Encumbrance to title, provided: (i) Lender shall not have issued a Declaration of Default hereunder; (ii) all proceeds from the PACE Loan either are utilized in the Work of the Project (and so offset against Budget Items) or paid to Lender to be applied against the Debt; and (iii) the proceeds from the PACE Loan are to be collaterally assigned to Lender in connection with the Loan.

**Section 5.14**    Estoppel Statements.

(a)    At any time within ten (10) days after request by Lender, Borrower shall furnish Lender or any proposed assignee of Lender with a written statement, duly acknowledged and certified by Borrower, setting forth (A) the original principal amount of the Note, (B) the unpaid principal amount of the Note, (C) the then current rate of interest of the Note, (D) the terms of payment, (E) the date installments of interest and/or principal were last paid, (F) that, except as provided in such statement, there are no events which, with the passage of time or the giving of notice or both, would constitute an Event of Default under the Loan Documents, (G) that the Loan Documents are valid, legal and binding obligations of the Borrower Parties and have not been modified or if modified, giving particulars of such modification, (H) whether any offsets or defenses exist with respect to the Loan or Lender and, if any are alleged to exist, a detailed description thereof, (I) whether or not, to the best knowledge of Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth the specific nature of all such defaults, and (J) as to any other matters reasonably requested by Lender.

(b)     Borrower shall deliver to Lender, upon request, an estoppel certificate from each Tenant under any Lease in form and substance reasonably satisfactory to Lender; *provided* that such certificate may be in the form required under such Lease; and *provided, further*, that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.

Section 5.15     Business Purposes; Use of Property.     The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes. Neither Borrower nor any Borrower Party shall change the current use of the Property in any material respect, nor shall Borrower or a Borrower Party initiate or consent to any zoning re-classification of any portion of the Property or seek any variance as to the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or other applicable land use law, without Lender's prior consent.

Section 5.16     Contracts.     Borrower shall deliver or cause to be delivered to Lender copies of all contracts or other agreements (and all amendments, modifications or supplements thereto), whether now existing or hereafter entered into, affecting Borrower, a Borrower Party or the use, maintenance, renovation, construction, development, management or operation of the Property, including any options to purchase or rights of first offer or first refusal to purchase the Property or any portion of the Property. Borrower shall not enter into any service, maintenance, renovation, construction, development, or other contracts affecting the Property without Lender's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed, *provided, however*, Lender's prior consent shall not be required with respect to any contracts or agreements unless such contracts or agreements (a) could have a Material Adverse Effect, (b) are not terminable on one month's notice or less without cause and without penalty or premium or (c) are for a period in excess of one year (unless cancellable with thirty (30) days' notice), or for an aggregate amount in excess of $50,000.00. All service, maintenance, renovation, construction, development or other contracts affecting the Property shall be arms-length transactions, in the ordinary course of Borrower's or a Borrower Party's business and shall provide for the payment of fees in amounts and upon terms not in excess of existing market rates. Borrower shall not enter into any brokerage agreement with respect to leasing or sales without the prior written consent of Lender.

Section 5.17     Maintenance of Property Following Completion; Payment for Labor and Materials; Alterations.     Following completion of all Work to be performed in connection with construction of the Project, thereafter:

(a)     Borrower or a Borrower Party, as applicable, shall promptly repair, replace or rebuild any part of the Austin Property, as applicable, which may be destroyed by any Casualty, or become damaged, worn or dilapidated and shall complete and pay for any structure at any time in the process of construction or repair on the Austin Property. Borrower or a Borrower Party, as applicable, will promptly pay when due all bills and costs for labor, materials and specifically fabricated materials incurred in connection with the Austin Property, as applicable, and never permit to exist beyond the due date thereof in respect of the Austin Property or any part thereof any Lien or security interest, even though subordinate to the Liens and the security interests of the Security Instruments, and in any event never permit to be created or exist in respect of the Austin Property or any part thereof any other or additional Lien or security interest other than the Lien created by the Loan Documents and the Permitted Encumbrances.

(b)     Borrower and the Borrower Parties shall cause the Austin Property, as applicable, to be maintained in a good and safe condition and repair. The Improvements shall not be removed, demolished or altered in any material respect nor shall any additional improvements be constructed without the prior, written consent of Lender.

(c)     Alterations.     Lender's prior approval shall be required in connection with (a) any alterations to any Improvements (i) that may have a Material Adverse Effect, (ii) that could adversely affect any structural component or the exterior of any Improvements or any utility or HVAC system at the Property, or (iii) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold, or (b) any alteration to any Improvements after a Declaration of Default has occurred (any of the foregoing, a "Material Alteration"). If the total unpaid amounts incurred and to be

incurred with respect to such alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's Obligations under the Loan Documents any of the following: (1) cash, (2) a Letter of Credit, or (3) other securities acceptable to Lender. Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases) over the Alteration Threshold. Upon substantial completion of any Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in accordance with applicable Legal Requirements, (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of liens, and (iii) all material licenses and permits necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued.

**Section 5.18**      Transfer or Encumbrance of the Property.

(a)      Borrower acknowledges that Lender, in agreeing to make the Loan, has examined and relied on the creditworthiness and experience of the Borrower Parties in owning and operating and developing properties such as the Property, and that Lender will continue to rely on Borrower's and the Borrower Parties' ownership, operation, and development of the Property, as applicable, as a means of maintaining the value of the Property as security for repayment of the Debt. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt, Lender can recover all or a portion of the Debt by a sale of the Property. Accordingly, subject to the terms of this Section 5.18, neither Borrower nor a Borrower Party shall, without the prior written consent of Lender, sell, convey, alienate, mortgage, encumber, pledge or otherwise Transfer any of the Property, or any part thereof or any interest therein, directly or indirectly, or permit the Transfer any of the Property, or any part thereof or any interest therein.

(b)      A Transfer of the Property within the meaning of this Section 5.18 shall be deemed to include: (A) an installment sales agreement wherein Borrower or a Borrower Party agrees to sell the Property or any part thereof or any interest therein for a price to be paid in installments; (B) an agreement by Borrower or a Borrower Party leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents, except as specifically permitted by the Loan Documents; (C) if Borrower or any partner or member of Borrower (or any indirect owner of an interest in Borrower or any constituent partner or member of Borrower no matter how remote) is a corporation, the Transfer of such corporation's stock or any portion thereof (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which any of such corporation's stock or any portion thereof shall be vested in a party or parties who are not now existing stockholders as of the date hereof or results in any change in the ultimate ownership or control of such corporation (no matter how remote); (D) if Borrower or any partner or member of Borrower (or other indirect owner of an interest in Borrower or any constituent partner or member of Borrower no matter how remote) is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a partner, joint venturer or member or the Transfer of the partnership or membership interest of any partner or any member or the Transfer of the interest of any joint venturer, partner or member; (E) if Borrower is a limited or general partnership, joint venture, limited liability company, trust, nominee trust, tenancy in common or other unincorporated form of business association or form of ownership interest, the Transfer of any interest (including any economic or profits interest) of any Person having a direct or indirect legal or beneficial ownership interest in Borrower, including any legal or beneficial interest in any constituent partner or member of Borrower; (F) except as otherwise provided in the Loan Documents, any instrument subjecting the Property to a condominium regime or transferring ownership to a cooperative corporation; (G) the dissolution or termination of Borrower or any general partner or managing member of Borrower or any constituent member or partner of Borrower or the merger or consolidation of Borrower or any general partner or member of Borrower with any other Person; (H) any transfer of a direct or indirect ownership interest in Borrower; (I) any other transaction pursuant to which any Person not holding a direct or indirect

ownership interest in Borrower on the Closing Date acquires a direct or indirect (and no matter how remote) ownership interest in Borrower, (J) any swap, derivative or other transaction shifting the risks and rewards of ownership of the Property, unless otherwise expressly required by the Loan Documents; (K) any transaction pursuant to which any Person is granted an option to purchase all or any portion of the Property or any direct, indirect or beneficial interest in Borrower, and (L) any transaction, agreement or arrangement pursuant to which any Person is given any right to control, direct or veto any material actions or decisions by Borrower, directly or indirectly, whether through an ownership interest, contract right or otherwise. *Notwithstanding the foregoing provisions of Section 5.18(b), the foregoing types of Transfers shall be permitted with Lender's sole approval if such Transfer is made to members of the immediate family of any individual Person or a family trust for the benefit of the immediate family of any individual Person (a "**Family Transfer**").

(c)     Lender acknowledges and agrees that, as of the Closing Date, Borrower and the General Partner of the Borrower are owned by Adam Zarafshani and Adam Zarafshani, as Trustee. Lender agrees that the partnership interests held by Adam Zarafshani as Trustee may be transferred to Adam Zarafshani as Trustee pursuant to a written trust agreement to be created following Closing (the "**Trust Agreement**"), provided (i) a copy of the proposed Trust Agreement is provided to Lender at least thirty (30) days prior to the proposed execution thereof; and (ii) Lender, in its sole discretion, shall approve the Trust Agreement and the beneficiaries thereunder (reserving the right to require additional guaranties from such beneficiaries).

(d)     Lender shall not be required to demonstrate any actual impairment or prejudice of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon any Transfer (other than a Transfer specifically permitted by this Agreement) without Lender's prior written consent which may be granted, withheld, delayed or conditioned in Lender's sole and absolute discretion. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

(e)     Lender's consent to one Transfer of the Property, including any Family Transfer, shall not be deemed to be a waiver of Lender's right to require such consent to any future Transfer. Any Transfer of the Property made in contravention of this Section 5.18 shall be null and void and of no force and effect.

(f)     Borrower agrees to bear and shall pay or reimburse Lender on demand for all costs and expenses (including title search costs, title insurance endorsement premiums and reasonable attorneys' fees and disbursements) incurred by Lender in connection with the review, approval and documentation of any proposed Transfer, whether or not such consent is granted, withheld, delayed, conditioned or denied and whether or not such transfer is expressly permitted herein.

(g)     Neither Borrower nor any Borrower Party shall create, incur, assume or permit to exist (i) any lien on the Property or any portion of the Property, except for Permitted Encumbrances or (ii) any lien on any direct or indirect interest in Borrower or a Borrower Party (other than pursuant to a Pledge Agreement).

**Section 5.19     ERISA.**

(a)     Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, under the Loan Documents (or the exercise by Lender of any of its rights under the Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)     Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender, that (i) Borrower is not an "**employee benefit plan**" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "**governmental plan**" within the meaning of Section 3(32) of ERISA or treats as holding assets of any such plan by reason of such plans ownership of an interest in Borrower; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(i) Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

or

(ii) Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "**benefit plan investors**" within the meaning of 29 C.F.R. § 2510.3-101(f)(2);

or

(iii) Borrower qualifies as an "**operating company**" or a "**real estate operating company**" within meaning of 29 C.F.R. § 2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940.

**Section 5.20** **Affiliate Transaction.** Except as previously disclosed to Lender in writing on or prior to the date hereof, Borrower shall not enter into any Affiliate Transaction without the prior written consent of Lender, which may be withheld in Lender's sole discretion and in any event only upon such terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such Affiliate.

**Section 5.21** **Service Rights.** Borrower shall not allow any Service Rights to be granted by any Person other than Borrower, and any Service Rights granted by any Person other than Borrower shall be null and void *ab initio*.

**Section 5.22** **Purchase Options.** Borrower shall deliver to Lender true and correct copies of any option agreement and any rights of first offer or rights of first refusal to purchase the Austin Property or any portion thereof, or any other similar agreement, together with all amendments and modifications thereto, within five (5) days after the execution thereof. The requirement for delivery of the foregoing shall not be deemed to imply Lender's consent thereto.

**Section 5.23** **Confirmation of Representations, Warranties and Covenants.** In addition to and not in limitation of the covenants and agreements of Borrower contained in this Agreement, if requested by Lender, Borrower shall deliver, one or more Officer's Certificates certifying as to the accuracy of all representations and warranties made by Borrower in the Loan Documents as of the Closing Date.

**Section 5.24** **Subdivision Maps.** Prior to entering into, agreeing to or recording any map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of the Property (collectively, "**Subdivision Map**"), or amending, modifying, terminating or taking any action with respect to any Subdivision Map, Borrower shall submit such Subdivision Map to Lender for Lender's review and approval, which approval may be withheld in Lender's reasonable discretion. As a condition precedent to approval by Lender, if required by Lender: (i) Borrower or a Borrower Party shall execute, acknowledge and deliver to Lender such amendments to the Loan Documents as Lender may reasonably require to reflect the change in the legal description of the particular Property resulting from the recordation of any Subdivision Map, and (ii) Borrower shall deliver to Lender, at Borrower's sole expense, a title endorsement to the Title Insurance Policy in form and substance satisfactory to Lender insuring the continued first priority lien of the applicable Security Instrument. Subject to the execution and delivery by Borrower of any documents required under this Section 5.24, Lender shall, if required by applicable law, sign any Subdivision Map approved by Lender pursuant to this Section 5.24.

**Section 5.25** **Delivery of Business Plan of Borrower.** Borrower shall provide Lender with Borrower's business plan to be prepared by Borrower in accordance with its operating agreement within the time period for such preparation provided therein.

**Section 5.26** **Equity Contribution.** Until such time as the Loan has been indefeasibly paid in full (together with all interest thereon and other sums payable with respect thereto), Borrower shall keep the Equity Contribution invested in the Property as equity and shall not permit any return of the Equity Contribution.

**Section 5.27** **Anti-Terrorism.**

(a) Neither Borrower nor any other Person owning a direct or indirect interest in Borrower is in violation of any Legal Requirements, including requirements of The Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and Regulations, Executive Order No. 13224 on Terrorist

614048825.12

Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (the "**Executive Order**") and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the "**Patriot Act**").

(b) None of Borrower, the direct members of Borrower, Guarantors, nor any of their respective constituents, investors or affiliates, any of their respective brokers or other agents, if any, acting or benefiting in any capacity in connection with the Loan is a "**Prohibited Person**" which is defined as follows:

(i) a Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii) a Person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Legal Requirements, including the Executive Order and the Patriot Act;

(iv) a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v) a Person that is named as a "**specially designated national and blocked person**" on the most current list published by the U.S. Treasury Department Office of Foreign Assets control at its official website, http://www.treas.gov/ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; and

(vi) a Person who is affiliated with a Person listed above.

(c) None of Borrower, the direct members of Borrower, Guarantors or any of their respective affiliates, investors or constituents or any of their respective brokers or other agents, if any, acting in any capacity in connection with the Loan are or will (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

(d) Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its reasonable discretion, confirming compliance with this Section.

(e) None of the funds or other assets of Borrower, the members of Borrower or Guarantors constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as defined below); (ii) no Embargoed Person has any interest of any nature whatsoever in Borrower or Guarantor, as applicable (whether directly or indirectly); and (iii) none of the funds of Borrower, the members of Borrower or Guarantors, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, the members of Borrower or Guarantors, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law. "**Embargoed Person**" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower, the members of Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of Applicable Law.

**Section 5.28** Leases.

(a)      All Leases and all renewals of Leases executed after the date hereof shall be on terms approved by Lender and: (i) provide for economic terms, including rental rates, comparable to existing local market rates for similar properties approved in advance by Lender; (ii) be on commercially reasonable terms; (iii) have a term of not less than three (3) years (unless Lender approves in writing a shorter term) and not more than fifteen (15) years, including extensions and renewals (unless Lender approves in writing a longer term); (iv) provide that such Lease is subordinate to the applicable Security Instrument and that the Tenant thereunder will attorn to Lender and any purchaser at a foreclosure sale; (v) be to Tenants that are creditworthy; (vi) be written substantially in accordance with the standard form of Lease which shall have been approved by Lender (subject to any commercially reasonable changes made in the course of negotiations with the applicable Tenant); (vii) not be to an Affiliate of Borrower, any Guarantor or any Manager; (viii) provide that the beneficiary of any mortgage or deed of trust may at any time unilaterally record, in its sole and absolute discretion, a declaration that subordinates and has the effect of subordinating the lien of the mortgage or deed of trust to such Lease; (ix) not contain any option to purchase, any right of first refusal to purchase, any right to terminate (except in the event of the destruction or condemnation of substantially all of the Property), any requirement for a non-disturbance or recognition agreement or any other terms which would materially adversely affect Lender's rights under the Loan Documents.     Lender shall execute and deliver its standard form of subordination, non-disturbance and attornment agreement to Tenants under any Lease approved by Lender promptly upon request, with such commercially reasonable changes as may be requested by such Tenants, and which are reasonably acceptable to Lender.     Borrower shall pay Lender's costs and expenses in connection with any such subordination, non-disturbance and attornment agreement, including, without limitation, reasonable legal fees and expenses.

(b)      Borrower: (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the Tenants thereunder to be observed or performed in a commercially reasonable manner; *provided, however,* Borrower shall not terminate or accept a surrender of a Lease without Lender's prior approval; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change any Lease so as to change the amount of or payment date for rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the Tenant or increase the obligations of the lessor; and (vi) shall promptly furnish to Lender any notice of default or termination received by Borrower from any Tenant, and any notice of default or termination given by Borrower to any Tenant. Upon request, Borrower shall promptly furnish Lender with executed copies of all Leases and a statement of all Tenant security or other deposits.

(c)      All security deposits of Tenants, whether held in cash or any other form, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at a separately designated account under its control. Any bond or other instrument which Borrower is permitted to hold in lieu of cash security deposits under any applicable Legal Requirements (i) shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as hereinabove described; (ii) shall be issued by an institution reasonably satisfactory to Lender; (iii) shall, if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender); and (iv) shall in all respects comply with any applicable Legal Requirements and otherwise be satisfactory to Lender. Borrower shall, upon request, provide Lender with evidence satisfactory to Lender of its compliance with the foregoing.

(d)      Borrower shall not permit or consent to any assignment or sublease of any Lease without Lender's prior approval.

**Section 5.29      After Acquired Property.**   Borrower will grant to Lender a first lien security interest in and to all Property, easements, entitlements, equipment, licenses, authorizations, permits, and any other personal property owned by Borrower, whether or not used in the construction, maintenance and/or operation of the Improvements, immediately upon acquisition of same or any part of same.

**Section 5.30** <u>Construction Advisor</u>. Borrower or the Borrower Parties will pay the reasonable fees and expenses of, and will at all times promptly cooperate with, Lender's Construction Advisor and, upon request, will promptly furnish to Lender's Construction Advisor any documents, instruments, agreements or other information requested in connection with the performance of such Construction Advisor's duties relating to the Austin Property.

**Section 5.31** <u>Licenses</u>. Borrower or the Borrower Parties will timely obtain all Licenses necessary for the development of the Austin Property and the sale of Condominium Units, and all such Licenses will timely be in full force and effect. Borrower or the Borrower Parties will deliver to Lender copies of all Licenses or other agreements with a Governmental Authority related to the development of the Austin Property.

**Section 5.32** <u>Dividends and Distributions</u>. Borrower will not declare or pay any dividends or distributions on any class of its membership or partnership interests or shares, as applicable, make any payment on account of the purchase, redemption or other retirement of any such membership or partnership interests or shares, as applicable, or make any distribution in respect thereof, either directly or indirectly, at any time during the Term without Lender's prior written consent, but in no event in any situation or circumstance where such dividend, distribution or payment would: (a) violate or constitute a breach of any representation or warranty of Borrower under this Agreement or the other Loan Documents; (b) violate or constitute a breach of any covenant, condition or other term or provision of this Agreement or the other Loan Documents, or (c) otherwise cause, create or constitute an Event of Default under this Agreement or the other Loan Documents.

**Section 5.33** <u>Condominium Regime</u>. Following recording of the Declaration in the public records of Travis County, Texas, the Austin Property will be subject to a condominium regime established pursuant to the Declaration. With respect to such condominium regime, Borrower hereby agrees as follows:

(a) Borrower shall comply with all terms, conditions and covenants of the Declaration, Bylaws, and Rules that are in force and effect.

(b) Borrower shall not, without Lender's prior written consent, modify, amend, supplement or in any other manner change or vote to change (or consent to change) the terms, conditions or covenants of the Bylaws, Declaration or the Rules, nor shall Borrower waive or consent to the waiver of any enforcement of the provisions thereof with respect to another Condominium Unit owner.

(c) Borrower shall promptly deliver to Lender a true and full copy of each and every notice of default or notice requiring the performance of any act by Borrower received by Borrower with respect to any obligation of Borrower under the provisions of the Bylaws, Declaration or the Rules.

(d) Borrower shall not, except with the prior written consent of Lender (i) institute any action or proceeding for partition of the Austin Property; (ii) vote for or consent to any modification of, amendment to or relaxation in the enforcement of any provision of the Bylaws, Declaration or the Rules; (iii) in the event of damage to or destruction of the Austin Property, vote in opposition to a motion to repair, restore, or rebuild.

(e) In each and every case in which, under the provisions of the Bylaws, Declaration or the Rules, the consent or the vote of the owners of Condominium Units is required, Borrower shall not vote or give such consent without, in each and every case, the prior written consent of Lender.

(f) Borrower shall promptly pay, as the same become due and payable, all common charges or other payments for maintenance and reserve funds and all assessments as required by the Bylaws, Declaration and the Rules and any resolutions adopted pursuant thereto, and shall promptly upon demand deliver receipts to Lender evidencing such payments. In the event that Borrower fails to make such payments as the same become due and payable, Lender may from time to time at its option, but without any obligation to do so and without notice to or demand upon Borrower, make such payments, and the same shall be added to the Debt, and shall bear interest until repaid at the Default Rate; provided, however, that the failure of the Borrower to make any such payment to the maintenance fund or to exhibit such receipts shall, at the election of Lender constitute an Event of Default hereunder.

(g)     In the event of the failure of Borrower to perform any of its obligations relating to the Austin Property under the Bylaws, Declaration or Rules within a period of ten (10) days (unless the Board of Directors (as defined in the Declaration) requires sooner performance) after notice from the Board of Directors or from Lender, or in the case of any such default which cannot with due diligence be cured or remedied within such period, if Borrower fails to proceed promptly after such notice to cure or remedy the same with due diligence, then in any such case, Lender may at its option, but without any obligation to do so, (i) cure or remedy any such default (Borrower hereby authorizing Lender to enter upon the Austin Property as may be necessary for such purposes), and all sums expended by Lender for such purposes, including reasonable counsel fees, shall be added to the Debt, shall become due and payable and shall bear interest until repaid at the Default Rate, or (ii) elect that such failure shall constitute an Event of Default.

(h)     Upon any Declaration of Default, Lender may by notice to Borrower require the resignation of Borrower's designees and the appointment in lieu thereof of Lender's designees as members of the Board of Directors that may be appurtenant to the Austin Property.

(i)     Borrower shall, at the election of Lender exercisable at any time after a Declaration of Default, pay to Lender at the time of each monthly payment to Lender in accordance with the Note, pay to Lender an additional amount sufficient to discharge the obligations under clause (f) when they become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Lender, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Lender in its discretion. Such amounts shall be held by Lender without interest and applied to the payment of the obligations in respect of which such amounts were deposited or, at Lender's option, to the payment of said obligations in such order or priority as Lender shall determine, on or before the respective dates on which the same or any of them would become delinquent. If one month prior to the due date of any of the aforementioned obligations the amounts then on deposit therefore shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after demand, deposit the amount of the deficiency with Lender. Nothing herein contained shall be deemed to affect any right or remedy of Lender under any provisions of the Security Instruments or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Default Rate to the Debt.

(j)     Neither Borrower nor any Affiliate of Borrower currently owns, or at any time until the Loan has been fully satisfied, will own any Condominium Unit or other interest in the Austin Property that is not part of the collateral for the Loan.

# VI     CASUALTY; CONDEMNATION; ESCROWS

**Section 6.1     Insurance; Casualty and Condemnation.**

**Section 6.1.1     Insurance.**

(a)     Borrower or the Borrower Parties, as applicable, shall obtain and maintain, or cause to be maintained, during all times that any sum is outstanding under the Note or the other Loan Documents (the "**Term**"), insurance for Borrower, the Borrower Parties and the Austin Property providing at least the following coverages or such other coverages acceptable to the Lender and its insurance consultant:

(i)     Property insurance coverage on a Special Cause of Loss form, including windstorm, in an amount not less than 100% of the replacement cost (as determined by an appraiser approved by Lender) of all insurable elements of the Property and of all tangible personal property, with coinsurance waived, or if a coinsurance clause is in effect, with an agreed amount endorsement acceptable to Lender. Coverage shall extend to the Property and to all tangible personal property and be on a replacement cost basis. The deductible shall not exceed $25,000 per loss without prior approval by Lender.

(ii)     If any boiler, pressure vessel or other large machinery is located on or about the Property, broad form boiler and machinery/equipment breakdown coverage, including a form of business income coverage.

(iii)     A form of business income coverage in the amount of 100% of one year's gross income from the Property, including a 60-day extended period of indemnity. Any time element deductible shall not exceed a 72-hour waiting period without prior approval of Lender.

(iv)     If the Austin Property is located in a special flood hazard area (that is, an area within the 100-year floodplain) according to the most current flood insurance rate map issued by the Federal Emergency Management Agency and if flood insurance is available, flood insurance coverage on all insurable elements of the Austin Property and of all tangible personal property in an amount equal the maximum coverage available through the National Flood Insurance Program.

(v)     In the event that the Austin Property is located in a geographic area which is considered "high risk" by Lender for potential earthquake damage, a Special Earthquake Hazard Report will be ordered by Lender, at Borrower's cost.  The Special Earthquake Hazard Report must be received and approved by Lender in its sole and absolute discretion prior to closing.  The Special Earthquake Hazard Report must indicate that the potential risk of earthquake damage is acceptable to Lender and/or can be adequately insured against.  Earthquake coverage shall be required if the Special Earthquake Hazard Report determines that a material risk exists that a significant earthquake may occur and result in a "probable maximum loss" or "Scenario Expected Loss" due to earthquake in excess of 20% of the value of the Property.

(vi)     Commercial general liability coverage (which may be in the form of umbrella/excess liability insurance) with a $1,000,000 combined single limit per occurrence and a minimum aggregate limit of $2,000,000.

(vii)     Workers compensation insurance, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000.00 per accident and per disease per employee, and $1,000,000.00 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable).

(viii)     If applicable, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000.00.

(ix)     Such other insurance and in such amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Austin Property is located. Additional coverages may include earthquake, mine subsidence, sinkhole, mold, personal property, supplemental liability, or coverages of other property-specific risks.

(b)     All insurance provided for in Section 6.1.1(a) shall be obtained under valid and enforceable policies ("**Policies**" or in the singular, "**Policy**"), and shall be subject to the approval of Lender as to form and substance including deductibles, loss payees and insureds.  Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance and, if requested by Lender, other documentation, in each case acceptable to Lender evidencing the Policies, accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender.

(c)     All insurance policies must require the insurance carrier to give the Lender a minimum of ten (10) days' notice in the event of cancellation or termination for non-payment of premium and a minimum of thirty (30) days' notice of non renewal.  Borrower shall provide current policy documents confirming all required coverages and conditions and Acord 27, Acord 28 (Evidence of Property Insurance ), and Acord 25 (Certificate of Liability Insurance), or another document satisfactory to the Lender conferring on the Lender rights and privileges of mortgagee.  Upon the request of the Lender, Borrower shall supply an original or certified copy of the original policy within ninety (90) days.  Borrower must also provide Lender with a paid insurance agent's receipt for all current coverages.  All insurance policies required hereunder shall be carried by companies rated A-:VIII or better by A.M. Best Company and shall not contain exclusions for terrorism coverage.  All binders, certificates of insurance, and policies must name Borrower as the insured, or as

an additional insured, must include the complete and accurate property address and must bear the original signature of the issuing insurance agent. On all property insurance policies and coverages required under this Section (including coverage against loss of business income), the Lender must be named as "Lenders Loss Payable" under standard mortgagee clause. On all liability policies and coverages, the Lender must be named as an "additional insured." The Lender should be referred to verbatim as follows: "Romspen Mortgage Limited Partnership, its successors and assigns."

(d)     Each coverage required under this Section shall be primary rather than contributing or secondary to the coverage that Borrower may carry for other properties or risks, provided however, that blanket coverage shall be acceptable if Lender determines, in the exercise of its sole and absolute discretion, that the amount of such coverage is sufficient in light of the other risks and properties insured under the blanket policy.

(e)     Borrower shall furnish to Lender, on or before thirty (30) days after the close of each calendar year, an Officer's Certificate stating the amounts of insurance maintained in compliance herewith, the risks covered by such insurance and the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, after five (5) Business Days' notice to Borrower, as applicable, to take such action as Lender deems necessary to protect Lender's interest in the Austin Property, including the obtaining of such insurance coverage as Lender in Lender's sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Loan Documents and shall bear interest at the Default Rate.

(g)     In the event of foreclosure of any Security Instrument, or other transfer of title to the Austin Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower, as applicable, in and to such Policies then in force concerning the Austin Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(h)     Within thirty (30) calendar days after written request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices of similarly situated lenders, and the like.

(i)     If the Austin Property or any portion of the Austin Property is materially damaged or destroyed, in whole or in part, by fire or other casualty, whether insured or uninsured (a "Casualty"), Borrower shall give prompt written notice thereof to Lender. Following the occurrence of a Casualty, Borrower shall, regardless of whether Insurance Proceeds are available, promptly proceed to restore, repair, replace or rebuild the same to be of at least equal value and of substantially the same character as prior to such damage or destruction. The reasonable expenses incurred by Lender in the adjustment and collection of the Insurance Proceeds shall become part of the Debt and be secured by the Loan Documents and shall be reimbursed by Borrower to Lender upon demand.

(j)     Borrower and the Borrower Parties shall comply with all insurance requirements of any insurer of the Property or any portion thereof and shall not bring or keep or permit to be brought or kept any article upon any of the Property or any portion thereof or cause or permit any condition to exist thereon which would be prohibited by an insurance requirement, or would invalidate any Policies then in effect or any of the insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Austin Property pursuant to this Agreement.

(k)     Any reimbursement due to Lender pursuant to this Section 6.1.1 must be paid within ten (10) Business Days (or sooner if required), or such amount shall accrue interest at the Default Rate until paid to Lender.

(l)     Lender shall not be responsible for nor incur any liability for the insolvency of any insurer or other failure of any insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of Borrower to furnish such insurance. Neither Borrower nor a Borrower Party shall obtain insurance for the Austin Property in addition to that required by Lender without the prior written consent of Lender, which consent will not be unreasonably withheld provided that (i) Lender is a named insured on such insurance, (ii) Lender receives complete copies of all policies evidencing such insurance; and (iii) such insurance complies with all of the applicable requirements set forth herein.

(m)     Notwithstanding the foregoing provisions of Section 6.1.1, if any portion of the foregoing risks and coverage shall be covered by any "builder's risk" or other insurance coverage provided by the applicable General Contractor ("**Contractor's Insurance**"), Borrower shall not be required to provide such coverage until such Contractor's Insurance is no longer in effect, so long as Lender is named as an additional insured thereunder and Borrower provides Lender with satisfactory evidence of such coverage. Any such Contractor's Insurance shall name Lender as an additional insured and otherwise shall comply with all of the requirements for insurance contained in this Article VI.

**Section 6.1.2     Casualty and Application of Proceeds.**

(a)     In case of loss or damages covered by any of the Policies, the following provisions shall apply:

(i)     In the event of a Casualty that is less than $250,000, Borrower may settle and adjust any claim without the consent of Lender and retain the proceeds thereof.

(ii)     In the event of a Casualty in excess of $250,000 if each of the following is true at all times: (A) the Insurance Proceeds are sufficient to pay for the Restoration as reasonably determined by Lender; (B) after such Restoration the Property will adequately secure the outstanding balance of the Loan; (C) no Declaration of Default has occurred; (D) the Austin Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements; and (E) the Casualty does not result in the loss of access to the Austin Property or the Improvements, then the Insurance Proceeds shall be deposited with Lender and after reimbursement of any expenses incurred by Lender, such Insurance Proceeds shall be maintained and applied to pay for the cost of restoring, repairing, replacing or rebuilding the Austin Property or part thereof subject to the Casualty ("**Restoration**"), in the manner set forth herein. Borrower hereby covenants and agrees to commence and diligently to prosecute such Restoration; provided that: (A) Borrower shall pay all costs (and if required by Lender, Borrower shall deposit the total thereof with Lender in advance) of such Restoration in excess of the net Insurance Proceeds made available pursuant to the terms hereof; (B) the Restoration shall be done in compliance with all applicable Legal Requirements; (C) Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after settlement with the applicable insurance carrier regarding the Insurance Proceeds arising from the Casualty) and shall diligently pursue the same to satisfactory completion; (D) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements, including any applicable Environmental Laws; and (E) Lender shall have received evidence satisfactory to Lender that, during the period of the Restoration, the sum of (A) income derived from the Austin Property, as reasonably determined by Lender, plus (B) proceeds of rent loss insurance or business interruption insurance, if any, to be paid, will equal or exceed the sum of (1) expenses in connection with the operation of the Austin Property, (2) the required payments of principal and interest on the Loan, and (3) the other payments required pursuant to this Agreement or the Loan Documents.

(b)     Except as provided above in Section 6.1.2(a), the Insurance Proceeds collected upon any Casualty shall be deposited with Lender and at Lender's option (in its reasonable discretion), be applied to the payment of the Debt after reimbursement of any reasonable expenses incurred by Lender or, if Lender so elects (without any obligation to do so), after reimbursement of any reasonable expenses incurred by

Lender, Lender shall hold such amount and such proceeds shall be maintained and applied in accordance with the Loan Documents to pay for the cost of any Restoration in the manner set forth herein. Any such application to the Debt shall be at Lender's reasonable discretion, except as specifically provided herein to the contrary, and shall be applied in accordance with the provisions of this Agreement.

(c)     In the event Borrower is eligible for reimbursement out of Insurance Proceeds held by Lender, such Insurance Proceeds shall be disbursed from the Lender from time to time (but not more than once per month) upon Lender being furnished with: (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) have been paid for in full; and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's option, assurances satisfactory to Lender that such funds are available, in addition to the Insurance Proceeds, to complete the proposed Restoration; (iv) such architect's certificates, waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve; and (v) all plans and specifications for such Restoration, such plans and specifications to be delivered and approved by Lender prior to commencement of any work.

(d)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and, if required by Lender, by an independent consulting engineer selected by Lender. Lender shall have the use of the plans and specifications and all permits, Licenses and approvals required or obtained in connection with the Restoration. The identity of the General Contractor engaged in the Restoration, as well as the Construction Contract under which it has been engaged, shall be subject to prior review and acceptance by Lender. All reasonable costs and expenses incurred by Lender in connection with making the insurance proceeds available for the Restoration, including reasonable counsel fees and disbursements, shall be deducted by Lender from such insurance proceeds.

(e)     In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than Insurance Proceeds shall be disbursed prior to disbursement of such Insurance Proceeds; and at all times, the undisbursed balance of such Insurance Proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Any surplus which may remain out of Insurance Proceeds after payment of such costs of Restoration shall be applied to the Loan in accordance with the provisions of this Agreement.

### Section 6.1.3    Condemnation.

(a)     Borrower shall promptly give Lender written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding against the Property or the Improvements or any part thereof (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served by or on or received by any of the Borrower Parties in connection with such Condemnation. Following the occurrence of a Condemnation, Borrower or the applicable Borrower Party, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to be effected in accordance with all Legal Requirements.

(b)     Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment ("**Award**") for any taking accomplished through a Condemnation and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Section, provided, however, Lender shall notify Borrower

of any action to be taken under such power of attorney at least five (5) days prior to the taking of such action. . Notwithstanding any taking in connection with a Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Note and the other Loan Documents and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to receive out of the Award interest at the rate or on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note. Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.

(c)    The proceeds of the Award collected upon any Condemnation, shall be deposited directly with Lender pursuant to Section 6.1.3(b) and at Lender's option (in its sole discretion), shall be applied to the payment of the Debt (after reimbursement of any expenses incurred by Lender) or, if Lender so elects (without any obligation to do so), (after reimbursement of any expenses incurred by Lender), Lender shall hold such amount and such proceeds shall be maintained and applied in accordance with the Loan Documents to pay for the cost of any Restoration in the manner set forth herein. Any such application to the Debt shall be at Lender's sole discretion and shall be applied in accordance with the provisions of this Agreement. If the Austin Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of said Award sufficient to pay the outstanding balance of the Debt, provided, however, Lender shall not be entitled to payment of any amount of such Award in excess of the outstanding balance of the Debt.

(d)    In the event Borrower or a Borrower Party is entitled to reimbursement out of the Awards held by Lender, such Awards shall be disbursed from Lender from time to time (but not more than once per month) upon Lender being furnished with: (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration; (ii) evidence satisfactory that: (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) have been paid for in full; and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Austin Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's option, assurances satisfactory to Lender that such funds are available, in addition to the Awards, to complete the proposed Restoration; (iv) such architect's certificates, waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve; and (v) all plans and specifications for such Restoration, such plans and specifications to be delivered and approved by Lender prior to commencement of any work.

(e)    All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and, if required by Lender, by an independent consulting engineer selected by Lender. Lender shall have the use of the plans and specifications and all permits, Licenses and approvals required or obtained in connection with the Restoration. The identity of the general contractor engaged in the Restoration, as well as the general contract under which it has been engaged, shall be subject to prior review and acceptance by Lender. All costs and expenses incurred by Lender in connection with making the Awards available for the Restoration, including reasonable counsel fees and disbursements, shall be deducted by Lender from such Awards.

(f)    In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than Awards shall be disbursed prior to disbursement of such Awards; and at all times, the undisbursed balance of such Awards remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all

Liens or claims for Lien. Any surplus, which may remain out of the Awards after payment of such costs of Restoration, shall be applied to the Loan in accordance with the provisions of this Agreement.

**Section 6.2** Tax and Insurance Escrows.

**Section 6.2.1** At any time during the Loan Term that Borrower shall have failed to pay any Tax by its due date, Lender shall have the right to require the establishment of a tax reserve to be funded by Borrower (**"Tax Reserve Right"**). In the event that Lender exercises the Tax Reserve Right, Borrower shall pay to Lender on each Scheduled Payment Date a sum equal to one-twelfth of the Taxes that Lender reasonably estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates (the **"Tax Escrow Fund"**).

**Section 6.2.2** At any time during the Loan Term that Borrower shall have failed to pay any Insurance premium by its due date, Lender shall have the right to require the establishment of an insurance reserve to be funded by Borrower (**"Insurance Reserve Right"**). In the event that Lender exercises the Insurance Reserve Right, Borrower shall pay to Lender on each Scheduled Payment Date a sum equal to one-twelfth of the Insurance Premiums that Lender reasonably estimates will be payable for the renewal of the coverage afforded by the Policies for the succeeding annual period upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (the **"Insurance Escrow Fund"**).

**Section 6.2.3** If Lender shall have exercised the Tax Reserve Right and/or the Insurance Reserve Right at or prior to Closing, Borrower shall also deposit with Lender on the Closing Date such amount as is required by Lender in order to provide adequate funds therefor on the first payment date for such Taxes and Insurance Premiums and annually thereafter, the Tax Escrow Fund and the Insurance Escrow Fund, as applicable, and the payments of interest or principal or both, payable pursuant to the Note, shall be added together and shall be paid as an aggregate sum by Borrower to Lender in immediately available funds. Lender will apply the Tax Escrow Fund and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.4 and under the other Loan Documents no Declaration of Default has occurred and is continuing. In making any disbursements from the Tax Escrow Fund and the Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax Lien or title or claim thereof. Borrower shall arrange for any such bills, statements or estimates to be delivered to Lender at least fifteen (15) Business Days prior to the date any such payment is due.

**Section 6.2.4** If at any time Lender reasonably determines that the Tax Escrow Fund or the Insurance Escrow Fund is not or will not be sufficient to pay the items set forth in Sections 6.2.2 or Section 6.2.3 above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be. In the event that Borrower shall have elected to dispute the amount of any Tax as provided in Section 5.4, Borrower shall not be required to place into the Tax Escrow Fund such amounts by which Borrower reasonably anticipates the disputed Tax will be reduced, provided the cash deposit or indemnity bond as set forth in Section 5.4 has been posted with Lender.

**Section 6.2.5** Borrower hereby pledges, assigns, and grants a security interest to Lender, as security for the Loan in all of Borrower's right, title, and interest in and to the Tax Escrow Fund and the Insurance Escrow Fund, the Interest Reserve Fund, any other Reserve Fund and all monies, and deposits contained therein.

**Section 6.2.6** If the amount of the Tax Escrow Fund or the Insurance Escrow Fund shall exceed the amounts due for Taxes or Insurance Premiums pursuant to Section 5.4, Lender shall, in its sole discretion, return any excess to Borrower or, at Lender's option, credit such excess against future payments to be made to the Tax Escrow Fund and Insurance Escrow Fund, as applicable. Any amount remaining in the Tax Escrow Fund and Insurance Escrow Fund after the Debt has been paid in full shall be returned to Borrower, or at Lender's option, may be deducted from the Loan payoff amount.

**Section 6.3** **The Management Agreement.** As of the Closing Date, Eightfold Developments, LLC shall manage the Austin Property. Any replacement Manager and/or Management Agreement shall be subject to Lender's prior approval, not to be unreasonably withheld, and Borrower hereby agrees that any fee paid to a Manager in compensation for such Manager's services conducted in connection with the management of the Property shall be subject to Lender's approval. Borrower shall: (a) cause the applicable Manager to manage the Austin Property in accordance with its Management Agreement; (b) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed; (c) promptly notify Lender of any default under the Management Agreement of which it is aware; and (d) promptly enforce the performance and observance of all of the covenants required to be performed and observed by a Manager under its Management Agreement. If Borrower shall default in the performance or observance of any material term, covenant or condition of a Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under the Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.

**Section 6.4** **Prohibition Against Termination or Modification.** Borrower shall not: (a) surrender, terminate, cancel, modify, renew or extend a Management Agreement (other than a renewal or extension provided for in a Management Agreement); (b) enter into any new or other agreement relating to the management or operation of the Austin Property with a Manager or any other Person; (c) consent to the assignment by a Manager of its interest under a Management Agreement; or (d) waive or release any of its rights and remedies under a Management Agreement, in each case without the express consent of Lender, which consent shall not be unreasonably withheld. If at any time Lender consents to the appointment of a new manager and/or the execution of a management agreement under this Article 6 or under Article 7, such manager and Borrower shall, as a condition of Lender's consent, execute a subordination of management agreement in the form then used by Lender.

**Section 6.5** **Replacement of Manager.** Lender shall have the right to require Borrower to replace a Manager with a Person chosen by Borrower and approved by Lender upon the occurrence of any one or more of the following events: (a) from and after the Maturity Date, (b) at any time following a Declaration of Default, (c) if the Manager shall be in default under its Management Agreement beyond any applicable notice and cure period, (d) if the Manager shall become insolvent or a debtor in a bankruptcy, reorganization, insolvency or similar proceeding under any Bankruptcy Law, or (e) if at any time the Manager has engaged in gross negligence, fraud or willful misconduct.

**Section 6.6** **Interest Reserve.** Contemporaneously with the first advance of the Loan, Borrower will establish with Lender a reserve in the amount of Eight Million Five Hundred Thousand and 00/100 Dollars ($8,500,000.00) (the "**Interest Reserve Fund**") payable from the Loan proceeds. Borrower understands and agrees that, notwithstanding the establishment of the Interest Reserve Fund, all of the proceeds of the Initial Advance has been, and shall be considered, fully disbursed and shall bear interest and be payable on the terms provided therein (although advances from the Interest Reserve Fund shall not bear interest until so advanced). For so long as no Declaration of Default has occurred hereunder or under any of the other Loan Documents, Lender shall, on each Scheduled Payment Date, advance from the Interest Reserve Fund to itself the amount of the Monthly Debt Service Payment (as defined in the Note) and other accrued interest then due and payable under the Notes. Once there are no funds remaining in the Interest Reserve Fund or upon a Declaration of Default, Lender shall have no further obligation for funding of accrued and unpaid interest, or amounts payable

and unpaid, whereupon Borrower shall be and remain responsible for the continuation of all such Monthly Debt Service Payments from funds other than proceeds of the Loan, except in such instances when Lender approves (in its reasonable discretion) Borrower's request to make Project savings available for Monthly Debt Service Payments. Without limitation upon the foregoing, for so long as there shall be funds held in the Interest Reserve Fund sufficient to pay the Monthly Debt Service Payment, Lender shall not issue any Declaration of Default by reason of the untimely or late payment of the Monthly Debt Service Payment.

## VII    DEFAULTS

**Section 7.1**      Events of Default.

Each of the following shall constitute an Event of Default hereunder:

(a)      if: (A) any payment due pursuant to the Note, this Agreement or any of the other Loan Documents, including the payment due on the Maturity Date (or, if the Maturity Grace Period defined and described in the Note is applicable, due at the end of such Maturity Grace Period), is not paid on or before the date the same is due; or (B) any other portion of the Debt is not paid on or before the date the same becomes due and payable by the terms of the Loan Documents;

(b)      subject to Borrower's right to contest Taxes and Other Charges pursuant to Section 5.4 above, any of the Taxes or Other Charges (other than any of the same payable on a Scheduled Payment Date) are not paid on or before the date the same are due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with terms of this Agreement and Lender fails to pay same;

(c)      the Policies are not kept in full force and effect, or copies of the Policies are not delivered to Lender within ten (10) days of written request by Lender;

(d)      a Transfer (other than a Transfer specifically authorized and permitted by Section 5.18) shall occur without Lender's prior written consent;

(e)      any representation or warranty made by Borrower or any of the Borrower Parties herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender in connection with the Loan, shall have been false or misleading in any respect as of the date the representation or warranty was made; provided, however, if such false or misleading representation or warranty is susceptible of being cured within thirty (30) days, the same shall be an Event of Default hereunder only if the same is not cured within a reasonable time, not to exceed thirty (30) days after notice from Lender;

(f)      if: (a) Borrower or any Borrower Party shall commence any case, proceeding or other action (1) under any existing or future Bankruptcy Laws, or (2) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for Borrower or any Borrower Party or for all or any substantial part of the assets of Borrower or any Borrower Party, or Borrower or any Borrower Party shall make a general assignment for the benefit of creditors; or (b) there shall be commenced against Borrower or any Borrower Party any case, proceeding or other action of a nature referred to in clause (a) above which (1) results in the entry of an order for relief or any such adjudication or appointment or (2) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (c) there shall be commenced against Borrower or any Borrower Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof, or (d) Borrower or any Borrower Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (a), (b), or (c) above; or (e) Borrower or any Borrower Party shall generally not, or shall be unable to, or shall admit in writing or in any proceeding its inability to, pay its debts as they become due; or (f) Borrower or any Guarantor files a petition,

complaint, answer or other instrument which seeks to effect a suspension of or which has the effect of suspending any of the rights or powers of Lender granted in this Agreement or in any of the other Loan Documents;

(g)      if Borrower or a Borrower Party shall be in default under any other permitted mortgage, deed of trust or security agreement covering any part of the Property whether it be superior or junior in Lien to the Security Instruments and whether it be permitted under the Loan Documents or if Borrower shall be in default of any other Indebtedness, secured or unsecured, owed by Borrower to any Person, provided, however, the foregoing shall not be deemed to permit Borrower to incur any other Indebtedness unless expressly permitted by the Loan Documents;

(h)      if Borrower or any Person owning a direct or indirect interest in Borrower shall be in default under any pledge agreement or security agreement covering any part of the equity interests in Borrower, whether it be permitted or prohibited under the Loan Documents;

(i)      subject to Borrower's (or the applicable Borrower Party's) right to contest set forth in the Security Instruments, if the Austin Property becomes subject to any mechanic's or materialman's lien or other Lien except a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(j)      a Declaration of Default is made under the terms of any other loan made by Lender or any of its Affiliates to Borrower, any Borrower Party, any Guarantor or any of their respective Affiliates;

(k)      if any term, covenant or provision of this Agreement or of any of the other Loan Documents specifies a cure period for any breach thereof, if Borrower shall continue to be in default under such term, covenant, or provision of any of the Loan Documents (including this Agreement), beyond such applicable cure periods contained herein or in those documents, or if no cure period is provided by this Agreement or the other Loan Documents, any other default hereunder or thereunder, which default is not cured (i) in the case of any default which can't be cured by the payment of a sum of money, within three (3) days after receipt of written notice from Lender to Borrower, or (ii) in the case of any default which cannot be cured by the payment of a sum of money, within fifteen (15) days after written notice from Lender to Borrower, provided, however, if such default is reasonably susceptible of cure, but not within such fifteen (15) day period, then Borrower may be permitted up to an additional thirty (30) days to cure such default provided that Borrower diligently and continuously pursues such cure;

(l)      if Borrower violates or does not comply with any of the provisions of Section 4.1(s) or if any general partner, managing member or manager of Borrower violates or does not comply with any of the provisions of Section 4.1(s);

(m)      the prohibition, enjoining or interruption of Borrower's or a Borrower Party's right to occupy, use or lease the Property for a continuous period of more than thirty (30) days;

(n)      the sequestration or attachment of, or any levy or execution upon any of the Property, any other collateral provided by Borrower or a Borrower Party under any of the Loan Documents, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of thirty (30) days or the sale of the assets affected thereby;

(o)      the failure at any time of the Austin Security Instrument to be a valid first lien upon the Austin Property or any portion thereof, other than as to the Permitted Exceptions and as a result of any release or reconveyance of the Austin Security Instrument with respect to all or any portion of the Austin Property pursuant to the terms and conditions of this Agreement;

(p) the failure at any time of any of the Edmonton Security Instruments to be a valid first lien upon the Edmonton Property or any portion thereof;

(q) the discovery of any significant Hazardous Materials in, on or about the Austin Property subsequent to the Closing Date which did not exist in, or about the Austin Property prior to the Closing Date. Any such Hazardous Materials shall be "**significant**" for this purpose if the presence of said Hazardous Materials, in Lender's reasonable discretion, have, or could have, a Material Adverse Effect on the value of the Austin Property;

(r) a Material Adverse Change in the financial condition, operations or business of Borrower, any Borrower Party, or any portion of the Property;

(s) except as permitted herein, the alteration, demolition or removal of any improvements at the Austin Property without Lender's prior consent;

(t) if, without Lender's prior consent, a Management Agreement is terminated (and no replacement has been entered into in accordance with this Agreement);

(u) if there shall be a default under any other Loan Document beyond any applicable notice and cure period, if any, or if any other event shall occur or condition shall exist; and the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the Maturity of any or all of the Debt;

(v) the liquidation, termination, dissolution, merger or consolidation of Borrower or any Guarantor which is an entity;

(w) the death or permanent disability of any Guarantor who is an individual, provided, however, if such Guarantor is replaced with a replacement Guarantor satisfactory to Lender within sixty (60) calendar days of such death or permanent disability, Lender shall not issue a Declaration of Default therefor.

(x) if Borrower or any Guarantor, or any party acting on behalf of Borrower or any Guarantor, shall take any action which seeks to cause any Loan Document or the liens, mortgages or security interests of Lender in any of the Property to cease to be in full force and effect, be declared null and void or unenforceable in whole or in part, cease to have the priority required herein, or the validity or enforceability thereof, in whole or in part, shall be challenged or denied by Borrower, any Guarantor or any party acting on behalf of Borrower or any Guarantor; or

(y) if Borrower breaches any covenant contained in Section 5.33 hereof or any representation contained in Section 4.1(ee) hereof.

**Section 7.2** **Remedies.**

(a) Upon the occurrence of any Declaration of Default, Lender may take such action, without further notice, demand presentment, protest or other requirements of any kind (all of which are expressly waived by Borrower), as Lender deems advisable to protect and enforce its rights and remedies against Borrower and/or any Borrower Party and in and to the Property, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender (provided that upon the occurrence of a Declaration of Default under Section 7.1(a)(vi), all commitments to make further advances shall automatically terminate, and the Debt shall become immediately due and payable, in each case without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind (all of which are hereby expressly waived by Borrower)):

Security Instrument;

    (i)    declare the entire Debt to be immediately due and payable;

    (ii)    terminate all commitments to make further advances;

    (iii)    exercise any of the rights or remedies specified in the applicable

    (iv)    apply any sums then deposited with Lender or any third party under the control of Lender and any other sums held in escrow or otherwise by Lender, including the Reserves, in accordance with the terms of this Agreement or any other Loan Document to the payment of the following items in any order in Lender's sole discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; and (v) all other sums payable pursuant to the Note, this Agreement and the other Loan Documents, including advances made by Lender pursuant to the terms of this Agreement;

    (v)    pursue such other rights and remedies as may be available at law or in equity or under the Uniform Commercial Code including the right to receive and/or establish a lock box for all Rents, proceeds from the Intangibles (as defined in the Security Instrument) and any other receivables or rights to payments of Borrower or a Borrower Party relating to the Property;

    (vi)    with or without actual or threatened waste to the Property, Lender shall, at Lender's discretion, be entitled, and is hereby expressly and irrevocably authorized, upon application to a court of competent jurisdiction, without notice to Borrower or any Borrower Party, or any other party (any and all such notice being waived hereby) and without regard to the adequacy of any security for the Debt or the solvency of Borrower or any other party liable for payment of the Debt, to appoint a receiver(s), on an emergency basis or otherwise (and if allowed by applicable law, on an *ex parte* basis), to take possession of and to operate the Property, and at Lender's option, to collect the Rents. Borrower and the Borrower Parties irrevocably waive all notice of and defenses and objections to the appointment of such receiver. Borrower and the Borrower Parties further irrevocably agree that the occurrence of a Declaration of Default *per se* would create an emergency and the necessity for immediate actions; and

    (vii)    pursue any other right or remedy allowed by any Loan Document or applicable law.

    (b)    Upon a Declaration of Default and continuance thereof, interest on the outstanding principal balance and, to the extent permitted by law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be computed from the Declaration of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due). To the extent permitted by applicable law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instruments. This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the Declaration of Default; the acceptance of any payment by Lender shall not be deemed to cure or constitute a waiver of any Event of Default; and Lender retains its rights under this Agreement and the other Loan Documents to accelerate and to continue to demand payment of the Debt following a Declaration of Default, despite any payments made to Lender after the occurrence of such Declaration of Default.

    (c)    Lender may resort to any remedies and the security given by any of the Loan Documents in whole or in part, and in such portions and in such order as determined by Lender in its sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Note, the Security Instruments or any of the other Loan Documents. The failure of Lender to exercise any right, remedy or option provided in any of the Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Note, the Security Instruments or the other Loan Documents. No acceptance by Lender of any payment after the occurrence of a Declaration of Default and no payment by Lender of any obligation for which Borrower is liable hereunder shall be deemed to

waive or cure any Event of Default, or Borrower's liability to pay such obligation.  No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Property or the liability of Borrower to pay the Debt.  No waiver by Lender shall be effective unless it is in writing signed by Lender and then only to the extent specifically stated.

(d)  With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt, and Lender may seek satisfaction out of the Property or any part thereof or decline to do so, in Lender's sole and absolute discretion.  In addition, Lender shall have the right from time to time to partially foreclose either or both of the Security Instruments in any manner and for any amounts secured by the Security Instruments then due and payable as determined by Lender in Lender's sole and absolute sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose either or both of the Security Instruments to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose either or both of the Security Instruments to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instruments as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instruments to secure payment of sums secured by the Security Instruments and not previously recovered.

(e)  Additionally, upon the occurrence of any Declaration of Default, Lender may, but without any obligation to do so and without notice to or demand on any Borrower Party and without releasing any Borrower Party from any obligation under the Loan Documents, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Following a Declaration of Default, Lender is authorized to enter upon the Property for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose the Loan Documents or collect the Debt, and the reasonable cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest at the Default Rate (as defined in the Note) for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Loan Documents and shall be due and payable to Lender upon demand.

(f)  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of the occurrence of one Event of Default shall not be construed to be a waiver of the occurrence of any subsequent Event of Default or to impair any remedy, right or power of Lender.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instruments to the extent necessary to foreclose on all or any portion of the Property, the Rents or any other collateral.

**Section 7.3   Right of Entry.**  In addition to any other rights or remedies granted under this Agreement, in the event of any default by Borrower hereunder, Lender and its agents shall have the right without notice to enter and inspect the Property at any reasonable time during the Term.  The reasonable cost of such inspections or audits, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Lender, shall be borne by Borrower.  The cost of such inspections, if not paid for by Borrower following demand, may, at Lender's option, be added to the principal balance of the sums due under the Note and shall bear interest thereafter until paid at the Default Rate.

**Section 7.4   Costs of Enforcement.**  In the event of the (i) exercise of any remedy by Lender under this Agreement or the other Loan Documents or following the occurrence of an Declaration of Default, (ii) foreclosure of any mortgage prior to or subsequent to the Security Instruments in which proceeding Lender is

made a party, (iii) bankruptcy, insolvency, reorganization, rehabilitation, liquidation or other similar proceeding in respect of any Borrower Party or an assignment by any Borrower Party for the benefit of its creditors, (iv) enforcement of any obligations of or collection of any payments due from any Borrower Party under this Agreement, the other Loan Documents or with respect to the Property, or (v) incurring of any costs or expenses by Lender in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out," then Borrower, its successors or assigns, shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting Lender's interest in the Property or in collecting any amount payable hereunder or in enforcing Lender's rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Declaration of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

**Section 7.5**    Violation of Legal Requirements.    If the Property is not in compliance with one, some or all of the Legal Requirements, Lender may impose additional requirements upon Borrower in connection therewith including, without limitation, monetary reserves or financial equivalents.

**Section 7.6**    Remedies Cumulative.    The rights, powers and remedies of Lender under this Agreement and the other Loan Documents shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower or any of the Borrower Parties pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. Any and all amounts collected or retained by Lender after a Declaration of Default has occurred, including interest at the Default Rate, late charges or any escrowed amount, may be applied by Lender to payment of the Debt in any order or priority that Lender in its sole discretion may elect.

## VII    TRANSFER OF LOAN AND REFINANCING

**Section 8.1**    Lender's Transfers.    Lender may, at any time and at its sole cost and expense: (i) sell, transfer or assign the Loan and the Loan Documents and any servicing rights with respect thereto; or (ii) grant participations therein or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (collectively, "**Securities**"). Lender may forward to any purchaser, transferee, assignee, servicer, participant, or investor in such Securities (collectively, "**Investors**"), to any Rating Agency (defined below) rating such Securities and to any prospective Investor, all documents and information which Lender now has or may later acquire relating to the Obligations, Borrower, guarantor(s), any indemnitor(s), or otherwise, as Lender determines advisable. Borrower, any guarantor and any indemnitor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Section 8.1 including the delivery of an estoppel certificate and such other documents as may be reasonably requested by Lender. Borrower shall also furnish consent of any guarantor and any indemnitor in order to permit Lender to furnish such Investors or such prospective Investors or such Rating Agency with any and all information concerning the Property, the Leases, the financial condition of Borrower, any guarantor and any indemnitor, as may be reasonably requested by Lender, any Investor, any prospective Investor or any Rating Agency and which may be complied with without undue expense. "**Rating Agency**" shall mean any one or more credit rating agencies approved by Lender. Lender shall comply in all respects with all applicable Legal Requirements relating to the protection of personal information of individual Persons, including but not limited to social security numbers, home addresses and financial information which includes bank account numbers.

**Section 8.2**    Register.    Lender, acting solely for this purpose as an agent of Borrower, shall maintain at one of its offices a register for the recordation of the names and addresses of each Lender, and principal amounts (and stated interest) of the Loans or other Obligations owing to such Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and Borrower and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

**Section 8.3** **Participations.** Any Lender may at any time, without the consent of, or notice to, Borrower, sell participations to any Person (other than a natural Person or Borrower or any Affiliate of Borrower) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loan owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Borrower shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that affects such Participant and (i) reduces or forgives the principal amount of any Loan or reduces the rate of interest thereon, or reduces or forgives any interest or fees payable hereunder, (ii) postpones any scheduled date of payment of the principal amount of any Loan, or any date for the payment of any interest, fees or other Obligations payable hereunder, or reduce the amount of, waive or excuse any such payment, (iii) releases any Guarantor from its obligation under its Guaranty (except as otherwise permitted herein or in the other Loan Documents), or (iv) releases all or substantially all of the collateral securing any Loan. Borrower agrees that each Participant shall be entitled to the benefits of Section 2.6 (subject to the requirements and limitations therein, including the requirements under Section 2.6(f) (it being understood that the documentation required under Section 2.6(f) shall be delivered to the participating Lender)) to the same extent as if it were the Lender and had acquired its interest by assignment, provided that such Participant shall not be entitled to receive any greater payment under Section 2.6, with respect to any participation, than Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

Each Lender that sells a participation shall, acting solely for this purpose as an agent of and for the benefit of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loan or other Obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and as described in Section 2.7(e). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

**Section 8.4** **Waiver.** Borrower agrees that upon any assignment or transfer of the entire Loan and the Loan Documents by Lender to any third party, upon receipt of notice given by Lender to Borrower of: (i) the name and business address of the assignee or transferee; (ii) the address to which all future Debt Service Payments should be made and the effective date such payments should commence; (iii) the name and business address of the party which will service the Loan, if it is not the assignee/transferee; (iv) the outstanding principal balance of the Loan, the date of the last Monthly Debt Service Payment, the amount of all Escrows and Reserves held by Lender and whether such Escrows and Reserves have been transferred in full to the assignee/transferee; (v) confirmation that the Lender has transferred all Collateral to the assignee/transferee; and (v) certification by Lender that it has made no prior assignments or transfers of the Loan or Loan Documents; then thereafter Lender shall have no obligations or liabilities under the Loan Documents, such third party shall be substituted as the lender under the Loan Documents for all purposes, and Borrower shall look solely to such third party for the performance of any obligations under the Loan Documents or with respect to the Loan.

**Section 8.5** **Collateral.** Upon an assignment or other transfer of the Loan Documents, Lender may, at its discretion, deliver all collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under

applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred to Borrower or to the assignee or transferee of the Loan Documents. This provision shall apply to every transfer of any collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to a new assignee or transferee.

**Section 8.6     Right of First Opportunity to Offer Permanent Financing.** Provided Lender has not previously assigned or otherwise transferred the Loan or any part of the Loan to a third party, Lender (but not any successor or assignee of Lender) shall have a right of first opportunity to extend replacement financing for the Austin Property (herein referred to as the "**Permanent Financing**").

**Section 8.7     Request.** If Borrower intends to seek Permanent Financing then, no later than one hundred twenty (120) days prior to the Maturity Date, Borrower shall provide to Lender in writing, a request for Permanent Financing (the "**Request**"), setting out the terms and conditions desired by Borrower. Lender acknowledges that, throughout the Loan Term, Lender will have received updated financial and other information regarding the Borrower Parties and updated information regarding the Property and therefore shall require only certifications that such information has not changed since the date such information was last updated or, if such information has changed, the details of such changes. Upon receipt of the Request, Lender shall have thirty (30) calendar days to issue an offer to extend to Borrower the Permanent Financing on such terms and conditions as Lender may determine (the "**Permanent Financing Offer**"). Borrower shall have the right to accept or reject the Permanent Financing Offer in its sole discretion and thereafter, Borrower shall be free to seek Permanent Financing from other sources.

## IX     EXCULPATION.

**Section 9.1     Full Recourse.** The Debt shall be fully recourse to Borrower. Borrower shall be fully personally liable for all of the Debt. Each Guarantor shall be, jointly and severally with Borrower, fully personally liable for all of the Debt in accordance with the Guaranty.

**Section 9.2     No Waiver.** Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents (including the provisions of this Article IX) Lender shall not be deemed to have waived any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

## X     INDEMNIFICATION.

**Section 10.1     Indemnification.** Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, provided such Losses are not the result of any Indemnified Party's fraud, gross negligence or intentional malfeasance.

**Section 10.2     Duty to Defend; Attorneys' Fees and Other Fees and Expenses.** Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals reasonably approved by the Indemnified Parties. Notwithstanding the foregoing, any of the Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding. Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith; provided, however, that all of the Indemnified Parties shall be defended by one firm of attorneys unless Lender in good faith determines that more than one law firm should be retained because of conflicts of interest or potential conflicts of interest.

**Section 10.3** **Changes in Laws Regarding Taxation.** If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay such tax, with interest and penalties thereon, if any, provided however, Borrower shall not be required to pay such interest and/or penalties if Lender shall fail to notify Borrower within thirty (30) calendar days after such interest and penalties begin to accrue/are imposed. In the event Lender is advised by counsel chosen by Lender that the payment of such tax or interest and penalties by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then in any such event, Lender shall have the option, by written notice of not less than one hundred twenty (120) calendar days, to declare the Debt immediately due and payable.

**Section 10.4** **No Credits on Account of the Debt.** Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Austin Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Austin Property, or any part thereof, for real estate tax purposes by reason of the Loan Documents or the Debt. In the event such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than one hundred twenty (120) calendar days, to declare the Debt immediately due and payable.

**Section 10.5** **Recording of Security Instrument.** Borrower forthwith upon the execution and delivery of this Agreement and thereafter, from time to time upon five (5) Business Days' notice from Lender, will cause the Security Instruments, and any other Loan Document creating a Lien or security interest or evidencing the Lien thereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by Lender or by any present or future law in order to publish notice of and fully to protect the Lien or security interest thereof upon, and the interest of Lender in, the Property or to correct any error in the legal description of the Property. Borrower will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of the Security Instruments, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document and any instrument of further assurance, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Security Instruments, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document or any instrument of further assurance, except where prohibited by law so to do. Borrower shall hold harmless and indemnify Lender, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of the Security Instruments or any other Loan Document. If at any time any Governmental Authority shall require revenue or other stamps to be affixed to any of the Loan Documents, or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any. Borrower hereby absolutely and irrevocably appoints Lender as Borrower's true and lawful attorney, coupled with an interest, in Borrower's name and stead to make and execute all documents necessary or desirable to effect the provisions of this Section 10.5 if Borrower fails to do so for five (5) days after demand by Lender. Borrower hereby ratifies all that Borrower's said attorney shall do by virtue of such power or authority. Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney.

**Section 10.6** **Brokers and Financial Advisors.** Borrower hereby represents that, except as previously disclosed to Lender, Borrower has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this Section 10.6 shall survive the expiration and termination of this Agreement and the payment of the Debt.

## XI    WAIVERS

**Section 11.1    Waiver of Counterclaim.** All amounts due under this Agreement or the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against Borrower by Lender or its agents, or otherwise offset any obligations to make payments required under the Loan Documents. Any Investor or assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of the Loan Documents, and no such unrelated offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon the Loan Documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower. If Borrower is indebted to Lender pursuant to more than one note or note or pursuant to any subordinate loan documents, (i) the preceding provisions shall apply to any note or other loan documents assigned or transferred by Lender, even if one or more notes are retained by Lender, and (ii) Borrower waives and releases any right to assert any claim, cause of action, offset or defense against Lender with respect to the Loan or the Loan Documents which is any way related to such other note or subordinate loan documents.

**Section 11.2    Marshalling and Other Matters.** Borrower and the Borrower Parties hereby waive, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein and the pleading of any statute of limitations as a defense to payment of the Debt or performance of the Obligations. Further, Borrower and the Borrower Parties hereby expressly waive any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instruments on behalf of Borrower or the Borrower Parties, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Agreement and on behalf of all Persons to the extent permitted by applicable law. Borrower and the Borrower Parties hereby waive and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States, Canada, and of any state, province, in and to the Property as against the collection of the Debt, or any part thereof. The interests and rights of Lender under the Note, the Security Instruments or in any of the other Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Lender may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, Borrower Party or surety of any of the Debt.

**Section 11.3    Waiver of Notice.** Borrower shall not be entitled to, and hereby waives the right to receive, any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

**Section 11.4    Trial by Jury.** BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

**Section 11.5    Credit Authorization and Consent to Disclosure.** Lender may collect, retain, release, disclose, exchange, share, transfer and assign from time to time, as it may determine in its sole discretion, all information and materials (including financial statements and information concerning the status of the Loan,

such as existing or potential Loan defaults, lease defaults or other facts or circumstances which might affect the performance of the Loan) provided to or obtained by it relating to Borrower, Property or the Loan (both before and after the disbursement of funds and/or default thereunder) without restriction and without notice to or the consent of Borrower and/or any guarantor (and Borrower hereby irrevocably consents thereto):

    (a)    to any other Lender or investor who has an interest in the Loan;

    (b)    to any proposed purchaser or subsequent owner of the Loan including any subsequent or proposed Lender and their respective third party advisors and agents, such as lawyers, accountants, auditors, consultants, appraisers and credit verification sources;

    (c)    to the public or any private group in any offering memorandum, prospectus or other disclosure document relating to any sale, syndication or securitization of the Loan (including all initial and continuing disclosure requirements), regardless of format or scope of distribution;

    (d)    to the public or other interested persons, directly or indirectly through information service providers or other market participants, for the purpose of providing market information from time to time relating to the status of the Loan or any related securitization or any interest therein, regardless of format or scope of distribution;

    (e)    to any governmental authority having jurisdiction over any sale, syndication or securitization of the Loan or any trade of any interest therein;

    (f)    to any other Person in connection with the sale, syndication or securitization of the Loan, including insurers and rating agencies; and

    (g)    to any other Person in connection with the collection or enforcement proceedings taken under or in respect of the Loan.

Without limiting the foregoing, Borrower hereby consents to the Lender obtaining all information as may be necessary from all available sources as to the creditworthiness of Borrower and acknowledges that the Lender may collect or come into possession of personal information relating to certain individuals either comprising or otherwise connected with the Borrower which information may include contact information (mailing address, e-mail address, telephone number or fax number), financial information and status (bank account numbers, existing debts, personal net worth or credit history), date of birth, place of employment and social security number. Borrower acknowledges and agrees that such personal information may be used by Lender in connection with the processing, approving, funding, servicing and administering the Loan and any sale, syndication or securitization of the Loan, and in so doing the Lender may disclose and otherwise deal with personal information in the same manner and to the same Persons as provided in the preceding paragraph without restriction and without notice to or the consent of Borrower or any related individual. Borrower for itself and on behalf of its directors, officers, shareholders and principals, hereby consents to and authorizes such use and disclosure of all such personal information by the Lender and represents and warrants that it has full power and authority to give such consent and authorization.

    **Section 11.6**    <u>Contributions and Waivers</u>.  To the extent permitted by applicable Legal Requirements, Borrower waives:

    (i)    any right to require Lender to proceed against any other Borrower or any other Person or to exhaust any security held by Lender at any time or to pursue any other remedy in Lender's power before proceeding against Borrower;

    (ii)    any defense based upon any legal disability or other defense of any other Borrower, any guarantor of any other Person or by reason of the cessation or limitation of the liability of any other Borrower or any guarantor from any cause other than full payment of all sums payable under the Loan Documents;

(iii) any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of any other Borrower or any principal of any other Borrower or any defect in the formation of any other Borrower or any principal of any other Borrower;

(iv) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

(v) any defense based upon any failure by Lender to obtain collateral for the indebtedness or failure by Lender to perfect a lien on any collateral;

(vi) presentment, demand, protest and notice of any kind;

(vii) any defense based upon any failure of Lender to give notice of sale or other disposition of any collateral to any other Borrower or to any other Person or any defect in any notice that may be given in connection with any sale or disposition of any collateral;

(viii) any defense based upon any failure of Lender to comply with applicable laws in connection with the sale or other disposition of any collateral, including any failure of Lender to conduct a commercially reasonable sale or other disposition of any collateral;

(ix) any defense based upon any use of cash collateral under Section 363 of the Bankruptcy Code;

(x) any defense based upon any agreement or stipulation entered into by Lender with respect to the provision of adequate protection in any bankruptcy proceeding;

(xi) any defense based upon any borrowing or any grant of a security interest under Section 364 of the Bankruptcy Code;

(xii) any defense based upon the avoidance of any security interest in favor of Lender for any reason;

(xiii) any defense based upon any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding, including any discharge of, or bar or stay against collecting, all or any of the obligations evidenced by the Note or owing under any of the Loan Documents;

(xiv) any defense or benefit based upon Borrowers', or any other party's, resignation of the portion of any obligation secured by the Security Instruments to be satisfied by any payment from any other Borrower or any such party;

(xv) all rights and defenses arising out of an election of remedies by Lender even though the election of remedies, such as non-judicial foreclosure with respect to security for the Loan or any other amounts owing under the Loan Documents, has destroyed Borrowers' rights of subrogation and reimbursement against any other Borrower; and

(xvi) all rights and defenses that Borrower may have because any of the Loan is secured by real property. This means, among other things (subject to the other terms and conditions of the Loan Documents): (1) Lender may collect from Borrower without first foreclosing on any real or personal property collateral pledged by any other Borrower Party, and (2) if Lender forecloses on any real property collateral pledged by any other Borrower Party, (I) the amount of the Debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price and (II) Lender may collect from Borrower even if any other Borrower Party, by foreclosing on the real property collateral, has destroyed any right Borrower may have to collect from any other Borrower Party. This is an unconditional and irrevocable waiver of any rights and defenses Borrower may have because any of the Debt is secured by real property; and except as may be expressly and specifically permitted herein, any claim or other right which Borrower might now have or hereafter acquire against any other Borrower Party or any other Person that arises from the existence or performance of any obligations under the Loan Documents, including

any of the following: (i) any right of subrogation, reimbursement, exoneration, contribution, or indemnification; or (ii) any right to participate in any claim or remedy of Lender against any other Borrower Party or any collateral security therefor, whether or not such claim, remedy or right arises in equity or under contract, statute or common law.

**Section 12.1**     Survival.     This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant to any of the Loan Documents, including the Sources and Uses of Funds and the Loan Term Sheet, shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**XII     MISCELLANEOUS**

**Section 12.2**     Governing Law.     Except as otherwise expressly set forth herein, this Agreement shall be governed, construed, applied and enforced in accordance with the laws of the state where the Austin Property is located without regard to the conflicts of law provisions thereof ("**Governing State**"). Borrower, the Borrower Parties hereby consent to personal jurisdiction in the Governing State. JURISDICTION AND VENUE OF ANY ACTION BROUGHT TO ENFORCE THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY ACTION RELATING TO THE LOAN OR THE RELATIONSHIPS CREATED BY OR UNDER THE LOAN DOCUMENTS ("**ACTION**") SHALL, AT THE ELECTION OF LENDER, BE IN (AND IF ANY ACTION IS ORIGINALLY BROUGHT IN ANOTHER VENUE, THE ACTION SHALL AT THE ELECTION OF LENDER BE TRANSFERRED TO) A STATE OR FEDERAL COURT OF APPROPRIATE JURISDICTION LOCATED IN THE GOVERNING STATE. BORROWER HEREBY CONSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF THE STATE COURTS OF THE GOVERNING STATE AND OF FEDERAL COURTS LOCATED IN THE GOVERNING STATE IN CONNECTION WITH ANY ACTION AND HEREBY WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY OTHER STATE TO OBJECT TO JURISDICTION WITHIN SUCH GOVERNING STATE FOR PURPOSES OF ANY ACTION. GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH STATE OR FEDERAL COURTS IN ANY SUIT, ACTION OR PROCEEDING, AND EACH GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

> Nicholas Legato, Esquire
> Hinshaw & Culbertson LLP
> 222 North LaSalle Street
> Suite 300
> Chicago, Illinois 60601

AS ITS AUTHORIZED AGENT TO ACCEPT ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING. GUARANTOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE STATE OF TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS, AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN THE STATE OF TEXAS, OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN

ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTIONS.

Borrower and the Borrower Parties hereby waive and agrees that it or is not subject to any jurisdiction, (ii) any claim that any Action may not be brought against it or is not maintainable in those courts or that this Agreement may not be enforced in or by those courts, or that it is exempt or immune from execution, (iii) that the Action is brought in an inconvenient forum, or (iv) that the venue for the Action is in any way improper.

**Section 12.3** **Modification, Waiver in Writing.** No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of any other Loan Document, nor consent by Lender to any departure by any Borrower Party from the Obligations, shall in any event be effective unless the same shall be in a writing signed by the Person against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on any Borrower Party shall entitle any Borrower Party to any other or future notice or demand in the same, similar or other circumstances.

**Section 12.4** **Delay Not a Waiver.** Neither any failure nor any delay on the part of Lender in insisting upon strict performance or compliance of any term, condition, covenant or agreement, or Lender's delay in exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount. Lender shall have the right, in its complete and sole discretion, to waive or reduce any time periods to which Lender is entitled under the Loan Documents.

**Section 12.5** **Notices.** All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing (including by facsimile) and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by facsimile (with a copy sent contemporaneously by certified or registered United States mail, postage prepaid) answer back acknowledged), addressed as follows:

If to Borrower:

    3443 Zen Garden Limited Partnership
    4210 Spicewood Springs Road Suite 205
    Austin, Texas 78759
    Telephone: 512-345-7000
    Email: adam@panachehomes.com

with a copy to:

    Nicholas Legatos, Esquire
    Hinshaw & Culbertson LLP
    222 North LaSalle Street Suite 300
    Chicago, Illinois 60601
    Telephone: 312-704-3051
    Email: nlegatos@hinshawlaw.com

If to Borrower Parties:

    2833 Broadmoor Boulevard
    Suite 260
    Sherwood Park, Alberta, Canada T8H 2H3
    Telephone: 780-237-9560
    Email: dwhite@symmetryinc.com

If to Lender:

Romspen Mortgage Limited Partnership
162 Cumberland Street, Suite 300
Toronto, Ontario M5R 3N5
Attention: Joel Mickelson and Blake Cassidy
Telephone: (416) 928-4870
Facsimile: (416) 966-1161
Email: Joel.Mickelson@romspen.com, Blake.Cassidy@romspen.com

with a copy to:

Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Attention: Clifton M. Dugas, II
Telephone: (214) 661-5545
Facsimile: (214) 889-5284
Email: cdugas@polsinelli.com

with a copy to:

Witten LLP
10303 Jasper Avenue, Suite 2500
Edmonton, Alberta T5J 3N6
Attention: Catherine A. Farnell
Telephone: (780) 441-3210
Facsimile: (780) 429-2559
Email: cfarnell@wittenlaw.com

or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section. A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day, in the case of facsimile, upon completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) with receipt acknowledged by the recipient thereof.

**Section 12.6 Headings.** The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. "Section" refers to the entire section and not to any particular subsection, paragraph of other subdivision. Reference to days for performance shall mean calendar days unless Business Days are expressly indicated.

**Section 12.7 Severability.** If any provision or obligation under this Agreement and the other Loan Documents shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that provision shall be deemed severed from the Loan Documents and the validity, legality and enforceability of the remaining provisions or obligations shall remain in full force as though the invalid, illegal, or unenforceable provision had never been a part of the Loan Documents.

**Section 12.8 Preferences.** Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by any of the Borrower Parties to any portion of the Obligations. To the extent any of the Borrower Parties makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Bankruptcy Law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 12.9** **Expenses.** Borrower covenants and agrees to pay to Lender upon receipt of written notice from Lender for all costs and expenses (including attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for the Borrower Parties (including any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) the ongoing performance of and compliance with the respective agreements and covenants of the Borrower Parties contained in this Agreement and the other Loan Documents; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents, including Lender's administration and servicing of the Loan; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing compliance with any requests made by any Borrower Party pursuant to any provision of any of the Loan Documents; (vi) the filing and recording of the Loan Documents, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting any Borrower Party, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; (viii) costs incurred by Lender in the review of easements, lot line agreements or similar matters, the review and approval of or consent to Leases and the negotiation of subordination, non-disturbance and attornment agreements, and other similar items required by Borrower or a Borrower Party in connection with Borrower's or a Borrower Party's use and enjoyment of the Property; (ix) costs incurred by Lender in responding to any subpoena or participating in, observing or preparing for any deposition or other legal or quasi-legal process; and (x) the amounts described in Section 7.4. Any cost and expenses due and payable to Lender shall be payable within five (5) Business Days of demand, shall be secured by the Loan Documents, and if not paid when due, shall bear interest at the Default Rate until paid. Borrower hereby agrees that Lender, in its sole discretion, may make advances under the Loan to pay any costs and expenses due and payable to Lender under the Loan Documents.

**Section 12.10** **Relationship of Borrower and Lender.** The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, the Security Instruments, this Agreement and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of the debtor and creditor relationship established pursuant to the Loan Documents. The relationship of Borrower and Lender is created and governed solely by the Loan Documents.

**Section 12.11** **No Joint Venture or Partnership; No Third Party Beneficiaries.**

(a) Any provision herein or in any of the other Loan Documents to the contrary notwithstanding, Lender, by virtue of its acceptance of this Agreement and the making of the Loan or any approval rights Lender may have herein or in any of the Loan Documents, this Agreement and the other Loan Documents shall not be deemed to constitute Lender a mortgagee-in-possession, tenant-in-common, or in control of, or a partner or joint venturer with, or insider (within the meaning of Section 101(31) of the Bankruptcy Code) of, any Borrower Party or any other Person; and Borrower shall indemnify Lender against, shall hold Lender harmless from, and shall reimburse Lender for, any and all claims, demands, judgments, penalties, fines, liabilities, costs, damages and expenses, including court costs and reasonable attorneys' fees incurred by Lender (whether incurred in connection with nonjudicial action, prior to trial, at trial, or on appeal or review) in any action against or involving Lender resulting from such a construction of the Loan Documents.

(b) Any inspection of the Property, any review or approval of any plans, contracts, subcontracts (including environmental reviews, audits, assessments and/or reports relating to the Property), and review or approval of budgets, expenses or obligations or any analysis of the Property made by Lender or any of its agents, architects or consultants is intended solely for the benefit of Lender and shall not be deemed to create

or form the basis of any warranty, representation, covenant, implied promise or liability to Borrower or any of its employees or agents, any guest or invitee upon the Property, or any other Person.

(c)  Except as otherwise provided in Article VIII hereof, this Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained in the Loan Documents. Except as otherwise provided in Article VIII hereof, all conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 12.12**  **Publicity.**  All news releases, publicity or advertising by the Borrower Parties or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents or to Lender, or any of their Affiliates shall be subject to the prior written approval of Lender, which approval shall not be unreasonably withheld.

**Section 12.13**  **Subrogation.**  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any Indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, Liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such Indebtedness and such former rights, claims, Liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the Lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of the Obligations.

**Section 12.14**  **Duplicate Originals; Counterparts.**  For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. A signature of a party by facsimile or other electronic transmission (including a .pdf copy sent by e-mail) shall be deemed to constitute an original and fully effective signature of such party. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**Section 12.15**  **Liability.**  If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 12.16**  **Prior Agreements.**  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, including any term sheets, discussion outlines or commitment letters (as same may be amended) between any of the Borrower Parties and Lender are superseded by the terms of this Agreement and the other Loan Documents. In the event of any conflict between the terms of this Agreement and the Loan Term Sheet, the terms of this Agreement shall govern.

**Section 12.17**  **No Usury.**  Any provision herein, in any Loan Document or any other document executed or delivered in connection with the Loan, or in any other agreement or commitment, whether written or oral, expressed or implied, to the contrary notwithstanding, Lender shall not in any event be entitled to receive or collect, nor shall or may amounts received hereunder be credited, so that Lender shall be paid, as interest, a sum greater than the maximum amount permitted by applicable law to be charged to the Person primarily obligated to pay the Debt and the Obligations at the time in question. If any construction of this Agreement, any

other Loan Document, or any other document executed or delivered in connection herewith, indicates a different right given to Lender to ask for, demand or receive any larger sum as interest, such is a mistake in calculation or wording which this clause shall override and control, it being the intention of Borrower and Lender that this Agreement, any other Loan Document and any other documents executed in connection herewith conform strictly to applicable usury laws. In no event shall the amount treated as the total interest exceed the maximum amount of interest which may be lawfully contracted for, charged, taken, received or reserved by Lender in accordance with the applicable usury laws, taking into account all items which are treated as interest under applicable law, computed in the aggregate over the full term of the Loan evidenced hereby. In the event that the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Agreement, any other Loan Document and any other documents executed in connection herewith shall ever exceed the maximum nonusurious rate under applicable law, any sum in excess thereof shall be applied to the reduction of the unpaid principal balance of the Debt and the Obligations, and if the Debt and the Obligations are paid in full, any remaining excess shall be paid to Borrower. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the maximum nonusurious rate under applicable law, if any, Borrower and Lender shall, to the maximum extent permitted under applicable law, (a) characterize any nonprincipal amount as an expense or fee rather than as interest, (b) exclude voluntary prepayments and the effects thereof, or (c) "spread" the total amount of interest throughout the entire term of the Debt and the Obligations so that the interest rate is uniform throughout the entire term of the Debt and the Obligations; provided, however, that if the Debt and Obligations are paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the maximum nonusurious rate, if any, Lender shall refund to Borrower the amount of such excess. If any provision of this Agreement would oblige the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by any applicable law or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(i)     first, by reducing the amount or rate of interest required to be paid to the Lender; and

(ii)    thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of Title 4, Chapter 302, Subchapter A, Texas Finance Code.

**Section 12.18   Construction.**  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender by virtue of the fact that this Agreement or any of the Loan Documents has originated with Lender as drafter. Borrower acknowledges that Borrower has reviewed this Agreement and the other Loan Documents and has had the opportunity to consult with counsel on same. This Agreement and the other Loan Documents, shall therefore be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties to the Loan Documents. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.

**Section 12.19   Invalidity of a Provision; Principles of Construction; Lender's Discretion.**  If any clause or provision shall be deemed invalid or unenforceable, then this Agreement shall be construed without such clause or provision and the remainder of such provision and this Agreement shall be given full force and effect to the greatest extent permissible by law. All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "including" is not limiting (and shall mean "including but not limited to"), and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." Wherever Lender's judgment, consent,

approval or discretion is required under this Agreement or any other Loan Document for any matter or thing or Lender shall have an option, election, or right of determination or any other power to decide any matter relating to the terms and conditions of this Agreement, including any right to determine that something is satisfactory or not ("**Decision Power**"), such Decision Power shall be exercised in the sole and absolute discretion of Lender unless otherwise expressly stated to be reasonably exercised.  Such Decision Power and each other power granted to Lender upon this Agreement may be exercised by Lender or by any authorized agent of Lender (including any servicer and/or attorney-in-fact), and Borrower hereby expressly agrees to recognize the exercise of such Decision Power by such authorized agent.

**Section 12.20  Lender**.  The rights of Lender pursuant to this Agreement and the other Loan Documents are in addition to all of the rights of Lender or any Affiliate of Lender may now or hereafter have by virtue of any ownership, directly or indirectly, in Borrower or any Affiliate of Borrower.  In acting as Lender pursuant to this Agreement or the Loan Documents, Borrower acknowledges that Lender shall owe no duties of any kind to Borrower or any other Person (other than those specifically stated in the Loan Documents) on account of such role of Lender or any Affiliate of Lender or by virtue of any ownership interest in Borrower or such Affiliates (directly or indirectly) or otherwise, and there shall be no limitations on Lender's rights or remedies or Lender's ability to act solely in Lender's best interests or in Lender's discretion, notwithstanding the role Lender or any such Affiliate of Lender may have by virtue of any ownership interest in Borrower or any Affiliate of Borrower.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to Lender under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by Lender or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire (directly or indirectly) in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  No assignee of any of Lender's rights with respect to the Loan or the Loan Documents shall be prejudiced or affected by any actions taken or not taken by Lender or its Affiliates prior to the assignment to the then current Lender and upon any such assignment, such assignee shall be in the same position as if such assignee had originated the Loan itself as of the date of such assignment and shall not be subject to any offsets, counterclaims or defenses to which Lender, any other Person which may from time to time be the "Lender" hereunder or their respective Affiliates might be subject.  Borrower acknowledges that Lender and its Affiliates engage in the business of real estate financings and other real estate transactions and investments, which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**Section 12.21  Limitation on Liability**.  Notwithstanding anything contained herein to the contrary, Borrower agrees that none of Lender, or its agents or employees shall be liable to Borrower for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence and strict liability) or any other legal or equitable principle and Borrower's sole remedies shall be limited to commencing an action for specific performance under the Loan Documents.

**Section 12.22  Appointment of Servicer and Delegation of Lender Rights**.  Borrower acknowledges and agrees that at the option of Lender, the Loan may be serviced by a servicer/trustee (the "Servicer") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement between Lender and Servicer; provided, however, such delegation will not release Lender from any of its obligations under the Loan Documents. Borrower shall not be responsible for any servicing fees payable to Servicer; provided, however that Borrower shall be responsible for the payment of all out-of-pocket costs and expenses incurred by Servicer in connection with the Loan (including the negotiation of subordination, non-disturbance and attornment agreements, property inspections, casualty or condemnation matters or in connection with any Declaration of Default).  Any action or inaction taken by the Servicer pursuant to this Agreement and the Loan Documents shall be binding to the same extent as if taken by Lender, and Borrower shall be entitled to rely on all actions and directions given by Servicer with respect to all matters concerning the Loan and Loan Documents unless and until Borrower receives contrary written instructions from the Lender.

**Section 12.23  Intentionally Deleted**.

**Section 12.24** Advertising. Borrower hereby agrees Lender (together with its Affiliates, "**Romspen**") may publicly identify details of the Loan in Romspen's advertising and public communications of all kinds, including, but not limited to, press releases, direct mail, newspapers, magazines, journals, e-mail, or internet advertising or communications. Such details may include the name of the Austin Property, the address of the Austin Property, the amount of the Loan, the date of the closing and a description of the size/location of the Austin Property.

**Section 12.25** Delay Outside Lender's Control. Lender shall not be liable in any way to Borrower or any third party for Lender's failure to perform or delay in performing under the Loan Documents (and Lender may suspend all or any portion of Lender's obligations under the Loan Documents for up to sixty days) if such failure to perform or delay in performing results directly or indirectly from, or is based upon, any Force Majeure Event. At the conclusion of such suspension of Lender's performance, if Lender still is unable to perform, Lender shall give Borrower thirty (30) days' notice and Borrower shall have the right to purchase or satisfy the Loan during such thirty (30) day period. Interest shall continue to be payable at the non-default interest rate during any such Force Majeure suspension. If Borrower does not purchase or satisfy the Loan, Lender may thereafter terminate the Loan, which termination shall not be deemed to have resulted from an Event of Default, but from the Force Majeure event.

**Section 12.26** Signage. Lender shall be entitled to place on the Property signage indicating Lender's participation in the funding of the Property.

**Section 12.27** Modification, Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of any Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the specific purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 12.28** Set-Off. In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by Legal Requirements, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in accordance with Legal Requirements, in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower. Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**3443 ZEN GARDEN LIMITED PARTNERSHIP,**
a Texas limited partnership

By      3443 Zen Garden GP LLC,
a Texas limited liability company, its general partner

By: _____
Name: Adam Zarafshani, President

By: _____
Name: Daniel White, Vice President

**LENDER:**

**ROMSPEN MORTGAGE LIMITED PARTNERSHIP**
an Ontario limited partnership

By: _____
Name: _____
Title: _____

**GUARANTORS:**

_____
Daniel White, Individually

**LOT 11 LIMITED PARTNERSHIP**
an Alberta limited partnership

By Lot 11 GP, Ltd.
an Alberta limited liability company, its general partner

By: _____
Daniel White, Director

**ECO-INDUSTRIAL BUSINESS PARK, INC.**
an Alberta corporation

By: _____
Daniel White, Director

BORROWER SIGNATURE PAGE TO LOAN AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**3443 ZEN GARDEN LIMITED PARTNERSHIP,**
a Texas limited partnership

By      3443 Zen Garden GP LLC,
        a Texas limited liability company, its general partner

                By: _____
                Name: Adam Zarafshani, President

                By: _____
                Name: Daniel White, Vice President

**LENDER:**

**ROMSPEN MORTGAGE LIMITED PARTNERSHIP**
an Ontario limited partnership

                By: _____
                Name: _____
                Title: _____

**GUARANTORS:**

_____
Daniel White, Individually

**LOT 11 LIMITED PARTNERSHIP**
an Alberta limited partnership

By Lot 11 GP, Ltd.
an Alberta limited liability company, its general partner

        By: _____
        Daniel White, Director

**ECO-INDUSTRIAL BUSINESS PARK, INC.**
an Alberta corporation

        By: _____
        Daniel White, Director

Active 30161074 9v1 1005367

**ABSOLUTE ENERGY RESOURCES, INC.**
an Alberta corporation

By: _____
Daniel White, Director

**ABSOLUTE ENVIRONMENTAL WASTE MANAGEMENT, INC.**
an Alberta corporation

By: _____
Daniel White, Director

**EIGHTFOLD DEVELOPMENT, LLC.**
a Texas limited liability company

By: _____
Adam Zarafshani, Manager

**ABSOLUTE ENERGY RESOURCES, INC.**
an Alberta corporation

By: _____
Daniel White, Director

**ABSOLUTE ENVIRONMENTAL WASTE MANAGEMENT, INC.**
an Alberta corporation

By: _____
Daniel White, Director

EIGHTFOLD DEVELOPMENT, LLC.
a Texas limited liability company

By: _____
Adam Zarafshani, Manager

**LENDER:**

**ROMSPEN MORTGAGE LIMITED PARTNERSHIP**,
an Ontario limited partnership

By:    Romspen Fund GP Inc.,
an Ontario corporation, its general partner

By: _____

Name: ~~Blake Cassidy~~

Title: _____

**Authorized Signing Officer**

6140482S.12

## SCHEDULE 1.1

## DEFINITIONS

"**Acceptable Accounting Principles**" shall mean GAAP or such other accounting methods or principles acceptable to Lender, consistently applied throughout the Loan Term.

"**Affiliate**" shall mean as to any Person, (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person, (ii) any Person (directly or indirectly) owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (iii) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (iv) if such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, employee or member, or (v) any entity in which such Person (together with family members if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more. Any reference in this Agreement to a "**Person and an Affiliate**" shall be deemed to refer to such Person and an Affiliate of such Person and any references in this Agreement to a "**Person or an Affiliate**" shall be deemed to refer to such Person or an Affiliate of such Person. As used in this Agreement, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policy and/or policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise.

"**Affiliate Transaction**" shall mean any contract, agreement or other arrangement between Borrower (or any other Person if such contract, agreement or other arrangement is in any way related to the Property) and any Borrower Party or any Affiliate of a Borrower Party or pursuant to which any Borrower Party or any Affiliate of any Borrower Party or any constituent member, partner or stockholder of Borrower or any Borrower Party or any Affiliate of a Borrower Party (direct or indirect) will receive any benefit of any kind.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean the amount of $250,000.00.

"**Approved Accounting Firm**" shall mean (a) one of the accounting firms commonly known as a "**Big Four**" accounting firm or (b) any other certified public accounting firm acceptable to Lender in its sole discretion.

"**Approved Budget**" shall have the meaning specified in Section 5.12(d).

"**Architect**" shall mean an architect and/or engineer with a valid contractor's license in Texas that has been approved by Lender, which approval shall not be unreasonably withheld.

"**Architect Agreement**" shall mean an agreement between Borrower and Architect for the Completion of the Infrastructure Work, the Building F Work, the Building H Work or the Building J Work (as applicable), in accordance with the Infrastructure Plans and Specifications, the Building F Plans and Specifications, the Building H Plans and Specifications or the Building J Plans and Specifications (as applicable), in form and content reasonably acceptable to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"**Assignment and Consent**" shall mean a consent agreement as to Lender's interests in form and content reasonably acceptable to Lender executed by the General Contractor with respect to a General Contractor Agreement, the Architect with respect to an Architect Agreement, or any other third party with respect to all other Major Contracts.

"**Assignments of Agreements**" shall mean, collectively, (i) with respect to the Austin Property, that certain first priority Assignment of Agreements, Licenses, Permit and Contracts dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to contracts, Licenses, permits and approvals necessary for the use and operation and development of the Austin Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, and (ii) with respect to the Edmonton Property, that

61404825.12

certain first priority Assignment of Agreements, Licenses, Permit and Contracts dated as of the date hereof, from Lot 2 Owner, Lot 3 Owner, Lot 11 Owner and Lot 12 Owner, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of such parties' interest in and to contracts, Licenses, permits and approvals necessary for the use and operation and development of the Edmonton Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Leases**" shall mean, with respect to the Austin Property, that certain Assignment of Leases and Rents dated even date herewith and from Borrower to Lender.

"**Assignment of Management Agreement**" shall mean that an assignment of any Management Agreement for the Austin Property as may be entered into by Borrower. As of the Closing Date, the Austin Property will be managed by Borrower.

"**Austin Land**" shall mean the real property legally described in the Austin Security Instrument.

"**Austin Property**" shall mean the "Property" described in the Austin Security Instrument.

"**Austin Security Instrument**" shall mean that certain first priority Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the date hereof, executed and delivered by Borrower as security for the Loan made to Lender and encumbering the Austin Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Authorized Representative**" shall mean a Person at the time designated and authorized to act on behalf of Borrower by a written certificate furnished to Lender containing the specimen signature of such Person and signed by Borrower.

"**Availability Period**" means the period from and including the Closing Date to but excluding the Maturity Date.

"**Award**" shall have the meaning set forth in Section 6.1.3(b).

"**Balancing Event**" shall mean that Lender shall have determined that the sum of the amount of unfunded Additional Advances available to Borrower hereunder for the payment of all of the work comprising the Infrastructure Work, the Building H Work, the Building J Work or the Building J Work, as applicable, that has not been completed is less than the amount actually necessary (as reasonably determined by Lender) to pay for the cost of all such work comprising the Infrastructure Work, the Building H Work, the Building H Work or the Building J Work, as applicable, that has not been completed through the completion thereof.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended from time to time.

"**Bankruptcy Laws**" shall mean the Bankruptcy Code together with any existing or future law of Canada relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Board of Directors**" shall mean the "Board" or "Board of Directors" as defined in the Declaration, which shall refer to the board of directors of the Zen Garden Commercial Condominium Association Inc.

"**Book Transaction**" shall have the meaning set forth in Section 2.3(ix).

"**Borrower**" has the meaning in the recitals hereto.

"**Borrower Parties**" shall mean the collective reference to Borrower, each Guarantor, Lot 2 Owner, Lot 3 Owner, Lot 4 Owner, Lot 11 Owner, Lot 12 Owner, any other guarantor, indemnitor or surety of any of the Obligations and any other Person (other than Lender) that is a party to any of the Loan Documents, other than any Manager that is not an Affiliate of Borrower. Individually, each of the Borrower Parties may be referred to herein as a "**Borrower Party**".

"**Building F**" shall mean that portion of the Austin Property designated on the Survey (or to be designated in the Declaration) as "Building F".

"**Building F Budget**" shall mean the budget of costs and expenses to be incurred in connection with the Completion of the Building F Work as approved by Lender in writing, which shall include fees and costs,

leasing costs, broker's fees, interest and carrying costs and other items acceptable to Lender, which may be modified from time to time with Lender's prior written approval.

"**Building F Expenditures**" shall mean the costs and expenses actually incurred in connection with the Completion by Borrower of the Building F Work in accordance with the Building F Budget, including but not limited to those set forth in the Building F Budget.

"**Building F Plans and Specifications**" shall mean each of the plans and specifications approved in writing by Lender for the completion of the Building F Work, as may be modified from time to time with Lender's prior written approval.

"**Building F Work**" shall mean the construction of renovations, including the construction of two (2) additional floors, and tenant improvements, to the existing Building F.

"**Building F, H and J Expenditures**" shall mean, collectively, the Building F Expenditures, the Building H Expenditures and the Building J Expenditures, which shall not exceed, in the aggregate, the Buildings F, H and J Tranche Maximum.

"**Building H**" shall mean that portion of the Austin Property designated on the Survey (or to be designated in the Declaration) as "Building H".

"**Building H Budget**" shall mean the budget of costs and expenses to be incurred in connection with the Completion of the Building H Work as approved by Lender in writing, which shall include fees and costs, leasing costs, broker's fees interest and carrying costs and other items acceptable to Lender, which may be modified from time to time with Lender's prior written approval..

"**Building H Expenditures**" shall mean the costs and expenses actually incurred in connection with the Completion by Borrower of the Building H Work in accordance with the Building H Budget, including but not limited to those set forth in the Building H Budget.

"**Building H Plans and Specifications**" shall mean each of the plans and specifications approved in writing by Lender for the completion of the Building H Work, as may be modified from time to time with Lender's prior written approval.

"**Building H Work**" shall mean the construction of renovations, including the construction of two (2) additional floors, and tenant improvements, to the existing Building H.

"**Building J**" shall mean that portion of the Austin Property designated on the Survey (or to be designated in the Declaration) as "Building J".

"**Building J Budget**" shall mean the budget of costs and expenses to be incurred in connection with the Completion of the Building J Work as approved by Lender in writing, which shall include fees and costs, leasing costs, broker's fees interest and carrying costs and other items acceptable to Lender, which may be modified from time to time with Lender's prior written approval.

"**Building J Expenditures**" shall mean the costs and expenses actually incurred in connection with the Completion by Borrower of the Building J Work in accordance with the Building J Budget, including but not limited to those set forth in the Building J Budget.

"**Building J Plans and Specifications**" shall mean each of the plans and specifications approved in writing by Lender for the completion of the Building J Work, as may be modified from time to time with Lender's prior written approval.

"**Building J Work**" shall mean the construction of renovations, including the construction of two (2) additional floors, and tenant improvements, to the existing Building J.

"**Business Day**" shall mean a day on which commercial banks are not authorized or not required by law to close in the State of Texas.

"**Bylaws**" means the Bylaws of Zen Garden Commercial Condominium (as may be amended, modified, restated or replaced), which Bylaws shall be subject to Lender's prior approval.

20-01047-hcm Doc#3-9 Filed 08/20/20 Entered 08/20/20 18:16:04 Exhibit 8 Pg 70 of 95

"**Casualty**" shall have the meaning set forth in Section 6.1.1(f).

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption of any new law, rule, regulation or treaty by any applicable Governmental Authority; (b) any substantial change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any applicable Governmental Authority; or (c) the making or issuance of any request, rule, guideline or directive having the force of law by any applicable Governmental Authority; including but not limited to: (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith; and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III; shall in each case be deemed to be a "Change in Law".

"**Closing Date**" shall mean the date of delivery of the fully executed Loan Documents to the Lender and the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral Assignment of Condominium Interests**" means that certain Collateral Assignment of Condominium Interests of even date herewith, from Borrower in favor of Lender.

"**Complete**" (and the lower-case version thereof) shall mean, with respect to any of the work constituting the Infrastructure Work that (a) such work is substantially completed in accordance with the Infrastructure Plans and Specifications and all Legal Requirements, subject only to the completion of minor punch-list items that do not limit the use of any portion of the Infrastructure Work for its intended purposes, (b) subject to any contest rights contained herein, the Infrastructure Work is free of all mechanics', materialmen's, and other similar liens (or such liens have otherwise been bonded over to Lender's satisfaction), and (c) Lender has received copies of all warranties from suppliers covering materials, equipment and appliances included within the applicable component of the Infrastructure Work. In addition, "Complete" (and the lower-case version thereof) shall also mean with respect to any of the work constituting the Building F Work that (a) such work is substantially completed in accordance with the Building F Plans and Specifications and all Legal Requirements, subject only to the completion of minor punch-list items that do not limit the use or occupancy of any portion of the Building F Work for its intended purposes, (b) if required by Legal Requirements, a final certificate of occupancy (or similar) has been obtained evidencing that full use of the Building F Work for its intended purposes has been authorized by all applicable Governmental Authorities, (c) subject to any contest rights contained herein, the Building F Work is free of all mechanics', materialmen's, and other similar liens (or such liens have otherwise been bonded over to Lender's satisfaction), and (d) Lender has received copies of all warranties from suppliers covering materials, equipment and appliances included within the applicable component of the work. In addition, "Complete" (and the lower-case version thereof) shall also mean with respect to any of the work constituting the Building H Work that (a) such work is substantially completed in accordance with the Building H Plans and Specifications and all Legal Requirements, subject only to the completion of minor punch-list items that do not limit the use or occupancy of any portion of the Building H Work for its intended purposes, (b) if required by Legal Requirements, a final certificate of occupancy (or similar) has been obtained evidencing that full use of the Building H Work for its intended purposes has been authorized by all applicable Governmental Authorities, (c) subject to any contest rights contained herein, the Building H Work is free of all mechanics', materialmen's, and other similar liens (or such liens have otherwise been bonded over to Lender's satisfaction), and (d) Lender has received copies of all warranties from suppliers covering materials, equipment and appliances included within the applicable component of the work. In addition, "Complete" (and the lower-case version thereof) shall also mean with respect to any of the work constituting the Building J Work that (a) such work is substantially completed in accordance with the Building J Plans and Specifications and all Legal Requirements, subject only to the completion of minor punch-list items that do not limit the use or occupancy of any portion of the Building J Work for its intended purposes, (b) if required by Legal Requirements, a final certificate of occupancy (or similar) has been authorized by all applicable Governmental full use of the Building J Work for its intended purposes has been

SCHEDULE I TO LOAN AGREEMENT – Page 4
61404825.12

Authorities, (c) subject to any contest rights contained herein, the Building J Work is free of all mechanics', materialmen's, and other similar liens (or such liens have otherwise been bonded over to Lender's satisfaction), and (d) Lender has received copies of all warranties from suppliers covering materials, equipment and appliances included within the applicable component of the work. The terms "Completed" and "Completion" (and lower-case versions thereof) shall have the same meaning when used in the Loan Documents.

"**Completion Guaranty**" shall mean that certain Completion and Cost Overrun Guaranty with respect to the Completion of the Infrastructure Work, the Building F Work, the Building H Work and the Building J Work at the Austin Property, executed by each Guarantor on the Closing Date, as amended and modified.

"**Condemnation**" shall have the meaning set forth in Section 6.1.3.

"**Condominium Annual Budget**" means the annual operating budget of the Condominium Association, including all capital reserve contributions, if applicable.

"**Condominium Association**" means Zen Garden Commercial Condominium Association, Inc.

"**Condominium Estoppel Certificate**" means that certain Condominium Estoppel Certificate of even date herewith from Condominium Association in favor of Lender.

"**Condominium Unit**" means the "Condominium Unit or Unit Parcel," "Unit or Unit Parcel" and "Completed Unit or Unit Parcel", each as defined in the Declaration.

"**Condominium Unit Sale Agreement**" shall mean any bona fide purchase agreement, lot sale agreement, contract of sale or similar agreement in form and substance satisfactory to Lender, pursuant to which Borrower proposes to sell one or more Condominium Units to a third party arms-length purchaser, together with all amendments, modifications, or supplements thereto and any other agreements between the purchaser thereunder and any of the Borrower Parties or their Affiliates related thereto.

"**Construction Contract**" shall mean each General Contractor Agreement, Architect Agreement, and each other agreement with any design professional or trade contractor relating to the Completion of the Infrastructure Work, the Building F Work, the Building H Work and/or the Building J Work, in each case, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time to time in accordance with the terms and conditions of this Agreement.

"**Construction Schedule**" means, as to the Infrastructure Work, the Building F Work, the Building H Work and the Building J Work, that schedule provided by the applicable General Contractor, setting out the estimated time of completion of each phase of such work from commencement to substantial completion. The Construction Schedule will make reference to each anticipated Request for Advance in the applicable Budget.

"**Creditors' Rights Laws**" shall mean any existing or future law (whether statute or case law) of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to debts or debtors, including, without limitation, the Bankruptcy Code.

"**Debt**" shall mean all Indebtedness of Borrower to Lender, including, without limitation, the outstanding principal amount set forth in, and evidenced by, the Note together with all interest accrued and unpaid thereon, and all other sums due to Lender in respect of the Loan under the Note, this Agreement or any other Loan Document.

"**Declaration**" means the Declaration of Covenants, Conditions, and Restrictions for Zen Garden Commercial Condominium, a Texas Condominium in the form approved by Lender and which will be filed for record in the public records of Travis County, Texas after Closing (together with all amendments and modifications thereto and replacements thereof), encumbering the Austin Property, with an appropriate amendment to the legal description of the Austin Property as contained in the Title Insurance Policy and an update to the exceptions contained therein, at Borrower's expense.

"**Declaration of Default**" means the giving of written notice by Lender to the Borrower Parties in accordance with Section 12.5 of the existence of an Event of Default.

"**Default**" shall mean the existence of an Event of Default following a Declaration of Default which remains uncured if any cure period is provided hereunder.

"**Default Rate**" shall have the meaning set forth in the Note.

"**Easements**" shall have the meaning set forth in Section 4.1(bb).

"**Edmonton Owners**" means Lot 11 Limited Partnership, Eco-Industrial Business Park Inc., an Alberta corporation, and any other person or entity who or which has any ownership interest in the Edmonton Property.

"**Edmonton Property**" shall mean the property legally described in the Edmonton Security Instruments and commonly identified as "Lot 2, Lot 3, Lot 4, Lot 11 and Lot 12".

"**Edmonton Security Instruments**" shall mean, collectively, the Lot 2 Security Instrument, the Lot 3 Security Instrument, the Lot 11 Security Instrument, the Lot 12 Security Instrument and (once executed) the Lot 4 Security Instrument, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Embargoed Person**" shall have the meaning set forth in Section 5.27(e).

"**Enforcement Costs**" shall mean any and all reasonable expenses, including reasonable legal expenses, attorneys' fees and expert witness fees, (i) described in Section 7.4 of this Agreement, (ii) incurred or paid by Lender in protecting Lender's interest in the Property, (iii) incurred in collecting any amount payable under this Agreement or the other Loan Documents, or (iv) incurred in enforcing Lender's rights under this Agreement or the other Loan Documents or with respect to the Property, in each of clauses (i) through (iv) whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Declaration of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such amounts are repaid to Lender.

"**Environmental Indemnities**" shall mean, collectively, (i) with respect to the Austin Property, that certain Hazardous Materials Indemnity Agreement dated as of the date hereof, executed by Borrower and Guarantors in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, and (ii) with respect to the Edmonton Property, that certain Hazardous Materials Indemnity Agreement dated as of the date hereof, executed by Borrower and Guarantors in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" has the meaning set forth in the Environmental Indemnities.

"**Equity Contribution**" shall have the meaning set forth in **Schedule II** of this Agreement.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall mean the occurrence of any of the conditions described in Section 7.1, which, following a Declaration of Default, shall entitle Lender to exercise the Remedies described in Section 7.2.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case; (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in the Loan pursuant to a law in effect on the date on which Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.7, amounts with respect to such Taxes were payable to Lender immediately before it changed its lending office; (c) Taxes attributable to Lender's failure to comply with Section 2.7(d), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Executive Order**" shall have the meaning set forth in Section 5.27(a).

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"**Financial Statements**" shall mean a balance sheet, income statement and statements of income and expense and cash flow of changes in financial position prepared in accordance with Acceptable Accounting Principles, and setting forth all items of income and expense and such other information required under Acceptable Accounting Principles to fairly present the financial position and results of operation of Borrower and the Property and which shall at a minimum be consistent in scope, form and content with such statements delivered to Lender prior to the Closing Date, unless otherwise agreed by Lender, and which are otherwise reasonably acceptable to Lender.

"**Fiscal Year**" shall mean each twelve-month period commencing on January 1 and ending on December 31 during the term of the Loan.

"*Force Majeure*" shall mean any event, circumstance or condition beyond the reasonable control of Borrower, including strikes, labor disputes, acts of God, the elements, governmental restrictions, regulations or controls, enemy action, civil commotion, fire, casualty, accidents, mechanical breakdowns or shortages of, or inability to obtain, labor, utilities or materials, or which causes delay; provided, however, that (a) neither any lack of funds (unless due to Lender non-compliance with this Agreement) nor any illiquidity or disruption affecting capital markets or other general economic conditions, shall be deemed to be a condition beyond the control of Borrower; (b) Borrower notifies Lender of the existence of such event, circumstance or condition within five (5) days from the date that Borrower becomes aware that such event, circumstance or condition could result in Force Majeure, (c) the delay that could result from such Force Majeure shall not cause or result in a default or violation by Borrower under any contracts or licenses and permits affecting the Property or under any Legal Requirement.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as promulgated by the United States Financial Accounting Standards Board as of the date of the applicable financial report, consistently applied.

"**General Contractor**" shall mean a general contractor with a valid contractor's license in Texas that has been approved by Lender, which approval shall not be unreasonably withheld.

"**General Contractor Agreement**" shall mean a guaranteed maximum price turnkey construction contract between Borrower and a General Contractor (i) for the completion of the Infrastructure Work in accordance with the Infrastructure Plans and Specifications, in the full amount of the Infrastructure Budget, in form and content reasonably acceptable to Lender, (ii) for the completion of the Building F Work in accordance with the Building F Plans and Specifications, in the full amount of the Building F Budget, in form and content reasonably acceptable to Lender, (iii) for the completion of the Building H Work in accordance with the Building H Plans and Specifications, in the full amount of the Building H Budget, in form and content reasonably acceptable to Lender, and (iv) for the completion of the Building J Work in accordance with the Building J Plans and Specifications, in the full amount of the Building J Budget, in form and content reasonably acceptable to Lender, and in each event, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Guarantor**" shall mean, individually and collectively, as the context may require: (i) Dan White, an individual, (ii) Lot 11 Limited Partnership, an Alberta limited partnership; (iii) Eco-Industrial Business Park Inc., an Alberta corporation; (iv) Eightfold Developments, LLC, a Texas limited liability company; (v) Absolute Energy Resources Inc., an Alberta corporation; and (vi) Absolute Environmental Waste Management Inc., an Alberta corporation.

"**Guaranty**" shall mean each Guaranty executed by a Guarantor, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Materials**" has the meaning set forth in the Environmental Indemnities.

"**Improvements**" has the meaning set forth in the Security Instruments.

"**Indebtedness**" of a Person, at a particular date, means the sum (without duplication) at such date of (a) all indebtedness or liability for borrowed money; (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Parties**" shall mean (a) Lender, (b) any prior or subsequent owner or holder of the Loan, (c) any Servicer or prior Servicer of the Loan, (d) any Investor or any prior Investor, (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or thereafter or as part of or following a foreclosure of the Loan.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document.

"**Infrastructure Budget**" shall mean the budget of costs and expenses to be incurred in connection with the Completion of the Infrastructure Work as approved by Lender in writing, which shall include fees and costs, leasing costs, broker's fees interest and carrying costs and other items acceptable to Lender, which may be modified from time to time with Lender's prior written approval.

"**Infrastructure Expenditures**" shall mean the costs and expenses actually incurred in connection with the Completion by Borrower of the Infrastructure Work in accordance with the Infrastructure Budget, including but not limited to those set forth in the Infrastructure Budget and which shall not exceed, in the aggregate, the Infrastructure Tranche Maximum.

"**Infrastructure Plans and Specifications**" shall mean each of the plans and specifications approved in writing by Lender for the completion of the Infrastructure Work, as may be modified from time to time with Lender's prior written approval.

"**Infrastructure Work**" shall mean the construction of infrastructure, utilities and other common components of Building F, Building H and Building J.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1.1(b).

"**Insurance Proceeds**" shall mean all proceeds received under Policies required to be maintained by Borrower.

"**Interest Reserve Fund**" shall have the meaning set forth in Section 6.3.

"**Investor**" shall have the meaning set forth in favor of Lender.

"**Irrevocable Condominium Proxy**" means that certain Irrevocable Condominium Proxy of even date herewith, from Borrower in favor of Lender.

"**Knowledge**" means the actual knowledge of the individuals who are the officers, directors, members, and managers of the Borrower and the Borrower Parties, after commercially reasonable investigation of: (i) those Parties correspondence, books and records; (ii) condition reports and physical examination of the Property; and (iii) any applicable public records.

"**Lamont Assembly Assignment**" shall mean that certain Assignment of Purchase and Sale Agreement of even date herewith from Absolute Energy Resources Inc. in favor of Lender, with respect to the Lamont Property.

"**Lamont Property**" shall mean, collectively, those properties subject to agreements of purchase and sale with Absolute Energy Resources Inc. as purchaser.

"**Land**" shall mean, collectively, the Austin Land and the Edmonton Land.

"**Lease**" shall have the meaning set forth in the Security Instruments.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, development and redevelopment plans and injunctions of Governmental Authorities affecting the Property or any part thereof or the construction, use, development, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, Licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including (i) applicable restrictive covenants, zoning ordinances, zoning resolutions, and building codes, (ii) subdivision and land use laws and regulations, (iii) all applicable health and Environmental Laws and regulations, and (iv) all standards and regulations of appropriate supervising boards of fire underwriters and similar agencies.

"**Lender**" has the meaning in the recitals hereto.

"**Lender's Construction Advisor**" shall mean that professional engineering firm or professional construction inspection firm which shall act on Lender's behalf to inspect the Work as it progresses, which shall issue to Lender reports and certifications of its inspection and of completion of each stage of the Work and which shall perform final inspections of the Work on Lender's behalf upon substantial completion of the Work.

"**Licenses**" shall have the meaning set forth in Section 4.1(m).

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof, or any interest of Borrower therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's or materialmen's liens and other similar liens and encumbrances.

"**Loan**" shall mean the advances made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instruments, the Assignment of Leases, each Security Agreement, each Pledge Agreement, the Assignments of Agreements, the Environmental Indemnities, each Guaranty, the Assignment of Management Agreement, the Collateral Assignment of Condominium Interests, the Irrevocable Condominium Proxy, the Condominium Estoppel Certificate, all Uniform Commercial Code financing statements filed in connection with the Loan, the Pledge of Economic Incentives, the Completion and Cost Overrun Guaranty, the Lamont Assembly Assignment, and all other documents now or hereafter evidencing, securing or otherwise executed and/or delivered by one or more of the Borrower Parties in connection with the Loan, together with all amendments, modifications or replacements thereto. Each of the Loan Documents may be referred to herein individually as a "**Loan Document**".

"**Loan Term Sheet**" shall mean that certain letter from Lender to Borrower or an affiliate thereof dated February 1, 2018.

"**Loss Proceeds**" shall mean any and all Casualty insurance proceeds, condemnation awards and any settlement payments made in lieu of either which are made to Borrower in connection with or in respect of the Property.

"**Losses**" shall mean any and all claims, suits, liabilities (including strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs (including any and all costs and expenses incurred in the preservation, restoration and protection of the Property), any deficiency claim in connection with the foreclosure

6140482S.12

of the Security Instruments, expenses, diminution in value of the Property, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement, punitive damages payable by Lender or any Indemnified Party, foreseeable consequential damages payable by Lender or any Indemnified Party, and damages and expenses of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense), including Enforcement Costs or any other amounts expended by Lender in connection with the Loan.

"**Lot 2**" shall mean the real property commonly identified as such and included in the Lot 2 Security Instrument.

"**Lot 3**" shall mean the real property commonly identified as such and included in the Lot 3 Security Instrument.

"**Lot 4**" shall mean the real property commonly identified as such, but not included any of the Edmonton Security Instruments as of the Closing Date. The parties intend to include Lot 4 in a new Lot 4 Security Instrument upon resolution of the Lot 4 Litigation, post-Closing.

"**Lot 11**" shall mean the real property commonly identified as such and included in the Lot 11 Security Instrument.

"**Lot 12**" shall mean the real property commonly identified as such and included in the Lot 12 Security Instrument.

"**Lot 2 Owner**" shall mean Eco-Industrial Business Park Inc., an Alberta corporation.

"**Lot 3 Owner**" shall mean Eco-Industrial Business Park Inc., an Alberta corporation.

"**Lot 4 Owner**" shall mean Eco-Industrial Business Park Inc., an Alberta corporation.

"**Lot 11 Owner**" shall mean Lot 11 Limited Partnership, an Alberta limited partnership.

"**Lot 12 Owner**" shall mean Eco-Industrial Business Park Inc., an Alberta corporation.

"**Lot 2 Security Instrument**" shall mean that certain first priority Mortgage/General Assignment of Leases and Rents dated as of the date hereof, executed and delivered by Lot 2 Owner as security for the Loan, made to Lender and encumbering Lot 2, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Lot 3 Security Instrument**" shall mean that certain first priority Mortgage/General Assignment of Leases and Rents dated as of the date hereof, executed and delivered by Lot 3 Owner as security for the Loan, made to Lender and encumbering Lot 3, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Lot 4 Security Instrument**" shall mean that certain first priority Mortgage/General Assignment of Leases and Rents to be executed and delivered by Lot 4 Owner as security for the Loan post-Closing upon resolution of the Lot 4 Litigation, made to Lender and encumbering Lot 4, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Lot 11 Security Instrument**" shall mean that certain first priority Mortgage/General Assignment of Leases and Rents dated as of the date hereof, executed and delivered by Lot 11 Owner as security for the Loan, made to Lender and encumbering Lot 11, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Lot 12 Security Instrument**" shall mean that certain first priority Mortgage/General Assignment of Leases and Rents dated as of the date hereof, executed and delivered by Lot 12 Owner as security for the Loan, made to Lender and encumbering Lot 12, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Management Agreement**" shall mean the Management Agreement entered into by and between Borrower and Manager with respect to the Austin Property.

"**Manager**" initially shall mean Eightfold Development LLC and, subsequently, any other manager approved by Lender.

"**Material Action**" shall mean, with respect to any Person: (A) to file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors' Rights Laws, (B) to seek or consent to the appointment of a receiver, liquidator, trustee or any similar official, (C) to take any action that might cause such entity to become insolvent, (D) to make an assignment for the benefit of creditors, (E) admit in writing such Person's inability to pay its debts generally as they become due, (F) declare or effectuate a moratorium on the payment of any obligation, or (G) take action in furtherance of any such action.

"**Material Adverse Change**" shall mean a material adverse change in (i) the assets, operations, or financial condition of Borrower or the Person in question, (ii) the ability to pay the Debt of Borrower or the Person in question in accordance with the terms hereof and otherwise comply with the terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement, or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the assets, operations, or financial condition of Borrower or the Person in question, (ii) the ability to pay the Debt of Borrower or the Person in question in accordance with the terms hereof and otherwise comply with the terms of this Agreement, and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement, or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Material Alteration**" shall have the meaning set forth in Section 5.17.

"**Maturity Date**" shall mean the "Maturity Date" set forth in the Note or any earlier date on which Lender's commitment to make advances under the Loan is terminated and the Loan is accelerated pursuant to the terms thereof, as may be extended in accordance with the terms of the Note.

"**Net Condominium Units Sales Proceeds**" shall mean, for any transaction for the sale of Condominium Units pursuant to a Condominium Units Sale Agreement, one hundred percent (100%) of the gross sale proceeds and all other consideration from whatever source from such sale minus (i) any excise Taxes payable thereon (if payable by Borrower), minus (ii) reasonable (as compared to the sale of similarly situated properties), demonstrable, out-of-pocket, third party, customary closing costs approved by Lender and actually incurred by Borrower in connection with such sale (including reasonable and customary third party broker fees, as compared to the broker's fees of similarly situated properties), and minus (iii) payments made to satisfy Permitted Encumbrances with respect to the Condominium Units sold.  The Net Condominium Units Sales Proceeds shall be set forth on a settlement statement approved by Lender, prepared by a title insurance company acceptable to Lender.

"**Net Proceeds**" shall mean collectively the Insurance Proceeds and Condemnation Proceeds.

"**Note**" shall mean that certain Promissory Note dated as of the date hereof, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, supplemented or otherwise modified from time to time.

"**Obligations**" shall mean any and all debt, liabilities and other obligations of Borrower, including all affirmative and negative covenants, to Lender or of any of the Borrower Parties in connection with the Loan or pursuant to the Loan Documents, including, without limiting the generality of the foregoing, the Debt.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower, which is signed by an authorized senior officer of the manager, managing member or general partner of Borrower.

"**Organizational Documents**" shall mean (i) with respect to a corporation, such Person's certificate of incorporation and by-laws, and any shareholder agreement, voting trust or similar arrangement applicable to any of such Person's authorized shares of capital stock, (ii) with respect to a partnership, such Person's certificate of limited partnership, partnership agreement, voting trusts or similar arrangements applicable to any of its partnership interests, (iii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability

company interests, and (iv) any and all agreements between any constituent member, partner or shareholder of Borrower, including any contribution agreement or indemnification agreements. In each case, "Organizational Documents" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"Origination Fee" shall mean a fee equal to (i) one percent (1%) of the Term Tranche and (ii) three percent (3%) of all Advances under this Agreement other than that made under the Term Tranche, plus Lender's or its Affiliate's administration fee of $1,000 on each of the Initial Advance and all Additional Advances.

"Other Business Activities" shall have the meaning set forth in Section 1.4.

"Other Charges" shall mean all maintenance charges, charges or amounts payable under any reciprocal easement agreement, ground rents, impositions other than Taxes, and any other charges (including any charges, payments or amounts, for which the failure to pay may give rise to a Lien against the Property), including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"Other Connection Taxes" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"PACE Loan" means that Property-Assessed Clean Energy loan extended by Travis County, Texas.

"Patriot Act" shall have the meaning set forth in Section 5.27(a).

"Permitted Encumbrances" shall mean, with respect to the Austin Property, collectively: (a) the Liens created by the Loan Documents; (b) the PACE Loan, subject to the provision of Section 5.13(c); (c) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Austin Property or any part thereof, which have been approved by Lender and which do not in any event have a Material Adverse Effect, (d) the Pending Austin Condemnation (e) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (f) statutory Liens for labor or materials securing sums not yet due and payable, provided (x) such labor or materials are included in the applicable Budget, or (y) Borrower has given advance written notice of same to Lender.

"Person" shall mean any individual, entity, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pledge Agreements" shall collectively mean: (i) that certain General Partnership Interest Pledge Agreement (3443 Zen Garden Limited Partnership) dated of even date herewith by Adam Zarafshani, individually and as Trustee, in favor of Lender; (ii) that certain Limited Partnership Interest Pledge Agreement (3443 Zen Garden Limited Partnership) dated of even date herewith by Adam Zarafshani, individually and as Trustee, in favor of Lender (iii) that certain Membership Interest Pledge Agreement (Eightfold Developments LLC) dated of even date herewith by Adam Zarafshani; (iv) that certain Stock Pledge Agreement (Eco-Industrial Business Park, Inc.) dated of even date herewith by 1468527 Alberta, Ltd., in favor of Lender, (v) that certain General Partnership Interest Pledge Agreement (Lot 11 GP Ltd.) dated of even date herewith by Symmetry Asset Management, Inc., in favor of Lender; (vi) that certain Limited Partnership Interest Pledge Agreement (Lot 11 Limited Partnership) dated of even date herewith by Eco-Industrial Business Park, Inc., in favor of Lender; (vii) that certain Stock Pledge Agreement (Absolute Energy Resources, Inc.) dated of even date herewith by 1468527 Alberta Ltd., in favor of Lender; and (viii) that certain Stock Pledge Agreement (Absolute

Environmental Waste Management, Inc.) dated of even date herewith by 1468527 Alberta Ltd., in favor of Lender.

"**Pledge of Economic Incentives**" shall mean, with respect to the Austin Property, that certain Pledge and Collateral Assignment of Economic Incentives dated of even date herewith by Borrower in favor of Lender, which shall expressly include the proceeds of any Property-Assessed Clean Energy ("PACE") loan or any similar financing, and a pledge of any applicable condemnation proceeds with respect to the Austin Property.

"**Policies**" or "**Policy**" shall have the respective meanings specified in Section 6.1.1(b).

"**Prohibited Person**" shall have the meaning set forth in Section 5.27(b).

"**Project**" means the construction and completion of the Infrastructure Work, the Building F Work, the Building H Work and the Building J Work.

"**Project Documents**" shall mean, collectively, as applicable, all construction contracts, the Infrastructure Plans and Specifications, the Infrastructure Budget, the Building F Plans and Specifications, the Building F Budget, the Building H Plans and Specifications, the Building H Budget, the Building J Plans and Specifications, the Building J Budget, all Licenses and Permits, as any of the foregoing may be amended, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"**Property**" shall mean collectively, (i) the Austin Land, the Improvements thereof, all personal property owned by Borrower and encumbered by the Austin Security Instrument and its Security Agreement, as applicable, in each case as more particularly described in the Austin Security Instrument and its Security Agreement, as applicable, and (ii) the Edmonton Property, the Improvements thereof, all personal property owned by Lot 2 Owner, Lot 3 Owner, Lot 4 Owner, Lot 11 Owner, and Lot 12 Owner and encumbered by the Edmonton Security Instruments and its Security Agreements, as applicable. As of the Closing Date, Lot 4 is subject to litigation styled Paragon Capital Corporation Ltd. v. Worthington Properties, Inc., *et al*, consolidated Actions No. 0801-15127, 0801-151-28, 0801-15129, 0801-15130, 0801-15131 and 0801-15132, all filed in the Court of Queen's Bench of Alberta (collectively the "**Lot 4 Litigation**"). At such time as Borrower can deliver to Lender a lender's title insurance policy insuring a mortgage from Lot 4 Owner to Lender as a valid first lien encumbering Lot 4 free and clear of the Lot 4 Litigation, Lender shall release the Lot 3 Security Instrument, at Borrower's expense.

"**Rating Agency**" shall have the meaning set forth in Section 8.1.

"**Rent(s)**" shall have the meaning set forth in the Security Instruments, as applicable.

"**Request for Advance**" shall have the meaning set forth in Section 2.2(a).

"**Restoration**" shall have the meaning set forth in Section 6.1.2(a).

"**Reserve Funds**" shall mean, collectively, the Tax and Insurance Escrow Fund, the Interest Reserve Fund and any other reserve fund account established pursuant to the Loan Documents.

"**Rules**" means collectively, all by-laws, rules and regulations promulgated or otherwise existing with respect to the Condominium Association (including, but not limited to, any requirements contained in the Bylaws and the Declaration and any applicable Legal Requirements with respect to the Condominium Association or the Condominium Units).

"**Scheduled Payment Date**" shall mean the first day of each calendar month, or if such first day is not a Business Day, the next Business Day.

"**Security Agreement**" shall mean that certain first priority security agreement from Borrower to Lender and from each Guarantor to Lender, each dated as of the date hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Security Deposits**" shall mean all security given to Borrower or any agent or Person acting on behalf of Borrower in connection with the Leases.

"**Security Instruments**" shall mean, collectively, the Austin Security Instrument and the Edmonton Security Instruments.

"**Service Rights**" shall mean any agreements, contracts, rights, licenses or other interests of any type (whether exclusive or non-exclusive) granted or given to any Person to provide any products or services to or for or with respect to the Property, any tenant or any occupants of the Property, including any of the same related to telecommunications, internet products or services, including, but not limited to, personal computer hardware and software, internet hardware and software, internet access services, printers, video display systems, audio sound systems and communication telephonic devices, as well as related and complementary products and services and any substitutes for, and items that are a technological evolution of, any of the foregoing products.

"**Servicer**" shall mean the servicer, if any, engaged by Lender with respect to the Loan.

"**Single Purpose Entity**" shall mean Person, other than a natural person, whose structure and organizational and governing documents are in form and substance that comply with the provisions of Section 4.1(s) hereof and are otherwise acceptable to the Rating Agencies and otherwise acceptable to Lender in its discretion.

"**Sources and Uses of Funds**" shall mean the Sources and Uses of Funds delivered to Lender in connection with the Loan and attached hereto as **Schedule 2.2.2**.

"**Subdivision Map**" shall have the meaning set forth in Section 5.24.

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the state where the Property is located and satisfactory to Lender and the Title Insurance Company issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender and such Title Insurance Company, sufficient to remove the general "survey exception" from the Title Insurance Policy.

"**Tax Exemption Documents**" shall have the meaning set forth in Section 2.7(e).

"**Taxes**" shall mean: (i) for all purposes other than for Section 2.6, all real estate and personal property taxes, assessments, water rates or sewer rents now or hereafter levied or assessed or imposed against the Property or any part thereof by reason of ownership of the Property; including (a) any *ad valorem* real or tangible personal property taxes levied against the Property; and (b) any intangible personal property tax levied or imposed on Lender with respect to its ownership in the Loan; and (ii) all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting the Austin Property.

"**Term**" shall have the meaning set forth in Section 6.1.1(a).

"**Title Insurance Commitment**" means that commitment to issue a policy of mortgagee title insurance to Lender issued by the Title Insurance Company, pursuant to which the Title Insurance Company shall issue the Title Insurance Policy upon fulfillment of all requirements as set forth in the Title Insurance Commitment

"**Title Insurance Company**" shall mean Chicago Title Company, 2828 Routh Street, Suite 800, Dallas, Texas 75201, Phone: (214) 220-1820, Attention: Donna Gulledge, Email: donna.gulledge@fnf.com, which Title Insurance Company shall issue the Title Insurance Commitment, the Title Insurance Policy and act as closing agent for the Loan contemplated herein.

"**Title Insurance Policy**" shall mean the ALTA (or equivalent if ALTA is not available in the state or province where the Property is located) loan title insurance policy (or mortgagee title insurance policy or policies acceptable to Lender) issued with respect to the Property and insuring Lender (in an amount satisfactory to Lender) of the validity and priority of the Lien of the Security Instruments, with all endorsements thereto as required by Lender.

"**Transfer**" shall mean any sale, assignment, conveyance, alienation, mortgage, encumbrance, pledge, hypothecation or other transfer, including any swap, derivative or other transaction shifting the risks and rewards of ownership, whether voluntary or involuntary.

"UCC" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the applicable state or commonwealth in which the Property is located, as the same may be amended from time to time.

"**UCC Financing Statement**" shall mean a financing statement as defined by and in accordance with the requirements of the Uniform Commercial Code including all original financing statements or original fixture financing statements and any amendments, renewals, continuations or assignments thereof evidencing a security interest granted to Lender.

"**U.S. Person**" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

## SCHEDULE 2.2.2

## SOURCES AND USES OF FUNDS

NOTE: SOURCES AND USES SCHEDULE SHALL INCLUDE THE FOLLOWING:

1.    $3.2 million to be paid to Panache Homes for work already incurred, to be paid at satisfaction of the Loan.

2.    $4.9 million to be paid to Panache Homes for work to be performed and profit, to be paid at satisfaction of the Loan.

## SCHEDULE 3.1

## CONDITIONS PRECEDENT

### PART A

Each of the following shall be satisfied by Borrower and/or the Borrower Parties as a condition precedent to the making of the Initial Advance of the Loan on the Closing Date.

(a)     Representations and Warranties; Compliance with Conditions.     The representations and warranties of each Borrower Party contained in this Agreement and the other Loan Documents shall be true and correct in all respects on and as of the Closing Date and no Material Adverse Change has occurred and no Declaration of Default shall have occurred and be continuing; and each Borrower Party shall be in compliance in all respects with all terms and conditions set forth in this Agreement and in each other Loan Document on their part to be observed or performed.

(b)     Delivery of Loan Documents; Title Insurance; Reports.

(i)     Note, Loan Agreement, Security Instruments, Assignments of Agreements and other Loan Documents.     Lender shall have received from Borrower fully executed (and acknowledged if required) counterparts of this Agreement, the Note, and all other Loan Documents and evidence that counterparts of the Security Instruments have been delivered to the Title Insurance Company for recording, so as to effectively create upon such recording valid and enforceable first priority Liens upon the Property, in favor of Lender, subject only to the Permitted Encumbrances.

(ii)     UCC Financing Statements.     Lender shall have received from Borrower (i) such UCC financing statements as Lender shall require, and such financing statements shall have been filed of record in the appropriate filing offices in each of the jurisdictions required by Lender or delivered to the Title Insurance Company for filing so as to effectively create upon such filing a valid and enforceable first priority Lien on the Property in favor of Lender, subject only to the Permitted Encumbrances and (ii) a list of the principal places of business, tax identification numbers, organizational identification number issued by its state of organization, and doing business names for Borrower and all other information as Lender may require to properly file such UCC financing statements and PPSA equivalents, all certified by Borrower.

(iii)     Title Insurance.     Lender shall have received the Title Insurance Policy dated as of the Closing Date, with co-insurance and/or reinsurance and direct access agreements acceptable to Lender. Such Title Insurance Policy shall (A) provide coverage in amounts satisfactory to Lender, (B) insure Lender that the Security Instruments create valid first Liens on the Property free and clear of all exceptions from coverage other than Permitted Encumbrances, (C) contain such endorsements and affirmative coverages as Lender may require and which are available in the state or province where the Property is located, (D) show good and marketable indefeasible fee simple title to the Property vested in Borrower or the applicable Borrower Party, and (E) name Lender as the insured.  The Title Insurance Policy shall be assignable.  Lender also shall have received evidence that all premiums in respect of the Title Insurance Policy have been paid.  The Lender shall have received satisfactory UCC financing statement, tax lien, judgment, bankruptcy, litigation and other Lien searches and reports conducted by a search firm acceptable to the Lender with respect to the Property and the Borrower Parties and all other relevant Persons, such searches to be conducted in each of the locations as shall be required by Lender.

(iv)     Insurance.     Lender shall have received valid certificates of insurance and the required endorsements for all Policies required hereunder or under any of the Loan Documents, and evidence of the payment of all premiums payable for the existing policy period, which shall not be less than one year from the Closing Date.  Lender shall have received a favorable opinion of Lender's insurance consultant on the adequacy of all Policies, certificates of insurance, and endorsements.

(v)     Encumbrances.     Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first Lien as of the Closing Date on the Property,

subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents, and Lender shall have received satisfactory evidence thereof.

(vi)   **Certificate.**   Lender shall have received a certificate signed by Borrower confirming the representations and warranties contained in this Agreement.

(vii)   **Opinion of Counsel.**   Lender shall have received a satisfactory opinion of legal counsel to Borrower and Guarantors with respect to due execution, authority, enforceability (including no usury) of the Loan Documents and such other matters as Lender may require, all such opinions to be in form, scope and substance satisfactory to Lender and Lender's counsel.

(c)   **Delivery of Organizational Documents; Consents.**   Borrower shall have delivered or caused to be delivered to Lender certified copies of all Organizational Documents related to the Borrower Parties and if any of the Borrower Parties is a partnership or limited liability company, the partners or members thereof, as Lender may request in its sole discretion, including good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender. The Lender shall have received copies of all consents, resolutions, Licenses and approvals, if any, required in connection with the execution, delivery and performance by the Borrower Parties and the validity and enforceability of the Loan Documents and such consents, resolutions, Licenses and approvals shall be in full force and effect. Lender shall have received a chart depicting the ownership structure of Borrower, each constituent partner or member of Borrower (including their respective ownership interests, direct or indirect, and capital contributions), which chart shall identify each Person who owns or controls, directly or indirectly, any such partner or member of Borrower.

(d)   **Taxes, Insurance Premiums and Other Charges.**   Borrower shall have paid all Taxes, Insurance Premiums and Other Charges relating to the Property which are due and payable or in arrears, including (i) accrued but unpaid Insurance Premiums, (ii) currently due Taxes (including any in arrears) relating to the Property, and (iii) currently due Other Charges relating to the Property, which amounts may be funded with proceeds of the Loan if such proceeds are sufficient therefor and as set forth in the Sources and Uses of Funds.

(e)   **Payments.**   All payments, deposits or escrows required to be made or established by the Borrower under this Agreement, and the other Loan Documents on or before the Closing Date shall have been paid and Lender shall have received (i) a settlement statement setting forth the disbursement of the Loan in form and content satisfactory to Lender and (ii) tax and insurance bills for the two calendar years prior to the Closing Date.

(f)   Confirmation of costs incurred, costs necessary to complete development, and other matters as required by Lender to be set forth in BTY Report.

(g)   **Other Third Party Reports.**   Lender shall have received a current seismic report, if required by Lender (prepared by a specialist acceptable to Lender), MAI appraisal report (prepared in compliance with FIRREA) (provided that Lender may accept evidence of value other than an MAI appraisal report, as determined by Lender), environmental property condition report (Phase I environmental reports for the Property and, where environmental consultants recommends, Phase II reports and/or further investigation or as Lender otherwise determines are required), and property condition / engineering report; each addressed to Lender and in form and substance satisfactory to Lender and dated within three (3) months of the Closing Date, if approved by Lender, if such third party reports that are not dated within three (3) months of the Closing Date but are otherwise acceptable to Lender, Borrower has delivered a reliance letter to Lender within three (3) months of the Closing Date that is in form and substance satisfactory to Lender. An appraiser, engineer and environmental specialist, each satisfactory to Lender, shall perform the appraisal and the structural engineering and environmental property condition reports.

(h)   **Survey.**   Lender shall have received, reviewed, and be satisfied with an ALTA survey of the Austin Property, prepared by a duly qualified land surveyor and certified to Lender and the Title Insurance Company showing (i) the boundaries and dimensions of the Austin Land and each Parcel, (ii) the locations of all buildings and other improvements (if any) on the Austin Property, (iii) the names and municipal block numbers

of adjacent streets, (iv) the location of all recorded easements, rights of way, and other recorded encumbrances of the Austin Property, and (v) any other ALTA survey requirements as specified by Lender.

(i)     Contracts with General Contractors.   Lender shall have received, reviewed, and be satisfied with the all contracts between Borrower or any Affiliate of Borrower and any General Contractor, and Lender shall have received an assignment of all such contracts in form and substance satisfactory to Lender and acknowledged by each applicable contractor.

(j)     Costs.   Borrower shall have paid all of Lender's cost and expenses associated with the making of the Loan with respect to the Austin Property, including all out-of-pocket due diligence expenses, the cost of all third party reports (such as but not limited to environmental, structural, appraisal and/or market study), legal fees and expenses, survey costs, title costs, etc.

(k)     Authorizations.   Borrower shall provide to the appropriate taxation, municipal, utility, and other authorities an authorization by which Lender or any Person authorized by Lender as its legal counsel, agent, or manager, shall be able to obtain, in the name of Borrower, a confirmation from such authorities that all payments, declarations, and other filings of Borrower are up to date, whether the authorities concerned have issued or will issue a default notice or demand for payment to Borrower and whether any such notice concerns arrears.

(l)     Site Inspection.   Lender has received an acceptable site inspection of the Austin Property.

(m)    Interview.   Lender has completed and is satisfied with an interview of Borrower and has reviewed and is satisfied with the present and intended use of the Property and the income to be generated from the Property.

(n)     Diligence.   Lender has received, reviewed, and is satisfied with all due diligence materials referred to in the Loan Term Sheet.

(o)     Proceeds of Crime and Terrorist Financing Act.   Lender shall have received evidence and be satisfied of Borrower's compliance with The Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and Regulations.

(p)     Closing Date Advance.   Lender shall have received, reviewed, and be satisfied with the amount of the Initial Advance to be made on the Closing Date together with copies of all other documentation requested by Lender supporting such the proceeds of such advance and copies of all other documentation requested by Lender supporting such advance.

(q)     Inspection.   Lender shall have received from Lender's independent consultant (if applicable) an inspection report certifying (or if no independent consultant, Lender shall have determined that) (i) the amount of the requested advance does not exceed the cost of the work completed, (ii) all work typically done at the stage of development when the advance is requested has been completed, and all materials, supplies, and fixtures typically furnished or installed at such stage of development have been furnished and installed, (iii) the undisbursed Loan proceeds are sufficient to complete the proposed development of the Property, (iv) the Request for Advance and all invoices and other supporting documentation delivered to Lender in connection with the Request for Advance have been verified and are in order, (v) Borrower has complied with all Legal Requirements and the requirements of Lender's independent consultant, and (vi) as to such other matters requested by Lender.

(r)     Lien Waivers.   Lender shall have received from each Person providing services or materials for the Property prior to the Closing Date an invoice, a lien waiver, and such other instruments and documents as Lender may require in form and substance satisfactory to Lender.   The invoice, lien waiver, and such other instruments and documents must cover and be based upon work actually completed or materials actually furnished through the Closing Date.

(s)     Licenses, Permits, and Approvals.   To the extent applicable as of the Closing Date, Lender shall have received, reviewed, and be satisfied that all necessary municipal approvals have been received, together with all necessary permits, Licenses, approvals, easements and agreements as may be required from all state, county and local Governmental Authorities and/or public utilities (including building permits and certificates of

occupancy) to permit the construction and occupancy of all Improvements in accordance with all Legal Requirements, including without limitation all approvals and permits for public sewer and water, availability notices from applicable private and public utilities indicating that electric, gas and telephone service will be available, and all sanitary sewer, water, utility, storm sewer, drainage, and other off-site easements necessary for construction and occupancy of such Improvements.

(t) No Violation of Legal Requirements. There shall be no outstanding notices of any uncorrected violations of any Legal Requirements with respect to the Property.

(u) Further Documents. Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may have reasonably requested in form and substance satisfactory to Lender and its counsel.

(v) Equity Contribution. Lender shall have received an Officer's Certificate and other reasonably satisfactory evidence (including invoices, cancelled checks, etc.) of capital contributions by the members of Borrower or the direct owner of Borrower in an aggregate amount not less than $4,000,000.00 (the "**Equity Contribution**"). No funds loaned to or borrowed by any Borrower Party shall count towards the Equity Contribution.

(w) Sources and Uses of Funds. Lender shall have approved the Sources and Uses of Funds for the initial advance and the financial pro formas for the Austin Property.

(x) Zoning. Lender has confirmed that the Austin Property is zoned for the intended uses thereof.

(y) Budgets. Lender has approved the Infrastructure Budget, the Building F Budget, the Building H Budget, and the Building J Budget, along with the Infrastructure Plans and Specifications, the Building F Plans and Specifications, the Building H Plans and Specifications, and the Building J Plans and Specifications.

(z) Network Group Lease. Lender has received a fully executed lease with Network Group and is satisfied with the financial capacity of the tenant and any guarantors thereunder.

(aa) Condominium Declaration. Lender has received the executed and recorded Declaration.

(bb) Loan Term Sheet. Any additional items required to be delivered to Lender set forth in Exhibit A to the Loan Term Sheet.

(cc) Agreement to Advance. Lender has been advised by its legal counsel that, giving regard to all the circumstances, such advance should be made, it being understood that neither the preparation nor the recordation or filing of any of the documents contemplated herein shall bind the Lender to advance the funds or any unadvanced portion thereof, and that the advance of funds or any part thereof from time to time shall be in the sole, absolute, unfettered and unqualified discretion of the Lender.

PART B

In addition to satisfaction of all items listed in Part A above, each of the following shall be satisfied by Borrower and/or the Borrower Parties as a condition precedent to the making of any Additional Advances after the Closing Date:

(a) Request for Advance. Lender shall have received, reviewed, and be satisfied with a Request for Advance for the Additional Advance to be made together with copies of invoices for items to be paid with the proceeds of such Additional Advance and copies of all other documentation supporting the Request for Advance.

(b) Inspection. Lender shall have received from Lender's Construction Advisor (if applicable) an inspection report certifying (or if Lender has not employed a Construction Advisor, Lender shall have determined that): (i) the amount of the requested Additional Advance does not exceed the cost of the Work completed, less all prior advances; (ii) all work typically done at the stage of development when the Additional Advance is requested has been completed, and all materials, supplies, and fixtures typically furnished or installed at such stage of development have been furnished and installed; (iii) the undisbursed Loan proceeds are

sufficient to complete the proposed development of the Austin Property, (iv) the Request for Advance and all invoices and other supporting documentation delivered to Lender in connection with the Request for Advance have been verified and are in order, (v) Borrower has complied with all Legal Requirements and the requirements of Lender's Construction Advisor, and (vi) as to such other matters reasonably requested by Lender related to the foregoing.

(d)    <u>Representations and Warranties; Compliance with Conditions</u>.  The representations and warranties of each Borrower Party contained in this Agreement and the other Loan Documents shall be true and correct in all respects on and as of the date of such Additional Advance and no Material Adverse Change has occurred and no Declaration of Default shall have occurred and be continuing; and each Borrower Party shall be in compliance in all respects with all terms and conditions set forth in this Agreement and in each other Loan Document on their part to be observed or performed. Borrower shall have delivered evidence satisfactory to Lender indicating that Policies in accordance with <u>Section 6.1</u> of this Agreement are in place as to all of the Property.

(e)    <u>Title Endorsement</u>.  Lender shall have received an endorsement to the Title Insurance Policy (or if an endorsement is not available, a title report, an abstractor's certificate or other evidence from the Title Insurance Company) bringing the Effective Date of the Title Insurance Policy to the date of issuance of the endorsement and showing no state of facts of record objectionable to Lender and affecting the Property from the date of recording of the Security Instruments.

(f)    <u>Lien Waivers</u>.  Lender shall have received from each Person providing services or materials for the Austin Property an invoice, a lien waiver, and such other instruments and documents as Lender may require in form and substance satisfactory to Lender.  The invoice, lien waiver, and such other instruments and documents must cover and be based upon work actually completed or materials actually furnished through the date of the requested advance.

(g)    <u>Licenses, Permits, and Approvals</u>.  To the extent applicable as of the date of such Additional Advance, Lender shall have received, reviewed, and be satisfied that all necessary municipal approvals have been received, together with all necessary permits, Licenses, approvals, easements and agreements as may be required from all state, county and local Governmental Authorities and/or public utilities (including building permits and certificates of occupancy) to permit the construction and occupancy of all Improvements in accordance with all Legal Requirements, including without limitation all approvals and permits for public sewer and water, availability notices from applicable private and public utilities indicating that electric, gas and telephone service will be available, and all sanitary sewer, water, utility, storm sewer, drainage, and other off-site easements necessary for construction of such Improvements.

(g)    <u>No Violation of Legal Requirements</u>.  There shall be no outstanding notices of any uncorrected violations of any Legal Requirements with respect to the Property.

(h)    <u>Affidavit</u>.  Lender and the Title Insurance Company shall have received an affidavit of a senior officer of Borrower certifying that since the preparation of the survey described in item (g) of Part A above, no new easement has been created, no construction of any building or other improvement shown thereon has been effected (other than as expressly approved by Lender), and no new construction has been erected by a neighbor along the boundaries of the Austin Land.

(i)    <u>Further Documents</u>.  Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may have reasonably requested in form and substance satisfactory to Lender and its counsel.

(j)    <u>Sources and Uses of Funds</u>.  Lender shall have approved the Sources and Uses of Funds for the initial advance.

(k)    <u>Agreement to Advance</u>.  Lender has been advised by its legal counsel that, giving regard to all the circumstances, such advance should be made, it being understood that neither the preparation nor the recordation or filing of any of the documents contemplated herein shall bind the Lender to advance the funds or any unadvanced portion thereof, and that the advance of funds or any part thereof from time to time shall be in the sole, absolute, unfettered and unqualified discretion of the Lender.

## SCHEDULE 4.1(D)

## PENDING LITIGATION

Case styled "*Central Texas Regional Mobility Authority and the State of Texas, Condemnor, vs. MOS8 Partners, Ltd., a Texas limited partnership, MOS8 GP LLC, in its capacity as General Partner, Condemnees,*" Cause No. C-1-CV-15-010397 in the Probate Court of Travis County, Texas,

## SCHEDULE 4.1
## DISCLOSURE SCHEDULE

[NONE]

## SCHEDULE 4.1(W)

## ORGANIZATIONAL STRUCTURE CHARTS



**3443 Zen Garden Limited Partnership**
a Texas limited partnership

**General Partner**
**3443 Zen Garden GP LLC**
a Texas limited liability company

**Limited Partners**
1. Adam Zarafshani, individually
2. Adam Zarafshani, Trustee

Partnership Interest:
1. Adam Zarafshani, Trustee: 99.80%
2. Adam Zarafshani, Individually: 0.10%
3. 3443 Zen Garden GP LLC: 0.10%

Officers:
1. Adam Zarafshani – President
2. Dan White – Vice President

SCHEDULE V TO LOAN AGREEMENT
61404825.12

## SCHEDULE 5.1.2
## RENT ROLL

**RENT ROLL**
Property of 3443 Zen Garden Limited Partnership, LLC

Tenant:   Network Group, LLC
As of:    16-Apr-18

| Period during lease term | Annual Base Rent per Rentable Square Foot | Annual Base Rent | Monthly Installment of Base Rent |
|---|---|---|---|
| Months 4-24 | $39.00 | $3,900,000.00 | $325,000.00 |
| Months 25-36 | $40.17 | $4,017,000.00 | $334,750.00 |
| Months 37-48 | $41.38 | $4,138,000.00 | $344,833.33 |
| Months 49-60 | $42.62 | $4,262,000.00 | $355,166.67 |
| Months 61-72 | $43.90 | $4,390,000.00 | $365,833.33 |
| Months 73-84 | $45.22 | $4,522,000.00 | $376,833.33 |
| Months 85-96 | $46.58 | $4,658,000.00 | $388,166.67 |
| Months 97-108 | $47.98 | $4,798,000.00 | $399,833.33 |
| Months 109-120 | $49.42 | $4,942,000.00 | $411,833.33 |

6

SCHEDULE VI TO LOAN AGREEMENT
6140482512

## EXHIBIT A-1

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Loan Agreement dated as of April 25, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), between 3443 Zen Garden Limited Partnership, a Texas limited partnership, as Borrower, and Romspen Mortgage Limited Partnership, an Ontario limited partnership, as Lender.

Pursuant to the provisions of Section 2.6 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Lender and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Lender, and (2) the undersigned shall have at all times furnished the Borrower and the Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF LENDER]

| By: | |
|---|---|
| Name: | |
| Title: | |

Date: _____, 20[ ]

6

## EXHIBIT A-2

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Loan Agreement dated as of April 25, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), between 3443 Zen Garden Limited Partnership, a Texas limited partnership, as Borrower, and Romspen Mortgage Limited Partnership, an Ontario limited partnership, as Lender.

Pursuant to the provisions of Section 2.6 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]

By:
Name:
Title:

Date: _____, 20[ ]

## EXHIBIT A-3

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE

### U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Loan Agreement dated as of April 25, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), between 3443 Zen Garden Limited Partnership, a Texas limited partnership, as Borrower, and Romspen Mortgage Limited Partnership, an Ontario limited partnership, as Lender.

Pursuant to the provisions of Section 2.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]

|  |  |
|---|---|
| By: | |
| Name: | |
| Title: | |

Date: _____, 20[ ]

# EXHIBIT A-4

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Loan Agreement dated as of April 25, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), between 3443 Zen Garden Limited Partnership, a Texas limited partnership, as Borrower, and Romspen Mortgage Limited Partnership, an Ontario limited partnership, as Lender.

Pursuant to the provisions of Section 2.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Lender and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Lender, and (2) the undersigned shall have at all times furnished the Borrower and the Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

Date: _____, 20[ ]

| [NAME OF LENDER] |
|---|
| By: |
| Name: |
| Title: |